# Exhibit A
# (Part 1 of 7)

The Arbitration Institute of the
Stockholm Chamber of Commerce

19/12/2013

Arbitration no. V 2010/116
Doc. no. 2010/116-130

SCC Arbitration V (116/2010)
1. **Anatolie Stati**
2. **Gabriel Stati**
3. **Ascom Group S.A.**
4. **Terra Raf Trans Traiding Ltd.**
versus
**The Republic of Kazakhstan**

# AWARD

### Date of Award: 19 December 2013

**The Arbitral Tribunal:**

**David R. Haigh QC (Co-Arbitrator)**
**Prof. Sergei N. Lebedev (Co-Arbitrator)**
**Prof. Karl-Heinz Böckstiegel (Chairman)**

Ms. Katherine Simpson (Secretary to the Tribunal)

| | |
|---|---|
| **Claimants:** | Anatolie Stati |
| | Gabriel Stati |
| | Ascom Group S.A. |
| | Terra Raf Trans Traiding Ltd. |
| **Claimants' counsel:** | Reginald R. Smith |
| | Héloise Hervé |
| | Kenneth Fleuriet |
| | King & Spalding |
| | Bulboaca Asociatii |
| **Respondent:** | Republic of Kazakhstan |
| **Respondent's counsel:** | Dr. Patricia Nacimiento |
| | Matthew Buckle |
| | Norton Rose Fulbright LLP |
| | |
| | Joseph Tiredo |
| | Winston & Strawn London |
| | |
| | Professor I. Zenkin |
| | Moscow Regional Collegium |
| | of Advocates |

**ARBITRATION INSTITUTE OF**

**THE STOCKHOLM CHAMBER OF COMMERCE**

Certified true copy of original

Natalia Petrik, Legal Counsel
Date 28 January 2014

**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

# Table of Contents

| | | | |
|---|---|---|---|
| **Abbreviations** | | | 6 |
| **A.** | **The Parties and Their Counsel** | | 8 |
| **B.** | **The Arbitral Tribunal** | | 9 |
| **C.** | **Short Identification of the Case** | | 10 |
| | C.I. | **The Claimants' Perspective** | 10 |
| | C.II. | **The Respondent's Perspective** | 13 |
| **D.** | **Procedural History** | | 18 |
| **E.** | **Relief Sought by the Parties** | | 79 |
| | E.I. | **Relief Sought by Claimants** | 79 |
| | E.II. | **Relief Sought by the Respondent** | 80 |
| **F.** | **Factual Background** | | 80 |
| | F.I. | **General Background Information** | 80 |
| | F.II. | **Timeline of Events** | 82 |
| | F.III. | **Respondent's Alleged "*Playbook*" / Campaign of Harassment and Interference** | 128 |
| | | 1. **Arguments by Claimants** | 128 |
| | | 2. **Arguments by Respondent** | 135 |
| **G.** | **Short Summary of Contentions** | | 142 |
| | G.I. | **Summary of Contentions by Claimants** | 142 |
| | G.II. | **Summary of Contentions by Respondent** | 146 |
| **H.** | **Preliminary Considerations and Conclusions of the Tribunal** | | 151 |
| | H.I. | **Jurisdiction** | 151 |
| | | 1. The Parties' Consent to Arbitration before the SCC | 151 |
| | |   a. **Arguments by Claimants** | 151 |
| | |   b. **Arguments by Respondent** | 152 |
| | |   c. **The Tribunal** | 153 |
| | | 2. **Jurisdiction Ratione Personae** | 154 |
| | |   a. **Arguments by Claimants** | 154 |
| | |   b. **Arguments by Respondent** | 157 |
| | |   c. **The Tribunal** | 161 |
| | | 3. **Jurisdiction Ratione Materiae – Existence of Investment** | 162 |
| | |   a. **Arguments by Claimants** | 162 |
| | |   b. **Arguments by Respondent** | 169 |
| | |   c. **The Tribunal** | 176 |
| | | 4. **Jurisdiction – Compliance with Three-Month Waiting Period** | 178 |
| | |   a. **Arguments by Claimants** | 178 |
| | |   b. **Arguments by Respondent** | 180 |
| | |   c. **The Tribunal** | 182 |
| | | 5 **Admissibility of Claimants' Claims Pursuant to ECT** | 183 |
| | |   a. **Arguments by Claimants** | 183 |
| | |   b. **Arguments by Respondent** | 184 |
| | |   c. **The Tribunal** | 185 |
| | H.II. | **Applicable Law** | 185 |
| | | 1. **Arguments by Claimants** | 185 |
| | | 2. **Arguments by Respondent** | 187 |
| | | 3. **The Tribunal** | 188 |

ARBITRATION INSTITUTE OF THE STOCKHOLM CHAMBER OF **418**

| | | | |
|---|---|---|---|
| **H.III.** | | **Considerations Regarding Arbitration Procedure** | 189 |
| | 1. | **Arguments by Claimants** | 189 |
| | 2. | **Arguments by Respondent** | 190 |
| | 3. | **The Tribunal** | 194 |
| **J.** | **Liability** | | 195 |
| | **J.I.** | Whether Kazakhstan Provided the Claimants' Investments with Fair and Equitable Treatment According to Art. 10(1) ECT | 195 |
| | 1. | **Arguments by Claimants** | 195 |
| | 2. | **Arguments by Respondent** | 202 |
| | 3. | **The Tribunal** | 209 |
| | **J.II.** | Whether Claimants' Interests were Expropriated (Art. 13 ECT) | 231 |
| | 1. | **Arguments by Claimants** | 231 |
| | | a. **Law on Expropriation** | 231 |
| | | b. **Exhaustion of Remedies** | 233 |
| | | c. **Indirect Expropriation** | 234 |
| | |    i. General Principles and Jurisprudence Regarding Indirect Expropriation | 234 |
| | |    ii. **Right to Regulate** | 235 |
| | |    iii. Acts Allegedly Amounting to An Indirect Expropriation | 236 |
| | | d. **Direct Expropriation** | 240 |
| | |    i. **Transfer of Title** | 240 |
| | |    ii. **Exercise of Regulatory Powers** | 242 |
| | 2. | **Arguments by Respondent** | 244 |
| | | a. **Law on Expropriation** | 245 |
| | | b. **Exhaustion of Remedies** | 245 |
| | | c. **Indirect Expropriation** | 248 |
| | |    i. General Principles and Jurisprudence Regarding Indirect Expropriation | 248 |
| | |    ii. **Right to Regulate** | 249 |
| | |    iii. Acts Allegedly Amounting to An Indirect Expropriation | 250 |
| | | d. **Direct Expropriation** | 255 |
| | |    i. **Transfer of Title** | 255 |
| | |    ii. **Exercise of Regulatory Powers** | 256 |
| | 3. | **The Tribunal** | 258 |
| | **J.III.** | Respondent's Provision of Domestic Legal Remedies (Art. 10(12) ECT) | 259 |
| | 1. | **Arguments by Claimants** | 259 |
| | 2. | **Arguments by Respondent** | 260 |
| | 3. | **The Tribunal** | 264 |
| | **J.IV.** | Whether Kazakhstan Provided the Most Constant Protection and Security to Claimants' Investments (Art. 10(1) ECT) | 264 |
| | 1. | **Arguments by Claimants** | 264 |
| | 2. | **Arguments by Respondent** | 268 |
| | 3. | **The Tribunal** | 270 |
| | **J.V.** | Whether Kazakhstan Impaired Claimants' Investment Through Reasonable and Non-Discriminatory Measures (Art. 10(1) ECT) (Alternative Claim) | 271 |



|   |   | 1. | Arguments by Claimants | 271 |
|---|---|---|---|---|
|   |   | 2. | Arguments by Respondent | 274 |
|   |   | 3. | The Tribunal | 280 |
|   | J.VI. | Respondent's Observance of Obligations It Entered Into with Respect to Claimants' Investments (Umbrella Clause in Art.10(1) ECT)) | | 280 |
|   |   | 1. | Arguments by Claimants | 280 |
|   |   | 2. | Arguments by Respondent | 283 |
|   |   | 3. | The Tribunal | 287 |
|   | J.VII. | Whether Kazakhstan Violated Its Obligation to Permit Claimants to Employ Key Personnel of Their Choice (Art. 11 ECT) | | 287 |
|   |   | 1. | Arguments by Claimants | 287 |
|   |   | 2. | Arguments by Respondent | 288 |
|   |   | 3. | The Tribunal | 289 |
| K. | Causation | | | 289 |
|   | K.I. | Law on Causation | | 289 |
|   |   | 1. | Arguments by Claimants | 289 |
|   |   | 2. | Arguments by Respondent | 290 |
|   |   | 3. | The Tribunal | 290 |
|   | K.II. | Whether Respondent's Breaches of the ECT Caused Claimants' Alleged Damages | | 291 |
|   |   | 1. | Arguments by Claimants | 291 |
|   |   | 2. | Arguments by Respondent | 294 |
|   |   | 3. | The Tribunal | 295 |
|   | K.III. | Whether Claimants' Alleged Inexperience and Own Actions Led to the Demise of KPM and TNG (Intervening Cause) | | 307 |
|   |   | 1. | Arguments by Claimants | 307 |
|   |   | 2. | Arguments by Respondent | 310 |
|   |   | 3. | The Tribunal | 312 |
| L. | Quantum | | | 314 |
|   | L.I. | Preliminary Considerations | | 314 |
|   | L.II. | Valuation Date | | 314 |
|   |   | 1. | Arguments by Claimants | 314 |
|   |   | 2. | Arguments by Respondent | 319 |
|   |   | 3. | The Tribunal | 322 |
|   | L.III. | Arguments Regarding the Treatment of Debt: Enterprise vs. Equity Value | | 324 |
|   |   | 1. | Arguments by Claimants | 324 |
|   |   | 2. | Arguments by Respondent | 326 |
|   |   | 3. | The Tribunal | 329 |
|   | L.IV. | Quantum Related to Borankol Field and Tolkyn Field | | 331 |
|   |   | 1. | Arguments by Claimants | 331 |
|   |   | 2. | Arguments by Respondent | 342 |
|   |   | 3. | The Tribunal | 351 |
|   | L.V. | Quantum Related to Contract 302 Properties | | 353 |
|   |   | 1. | Arguments by Claimants | 353 |
|   |   | 2. | Arguments by Respondent | 358 |
|   |   | 3. | The Tribunal | 367 |
|   | L.VI. | Quantum Related to LPG Plant | | 368 |
|   |   | 1. | Arguments by Claimants | 368 |

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE - 420 -

|  |  | 2. | **Arguments by Respondent** | 373 |
|  |  | 3. | **The Tribunal** | 381 |
|  | L.VII. | | The Parties' Arguments Concerning the Tristan Notes | 382 |
|  |  | 1. | **Arguments by Claimants** | 382 |
|  |  | 2. | **Arguments by Respondent** | 385 |
|  |  | 3. | **The Tribunal** | 387 |
|  | L.VIII. | | **Moral Damages** | 387 |
|  |  | 1. | **Arguments by Claimants** | 387 |
|  |  | 2. | **Arguments by Respondent** | 389 |
|  |  | 3. | **The Tribunal** | 390 |
|  | L.IX. | | **Tax Claims** | 390 |
|  |  | 1. | **Arguments by Claimants** | 390 |
|  |  | 2. | **Arguments by Respondent** | 391 |
|  |  | 3. | **The Tribunal** | 392 |
|  | L.X. | | **Relevance of Cliffson SPA and Other Factors in Establishing Fair Market Value (FMV)** | 393 |
|  |  | 1. | **Arguments by Claimants** | 393 |
|  |  | 2. | **Arguments by Respondent** | 394 |
|  |  | 3. | **The Tribunal** | 398 |
|  | L.XI. | | **Credibility of the Parties Experts** | 398 |
|  |  | 1. | **Arguments by Claimants** | 398 |
|  |  | 2. | **Arguments by Respondent** | 399 |
|  |  | 3. | **The Tribunal** | 402 |
|  | L.XII. | | **Interest** | 402 |
|  |  | 1. | **Arguments by Claimants** | 402 |
|  |  | 2. | **Arguments by Respondent** | 403 |
|  |  | 3. | **The Tribunal** | 405 |
|  | L.XIII. | | **Summary of Tribunal's Conclusions Regarding Quantum** | 406 |
| M. | **Arbitration Costs** | | | 407 |
|  | M.I. | | **Arguments by Claimants** | 407 |
|  | M.II. | | **Arguments by Respondent** | 409 |
|  | M.III. | | **The Tribunal** | 412 |
| N. | **Decisions** | | | 414 |

# Abbreviations

| | |
|---|---|
| ¶ / ¶¶ | Paragraph / Paragraphs |
| § / §§ | Section or Clause / Sections or Clauses |
| ARNM | Agency for Regulation of Natural Monopolies |
| Ascom | Ascom Group S.A. |
| Art. | Article / Articles |
| Bcm³ | Billion cubic meters |
| BIT | Bilateral Investment Treaty |
| BOE | Barrels of Oil Equivalent |
| C | Claimants' Exhibit |
| C-0 | Claimants' Request for Arbitration |
| C-I | Claimants' Statement of Claim (18 May 2011) |
| C-II | Claimants' Reply Memorial on Jurisdiction and Liability (7 May 2012) |
| C-III | Claimants' Reply Memorial on Quantum (28 May 2012) |
| CAC Pipeline | Center Asia Center Pipeline |
| CAPEX | Capital Expenditure |
| CC RF | Criminal Code of the Russian Federation |
| CC RK | Civil Code of the Republic of Kazakhstan |
| CPC | Criminal Procedure Code of the Republic of Kazakhstan |
| CPHB 1 | Claimants' First Post-Hearing Brief (8 April 2013) |
| CPHB 2 | Claimants' Second Post-Hearing Brief (3 June 2013) |
| C Costs | Claimants' Request for Costs (1 July 2013) |
| C Costs Reply | Claimants' Reply on Costs (8 July 2013) |
| DCF | Discounted Cash Flow |
| ECOS | Economic Chance of Success |
| ECT | The Energy Charter Treaty |
| ECtHR | European Court of Human Rights |
| EPT | Excess Profits Tax |
| FDP | Field Development Plan |
| FET | Fair and Equitable Treatment |
| FMV | Fair Market Value |
| FTI | FTI Consulting |
| GCA | Gaffney, Cline, & Associates |
| GCOS | Geological Chance of Success |
| GPO | General Prosecutor's Office (Kazakhstan) |
| ICC | International Chamber of Commerce |
| ICSID | International Centre for Settlement of Investment Disputes |
| IPO | Initial Public Offering |



| JSC | Joint Stock Company |
| --- | --- |
| KMG | KazMunaiGas / KazMunaiGaz |
| KMG EP | KazMunaiGaz Exploration Production |
| KMG NC | KazMunaiGaz National Company |
| KMT | KazMunaiTeniz JSC |
| KNOC | Korea National Oil Company |
| KPM | Kazpolmunay LLP |
| Law on Oil | Law of the Republic of Kazakhstan of 28 June 1995, No. 2350 "*On Petroleum*" (as amended in 2003) |
| LLP | Limited Liability Partnership |
| LPG | Liquefied Petroleum Gas |
| ltr. | Letter |
| MBbls /MMBbl | Million barrels |
| MEMR | State of Kazakhstan Ministry of Energy and Mineral Resources |
| MES | Ministry of Emergency Situations |
| Mln | Million |
| MOG | Kazakh Ministry of Oil and Gas |
| NPV | Net Present Value |
| OJSC | Open Joint Stock Company |
| OTP | Oil Treatment Plant |
| p. / pp. | Page / Pages |
| PO | Procedural Order |
| R | Respondent's Exhibit |
| R-I | Respondent's Statement of Defence (21 November 2011) |
| R-II | Respondent's Rejoinder on Jurisdiction and Liability (13 August 2012) |
| R-III | Respondent's Rejoinder Memorial on Quantum (1 December 2012) |
| RPHB 1 | Respondent's First Post-Hearing Brief (8 April 2013) |
| RPHB 2 | Respondent's Second Post-Hearing Brief (3 June 2013) |
| R Costs | Respondent's Submission on Costs (1 July 2013) |
| R Costs Reply | Respondent's Comments on Claimants' Costs Submission (8 July 2013) |
| SCC | Stockholm Chamber of Commerce |
| SM Law | Law of the Republic of Kazakhstan of 5 March 1997 , No. 77-1 On the Securities Market |
| Subsoil Law | Law of the Republic of Kazakhstan "*On Subsoil and Subsurface Use*" |
| TNG | Tolkynneftegaz LLP |
| TOO | Limited Liability Partnership |
| USD | United States Dollar(s) |
| VCLT | 1969 Vienna Convention on the Law of Treaties |
| WS | Witness Statement |



# A.    The Parties and their Counsel

**The Claimants**                          Anatolie Stati
                                           Gabriel Stati
                                           Ascom Group S.A.
                                           Terra Raf Trans Traiding Ltd.

*Represented by*                           Héloise Hervé
                                           Kenneth Fleuriet
                                           King & Spalding
                                           1100 Louisiana, Suite 4000
                                           Houston, Texas 77002
                                           **USA**

                                           King & Spalding
                                           12, cours Albert 1er
                                           75008 Paris
                                           **FRANCE**

                                           Bulboaca & Asociatii
                                           UTI Business Center, 9th Floor
                                           31 Vasile Lascar Street, District 2
                                           020492 Bucharest
                                           **ROMANIA**

**The Respondent**                         Republic of Kazakhstan

*Represented by*                           Dr. Patricia Nacimiento
                                           Norton Rose Fulbright LLP
                                           Stephanstrasse 15
                                           60313 Frankfurt
                                           **GERMANY**

                                           Matthew Buckle
                                           Norton Rose Fulbright LLP
                                           3 More London Riverside
                                           London SE1 2AQ
                                           **UNITED KINGDOM**

                                           Joseph Tiredo
                                           Winston & Strawn London
                                           CityPoint
                                           1 Ropemaker Street
                                           London EC2Y 9HU
                                           **UNITED KINGDOM**

                                           Professor I. Zenkin
                                           Moscow Regional Collegium of Advocates
                                           Aviazionnaya Street, 79-1-37
                                           123182 Moscow
                                           **RUSSIA**



# B. The Arbitral Tribunal

Appointed as Chairman by SCC Letter dated 28 September 2010:

Professor Dr. Karl-Heinz Böckstiegel, Chairman
Parkstrasse 38
D-51427 Bergisch-Gladbach
**GERMANY**

Nominated by Claimants in their Request for Arbitration filed on 26 July 2010:

David Haigh, QC
Burnett, Duckworth & Palmer LLP
2400, 525 – 8 Avenue S.W.
Calgary, Alberta T2P 1G1
**CANADA**

Appointed by the SCC on behalf of Respondent by letter dated 23 September 2010
and confirmed on 15 December 2010:

Prof. Sergei N. Lebedev
Staroalexeevskaya Str., 16/49
129626 Moscow
**RUSSIA**



## C. Short Identification of the Case

1. The short identification below is without prejudice to the Parties' full presentation of the factual and legal details of this case, and the Tribunal's considerations and conclusions.

### C.I. The Claimants' Perspective

2. Claimants summarize the main aspects of the dispute at C-I ¶¶ 2 – 24 and C-II ¶¶ 1 - 31, partially quoted and summarized below; CPHB 1 ¶¶ 2 – 42, CPHB 2 ¶¶ 1 – 8:

    *2. [...] In reliance on Kazakhstan's solemn commitments under international law, Claimants invested more than US$ 1 billion breathing new life into previously-neglected oil and gas fields, and constructing a state-of-the art LPG Plant that Kazakhstan itself described as having "great regional and industrial importance for development of the region." But just as those investments matured and began to generate returns, Kazakhstan launched a targeted campaign of intimidation and harassment designed to pressure Claimants into selling their investments to the state-owned oil company at a firesale price. Kazakhstan went so far as to imprison a senior KPM employee on patently bogus criminal charges, and to threaten other employees with the same fate, in furtherance of its strong arm tactics. When its plan failed — because Claimants defiantly refused to give in to Kazakhstan's pressure — the government simply seized the investments, deciding to take its chances in arbitration.*

    *3. Perhaps most shocking, this plan originated from the highest level of the Kazakhstan government, namely, President Nazarbayev himself. That fact would sound far-fetched if it were not admitted, but Kazakhstan concedes that President Nazarbayev personally issued the order that led to the expropriation of Claimants' investments.*

    *4. [...] Kazakhstan attempts to shroud its violations of international law in a cloak of legitimacy by focusing on each minute detail in isolation rather than the totality of its conduct as a whole. It argues that its extraordinary campaign of inspections was perfectly normal, and that its subsequent actions were appropriate responses to the information it discovered under arcane, Delphic, and often-misstated provisions of its own domestic law. These arguments, however, crumble under the weight of the evidence. Kazakhstan did not discover any wrongdoing by Claimants' companies, much less violations that would justify the extraordinary actions that followed. Viewing Kazakhstan's conduct in its entirety, it is evident that Kazakhstan's objective from the start was to devalue Claimants' investments by making it virtually impossible for Claimants to operate or sell the businesses, so that Claimants would sell to Kazakhstan at a firesale price. Moreover, Kazakhstan also anticipated this arbitration from the beginning, and cloaked its actions under mystifying interpretations of domestic laws and regulations in order to create an appearance of normalcy and legitimacy.*



5.    Furthermore, Kazakhstan has continued its blatant disregard for its obligations under international law in its conduct of this arbitration. Kazakhstan consistently attempts to obstruct this Tribunal's consideration of Claimants' claims by raising utterly baseless arguments, flatly misstating facts and law, and engaging in procedural misconduct of the worst kind. [Kazakhstan hopes that through the sophistry of focusing on each small fact individually, the Tribunal will lose sight of the fact that Kazakhstan launched the investigations for the precise purpose of acquiring Claimants' investments for less than fair value.] (C-II ¶¶ 2 – 5, 7). [...]

15.   Moreover, while Kazakhstan publicly maintained that it would honor its earlier contracts, its practice has been quite to the contrary.  [...] Kazakhstan has become adept at pressuring foreign investors to sell equity stakes to KazMunaiGaz through a combination of Financial Police investigations, baseless criminal allegations, fines, and tax threats. Kazakhstan makes it essentially impossible to continue normal operations, and then makes it known that the sale of a substantial equity stake to KazMunaiGaz would resolve the company's various legal difficulties. Kazakhstan has run this "playbook" on foreign investors — and especially, investors in 100% foreign-owned projects — time and again. [That is precisely what happened here. And when Claimants' refused Kazakhstan's below-average bid for Claimants' investments, Kazakhstan turned up the pressure. After six months of government harassment, they offered USD 150 million less. This is the Kazakhstan playbook to the letter.] (C-II ¶¶ 15 - 16). [...]

17.   Moreover, when Claimants rejected KazMunaiGaz's lowball offer in June 2009, Kazakhstan simply turned up the pressure. It interfered in the trial of Mr. Cornegruta to ensure a guilty verdict, then sentenced him to four years in Kazakhstan's notoriously dangerous prison system as punishment. It continued to threaten the same fate for KPM and TNG's other directors. It engineered a massive fine against KPM (which was not even a party to the criminal trial) that was large enough to bankrupt the company and provide a ground for seizing its assets. And it continued to interfere with the day-to-day operations of the businesses, including more inspections and audits, asset seizures, and apparent interference with TNG's access to gas markets that choked the company's cash flows. Then, in November 2009, KazMunaiGaz made another bid to buy the companies, this time attempting to circumvent the Claimants by negotiating with the companies' note-holders, and then offering even less to the Claimants than it had offered in June 2009.

18.   Despite all this, Claimants continued to resist Kazakhstan's coercion, and ultimately found a Kazakhstan-based buyer for the companies.   In February 2010, Claimants signed an agreement to sell their Kazakhstan investments to the Cliffson company for more than US$ 920 million — which was nearly 70% higher than KazMunaiGaz's lowball offer in June 2009. And that presented a dilemma for Kazakhstan. Cliffson was owned by the wealthy and politically connected Assaubayev family. In the course of those negotiations, it became clear to all involved (and no doubt to



Kazakhstan as well) that Claimants intended to bring arbitration claims against Kazakhstan once the sale closed for the diminution in the sale price caused by Kazakhstan's harassment campaign. Thus, Kazakhstan faced the prospect of either allowing the companies to slip out of its hands or exercising its pre-emptive rights (which would have required it to match Cliffson's offer), while still facing arbitration claims for the diminution in value. Kazakhstan delayed approval of the transaction for several months with requests for additional details and documentation, but Claimants submitted everything the Government requested in June 2010. Within a week, on June 29, 2010, Kazakhstan launched the final inspection blitz that led to the outright seizure of the companies on July 21, 2010. Kazakhstan apparently concluded that if it was going to face arbitration claims anyway, it might as well take the assets for free and posture a termination basis for the coming arbitration fight. (C-II ¶ 18).

19.     This tale of conspiracy coordinated at the highest levels of government might seem contrived if it were not both a familiar pattern of behavior in Kazakhstan and admitted in this case that President Nazarbayev was personally involved. But viewed in the context of all the facts, this is a far more plausible explanation than Kazakhstan's suggestion that this was just the normal operation of law in Kazakhstan. Only Kazakhstan knows precisely why it chose this path: a favor to a regional ally, punishment for a 100% foreign-owned company that had refused purchase overtures in the past, an old-fashioned money grab, or some combination of all three. But it is beyond serious dispute that it occurred. [And, Kazakhstan's own documents and admissions in this proceeding confirm that it did. (C-II ¶¶ 19 – 20)]. [...]

30.     [In these proceedings, Kazakhstan's] conduct goes beyond zealous advocacy in a contentious arbitration. [Kazakhstan has delayed proceedings, unfairly and obstructionistically submitted evidence, and has made meritless jurisdictional objections.] Kazakhstan seeks to obscure the truth from this Tribunal and make it as costly, time-consuming, and difficult as possible for Claimants to obtain justice, in furtherance of its strategy of harassment and intimidation. Indeed, if Kazakhstan can bully or mislead this Tribunal into an award favoring Kazakhstan — or even an award for Claimants that undervalues damages — then Kazakhstan will have accomplished its objective of seizing Claimants investments for less than fair value, and also can discourage other foreign investors from resisting its coercion in the future based on hope of obtaining redress in arbitration. (C-II ¶¶ 22 – 30).

3.     Prior to the Hearing on Quantum, Claimants summarized the main aspects of the dispute at C-III ¶¶ 1-7, partially quoted and summarized below:

1.      [...] Kazakhstan's harassment campaign had as its principal objective a devaluation of Claimants' investments in an effort to acquire them for far less than their fair market value. Kazakhstan saddled KPM and TNG with unfounded liabilities, interfered with the companies' cash flows, and obstructed the sale of the companies, all as part of its strategy to force Claimants to sell to KazMunaiGas at a firesale price. When that strategy



*failed, Kazakhstan seized the investments, deciding to take its chances in arbitration.*

2. *Respondent has continued that strategy in this arbitration, making a series of disingenuous arguments about the value of Claimants' investments in an effort to enlist the Tribunal in accomplishing the objective Respondent could not accomplish in negotiations with Claimants — namely, acquiring Claimants' investments for far less than their actual worth. In summary, Kazakhstan argues that the value of Claimants' investments as of October 14, 2008 (the valuation date used by Claimants) was significantly less than Claimants calculate; that Claimants' investments were of de minimis value by the time of their final seizure in July 2010; and that, between October 2008 and July 2010, "there are other possible causes of a reduction in the value of the Claimants' investments that cannot possibly be attributable to the Republic and may even be attributable to the Claimants."*

4. *Respondent purportedly arrives at a range for the total market value of Claimants' investments, as of its chosen July 21, 2010 valuation date, of US $161 to US $237 million on an enterprise value basis (i.e., without considering debt). To arrive at this exceedingly low value, Respondent fabricates capital costs, overstates operating costs, ignores existing reserves, fabricates artificially low gas prices, attributes no value at all to five of the six resource areas at issue in the Contract 302 Properties, relegates the LPG Plant to scrap value, and ignores entirely any attributes of the investments that would be of uniquely enhanced value to the State itself.*

## C.II. The Respondent's Perspective

4. Respondent summarizes the main aspects of the dispute at R-I ¶¶ 2 *et seq.*, and R-II ¶¶ 1 – 9, RPHB 2 ¶¶ 1 – 3, 59 partially quoted and summarized below:

1. *[...] A claimant raising claims must state and prove his case. Stating one's case means that the claimant must present to a tribunal a complete, plausible and logical factual story without contradictions. Proving one's case means that the investor must prove that the tribunal has jurisdiction to hear the case and that the applicable treaty was breached by the state. The claiming investor must further prove causation, [...][i.e.] that he incurred damages as a result of such breach. And finally the claiming investor must prove and specify the precise amount of the damages he requests the tribunal to award based on a certain valuation date which also needs to be correctly determined by the claiming investor. [...]*

3 *[...] [The]need for the claimant to fulfil its procedural duties cannot be replaced by mere reference to an alleged discretion of a tribunal. A claimant may not simply anchor the highest possible value and the earliest valuation date he could think of and leave it to the tribunal to award a portion of this maximum threshold established by a claimant. Rather, any claimant must submit a specified request for damages based on specific and proven facts. A claimant must further establish a causal link between the alleged breach by a respondent and the requested damages. And this*

*must be linked to a specific date for the valuation of the damages requested. Once the claimant has done so, he is bound by the choices he made as to facts, causation, amount requested and valuation date. Equally, the tribunal is bound by those choices and bound to verify whether the claimant has discharged its various procedural duties. Where this is not the case, the tribunal cannot put its own discretion to cover up for claimant's failure. Rather, if a claimant fails in any of the mandatory steps required of a claiming party, his claim must also fail. [...]*

59.     *Claimants have in many instances failed to coherently state their case. Where they did present a coherent set of factual allegations, they generally failed to provide proof of their contentions: Their witnesses are non-credible, many of their documents are tainted with procedural misconduct, and their experts lack independence as well as the competence necessary to provide useful opinions on valuation issues. The latter is evidenced not least by Claimants' ever changing prayers for relief. Ultimately, all of this does not matter, as Claimants have not presented a valuation corresponding to the facts of this case and the timing of the alleged breaches of the law. In summary, Claimants' claims must be dismissed (RPHB 2 ¶¶ 1 -3, 59).*

1       *Anatolie Stati is a Moldovan businessman [who] [...] claims to have acquired two relativley minor oil and gas companies in Kazakhstan, KPM and TNG. The mechanism of the supposed acquisition and holding of these companies is opaque, involving multiple intermediate entities outside Kazakhstan, some disclosed others not.*

2       *The rationale for this complex holding structure is unknown, but liabilities seemed to gravitate to KPM and TNG from their owners and their owner's afiliates, whilst cash flowed out to a number of afiliated companies outside Kazakhstan.*

3       *Tristan Oil, a BVI registered entity has no disclosed stake in KPM or TNG, but since the end of 2006, it has issued over half a billion dollars in debt, ostensibly for the purpose of funding KPM and TNG. Whilst KPM and TNG are apprently guarantors of this debt, it is by no means clear that they benefited from all of the funds this brought into Tristan Oil. As a BVI registered entity Tristan Oil does not benefit from the protection of the ECT.*

4       *In late 2008, when at a domestic level the Republic began to become aware of problems with KPM and TNG, it seems that KPM and TNG's precarious debt laden ownership structure was pushed to the brink by the financial crisis, resulting in yet more funds being stripped from the companies.*

5       *In late 2008 little of the above was known to the agencies of the Republic that regulated the performance of KPM and TNG. At that time their principal concern was a littany of breaches by KPM and TNG of their contractual and other legal obligations. There were also wider social consequences for the area in which the companies operated, caused by what, at the time, seemed an inexplicable decline in the companies' performance and indiference of their management.*



6    *The Republic was ultimately driven to terminate KPM and TNG's contract contracts and place their subsoil use assets into trust management to preserve them from decay. That was not the outcome that anyone wanted, least of all the Republic, which generates much of its income from active subsoil users. However, KPM and TNG's apparent disinterest in remedying their desructive poor performance made it unavoidable.*

7    *Since this Arbitration was commenced, the Republic has learned rather more about KPM and TNG and Mr Stati, though perhaps not enough fully to explain the decline of KPM and TNG. However, what it has learned has re-inforced its view that fundamentally the Claimants are seeking to use international arbitration to shield them from the consequences of their wrongdoing in Kazakhstan and perhaps from matters outside Kazakhstan as well.*

8    *In the Republic's respectful submission, the Tribunal should not allow its power to be abused either to protect the Claimants from the Republic's legitimate reaction to KPM and TNG's illegal conduct or from the apparent wider troubles of Mr Stati's buiness empire in which the Republic plays no part.*

9    *In dealing with this case, the Tribunal should keep four basic points in mind:*

    *(a)    First, the Claimants' illegal and bad faith conduct already excludes any protection under the ECT and any jurisdiction of the Tribunal. A foreigner breaching the laws of a state cannot expect protection under international law. Conversely, a state making promises in the expectation of (i) lawful investor conduct, (ii) mutual cooperation and (iii) mutual profiting of both the state and the investor from the investment cannot be held to such promises when the investor acts illegally and contrary to the purposes of admission of foreign investment.*

    *(b)    Second, Claimants claims are in any event completely without merit. Claimants suggest that they fell victim to a "harassment campaign" initiated by the President of the Republic for the purpose of expropriating the Claimants' assets and that this "harassment campaign" was based on a "Kazakhstan playbook". These are mere pretty words with which Claimants try to turn the case on its head. Claimants, as foreign subsoil use contractors in Kazakhstan, were not respecting the laws that Kazakhstan had enacted in order to safeguard its interests and ensure its subsoil use policies. The Republic's audits, inspections and investigations were the lawful reaction to Claimants' illegal conduct. This is not harassment but the legitimate measures any state in the position of the Republic would have taken.*

    *(c)    Third, Claimants are trying to blame the Republic for the demise of their companies, when it was in fact the Claimants' own conduct,*



*as well as external circumstances, which made the Claimants' project companies KPM and TNG fail in the end. Claimants overburdened KPM and TNG with debt. This approach backfired when the global financial crisis hit the markets in 2008, energy prices took a dive and important local customers of KPM and TNG could no longer fulfil their contracts with Claimants. Yet, in this severe situation, instead of supporting the companies, Claimants decided to strip them of cash even more. The ultimate failure of the companies can come as no surprise against this background.*

(d)    *Fourth, Claimants also largely overstate the importance of their alleged investment within the Republic. Claimants' activities were of a rather minor scale compared to many other exploration and production projects in the Republic. This has two consequences: For one, this further undermines Claimants' spurious allegation of a "harassment campaign" initiated by the President of the Republic. Apart from all other reasons excluding this argument, Claimants' assets were simply not valuable enough to merit such action in the first place. Moreover, this also shows that Claimants' claim for compensation is artificially inflated. In fact, Claimants claim for compensation runs into billions, a sum which no interested third party ever offered to pay for KPM and TNG.*

5.    Prior to the Hearing on Quantum, Respondent summarized the main aspects of the dispute at R-III ¶¶ 1 – 12, partially quoted and summarized below (citations omitted):

3    *[T]he billions of USD claimed by Claimants in this arbitration, are reached by a blatant breach of universally accepted valuation standards. Moreover, they are reached by simply disregarding a whole range of inconvenient facts and substituting reality by wishful thinking. [...]*

5    *The largest part of Claimants' damages claim is taken up by the claim relating to Contract No. 302. Claimants demand a whopping USD 1.58 billion in compensation for the "loss of opportunity" to develop the Contract 302 Properties. However, as even Claimants' expert confirms, the chances of success were minimal and this must be reflected in the valuation. [Claimants disregard risk in their valuation.] [...]*

10    *The central element of Claimants' wishful thinking approach is Claimants' improperly early valuation date. Claimants set their valuation date to 14 October 2008, a date on which no state action had any actual effect on KPM and TNG and, moreover, a date which is months or even more than a year prior to many of the state measures Claimants complain of. By choosing 14 October 2008 as their valuation date, Claimants find a way to disregard many developments after that date[,] which drive down the value of their assets. In particular, Claimants ignore the sharp drop in oil prices, the sharp drop in demand for TNG's gas[,] and the failure to conclude the so-called tri-partite agreement with KazAzot. Taking into account these developments, as international law requires, Claimants' claims shrink decisively.*



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF CC **-432 -**

*11*       *There are also other instances throughout Claimants' case on damages in which Claimants completely disregard the existing facts or the legal framework surrounding KPM and TNG. For example, Claimants ignore that KPM and TNG were never able to export gas because they could not secure a contract for export. Claimants simply apply export prices – even though their own reserves reports from 2008 and 2009 reveal that at the time of events, they did not actually expect that they would be able to achieve export prices.*

*12*       *In a final attempt at inflating their damage claims, Claimants demand the compensation of moral damages in the amount of "at least" 10% of compensatory damages awarded. Since Claimants inflated damage claim comprises approximately USD 2.7 billion, their moral damages claim thus amounts to at least USD 270 million. This further inflation of Claimants' claim borders on the ridiculous as is reflected by the fact that the highest amount of moral damages ever awarded by an investment tribunal was USD 1 million. (R-III ¶¶ 1 – 12, partially quoted).*



## D.    Procedural History

6.    On **26 July 2010** Claimants filed of their **Request for Arbitration** (C-0) and appointed Mr. David R. Haigh, QC of Canada as arbitrator. (C-0 ¶ 112).

7.    On **23 September 2010**, Arbitration Institute of the SCC appointed Prof. Sergei Lebedev as an arbitrator.

8.    On **28 September 2010**, Prof. Karl-Heinz Böckstiegel accepted his appointment as Chairman of the Tribunal.

9.    On **10 November 2010**, the Chairman, on behalf of the Tribunal, issued his first email to the Parties and the Tribunal members, inviting the Parties to prepare for an in-person procedural meeting and to inform the Tribunal as to when and where to hold that meeting.

10.   Respondent's then-counsel, Curtis, Mallet-Prevost, Colt & Mosle LLP, advised that it had been retained on 8 November 2010 but had only received the file on 12 November.

11.   On **22 November 2010**, the Chairman, on behalf of the Tribunal, sent the Parties an **Annotated Preliminary Agenda of Issues Regarding the Further Procedure** in preparation for the First Procedural Meeting with the Parties in Stockholm, scheduled for 15 December 2010.

12.   On **2 December 2010**, Respondent challenged the 23 September 2010 appointment of Prof. Sergei Lebedev as arbitrator. Respondent argued that, especially in light of the necessary translation issues and the fact that the arbitration involves a State as Respondent, the 21 and even 35-day time limits within which Respondent was to have filed its Answer were exceptionally short – even shorter than would have been demanded in a commercial arbitration. Respondent also noted that a member of the SCC Board is a Consultant in the King & Spalding firm, which is representing Claimants in this case, and indicated that this fact raises concerns about the undue haste. Respondent indicated that it has been prejudiced and that procedural fairness has been impaired by the hasty appointment.

13.   On **15 December 2010** and after considering comments from the Parties, the Arbitration Institute of the SCC dismissed Respondent's challenge of Prof. Lebedev, having found no ground for disqualification.

14.   On **20 December 2010**, the Chairman circulated the draft Procedural Order 1 (PO-1), which resulted from the First Meeting in Stockholm, to the Parties for their comment by 3 January 2011.

15.   On **27 December 2010**, Respondent wrote to the Secretary General of the Arbitration Institute of the SCC, expressing disappointment with the Decision of 15 December and noting that no explanation had been provided for the decision. Neither the SCC nor Claimants' comments addressed whether Ms. Margrete Stevens of King & Spalding participated in any way in the consultations regarding the selection or appointment of Prof. Lebedev. Respondent again protested Prof.



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE **434 -**

Lebedev's appointment and argued that "*the SCC's own rules do not prescribe a specific time period for filing an Answer and appointing an arbitrator, and the short time given by the SCC was unreasonable and constitutes clear procedural unfairness.*" Respondent maintained that the necessities of governmental procedures required due consideration in the setting of time limits. Respondent maintained its objections and indicated that it participates in these proceedings in good faith and with full reservation of all of its rights, defenses, and objections.

16. The Arbitration Institute of the SCC responded by letter dated **29 December 2010** and stated that Ms. Margrete Stevens, a member of the SCC Board, did not take part in the decisions made by the SCC Board on this case.

17. On **3 January 2011**, Claimants wrote to the Tribunal, indicating that they had no comments to the draft procedural order. They made two comments related to potential jurisdictional objections by Respondent and requested that the Tribunal "*clarify that, in the event Kazakhstan elects to make a jurisdictional objection, 1) it must do so in its Counter-Memorial, and 2) if Kazakhstan submits a reply on its jurisdictional objection in its Rejoinder, Claimants will be entitled to submit a brief rejoinder, on jurisdictional issues only, on 10 May 2012 (i.e., 30 days after receipt of Kazakhstan's Rejoinder).*"

18. On **3 January 2011**, Respondent submitted comments to the draft procedural order, objecting to calling the second week of the hearing an "*extension.*" In response to Claimants' email of 3 January 2011, Respondent objected to any limitations on its right to assert jurisdictional objections. Respondent also objected to Claimants' request for an additional round of briefing on jurisdictional issues, explaining that Claimants had "*opposed bifurcation and agreed to the briefing schedule discussed at the December 15 meeting, fully aware that Respondent contemplated asserting jurisdictional objections. There is no reason to alter that arrangement.*"

19. In a second email on **3 January 2011**, Claimants stated that they are merely seeking to ensure that both Parties have an equal opportunity to address jurisdictional objections and indicated that the issue of bifurcation had not been entirely decided at the meeting. Claimants then stated that, since the Tribunal had indicated that there would be no bifurcation, it would be appropriate to address the schedule for jurisdictional submissions.

20. On **12 January 2011**, the Tribunal issued **Procedural Order No. 1** (PO-1) The operative text is provided below for convenience:

> *Procedural Order (PO) No.1*
> *Regarding the further procedure*

> *1.    Procedural Meeting Stockholm 15 December 2010*

> *The Procedural Meeting was attended by:*

> *For Claimants:        Mr. Ken Fleuriet, Esq. (King & Spalding)*



| *For Respondent:* | *Ms. Miriam K. Harwood, Esq. (Curtis, Mallet-Prevost, Colt & Mosle LLP)* |
|---|---|
| | *Ms. Aizhan Galimovna Irgaliyeva (Deputy Director, Legal Service Department, Ministry of Oil and Gas, Republic of Kazakhstan)* |
| *The Tribunal:* | *David R. Haigh QC* |
| | *Prof. Sergei Lebedev* |
| | *Prof. Karl-Heinz Böckstiegel (Chairman)* |

## 2. *Results of Meeting*

2.1. *This PO records the results of the discussion and agreements reached at the Meeting. A draft of this PO was sent to the Parties after the Meeting inviting comments by 3 January 2011, if a Party considered that a result was not correctly recorded. Taking into account comments received, the Tribunal examined whether any changes seemed appropriate and hereby issues the Order in its final version.*

2.2. *At the beginning of the Meeting Respondent declared that it maintained its objections raised in its letter of 2 December 2010 regarding the appointment of Prof. Lebedev.*

## 3. *Communications*

3.1. *The Tribunal shall address communications to by e-mail to all Counsel of the Parties. In so far as such communications are confirmed by courier, such courier mail will be addressed to the lead counsel indicated by each Party.*

3.2. *Counsel of the Parties shall address communications directly to each member of the Tribunal (with a copy to counsel for the other Party and to the SCC)*

* *by e-mail, to allow direct access during travel,*

* *and in addition, longer letters and substantial submissions as well as memorials shall be confirmed either by courier or by fax ( but fax communications shall not exceed 10 pages).*

3.3. *Deadlines for submissions shall be considered as complied with if the submission is received by the Tribunal and the other Party in electronic form or by courier on the respective date.*

3.4. *Longer submissions and memorials shall be preceded by a Table of Contents.*

3.5. *To facilitate word-processing and citations in the deliberations and later decisions of the Tribunal, the e-mail transmission of*



*memorials and substantial or longer submissions shall be in Windows Word, or in a PDF document that can be word-searched and from which text can be copied and pasted into Windows Word.*

3.6. *To facilitate that parts can be taken out and copies can be made, submissions of all documents including statements of witnesses and experts shall be submitted separated from Memorials, **unbound in A5 size binders** and preceded by a list of such documents, consecutively numbered with consecutive numbering in later submissions (C-1, C-2 etc. for Claimant; R-1, R-2 etc. for Respondents) and with dividers between the documents. In addition, documents shall also be submitted in electronic form on a CD or USB-device (preferably in Windows Word to facilitate word processing and citations).*

## 4. **Particulars Regarding the Procedure**

4.1. *The Procedure shall be in accordance with the SCC Rules of Arbitration in force as from 2010.*

4.2. *As decided by the SCC Board according to SCC letter of 23 September 2010, the seat of arbitration for this case is Stockholm.*

4.3. *The language of the arbitral procedure shall be English.*

4.4. *In view of Art. 37 SCC Rules and in order to avoid the considerable delay caused by bifurcation, the procedure will not be bifurcated. It will deal with any jurisdictional objections, liability and quantum in one procedural phase.*

## 5. **Timetable**

5.1. ***By 1 March 2011**, the Claimant shall submit its Statement of Claim according to Art. 24 SCC Rules together with all evidence (documents, witness statements, expert statements) it wishes to rely on in accordance with the sections below.*

5.2. ***By 1 September 2011**, the Respondent shall file its Statement of Defence according to Art. 24 SCC Rules, including objections to jurisdiction if any, together with all evidence (documents, witness statements, expert statements) it wishes to rely on in accordance with the sections below.*

5.3. ***By 9 September 2011**, the Parties may request disclosure of documents from the other Party (with a copy to Tribunal).*

5.4. ***By 23 September 2011**, the receiving Party either produces the requested documents or replies by a reasoned objection to the other Party (with a copy to Tribunal).*



5.5.  *By 30 September 2011, the Parties try to agree regarding the documents to which objections have been made.*

5.6.  *By 10 October 2011, insofar as they cannot agree, the Parties may submit reasoned applications in the form of Redfern Schedules to the Tribunal to order production of documents.*

5.7.  *By 21 October 2011, the Tribunal decides on such applications.*

5.8.  *By 4 November 2011, the Parties produce documents as ordered by the Tribunal.*

5.9.  *By 16 January 2012, the Claimant files its Reply Memorial with any further evidence (documents, witness statements, expert statements), but only in rebuttal to Respondent's Statement of Defence or regarding new evidence from the procedure for document production above.*

5.10.  *By 10 April 2012, the Respondent files its Rejoinder Memorial with any further evidence (documents, witness statements, expert statements), but only in rebuttal to Claimant's Reply memorial or regarding new evidence from the procedure for document production above.*

5.11.  *Should Respondent's submission according to section 5.10. contain further arguments regarding objections to jurisdiction, Claimant may submit a brief Rejoinder on Jurisdiction, but only in rebuttal to these further arguments by Respondent, by 23 April 2012.*

5.12.  *Thereafter, no new evidence may be submitted, unless agreed between the Parties or expressly authorized by the Tribunal.*

5.13.  *By 30 April 2012, the Parties submit*

*\*notifications of the witnesses and experts presented by themselves or by the other Party they wish to examine at the Hearing including any information which witness or expert cannot testify in English,*

*\* and an updated list of all exhibits with indications where the respective documents can be found in the file and an electronic version on a CD or USBB-device of that list hyperlinked to the exhibits.*

5.14.  *By 7 May 2012, a Party may amend its notification of witnesses and experts, if it considers that necessary in view of the notification received from the other Party.*



5.15.    *Thereafter, the Tribunal will send the Parties a draft of a Procedural Order regarding further details of the Hearing inviting comments from the Parties.*

5.16.    **Within 3 weeks later,** *at a date set by the Tribunal after consultation of the Parties, a Pre-Hearing Conference by telephone between the Parties and the Tribunal may be held, if considered necessary by the Tribunal.*

5.17.    *As soon as possible thereafter, Tribunal will issue a Procedural Order regarding details of the Hearing.*

5.18.    **Hearing from 23 (afternoon) to 27 July 2012,** *and, if found necessary by the Tribunal after consultation with the Parties, extended to continue from* **30 July to 3 August 2012.**

5.19.    *Towards the end of the Hearing, the Tribunal will consult with the Parties whether the Parties shall submit Post-Hearing Briefs and further details of such briefs.*

### 6.    *Evidence*

*The Parties and the Tribunal may use, as an additional guideline, the 2010 version of the "IBA Rules on the Taking of Evidence in International Arbitration", always subject to the SCC Rules and changes considered appropriate in this case by the Tribunal.*

### 7.    *Documentary Evidence*

7.1.    *All documents ( including texts and translations into English of all substantive law provisions, cases and authorities) considered relevant by the Parties shall be submitted with their Briefs, as established in the Timetable.*

7.2.    *All documents shall be submitted in the form established above in the section on communications.*

7.3.    *New factual allegations or evidence shall not be any more permitted after the respective dates for the Rebuttal Briefs indicated in the above Timetable unless agreed between the Parties or expressly authorized by the Tribunal.*

7.4.    *Documents in a language other than English shall be accompanied by a translation into English.*

### 8.    *Witness Evidence*

8.1.    *Written Witness Statements of all witnesses shall be submitted together with the Briefs mentioned above by the time limits established in the Timetable.*



8.2.   In order to make most efficient use of time at the Hearing, written Witness Statements shall generally be used in lieu of direct oral examination though exceptions may be admitted by the Tribunal. Therefore, insofar as such witnesses are invited by the presenting Party or asked to attend the hearing at the request of the other Party, the available hearing time should mostly be reserved for cross-examination and re-direct examination, as well as for questions by the Arbitrators.

## 9.   Expert Evidence

Should the Parties wish to present expert testimony, the same procedure would apply as for witnesses.

## 10.   Hearing

Subject to changes in view of the further procedure up to the Hearing:

10.1.   The dates of the hearing shall be as given in the Timetable above.

10.2.   The hearing shall be held in Paris. (See Art. 20(2) SCC Rules) The chairman of the Tribunal will proceed with making appropriate reservations and then inform the Parties regarding further details and steps to be taken.

10.3.   The Parties may present short opening statements of not more than two hours, unless decided otherwise by the Tribunal after receiving an application in that respect from a Party.

10.4.   No new documents may be presented at the Hearing unless authorized in advance by the Tribunal. This also applies to documents regarding the credibility of a witness or expert. But demonstrative exhibits may be shown using documents submitted earlier in accordance with the Timetable.

10.5.   Taking into account the time available during the period provided for the Hearing in the Timetable, the Tribunal intends to establish equal maximum time periods both for the Claimants and for the Respondent which the Parties shall have available. Changes to that principle may be applied for at the latest **by 25 April 2012**.

10.6.   A live **transcript** shall be made of the Hearing. The Parties, who shall share the respective costs, shall try to agree on and make the necessary arrangements in this regard and shall inform the Tribunal accordingly two months before the time set for the Hearing, i.e. **23 May 2012**.

10.7.   Should the Parties be presenting a witness or expert not testifying in English and thus requiring **interpretation**, they are expected to provide the interpreter unless agreed otherwise. Should more than one witness or expert need interpretation, to avoid the need of



*double time for successive interpretation, simultaneous interpretation shall be provided. The Parties, who shall share the respective costs, shall try to agree on and make the necessary arrangements in this regard and shall inform the Tribunal accordingly two months before the time set for the Hearing, i.e. **23 May 2012.***

### 11. Extensions of Deadlines and Other Procedural Decisions

*11.1.* *Short extensions may be agreed between the Parties as long as they do not affect later dates in the Timetable and the Tribunal is informed before the original date due.*

*11.2.* *Extensions of deadlines shall only be granted by the Tribunal on exceptional grounds and provided that a request is submitted immediately after an event has occurred which prevents a Party from complying with the deadline.*

*11.3.* *The Tribunal indicated to the Parties, and the Parties took note thereof, that in view of travels and other commitments of the Arbitrators, it might sometimes take a certain period for the Tribunal to respond to submissions of the Parties and decide on them.*

*11.4.* *Procedural decisions will be issued by the chairman of the Tribunal after consultation with his co-arbitrators or, in cases of urgency or if a co- arbitrator cannot be reached, by him alone.*

*11.5.* *In view of the expected volume and complexity of the file in this procedure, the Tribunal may appoint an Administrative Secretary. The Tribunal will inform the Parties of such an appointment and of the fees of the Secretary. The costs for the Secretary shall be treated as expenses of the arbitration.*

### 12. Other Issues

*At the Meeting, Claimants notified the Respondents and the Tribunal that they may in the future seek interim measures in the event that the Government of Kazakhstan seeks to dispose of some or all of the assets that it has seized and are subject to these proceedings.*

21.  On **18 January 2011**, Respondent requested that the Tribunal "*order Claimants to engage in amicable settlement discussions as required by Article 26 of the ECT, and that the proceedings be suspended during the three—month period in satisfaction of that jurisdictional requirement.*" Respondent argued that the Art. 26 ECT requirement that parties refrain from submitting a dispute to international arbitration unless and until three months have elapsed from the date on which a party requested amicable settlement of the dispute had not been met. Claimants asserted that Respondent breached its obligations on 21 July 2010 – five days before Claimants filed their Request for Arbitration. In addition, Claimants never gave notice that they intended to assert treaty claims under the ECT and this is in



violation of the requirements of the ECT. Claimants' reliance on two letters from 2009 was misplaced and did not satisfy the ECT requirements.

22.    On **24 January 2010**, Claimants replied that they have observed the three-month notice period set forth in Art. 26(2) ECT.    Claimants reject Respondent's arguments that there was insufficient notice of the dispute, and offered instances where, between 2008 and mid-2010, the Parties attempted to resolve their dispute. Claimants rejected Respondent's reliance on a recent decision, *Murphy Exploration and Production Co. Int'l. v. Republic of Ecuador*, calling it an aberration in terms of the weight of investment treaty case law on this subject.    Alternatively, Claimants indicated that, although they would be willing to suspend the arbitration in order to attempt to achieve settlement, they are not willing to delay the merits hearing.  Claimants would allow for a sixty-day extension of the proceedings if Respondent were to (1) agree to waive its objections to the notice period and (2) apportion the suspension time equally between the parties, and (3) make a settlement proposal or propose a settlement meeting, in a neutral location, within one week of the letter.

23.    On **28 January 2011**, Respondent answered Claimants' letter.

24.    The Tribunal responded to the Parties on **1 February 2011**.    The Tribunal encouraged the Parties to make a good faith effort to agree on a solution, hopefully maintaining the agreed hearing dates.  The Tribunal also indicated its willingness to select a new, later hearing date in October 2012.

25.    On **2 February 2011**, Claimants responded to the Tribunal's letter of 1 February, and to Respondent's letters of 18 and 28 January 2011.  Maintaining its objections to Respondent's points, Claimants proposed a 90-day suspension of the arbitration and proposed some changes to the submissions schedule, while maintaining the hearing date.  Claimants indicated their agreement to this would be subject to Respondent's agreement that it will not use the suspension period to aggravate the dispute and requested a response by 4 February 2011 at 17:00 CET.

26.    Respondent replied to Claimants' letter on **6 February 2011**, rejecting Claimants' arguments that there had been notice and that such notice had been sufficient under the ECT.  Respondent proposed an alternative time table that would allow for a suspension of the hearing.

27.    On **8 February 2011**, Claimants requested that that Tribunal advise the Parties as to its availability for a 2-week hearing in October 2012.

28.    On **14 February 2011**, the Arbitration Institute of the SCC wrote to the Tribunal, stating that "*the final award in the above arbitration shall be rendered on 26 April 2011*" and that the Tribunal must request an extension of time for rendering the final award.

29.    On **22 February 2011**, the Tribunal, in consultation with the Parties, created a revised time table for the dates in Section 5 of PO-1.

| *Procedural Order* | *Event* | *Current Schedule* | *Revised Schedule* |
|---|---|---|---|



| 5.1 | Statement of Claim | March 1, 2011 | May 16, 2011 |
|---|---|---|---|
| 5.2 | Statement of Defense | September 1, 2011 | November 16, 2011 |
| 5.3 | Document Requests | September 9, 2011 | November 28, 2011 |
| 5.4 | Responses/Objections to Document Requests | September 23, 2011 | December 9, 2011 |
| 5.5 | Agreement on Documents | September 30, 2011 | December 20, 2011 |
| 5.6 | Redfern Schedule on Document Objections | October 10, 2011 | December 30, 2011 |
| 5.7 | Decision on Document Objections | October 21, 2011 | January 10, 2012 |
| 5.8 | Produce Remaining Documents (if any) | November 4, 2011 | January 23, 2012 |
| 5.9 | Claimants' Reply | January 16, 2012 | April 2, 2012 |
| 5.10 | Respondent's Rejoinder | April 10, 2012 | June 26, 2012 |
| 5.11 | Rejoinder on Jurisdiction (if any) | April 23, 2012 | July 9, 2012 |
| 5.13 | Pre-Hearing Witness Notifications and Exhibit Lists | April 30, 2012 | July 16, 2012 |
| 5.14 | Amended Pre-Hearing Witness Notifications | May 7, 2012 | July 23, 2012 |
| 5.16 | Pre-Hearing Telephone Conference (if necessary) | By May 28, 2012 | By August 13, 2012 |
| 5.18 | Hearing | July 23-27, 2012 July 30-August 3, 2012 | October 1-5, 8-12, 2012 |

30. In its **Statement of Defence** (R-I), Respondent characterized this as the Tribunal having awarded a stay of proceedings with the intention of providing a window for settlement on 22 February 2011. (R-I ¶ 7.2; C-II ¶ 72).

31. On **4 March 2011**, the Arbitration Institute of the SCC granted the Tribunal an extension until 31 July 2013 render an Award.

32. The Parties met on **10 March 2011** in London for a settlement negotiation. (C-I ¶ 40).

33. On **18 May 2011**, Claimants submitted their **Statement of Claim** (C-I) to the Tribunal.



34. On **16 June 2011**, Respondent retained the law firm Norton Rose to represent it in this dispute, in place of the law firm of Curtis, Mallet-Prevost, Colt & Mosle LLP. The SCC reacted on 20 June 2011, sending a "*Power of Attorney*" for Respondent's new counsel.

35. On **29 June 2011**, Respondent returned the completed Power of Attorney forms to the SCC and informed the Tribunal and Claimants that the interests of the Republic of Kazakhstan will be represented by the Norton Rose law firm and by Prof. I. Zenkin, Attorney of Moscow Regional Collegium of Attorneys.

36. On **21 November 2011**, Respondent submitted its **Statement of Defence** to the Tribunal.

37. In a separate writing on **21 November 2011**, Respondent proposed trifurcation of the proceedings. Respondent argued that the Tribunal's reasons for refusing bifurcation were not compelling and that trifurcation would be necessary to re-balance the time table, especially in light of the size and complexity of the case.

38. On **8 December 2011**, Respondent submitted its **Request for Disclosure of Documents and the Explanatory Note thereto** to the Tribunal.

39. On **8 December 2011**, Claimants submitted their **Request for Production of Documents**. Claimants also requested production of the documents referred to and relied upon in the expert reports, which were not submitted with those reports. Claimants indicated that they would seek an order striking the so-called "*sleeper exhibits*" (witness statements disguised as exhibits) from the record.

40. Claimants produced 30 documents on **15 December 2011** and 14 documents on **22 December 2011**.

41. On **5 January 2012**, Claimants submitted their **Request for Production of Documents** and a cover letter detailing the request and responses to Respondent's production objections to the Tribunal. Claimants objected to Respondent's provision of so-called "*sleeper*" witness statements.

42. On **5 January 2012**, Respondent submitted its **Redfern Schedule** to the Tribunal.

43. On **5 January 2012**, Claimants submitted their **Redfern Schedule** to the Tribunal, along with lengthy arguments refuting Respondent's position.

44. On **16 January 2012**, Respondent submitted its WORD version of the **Redfern Schedule** to the Tribunal.

45. On **26 January 2012**, the Tribunal proposed the appointment of Katherine Simpson as Administrative Secretary to the Parties and requested their comment by 2 February 2012.

46. On **2 February 2012**, the Tribunal, after consultation with the Parties, appointed Ms. Simpson as Administrative Secretary.



47. The Tribunal issued **Procedural Order No. 2 on Production of Documents** (PO-2) on **3 February 2012**. The operative parts of that PO, but not the attached completed **Redfern Schedules**, is provided below:

### Procedural Order (PO) No. 2
### On Production of Documents

#### 1. Introduction

1.1. *The Tribunal has taken note of the submissions of the Parties regarding document production.*

1.2. *The Tribunal recalls Art. 26 SCC Rules regarding evidence.*

1.3. *The Tribunal further recalls section 5.6. of PO-1 providing for the submission of Redfern Schedules, and that, by the Chairman's mails of 5 and 12 January 2012, the Tribunal had asked Respondent to submit its Redfern schedule in WORD format so that the Tribunal can insert its decisions. The Tribunal notes that, only on 16 January 2012, Respondent provided such a submission. Due to this delay, the Tribunal could only issue the present decision today.*

1.4. *According to section 6 of PO-1, the "IBA Rules on the Taking of Evidence in International Arbitration" can be used as a guideline giving indications regarding the relevant criteria for what documents may be requested and ordered to be produced. The Tribunal will use the IBA Rules (as re-issued 29 May 2010), taking into account the relevant practice of their application in international arbitration. In this context, the Tribunal has taken note of the Parties' submissions regarding the applicable criteria and will take them into account insofar as they are not in conflict to the IBA Rules.*

1.5. *The Tribunal recognizes that, on the one hand, ordering the production of documents can be helpful for a party to present its case and in the Tribunal's task of establishing the facts of the case relevant for the issues to be decided. On the other hand, the process of disclosure may be time-consuming, excessively burdensome, and even oppressive. Unless carefully limited, the burden may be disproportionate to the value of the result. Further, the Parties may have a legitimate interest in confidentiality.*

1.6. *Further, the Tribunal notes that, insofar as a Party has the **burden of proof**, it is sufficient for the other Party to deny what the respective Party has alleged and then respond to and rebut the evidence provided by that respective Party to comply with its burden of proof.*

#### 2. Documents to be produced

*All documents identified in requests to be "admitted" in the Annexes I and II attached to this Order shall be produced by 17 February 2012 to the other Party in this procedure, but not yet to the Tribunal, subject to the further qualifications and limitations in this Order. The receiving Party may then decide the extent to which it wishes to rely on such documents in*



its *further submissions to the Tribunal and may submit the respective documents with its next Memorial.*

**3.**     ***Qualifications and Limitations of Document Production***

*3.1.*     *All documents produced under this Order may be utilized by the other Parties only in direct connection with the present arbitration procedure.*

*3.2.*     *Of the documents ordered by the Tribunal, the following documents or categories of documents **need not be produced, but the reason for the non-production must be identified.** If they:*

         *do not exist or do not yet exist,*

         *or are not in the possession, custody or control of a Party,*

         *or have already been sent or copied to the requesting Party,*

         *or contain commercially sensitive information,*

         *or include information regarding third parties for which the ordered Party has an obligation of confidentiality,*

         *or are subject to attorney-client privilege under the legal or ethical rules by which Counsel of the Parties are bound in their respective jurisdictions,*

         *or which reflect the seeking or rendering of a legal opinion by internal or external counsel.*

*3.3.*     *If a document or category of documents ordered by the Tribunal only contains some information or sections which do not have to be produced according to Section 3.3 above, the respective document **may be redacted** in such a way that those sections are excluded from the production. **But the reason** for non-production or redaction and the extent of such redaction **must be indicated** in a separate note or in the document.*

*3.4.*     *"Documents" should be understood to include permanent records in any form, including on paper and electronic.*

**4.**     ***Adverse Inference***

*Insofar as documents ordered are not produced or are not produced as ruled in this Order, the Tribunal may take this into account in its evaluation of the respective factual allegations and evidence and may draw an inference against the Party refusing production.*

**5.**     ***Tribunal's Decisions in attached Redfern Schedules***

*According to Section 2 above, as Annexes I and II, the following Redfern Schedules submitted by the Parties are attached in which the respective decisions of the Tribunal are added in the last column:*



> *Claimants' Redfern Schedule dated 5 January 2012,*
>
> *Respondent's Redfern Schedule dated 5 January 2012, but submitted in WORD format on 16 January 2012.*

**6.**   **Claimants' application dated 5 January 2012 regarding "Sleeper Expert reports and Witness Statements"**

6.1.   *The Tribunal has taken note of Claimants' earlier letter of 8 December 2011 and Claimant's applications in its letter of 5 January 2012, to which Respondent has not yet replied.*

6.2.   *The Tribunal invites both Claimants and Respondent, after having taken note of the Tribunal's decisions on their Redfern schedules, to submit any further comments in this regard by 17 February 2012.*

48.   The Chairman's email of **3 February 2012** is also provided for convenience:

> *Dear colleagues,*
>
> ### *1. Production of Documents*
>
> *Attached please find Procedural Order No.2 (PO-2) together with its two Annexes containing the Tribunal's decisions on the Parties' Redfern Schedules.*
>
> *Since, due to the delayed submission of the WORD version of Respondent's Redfern schedule, PO-2 could not be issued in time, as you see, the production is now ordered to be by 17 February which is the period of two weeks after the Tribunal's decisions originally provided in the agreed revised timetable confirmed by my mail of 2 December 2011.*
>
> ### *2. New date for Claimant's Reply Memorial*
>
> *In view of the above mentioned delay, the date by which Claimant is to submit its Reply Memorial is now set two weeks later, i.e. 16 April 2012. As, thereafter, Respondent's Rejoinder is only due by 26 June 2012, the remainder of the agreed timetable up to the hearing is maintained without prejudice to the further exchange under section 3 hereafter.*
>
> ### *3. Respondent's Procedural Applications dated 21 November 2011*
>
> *After the decisions on document disclosure have now been issued, Claimants are hereby invited to comment by 17 February 2012 on Respondent's procedural applications submitted by letter of 21 November 2011.*
>
> ### *4. Communications to Tribunal's Administrative Secretary*
>
> *In follow-up to my mail of 26 January 2012, the Parties are from now on invited to send copies of all electronic and hard copy communications, in*



**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

**447**

*addition to each member of the Tribunal, also to the Administrative Secretary:*

*Katherine Simpson*
*Graeffstr. 1*
*Zi. 1908*
*50823 Köln*
*Germany*
*Ksimpson.llm@hotmail.com*

### *5. Correct Address of Prof. Lebedev*

*As communications to Co-Arbitrator Prof. Lebedev have been sent to different addresses, the Parties are invited to submit further communications only to his following address:*

*Moscow 129626, Staroalexeevskaya 16/49.*

49. On **7 February 2012**, the SCC confirmed the appointment of Ms. Simpson.

50. On **16 February 2012**, Claimants wrote to Respondent, requesting the production of the documents and data referred to and relied upon by its party-appointed experts, Deloitte and GCA.

51. On **17 February 2012**, Claimants wrote to Respondent in response to PO-2. Claimants would provide Respondent's counsel 285 documents, in addition to those produced on 15 and 22 December 2011. Claimants indicated reasons for non-production of some of the requested documents.

52. On **17 February 2012**, Claimants requested that the Tribunal:

    - *Order Kazakhstan to produce immediately all materials upon which Deloitte and GCA relied when preparing their expert reports;*

    - *Clarify its decision with respect to Kazakhstan's "sleeper" expert reports and witness statements to the extent necessary;*

    - *Order Kazakhstan to identify immediately all of the individuals who authored the twenty "sleeper" expert reports and witness statements;*

    - *Reject Kazakhstan's application to trifurcate this proceeding;*

    - *Reject Kazakhstan's request to "rebalance" the procedural calendar; and*

    - *Reject Kazakhstan's request to extend the currently-scheduled 10 day hearing to 22 days in length.*

53. On **21 February 2012**, Claimants requested that the Tribunal instruct Respondent to comply with its document production obligations, or suffer the consequences of its failure to comply with the Tribunal's document production decision.



54. On **22 February 2012**, the Tribunal invited the Parties to submit any comments to the other's submissions of 16 and 17 February by 12 March 2012.

55. On **12 March 2012**, Claimants wrote in response to the Tribunal's 22 February 2012 request for additional comments, reiterating its earlier arguments and urging the Tribunal not to allow Respondent to benefit from its obstructionism, while protecting Claimants' right to a fair hearing.

56. On **24 March 2012**, the Tribunal issued Procedural Order No. 3 (PO-3). The entire text of PO-3 is set out below:

### *Procedural Order (PO) No. 3*

#### *I.*     *Introduction*

*1.1.*     *The Tribunal has taken note of the recent submissions of the Parties regarding document production and regarding the further procedure. Since the Parties had the opportunity to file two rounds of submissions and since the arguments put forward in these submissions are well known to the Parties, the Tribunal sees no need to repeat the many arguments of the Parties.*

*1.2.*     *Taking into account all the arguments presented by the Parties, the Tribunal comes to the following observations and conclusions.*

#### *2.*     *Document Production*

*2.1.*     *The earlier rulings of the Tribunal, particularly in PO-2, its Annexes, and the Chairman's letter of 3 February 2012, are maintained and are hereby confirmed.*

*2.2.*     *Due to a clerical error, Claimant's Request no. 48 in Annex 1 of PO-2 was not decided. It is now decided as follows:*

    *"Admitted in so far as documents are referenced or relied upon in Exhibit R-118."*

*2.3.*     *Regarding supporting documents to the reports by Deloitte, GCA, and Neftegazconsult, as well as to other reports submitted by Claimants and Respondent, it is confirmed that these have to be produced now, in so far as they have not yet been produced. If a Party chooses not to produce them, this will have the consequences mentioned in Section 4 of PO-2 and in the last paragraph on the title page of Annex 1 to PO-2.*

*2.4.*     *Regarding what the Claimants refer to as "Sleeper" reports and statements, the Tribunal has already admitted the respective requests by Claimants in Annex 1 to PO-2, as explained in the last paragraph on the title page of Annex 1 to PO-2. It is clarified that the required disclosure includes the identification of the authors of such documents. And, it is confirmed that, if Respondent chooses not to produce, this will have the consequences mentioned in Section 4 of PO-2 and in the last paragraph on the title page of Annex 1 to PO-2.*



2.5.    *Insofar as the Parties in view of PO-2, in view of their further submissions thereafter regarding their own or the othe rParty's production up to now, and in view of the above clarifications in this PO, choose to still produce documents, they shall do so by 2 **April 2012** in order to provide for the next procedural step according to the agreed timetable, i.e. to enable Claimant to take such documents into account in its Reply Memorial now due by 16 April 2012 according to my letter of 3 February 2012. Otherwise it will be assumed that the Party has chosen not to produce with the consequences mentioned above.*

2.6.    *Finally, the Tribunal confirms that it is left to each Party whether or not it will produce documents. However the Tribunal stresses, that both the Parties and the Tribunal have an interest that all relevant evidence is available for an orderly discussion and for decisions by the Tribunal and also an interest that neither non-production leads to adverse inferences nor that submitted evidence may be considered of little or even no evidentiary value due to non-production of supporting documents or information.*

**3.      Further Procedure**

3.1.    *Regarding the **further procedure**, the Tribunal recalls Section 2.1 of PO-1:*

        2.1.    *This PO records the results of the discussion and agreements reached at the Meeting. A draft of this PO was sent to the Parties after the Meeting inviting comments by 3 January 2011, if a Party considered that a result was not correctly recorded. Taking into account comments received, the Tribunal examined whether any changes seemed appropriate and hereby issues the Order in its final version.*

3.2.    *The Tribunal notes that Respondent is well acquainted with international arbitration procedures from other earlier cases and was represented at the Stockholm meeting by counsel also regularly active in this field.*

3.3.    *It is further recalled that, in February 2011, the Parties submitted a joint proposal for a new timetable, which the Tribunal accepted by the Chairman's letter of 22 February 2011.*

3.4.    *The Tribunal considers that changing the agreed and so far implemented procedure at the present stage would considerably disrupt the procedure and would only be acceptable for mandatory and urgent reasons. The Tribunal does not see any such reasons in the present case.*

3.5.    *Therefore, the procedure shall proceed as established in PO-1 and later rulings of the Tribunal slightly adapting the timetable.*

3.6.    *According to the agreement recorded in Sections 4.3 and 7.4 of PO-1, English will remain the **language of this procedure**. However, while accordingly, the hearing shall also be conducted in English, the Parties may make arrangements at the hearing for simultaneous interpretation to Russian. Anyhow, if witnesses or experts are examined at the hearing who do not testify in English, such arrangement will have to be made by the*



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF 450

Parties in accordance with Section 10.7 of PO-1. Therefore, it is suggested that the Parties when they contact the ICC Hearing Centre in accordance with the Chairman's mail of 4 April 2011 regarding the logistics of the hearing (it is suggested that they do so soon), they also request to use the logistics for simultaneous interpretation which are available at the Centre.

3.7.    Regarding the **length of the hearing**, the Tribunal recalls the agreement recorded in section 6.18 o fPo-1 which, taking into account the dates of the jointly proposed and accepted new timetable provides for the Hearing to be held from 1 to 5 October 2012, and, if found necessary by the Tribunal after consultation with the Parties, extended to continue from 8 to 12 October 2012.

3.8.    Further, the Tribunal recalls the agreement recorded in Section 10.5 of PO-1:

Taking into account the time available during the period provided for the Hearing in the Timetable, the Tribunal intends to establish equal maximum time periods both for the Claimants and for the Respondent which the Parties shall have available. Changes to that principle may be applied for at the latest by 25 April 2012.

3.9.    To clarify the intention of the Tribunal regarding the conduct of the hearing, though further details will have to be determined later according to Section 5.17 of PO-1 after consultation with the Parties, the Tribunal already now informs the Parties that it intends to include the following rulings, which have proved to be efficient and acceptable to the parties in similar cases:

A.    In order to make most efficient use of time at the Hearing, written Witness Statements or Expert Reports shall generally be used in lieu of direct oral examination though exceptions    may    be admitted by the Tribunal. Therefore, insofar as, at the Hearing, such witnesses or experts are invited by the presenting Party or asked to attend at the request of the other Party, the presenting Party may introduce the witness or expert for up to 10 minutes and add direct examination on issues, if any, which have occurred after the last written statement or report of the witness or expert has been submitted. The remaining hearing time shall be reserved for cross-examination and re-direct examination, as well as for questions by the Arbitrators.

B.    The following Agenda is intended to be established for the Hearing:

1.    Introduction by the Chairman of the Tribunal.

2.    Opening Statements of not more than total of two hours for each Party

First on jurisdiction



    *a)*     *Respondent up to 30 minutes*

    *b)*     *Claimants up to 30 minutes*

    *Second on all other issues including the Merits*

    *a)*     *Claimants up to 90 minutes*

    *b)*     *Respondent up to 30 minutes*

3.     *Unless otherwise agreed by the Parties: Examination of Claimants' fact witnesses:*

    *a)*     *Affirmation of witness to tell the truth.*

    *b)*     *Short introduction by Claimants*

    *c)*     *Cross-examination by Respondent.*

    *d)*     *Re-direct examination by Claimants, but only on issues raised in cross-examination.*

    *e)*     *Re-cross examination by Respondent but only on issues raised in re-direct examination.*

    *f)*     *Remaining questions by members of the Tribunal, but they may raise questions at any time.*

4.     *Examination of Respondent's fact witnesses. For each: vice versa as under 3.a) to f) above.*

5.     *Examination of experts as under 3.a) to f) above.*

6.     *Any witness or expert may only be recalled for rebuttal examination by a Party or the members of the Tribunal, if such intention is announced in time to assure the availability of the witness and expert during the time of the Hearing.*

7.     *Oral closing arguments of up to 2 hours (or longer if authorized by the Tribunal after consultation with the Parties during the hearing) each for the*

    *a)*     *Claimants,*

    *b)*     *Respondent.*

8.     *Remaining questions by the members of the Tribunal, if any.*

9.     *Discussion regarding the timing and details of post-hearing submissions and other procedural issues.*

3.10.   *Taking into account the above rulings and intended conduct of the hearing, and also taking into account, from the submissions already received, the*


**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE 452

       *volume and complexity of the issues to be dealt with at the hearing, the Tribunal concludes that the period blocked for the hearing in accordance with the agreed timetable is sufficient.*

    4.    *Beyond the above observations and rulings, the Tribunal does not consider any action necessary from its side.*

57.    On **2 April 2012**, Respondent confirmed that it had sent Claimants approximately 32,000 pages of requested documents. Respondent also contacted the ICC Hearing Center. Finally, Respondent stated that the time period for the oral hearing on jurisdictional matters is not sufficient and proposed devoting the period from $1 - 5$ October to jurisdictional matters.

58.    On **4 April 2012**, Claimants requested an extension of six weeks for the preparation of their Reply, since that amount of time would be necessary to translate and read the 32,000 pages of documents sent by Respondent – sent 14 days prior to Claimants' deadline to submit the Reply.

59.    On **10 April 2012**, the Tribunal wrote to the Arbitration Institute of the SCC. In light of changes in the case, it became necessary for the Tribunal to ask that its fees and the Security for Expenses be doubled.

60.    On **11 April 2012**, Respondent wrote to the Tribunal, objecting to Claimants' requests for extensions of time unless the same time period would be granted for Respondent's Rejoinder.

61.    On **21 April 2012**, the Tribunal circulated a draft of Procedural Order No. 4 (PO-4) to the Parties for their review and comment by 30 April 2012.

62.    On **23 April 2012**, the Arbitration Institute of the SCC forwarded the Parties the Tribunal's letter of 10 April 2012 and requested their response by 30 April 2012.

63.    On **24 April 2012**, Claimants provided their comments to draft PO-4. Claimants objected to moving the hearing date and proposed alternatives.

64.    On **4 May 2012**, the Tribunal issued **Procedural Order No. 4** to the Parties. The entire text is provided below, for ease of reference:

### *Procedural Order (PO) No.4*

*A draft of this PO was sent to the Parties for comments by 30 April 2012. Taking into account the comments received from the Parties, the Tribunal now issues the PO in its final form.*

*1.*    **Introduction**

        *1.1.*    *The Tribunal has taken note of Claimants' Application of 4 April and letter of 24 April 2012 and of Respondent's comments of 11 April and letters of 30 April 2012, both with attachments and proposals for a new timetable. Since the arguments put forward in*



*these submissions are well-known to the Parties, the Tribunal sees no need to repeat them here.*

*1.2.* *Taking into account all the arguments presented by the Parties, the Tribunal comes to the following observations and conclusions.*

## 2. **Relevant aspects of the procedure up to now**

*2.1.* *The Tribunal recalls **Procedural Order No.3 (PO-3)**, particularly its Section 3. The respective rulings are confirmed, subject to changes hereafter in this PO.*

*2.2.* *The Tribunal notes that both Parties now agree that the timetable as confirmed by PO-3 should be changed. But they disagree in which way it should be changed.*

*2.3.* *The Tribunal recalls the second introductory paragraph of Annex I to PO-2 dated 3 February 2012:*

*Further, the Tribunal clarifies that, in so far as Respondent has submitted exhibits, in particular statements and reports (which Claimants refer to as "Sleeper" Reports and Statements), the Tribunal has admitted Claimants' requests that documents on which such exhibits rely, etc., shall be produced. However, if Respondent chooses not to produce such documents, this will be taken into account by the Tribunal regarding the evidentiary value of such exhibits. The same may apply, if persons who have produced such exhibits and who are called for cross-examination by Claimants, do not appear at the hearing for cross examination.*

*2.4.* *In their submissions dated 17 and 21 February 2012, Claimants identified and listed a number of such documents alleging that they had not been produced by Respondent and requested (pages 11 and 12 of the letter of 17 February 2012) that the Tribunal order Respondent to produce them "immediately."*

*2.5.* *The Tribunal understands that, rather than relying on the Tribunal's reaction concerning ordered but not produced documents identified in the paragraph quoted above from Annex I, Claimants considered the disclosure of these documents so essential for their Reply Memorial that they insisted on their production.*

*2.6.* *Taking into account Claimants' submissions and Respondent's further submissions, in Section 2 of PO-3, the Tribunal provided further clarifications and a further opportunity to the Parties to produce further documents by the new deadline of 2 April 2012.*

*2.7.* *By that date of 2 April 2012, Respondent submitted its letter of that date announcing the disclosure of a great number of documents which seem to include all those requested by Claimants.*



2.8.    By letter of 4 April 2012, Claimants submitted that they could not address this volume of documents now disclosed by Respondent by the deadline of 16 April set for their Reply Memorial. Therefore, they proposed a new timetable.

2.9.    By letter of 11 April 2012, Respondent submitted comments on Claimants' letter. Particularly, Respondent listed a number of documents which it alleged Claimants should have disclosed according to PO-3 and proposed a new timetable different from that proposed by Claimants.

2.10.   By letter of 24 April 2012, Claimants submitted comments on the draft PO and, particularly, declared themselves ready to submit their Reply Memorial on Jurisdiction and Liability by 7 May and their Reply Memorial on Quantum by 28 May 2012. On that basis, Claimants suggested new alternative timetables.

2.11.   By letters of 30 April 2012, Respondent submitted letters and appended comments on the draft PO-4 and on Claimants' letter of 24 April 2012.

### 3.   **The Tribunal's Conclusions**

3.1.    The Tribunal understands that the Parties prefer to have as many relevant documents as possible available for their final Memorials before the hearing on the merits.

3.2.    The Tribunal also feels that every effort should be made to have all relevant documentation on file in order to fully evaluate the Parties' submissions and evidence.

3.3.    The Tribunal agrees with the Parties that, therefore, the timetable should be changed. The Tribunal recalls that, in its draft PO-4, it already asked for the Parties' views regarding a bifurcation with an early hearing on jurisdiction. The Tribunal notes that both the Claimants (in their Alternative 2) and the Respondent now accept bifurcation, though they do not agree on its scope.

3.4.    Since the great majority of the large volume of documents which Respondent should have produced by 17 February 2012 according to the second introductory paragraph of Annex I to PO-2, but were produced only by 2 April 2012, concerns the quantum of the claims, the Tribunal finds that bifurcating the procedure into a first phase on jurisdiction and liability and a second phase on quantum, is the relatively best solution in order to avoid undue delay for the entire procedure under the present circumstances.

3.5.    In this context, the Tribunal finds it helpful that Claimants now accept 7 May 2012 as an earlier deadline for their Reply Memorial on jurisdiction and liability, and still the originally suggested



deadline of 28 May 2012 for their Reply Memorial on quantum, and also foregoes its Rejoinder on Jurisdiction. Insofar as, from the list of allegedly missing documents according to Respondent's letter of 11 April 2012, Claimants are ready to submit such documents, they should at the latest be submitted with these Memorials.

3.6. While the Tribunal agreed with Respondent that the deadline originally suggested by Claimants for Respondent's Rejoinder Memorial, i.e. 6 August 2012, was not sufficient, bifurcation would allow different deadlines for Respondent's two Rejoinder Memorials in the two phases. Since Claimants' Reply Memorial on Jurisdiction and Liability can now be submitted **by 7 May 2012**, the Tribunal considers that Respondent can now be expected to submit its Rejoinder Memorial restricted to jurisdiction and liability **by 26 July 2012**.

3.7. Thereafter, as Claimants have forgone their right to submit a Rejoinder on Jurisdiction, there will be sufficient time for the further procedural steps up to a hearing starting at the originally agreed date of 1 October 2012, but restricted to jurisdiction and liability.

3.8. Regarding the procedure on quantum, a separate timetable could, thus, be set up leading to a shorter hearing on quantum only at a later time.

## 4. New Timetable

4.1. Taking into account its above conclusions, the Tribunal hereby sets the following new **Timetable** for the further procedure using and adapting the originally agreed procedural steps in Sections 5.9 to 5.19 of PO-1.

4.2. **By 7 May 2012**, the Claimants file their Reply Memorial on jurisdiction and liability with any further evidence (documents, witness statements, expert statements), but only in rebuttal to Respondent's Statement of Defence or regarding new evidence from the procedure for document production.

4.3. **By 28 May 2012**, the Claimants file their Reply Memorial on quantum with any further evidence (documents, witness statements, expert statements), but only in rebuttal to Respondent's Statement of Defence or regarding new evidence from the procedure for document production.

4.4. **By 26 July 2012**, the Respondent files its Rejoinder Memorial on jurisdiction and liability with any further evidence (documents, witness statements, expert statements), but only in rebuttal to Claimants' Reply Memorial or regarding new evidence from the procedure for document production.



4.5.    *Thereafter, no new evidence may be submitted regarding jurisdiction and liability, unless agreed between the Parties or expressly authorized by the Tribunal.*

4.6.    **By 3 August 2012**, *the Parties submit*

\*       *notifications of the witnesses and experts presented by themselves or by the other Party they wish to examine at the Hearing on jurisdiction and liability including any information which witness or expert cannot testify in English,*

\*       *and an updated list of all exhibits regarding jurisdiction and liability with indications where the respective documents can be found in the file and an electronic version on a CD or USBB-device of that list hyperlinked to the exhibits.*

4.7.    **By 10 August 2012**, *a Party may amend its notification of witnesses and experts, if it considers that necessary in view of the notification received from the other Party.*

4.8.    *Thereafter, the Tribunal will send the Parties a draft of a Procedural Order regarding further details of the Hearing inviting comments from the Parties.*

4.9.    **Within 3 weeks later**, *at a date set by the Tribunal after consultation of the Parties, a Pre-Hearing Conference by telephone between the Parties and the Tribunal may be held, if considered necessary by the Tribunal.*

4.10.   *As soon as possible thereafter, Tribunal will issue a Procedural Order regarding details of the Hearing on jurisdiction and liability.*

4.11.   **Hearing from 1 to 5 October 2012**, *and, if found necessary by the Tribunal after consultation with the Parties, extended to continue from **8 to 9 October 2012**.*

4.12.   *Towards the end of the Hearing, the Tribunal will consult with the Parties regarding the further procedure up to the hearing on quantum.*

4.13.   *Subject to any changes resulting from the discussion at the above hearing in October, **by 21 November 2012**, Respondent's Rejoinder on quantum.*

4.14.   *Dates for a period of up to 4 days for the **hearing on quantum** will be determined after further exchanges between the Tribunal and the Parties as soon as possible.*

**5.      Logistics at the Hearing**



     *5.1.    The Tribunal recalls regarding the logistics at the Hearing:*

     \*     *Section 10.6 of PO-1 (transcript)*
     \*     *Section 10.7 of PO-1 (interpretation)*
     \*     *the Chairman's mail of 4 April to the ICC Hearing Centre in Paris, which was copied to the Parties (arrangements and billing at the Centre).*

     *5.2.    The Parties are invited to jointly make the necessary arrangements and inform the Tribunal accordingly by 26 July 2012.*

65.    On **7 May 2012**, Claimants notified the Tribunal that it required an extension until 14:00 CET on 8 May in order to make its submission, due to the size of the submission, as well as lingering issues of obtaining signatures and translations across various jurisdictions.

66.    On **8 May 2012**, Claimants submitted **Claimants' Reply Memorial on Jurisdiction and Liability** (C-II), together with 7 witness statements and 5 expert reports, to the Tribunal.

67.    On **9 May 2012**, the Arbitration Institute of the SCC decided that additional advances, in the amount of EUR 422 000 shall be paid by Respondent by 23 May 2013 and so notified the Parties.

68.    On **24 May 2012**, the Arbitration Institute of the SCC wrote to the Parties, reminding Respondent to pay the outstanding advance of EUR 422 000 and extending the deadline to 1 June 2012.

69.    On **28 May 2012**, Claimants submitted **Claimants' Reply Memorial on Quantum** (C-III) to the Tribunal.

70.    On **30 May 2012**, Respondent advised the Tribunal that Respondent appointed Dr. Patricia Nacimiento of Norton Rose LLP as counsel.

71.    On **30 May 2012**, Respondent applied for an extension of the deadline to submit **Respondent's Rejoinder on Jurisdiction and Liability** (R-II).

72.    On **31 May 2012**, the Tribunal confirmed receipt of Respondent's two letters of 30 May 2012 and invited Claimants to submit any comments thereto by 4 June 2012.

73.    On **4 June 2012**, Claimants responded that they do not object to Respondent being provided a brief extension of one week or less for its Rejoinder, and left the matter to the Tribunal's discretion.

74.    On **5 June 2012**, Respondent urged the Tribunal to grant the requested extension and arguing that an extension was necessary in order that Respondent adequately reply to Claimants' new evidence.

75.    On **5 June 2012**, Claimants urged the Tribunal to grant a shorter extension that would leave the bulk of August and September available to prepare for the October hearing.



76. On **6 June 2012**, the Tribunal sent the following email to the Parties.

> *[T]he Tribunal has taken note of the Parties' recent communications. Since they are well known to all concerned, there is no need to repeat or summarize them again.*
>
> ***1.    Regarding Respondent's 1ˢᵗ letter of 30 May 2012.***
>
> *In this regard, I as Chairman disclose the following.*
>
> *Dr. Patricia Nacimiento, who is announced as a new additional counsel, is one of my two co-editors of the book "Arbitration in Germany" published some years ago and planned for a 2ⁿᵈ edition in the future. I have not ever had and still do not have any other professional contact with her. I do not consider that her appointment raises any professional conflict either for her or for my involvement in this arbitration. However, as a precaution, I inform the parties of the above (which anyhow can be seen from the book having been on the market for some years). I add that the other members of the Tribunal also do not see any conflict. Unless we receive an objection from one of the Parties within one week of this letter, we consider this matter as closed,*
>
> ***2.    Regarding Respondent's 2ⁿᵈ letter of 30 May 2012.***
>
> *After an examination of the Respondent's extension application and the comments received from the Parties, mainly for the reasons mentioned in the Respondent's letter of 30 May, the Tribunal concludes that the requested extension shall be granted as follows:*
>
> *The dates in PO-4 are changed as hereafter:*
> ☐     ***Section 4.4. to 13 August 2012***
> ☐     ***Section 4.6. to 20 August 2012***
> ☐     ***Section 4.7. to 27 August 2012***
> ☐     ***with the later sections and, of course, the hearing dates remaining unchanged.***
>
> ***3.    Hearing on Quantum.***
>
> *Pursuant to 4.14 of PO-4, the Tribunal has had an exchange on possible dates for the Hearing on Quantum. It has turned out that, after the Respondent's Rejoinder due by 21 November 2012, the only period prior to April 2012 at which all three members of the Tribunal are available for the 4 day hearing, is **28 to 31 January 2013**.*
>
> *Therefore, the Tribunal sets the hearing for these dates and requests the Parties to block that period for a hearing in Paris. Further details will be determined later.*

77. On **12 June 2012**, the Arbitration Institute of the SCC advised that Respondent still has not made the required EUR 422 000 payment. Claimants were, therefore, invited to make the payment by 19 June 2012.



78.   On **20 June 2012**, the Arbitration Institute of the SCC advised that Claimants provided the additional advance of EUR 422 000, as ordered.

79.   On **24 June 2012**, the Tribunal provided the Parties the ICC Centre's revised reservation confirmation for the shortened hearing in October 2012 and the ICC Centre's Quotation for the 2nd hearing to take place in January 2013. The Tribunal invited the Parties to confirm the reservation to the ICC Centre by 9 July 2012 and to inform the Tribunal by the same date.

80.   On **4 July 2012**, Claimants announced the confirmation of the reservations with the ICC Centre for the October 2012 and the January 2013 hearings and also announced the relocation of its counsel's Paris office.

81.   On **1 August 2012**, the Tribunal requested that the Parties submit Microsoft WORD versions of each of the Memorials to the Tribunal. The Parties complied on **3 August 2012**.

82.   On **13 August 2012**, Respondent filed its **Rejoinder on Jurisdiction and Liability**, and the accompanying witness statements and export reports, with the Tribunal.

83.   On **20 August 2012**, the Parties submitted their respective notifications of witnesses and experts for examination at the hearing, pursuant to PO-4 as amended on 6 June 2012, to the Tribunal.

84.   On **23 August 2012**, the Chairman distributed the **Tribunal's draft for a Procedural Order No. 5 regarding the details of the hearing in October** to the Parties. The Tribunal requested responses by 7 September.

85.   On **27 August 2012**, Respondent emailed the Tribunal. Respondent confirmed receipt of draft PO-5 and requested that the Tribunal confirm that, by the attached draft, the deadline initially established for 27 August 2012 for the Parties' comments to the respective letters of 20 August 2012 is superseded and that the next relevant deadline is 7 September 2012.

86.   On **27 August 2012**, the Tribunal confirmed the 27 August deadline.

87.   On **27 August 2012**, the Parties, in separate emails, confirmed their 20 August 2012 notifications of witnesses and experts for examination at the hearing and indicated that neither wished to make any changes to those lists.

88.   On **7 September 2012**, Claimants and Respondent, in separate letters, submitted their comments to draft PO-5 to the Tribunal.

89.   On **8 September 2012**, Respondent wrote in response to Claimants' letter of 7 September 2012, indicating that the contents of Claimants' letter deviated in part from the Parties' discussions. In particular, Respondent strongly objected to using the January hearing for any purpose other than quantum.


ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF **460**

90. On **11 September 2012**, the Tribunal thanked the Parties for their cooperation on logistics and arrangements with the ICC Hearing Centre and invited them to a telephone conference at 15:00 Paris time on 15 September.

91. On **13 September 2012**, Claimants confirmed their attendance for the October hearing. While Claimants would prefer to hear expert testimony at the hearing, they are mindful that the Tribunal considers that oral testimony from the experts may be unnecessary. Instead, Claimants stated that they will not insist on presenting experts or on cross-examining Respondent's experts at the October hearing unless Respondent calls an expert. Finally, Claimants stated that they did not consider a pre-hearing telephone conference with the Tribunal to be necessary.

92. On **14 September 2012**, Respondent wrote to the Tribunal with comments on PO-5. Respondent suggested that the order of witnesses should be notified by 26 September, at the latest. Respondent also requested that witnesses Messrs. Smagulov, Aubakirov, and Aldashev be heard by video-conferencing. Respondent asked that the deadline for Post-Hearing Briefs be set after the January 2013 hearing.

93. On **14 September 2012** the Chairman replied, stating that Respondent would need to make witnesses Smagulov, Aubakirov, and Aldashev available for oral testimony at the hearing or, alternatively, could withdraw their witness statements, per section 3.6 of draft PO-5.

94. On **14 September 2012**, Claimants requested the Tribunal's permission to submit a limited number of documents into evidence in advance of the October hearing, pursuant to points 7.3 and 10.4 of PO-1.

95. On **16 September 2012**, Respondent urged dismissal of the request.

96. On **16 September 2012**, Claimants replied to Respondent's email, explaining that the evidence sought to be admitted is pertinent and responsive to new arguments made by Respondent.

97. On **18 September 2012**, the Tribunal issued **Procedural Order (PO) No. 5 Regarding further details of the Hearing on Jurisdiction and Liability** (PO-5). The entire text is provided below for ease of reference:

### *Procedural Order (PO) No.5*
### *Regarding further details of the Hearing on Jurisdiction and Liability*

*A draft of this PO was sent to the Parties for comments by 7 September 2012.*

*Thereafter, taking into account:*

- *the comments on the draft and further submissions received from the Parties,*
- *the Tribunal's letter to the Parties dated 11 September 2012*
- *and the submissions received from the Parties thereafter,*

*the Tribunal now issues the PO in its final form.*



### 1.    **_Earlier Agreements and Rulings_**

1.1.    *In order to have all rulings relevant for the hearing available in one document, this Order recalls the **earlier agreements and rulings** of the Tribunal and confirms them, to the extent that they are not amended in this PO, in bracketed text or elsewhere. The Tribunal particularly takes into account the recent submissions and letters of the Parties.*

1.2.    *In particular, with reference to section 2.1 of PO-4, the **following sections of PO-3** are recalled and again confirmed:*

  3.7.    *Regarding the **length of the hearing**, the Tribunal recalls the agreement recorded in Section 6.18 of PO-1 which, taking into account the dates of the jointly proposed and accepted new timetable, provides for the Hearing to be held from 1 to 5 October 2012, and, if found necessary by the Tribunal after consultation with the Parties, extended to continue from 8 to 9 October 2012. [In this regard, section 4.11 of PO-4 decided on the bifurcation of the proceedings and ruled that extension days would include only 8 to 9 October.].*

  3.8.    *Further, the Tribunal recalls the agreement recorded in Section 10.5 of PO-1:*

     *Taking into account the time available during the period provided for the Hearing in the Timetable, the Tribunal intends to establish **equal maximum time periods** both for the Claimants and for the Respondent which the Parties shall have available. Changes to that principle may be applied for at the latest by 25 April 2012.*

  3.9.    *To clarify the **intention of the Tribunal regarding the conduct of the hearing**, though further details will have to be determined later according to Section 5.17 of PO-1 after consultation with the Parties, the Tribunal already now informs the Parties that it intends to include the following rulings which have proved to be efficient and acceptable to the parties in similar cases:*

     *[The later provisions of § 3.9 of PO-3 are not recalled, but are later included in this PO-5 in their amended form as now valid for the hearing.]*

  3.10.    *Taking into account the above rulings and intended conduct of the hearing and also taking into account, from the submissions already received, the volume and complexity of the issues to be dealt with at the hearing, the Tribunal concludes that the **period blocked for the hearing in accordance with the agreed timetable is sufficient.***

1.3    *Further, the Tribunal recalls from **PO-1 the following sections:***

  10.4.    ***No new documents** may be presented at the Hearing unless authorized in advance by the Tribunal. This also applies to documents regarding the*



credibility of a witness or expert. But demonstrative exhibits may be shown using documents submitted earlier in accordance with the Timetable.

10.5.    Taking into account the time available during the period provided for the Hearing in the Timetable, the Tribunal intends to establish equal maximum time periods both for the Claimants and for the Respondent which the Parties shall have available. Changes to that principle may be applied for at the latest by 25 April 2012.

10.6.    A live **transcript** shall be made of the Hearing. The Parties, who shall share the respective costs, shall try to agree on and make the necessary arrangements in this regard and shall inform the Tribunal accordingly two months before the time set for the Hearing, i.e. 23 May 2012.

10.7.    Should the Parties be presenting a witness or expert not testifying in English and thus requiring **interpretation**, they are expected to provide the interpreter unless agreed otherwise. Should more than one witness or expert need interpretation, to avoid the need of double time for successive interpretation, simultaneous interpretation shall be provided. The Parties, who shall share the respective costs, shall try to agree on and make the necessary arrangements in this regard and shall inform the Tribunal accordingly two months before the time set for the Hearing, i.e. 23 May 2012.

1.4    Further, the Tribunal recalls from **the Tribunal's letter dated 11 September 2012** the following sections:

### 1. Logistics of the Hearing

1.1.    The Tribunal thanks the Parties for their arrangements with the ICC Hearing Centre.

1.2.    The Parties' selection of Mr. McGowan as **court reporter** is an excellent one. It should be pointed out to him that very few interruptions of the hearing will be possible so that he can bring a colleague in case he considers that necessary.

1.3.    For the same reasons, the **interpreters** should be notified and it may be necessary for them to bring a second team to allow un-interrupted simultaneous interpretation.

1.4.    In order to make sure that all the **logistics are ready before the beginning of the hearing Monday 1 October 2012 at 9:30**, it should be assured early enough (either on Sunday or very early Monday morning) that the hearing room is set up, including in particular that:

*        All files of the Parties are set up,
*        There is sufficient room for the members of the Tribunal to spread their files on their desks,
*        The hearing binders for the Tribunal on separate carts behind        every member of the Tribunal,



\*     *Microphones for all speaking connected to loud speakers,*
\*     *All of the equipment of the court reporter is set up,*
\*     *All of the equipment for the simultaneous interpretation is set up, and*
\*     *There are sufficient plugs available for the individual laptops of the Parties, of the members of the Tribunal, and of the Tribunal Secretary, in addition to the live laptops of the court reporter.*

*The Parties are invited to inform the Tribunal in advance at which time this preparation will be done so that the Tribunal Secretary can join them at an appropriate time.*

*1.6.    Subject to the provisions below, for the case that Mr. Seong-Hoon Kim is to be examined orally, the Parties should make all arrangements for a **video examination** from Korea for an appropriate time during the hearing agreed between the Parties and notified to the Tribunal.*

## 2.    Fact Witnesses

*2.1.    The Tribunal thanks the Parties for reducing the number of fact witnesses to be heard at the hearing.*

*2.2.    As agreed between the Parties, they are invited to notify the other Party and the Tribunal as early as possible and at the latest by the beginning of the hearing regarding the order in which the fact witnesses should be heard.*

## 3.    Experts

*3.1    The Tribunal thanks the Parties for their efforts and suggestions regarding the examination of experts.*

*3.2.    The Tribunal recalls from the chairman's letter of 23 August 2012 the indication that, in view of the extensive reports of most experts, the Tribunal considers that oral examination of most experts may not be necessary.*

*3.3.    Having reviewed the various considerations and suggestions of the Parties in their recent communications in this regard, the Tribunal rules as follows:*

     *3.3.1.   With their 1st round of Post-Hearing Briefs after the October hearing, the Parties may submit comments of their experts, but only regarding any new developments or issues which they have not addressed in their earlier reports, if considered necessary.*

     *3.3.2.   With their 2nd round of Post-Hearing Briefs after the October hearing, the Parties may submit reply comments of their experts to the comments of the experts of the other Party submitted in the 1st round, if considered necessary.*



3.3.2. *[sic] If, in spite of the above opportunity for written additional comments by the experts, a Party insists that oral examination should take place at the hearing, the examination of experts will be conducted by expert conferencing of the experts from both sides on the respective issues as follows:*

- *Short introduction up to 5 minutes of each expert by the Party which presented that expert,*
- *Questions by the Parties to the experts, but only regarding any new developments or issues which the experts have not yet addressed in their earlier reports,*
- *Additional questions by the Tribunal, if any, and*
- *Follow-up questions by the Parties on the questions raised by the Tribunal, if any.*

3.3.3. *In so far as a Party insists on oral examination of an expert according to section 3.3.2. above, it shall notify the Tribunal **by noon (Paris time) Friday 14 September 2012***

- *of the respective expert who should be examined,*
- *the respective expert from the other side who should join the conferencing, and*
- *the issues on which the conferencing examination should focus.*

3.3.4. *In so far as a notification is made according to section 3.3.3. above, the Parties shall make the respective experts available at the hearing.*

3.3.5. *In preparation of the hearing, the notified experts regarding the same issues, in so far as they will attend the hearing, are invited to try to agree on a note, or otherwise send separate notes, listing major points of agreement and disagreement, and the **Parties** shall submit such notes to the Tribunal **by 24 September 2012**.*

## 4. **Further procedure**

4.1. *As the Parties must have sufficient time to prepare the hearing and assure attendance (including getting visas etc) of the witnesses and experts required at the hearing, the Tribunal intends to issue **PO-5** as soon as possible after 14 September 2012 and any possible notifications received by that time. The Parties are invited to start their preparations for the hearing already now on the basis of the provisions in the draft PO-5 they received in so far as these are not affected by the rulings in this letter of the Tribunal.*

4.2. *At the present time and in view of the above rulings, the Tribunal does not consider it necessary to, additionally, hold a telephone conference for which an option is provided in section 4.9 of PO-4," if considered necessary by the Tribunal".*



4.3.   In view of other commitments of the members of the Tribunal, the only possible date on which Mr. Haigh and the chairman would be available for a telephone conference on any further details would be Saturday 15 September. But Prof. Lebedev, who is travelling, is not sure he could join in.

4.4.   If the Parties agree that a telephone conference is still necessary and if they are available on that day, they are invited to arrange a telephone conference for that day which, in view of the time differences involved, should start at **15:00 hours Paris time on 15 September**.

4.5.   If it turns out that the Parties are not available on that date, the Tribunal will issue PO-5 taking into account any notifications and comments received from the Parties.

4.6.   At the end of the January hearing, the Tribunal will consult with the Parties whether a one day hearing should be set for final pleadings in April 2013.

## 2.   Procedural Steps before the Hearing

2.1.   Claimants are authorized to submit, **by 21 September 2012**, the new documents mentioned in its letter dated 14 September 2012. If Respondent wishes to submit any new documents in rebuttal to these documents, it may do so **by 27 September 2012**.

2.2.   In view of the great number of exhibits submitted by the Parties and in order to facilitate references and using these exhibits at the Hearing and to avoid that each member of the Tribunal has to bring all of them to the Hearing, the **Parties** are invited to bring to the Hearing:

- for the other Party and for **each** member of the Tribunal **Hearing Binders** in **A5 format** of those exhibits or parts thereof on which they intend to rely in their oral presentations at the hearing, together with a separate consolidated Table of Contents of the Hearing Binders of each Party.
- a **USB-Device** with the contents of the Hearing Binders for the other Party, for each member of the Tribunal, and for the Tribunal Secretary.
- for the use of the Tribunal, in **A5 format one full set of all exhibits** the Parties have submitted in this procedure, together with a separate consolidated Table of Contents of these exhibits.

## 3.   Further Details regarding the Hearing

3.1.   As ruled in section 4.11 of PO-4, the Hearing shall be held at the **ICC Hearing Centre in Paris from 1 to 5 October 2012**, and, if found necessary by the Tribunal after consultation with the Parties, extended to continue from **8 to 9 October 2012.**

3.2.   No extension of the hearing will be possible due to other commitments of members of the Tribunal.



3.3.   *To give sufficient time to the Parties and the Arbitrators to prepare for and evaluate each part of the Hearings, the daily sessions shall not go beyond the period between 9:30 a.m. and 5:30 p.m. However, the Tribunal, in consultation with the Parties, may change the timing during the course of the Hearings.*

3.4.   *In accordance with section 10.5 of PO-1, the Tribunal establishes the following maximum time periods which the Parties shall have available for their presentations and examination and cross-examination of all witnesses and experts. Taking into account the Calculation of Hearing Time attached to this Order, the total maximum time available for the Parties (including their opening statements and closing arguments, if any) shall be as follows:*

> *15.5 hours for Claimants*
> *15.5 hours for Respondent*

*It is left to the Parties how much of their allotted total time they want to spend on their various Agenda items above, as long as the total time period allotted to them is maintained.*

3.5.   *The Parties shall prepare their presentations and examinations at the Hearing on the basis of the time limits established.*

3.6.   *If a witness whose statement has been submitted by a Party and whose examination at the Hearing has been requested by the other Party, does not appear at the Hearing, his or her statement will not be taken into account by the Tribunal. A Party may apply with reasons for an exception from that rule.*

### 4.   **Conduct of the Hearing**

4.1.   *In addition to the above cited provisions of PO-1, PO-3, and the Tribunal's letter dated 11 September 2012, the following shall apply:*

4.2.   *The following **Agenda** is established for the Hearing:*

   *1.   Introduction by the Chairman of the Tribunal.*

2.   *Opening Statements of not more than a total of two hours for each Party:*

*First on jurisdiction*
   *a)   Respondent up to 30 minutes*
   *b)   Claimants up to 30 minutes*

*Second on all other issues including the merits*
   *a)   Claimants up to 90 minutes,*
   *b)   Respondent up to 90 minutes.*

### 3.   **Fact Witnesses:**

*3.1.   In order to make most efficient use of time at the Hearing, written Witness Statements or Expert Reports shall generally be used in lieu of direct oral examination though exceptions may be admitted by the Tribunal. Therefore, insofar*



*as, at the Hearing, witnesses are invited by the presenting Party or asked to attend at the request of the other Party, the presenting Party may introduce the witness for up to 5 minutes and add a short direct examination on issues, if any, which have occurred after the last written statement or report of the witness has been submitted. The remaining hearing time shall be reserved for cross-examination and re-direct examination, as well as for questions by the Arbitrators.*

*3.2.    Unless otherwise agreed by the Parties: Examination of **Claimant's fact witnesses** in the order set by Claimant:*

*a)    Affirmation of witness to tell the truth.*

*b)    Short introduction by Claimants*

*c)    Cross-examination by Respondent.*

*d)    Re-direct examination by Claimants, but only on issues raised in cross-examination*

*e)    Re-cross examination by Respondent but only on issues raised in re-direct examination*

*f)    Remaining questions by members of the Tribunal, but they may raise questions at any time.*

*3.3.    Examination of **Respondent's fact witnesses** in the order set by Respondent:*

*For each:*
*vice versa as under 3.a) to f) above.*

*4.    **Examination of experts**:*

*No experts will be examined orally at the hearing. But attention is drawn to the respective rulings in the Tribunal's letter dated 11 September 2012, quoted above.*

*5.    Any witness may only be recalled for rebuttal examination by a Party or the members of the Tribunal, if such intention is announced in time to assure the availability of the witness during the time of the Hearing.*

*6.    Remaining questions by the members of the Tribunal, if any.*

*7.    Discussion regarding the timing and details of post-hearing submissions and other procedural issues, including the question whether Post-hearing Briefs shall be submitted soon after the October Hearing or only after the January Hearing.*

*4.3.    Unless otherwise agreed between the Parties or ruled by the Tribunal, witnesses may be present in the Hearing room during the testimony of other witnesses.*



**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF **468**

### 5. *Other Matters*

5.1 *The Tribunal may change any of the rulings in this Order, after consultation with the Parties, if considered appropriate under the circumstances.*

5.2 *The Parties are invited to submit, by 19 October 2012, a short statement to the Tribunal regarding which Party made which payments up to the October Hearing for deposits on arbitration costs to the SCC, and for the expenses related to the reservation of the ICC Hearing Centre, the transcript, and the interpretation at the Hearing.*

*Attachment to Procedural Order No. 5:*

*Calculation of Hearing Time*

| | |
|---|---|
| **Time available** | *Hours* |
| *Hours* | |
| | *56* |
| *7 days of 8 hours* | *56* |
| | |
| **Time needed** | |
| | |
| *Lunch breaks: 7 x 1 hour* | *7* |
| *Various breaks (procedural and coffee)* | *7* |
| *Procedural discussions (estimated total)* | *4* |
| *Introduction by Chairman* | *0.5* |
| *Additional Questions by Members of Tribunal* | *6.5* |
| | |
| *Total time for other purposes* | *25.0* |
| | |
| *Total time available to Parties* | *31* |
| | |
| ***Time available to each Party (including their opening statements and closing arguments, if any)*** | ***15.5*** |

98. On **20 September 2012**, Claimants sent exhibits C-700 – C-717 to the Tribunal and to Respondent.

99. On **21 September 2012**, Respondent stated that it had not received any documents from Claimants prior to the deadline and requested that the Tribunal exclude the documents.

100. On **22 September 2012**, Claimants sent Respondent the allegedly outstanding exhibits, via email.

101. On **22 September 2012**, Respondent requested that the Tribunal exclude Claimants' new and allegedly late exhibits from the arbitration.

102. On **22 September 2012**, Claimants sent the Tribunal the FedEx tracking report, demonstrating that Claimants had met the Tribunal's deadline.


ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF C **469**

103. On **23 September 2012**, Claimants wrote in response to Respondent's request to exclude certain exhibits submitted on 21 September, explaining that Respondent's complaints are without merit and should be rejected.

104. On **24 September 2012**, Respondent again objected to Claimants' exhibits.

105. On **27 September 2012**, the Chairman invited the Parties to submit a final list of all persons attending the hearing, and their respective sides identifying their function, at the start of the hearing.

106. On **27 September 2012**, Respondent submitted new exhibits in reply to Claimants' new documents submitted on 21 September 2012. Respondent requested that the Tribunal order the Claimants to indicate specific parts of the documents they intend to rely upon.

107. On **28 September 2012**, the Tribunal wrote to the Parties in reference to Respondent's applications of 24 and 27 September. The Tribunal indicated that the application to exclude documents would be decided after the Tribunal has had an opportunity to discuss it at the beginning of the hearing. The Tribunal invited Claimants to indicate, at the beginning of the hearing, the specific parts of the exhibits submitted on 21 September 2012 upon which they intend to rely. The Tribunal also allowed Respondent to extend its direct examinations beyond 5 minutes, so far as the new exhibits would concern matters not previously addressed in the witness statements.

108. On **28 September 2012**, Claimants stated that they would not object to Respondent's new witness statements and agreed to withdraw the documents not accompanied by English translations. Claimants requested leave under PO-1 ¶ 5.12 to submit two additional documents.

109. On **1 October 2012**, Respondent had no objection to Claimants' withdrawal of its documents submitted on 21 September 2012. Respondent stated, however, that its preparation for the hearing would be prejudiced by the late submission of additional material. Respondent offered to allow the admission of new documents in exchange for Mr. Rakhimov being allowed to submit a third witness statement on the matter.

110. The **Hearing on Jurisdiction and Liability** was held at the ICC Hearing Centre in Paris from **1 – 8 October 2012**. A transcript was made. Reginald Smith, Kenneth Fleuriet, Kevin Mohr, Heloise Herve, Amy Roebuck Frey, Alexandra Kotlyachkova, and Valerya Subocheva of King & Spalding appeared on behalf of Claimants. Dr. Patricia Nacimiento, Joseph Tirado, Simon Ramsden, Zhanibek Saurbek, Max Stein, and Sven Lange of Norton Rose LLP and Prof. Igor V. Zenkin of the Moscow Regional Collegium of Advocates appeared on behalf of Respondent. Also appearing for Claimants were Zhennia Silverman and Vicki Mason of King & Spalding and Mihail Popovici of the Ascom Group SA. Also appearing for Respondent were Anastasia Maltseva and Natalia Nikiforova of Norton Rose, Marat Beketayev, Secretary of the Ministry of Justice and Deputy Minister of Justice, Yerlan Tuyakbayev, Director of the Department of Legal Support and International Cooperation of the Financial Police, Alan Tlenchiev, Head of the Division on the Supervision over Compliance with Environmental



Legislation of the Department of Supervision over Compliance with Legislation in the socio-economic sphere of the GPO Office, Aman Sagatov, Senior Prosecutor of the Division on the Supervision over Compliance with Environmental Legislation of the Department of Supervision over Compliance with Legislation in the socio-economic sphere of the GPO, Gani Bitenov, Chief Expert of the Department of Protection of State Property Rights of the Ministry of Justice, and Prof. Martha Brill Olcott, Carnegie Endowment for International Peace. Anatolie Stati, Artur Lungu, Grigore Pisica, and Alexandru Condorachi were also present.

111. On **1 October 2012**, the Tribunal heard the Parties' respective opening statements on jurisdiction / merits and heard testimony from Artur Lungu.

112. On **2 October 2012**, the Tribunal heard testimony from Mr. Anatolie Stati, Mr. Grigore Pisica, Mr. Victor Romanosov, and Mr. Alexandru Condorachi.

113. On **3 October 2012**, the Tribunal heard testimony from Alexandru Condorachi, Mr. Alexandru Cojin, Mr. Veaceslav Stejar, Mr. Eduard Calancea, and Minister Sauat Mukhametbayevich Mynbayev.

114. On **4 October 2012**, the Tribunal heard testimony from Mr. Herve Chagnoux, Mr. Andrey Kravchenko, and Mr. Medet Suleymenov.

115. On **5 October 2012**, the Tribunal heard testimony from Mr. Arman Testemirovich Rakhimov and Mr. Daniyar Mukanovich Turganbayev.

116. On **6 October 2012**, Respondent notified the Tribunal of its intention to call Mr. Akhmetov for direct examination.

117. On **8 October 2012**, the Tribunal heard testimony from Dr. Seong Hoon Kim, Mr. Serik Dosymovich Rakhimov, Mr. Rustam Nurlanovich Akhmetov, Mr. Mirbulat Zarifovich Ongarbaev, and Mr. Salamat Sartevich Baymaganbetov. At the close of the hearing, the Chairman asked the Parties if they had any objections to the procedure, as conducted to date. The Parties each answered that they had no objections.

118. On **15 October 2012**, the Tribunal issued **Procedural Order No. 6** (PO-6):

> ### *Procedural Order (PO) No. 6*
> ### *Regarding the further procedure after*
> ### *the Hearing on Jurisdiction and Liability*
>
> #### *1.     Timetable*
>
> *Resulting from the discussion between the Parties and the Tribunal at the end of the Hearing on Jurisdiction and Liability in Paris, the following timetable is set for the further procedure:*
>
> *1.1.   **By 19 October 2012**, as ruled in § 5.1 of PO-5, the Parties are invited to submit a short statement to the Tribunal regarding which Party made which payments up to the October Hearing for deposits on arbitration*



*costs to the SCC and for the expenses related to the reservation of the ICC Hearing Centre, the transcript, and the interpretation at the Hearing.*

*1.2.* *By **21 November 2012**, as ruled in § 4.13 of PO-4, Respondent is invited to submit Respondent's Rejoinder on Quantum.*

***No new evidence** on quantum may be submitted after this date unless the Tribunal has authorized such submission in reply to a reasoned request by a Party.*

*1.3.* ***By 3 December 2012**, the Parties are invited to notify which witnesses and experts on quantum presented by themselves or the other side they wish to examine at the January Hearing.*

*1.4.* ***By 10 December 2012**, the Parties are invited to notify whether they wish to change their notifications of 3 December in view of the notification received from the other side.*

*1.5.* *In preparation of a possible expert conferencing at the hearing, **experts** that have been notified for examination at the January hearing are invited to contact, either directly or with the help of the Parties, the expert from the other side addressing the same issues and try to agree on a short note identifying the major sub-issues on which they agree and disagree.*

*1.6.* ***By 11 January 2013**, the Parties are invited to submit*

- *either the notes agreed by the experts according to section 1.5 above or separate notes of each expert in so far as they cannot agree on a joint note,*
- *lists of the persons which intend to participate in the hearing from their respective sides.*

*1.7.* ***28 to 31 January 2013**, starting at 9:30, **Hearing on Quantum** at the ICC Hearing Centre, 112 Avenue Klebèr, Paris. The Parties are invited to make the necessary logistical arrangements as they did for the October hearing. The Tribunal intends to issue a Procedural Order closer to the time of the hearing regarding further details, in a similar fashion as it did for the October hearing.*

*1.8.* ***By 8 March 2013**, simultaneous submission of 1st Round Post Hearing Briefs by the Parties regarding all issues addressed in the October and January hearings. As provided in § 3.3.1 of the Chairman's letter of 11 September 2012, the submissions may include comments of their experts on issues of jurisdiction and liability, but only regarding any new developments or issues which these have not addressed in their earlier reports. Further details regarding the Post Hearing Briefs may be determined in a discussion with the Parties at the end of the January hearing.*

*1.9.* **By 29 March 2013**, *simultaneous submission of 2nd Round Post Hearing Briefs, but only addressing issues in rebuttal of the 1st Round Post Hearing Brief of the other side.*

*1.10.* **By 19 April 2013**, *simultaneous submission of Cost Statements will be made by the Parties.*

*1.11.* **By 26 April 2013**, *simultaneous submission of comments, if any, regarding the Cost Statement of the other side.*

## 2. Other rulings

*The Tribunal may change or amend the above rulings if considered appropriate after consultation with the Parties.*

119. On **17 October 2012**, Respondent requested a two-week extension on its deadline to make its submission on quantum, to 5 December 2012.

120. On **18 October 2012**, the Tribunal granted the extension until 1 December 2012, so long as both Parties could agree and confirm that they could maintain the procedural steps in the timetable in PO-6.

121. On **18 and 19 October 2012**, respectively, Claimants and Respondent confirmed that they could maintain the procedural timetable and consented to the extension.

122. On **19 October 2012**, Claimants submitted a costs summary to the Tribunal, detailing Claimants payment of the SCC costs to date, amounting to € 1,034,000.00.

123. On **19 October 2012**, Respondent stated that it will pay its share of the costs upon receipt of the invoices.

124. On **1 December 2012**, Respondent filed its **Rejoinder on Quantum,** together with supplementary evidence, to the Tribunal.

125. On **3 December 2012**, Respondent submitted the English version of Mr. Khalelov's witness statement to the Tribunal.

126. On **3 December 2012**, Claimants and Respondent each submitted their respective notifications of witnesses and experts to the Tribunal.

127. On **7 December 2012**, Claimants wrote to Respondent, renewing requests that Respondent produce the four referenced enclosures to R-41.1.

128. On **10 December 2012**, Claimants and Respondent each submitted their updated notifications of witnesses and experts to the Tribunal. Each commented on the other's notifications. Claimants moved to exclude newly submitted evidence and renewed arguments to exclude other evidence.

129. On **13 December 2012**, Respondent answered Claimants' arguments from their 10 December 2012 letter.



130. On **17 December 2012**, the Tribunal issued **Procedural Order No. 7** (PO-7):

### *Procedural Order (PO) No.7*
*Regarding the Preparation and Conduct of the Hearing on Quantum*

#### *1.    Introduction*

*In view of the recent submissions of the Parties, the Tribunal considers that it should already now issue its Procedural Order provided for in section 1.7 of PO-6.*

#### *2.    Preparation of the Hearing*

2.1.   *The Tribunal also confirms its earlier rulings on the form and contents and on the timetable for the Parties' submissions including those on the still outstanding procedural steps according to PO-6.*

2.2.   *The Tribunal considers that, at this stage, it should not exclude any evidence provided by the Parties. But this is without prejudice to later decisions during or after the hearing in view of the following.*

2.3.   *As is clear from the earlier rulings of the Tribunal, the hearing in January is strictly limited to matters of QUANTUM.*

2.4.   *The Parties are invited to prepare their presentations and examination of witnesses and experts at the hearing accordingly. Any parts of submissions or any evidence going beyond that limit will not be considered by the Tribunal. In so far as the Parties disagree in this regard, they may explain their positions at the hearing and the Tribunal will take that into account.*

2.5.   *The Parties may, in direct contact, try to reach agreement on the final list of witnesses and experts to be examined at the hearing and on the order of examination, and inform the Tribunal in this regard by 11 January 2013.*

#### *3.    Conduct of the Hearing*

3.1.   *The hearing shall take place at the ICC Hearing Centre from 28 to 31 January 2013.*

3.2.   *Subject to PO-6 and to the following provisions, the rulings on the conduct of the October Hearing in PO-5 apply, mutatis mutandis, also to the January Hearing.*

3.3.   *Particular attention is drawn to the following provisions of PO-5:*

3.3.1.  *§ 2.2. on Hearing Binders*

3.3.2.  *§ 3.4. on time slots attributed to the Parties.*



*In this context, according to the adapted calculation of hearing time as annexed to this PO, the total maximum time available for the Parties (including their opening statements and closing arguments, if any) shall be as follows:*

> *8 hours for Claimants*
> *8 hours for Respondent*

*It is left to the Parties how much of their allotted total time they want to spend on their various Agenda items, as long as the total time period allotted to them is maintained.*

*At the beginning of the hearing, the Parties are invited to nominate one member of their teams who will coordinate the time keeping with the Tribunal Secretary.*

3.3.3.  *§ 4.2. on the **Agenda of the Hearing***

3.3.4.  *After the preparation according to sections 1.5 and 1.6 of PO 6, § 1.4.3. of PO-5 provided on **expert conferencing**:*

> *(T)he examination of experts will be conducted by expert conferencing of the experts from both sides on the respective issues as follows:*

- *Short introduction up to 5 minutes of each expert by the Party which presented that expert,*
- *Questions by the Parties to the experts, but only regarding any new developments or issues which the experts have not yet addressed in their earlier reports,*
- *Additional questions by the Tribunal, if any, and*
- *Follow-up questions by the Parties on the questions raised by the Tribunal, if any.*

**Attachment to Procedural Order No. 7:**

**Calculation of Hearing Time**

| *Time available* | *Hours* |
| --- | --- |
| *4 days of 8 hours* | *32* |

*Time needed*

| | |
| --- | --- |
| *Lunch breaks: 4 x 1 hour* | *4* |
| *Various breaks (procedural and coffee)* | *4* |
| *Procedural discussions (estimated total)* | *4* |
| *Introduction by Chairman* | *0.5* |
| *Additional Questions by Members of Tribunal* | *3.5* |



| | |
|---|---|
| *Total time for other purposes* | *16.0* |
| *Total time available to Parties* | *16* |

*Time available to each Party (including their opening*  *8*
*statements and closing arguments, if any)*

131. On **18 December 2012**, Suvi Lappalainen of the SCC wrote to the Parties. In reference to the correspondence between the Tribunal and the Parties about appointing an Administrative Secretary, the SCC decided that additional advances in the amount of EUR 60 000 shall be paid in equal shares and will cover the fee of the secretary. The Parties were requested to make payment by 2 January 2013.

132. On **18 December 2012**, Claimants requested that Respondent provide the documentation or data relied upon in the expert reports submitted on 1 December 2012, pursuant to Art. 5(2)(e) IBA Rules. Claimants pointed out that Respondent had already failed to provide such information earlier in the procedure, requiring a procedural order to be issued. Claimants argued that they are highly prejudiced by Respondent's failure to provide this documentation, since it hinders their trial preparation.

133. On **31 December 2012**, Claimants informed Respondent and the Tribunal that, on 17 December 2012, Claimants entered into a Sharing Agreement with the holders of the majority of the notes issued by Tristan Oil Limited.

134. On **2 January 2013,** Claimants sought instruction from the Tribunal that Respondent is not excused from bringing Mr. Mynbayev and Mr. Suleymenov to the Quantum Hearing.

135. On **2 January 2013**, Claimants submitted **Claimants' Application to Compel Production** to the Tribunal. Therein, Claimants requested the production of four documents that the Tribunal ordered produced in PO-2. Claimants requested that the Tribunal draw specific adverse inferences against Respondent, should Respondent fail to produce these documents.

136. On **3 January 2013**, the Arbitration Institute of the SCC notified the Tribunal and the Parties that payment of 30 000 Euro had been made by Claimants, and that 30 000 from Respondent was still outstanding. Later that day, Respondent confirmed that payment had been made.

137. On **4 January 2013**, Respondent submitted **Respondent's Application for Postponement of the Hearing on Quantum**. Respondent also requested that the Tribunal grant it leave to reply to Claimants' "Application to Compel Production" and to submit a response to the Sharing Agreement and to dismiss Claimants' Application to Compel Production.

138. On **7 January 2013**, Claimants submitted their **Opposition to Respondent's Application for Postponement of Hearing on Quantum**.


**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF **476**

139. On **9 January 2013**, Respondent argued that postponement of the Hearing and the dismissal of Claimants' "Application to Compel Production" is the only way to safeguard procedural justice and to restore procedural equality.

140. On **10 January 2013**, the Tribunal issued **Procedural Order (PO) No. 8 Regarding several Applications of the Parties**, provided below:

> ### *Procedural Order (PO) No.8*
> ### *Regarding several Applications of the Parties*
>
> #### *1.    Introduction*
>
> *The Parties have submitted several Applications before the Hearing scheduled from 28 to 31 January 2013. As they are well-known to all concerned, the Tribunal will not repeat or summarize these Applications or the arguments put forward by the Parties. And, as it is in the interest of the Parties to have these Applications decided without any delay, to avoid longer deliberation exchanges between members of the Tribunal, this PO will not go into any details of the Tribunal's reasoning in dealing with the arguments presented by the Parties. Rather, in this PO, the Tribunal will immediately turn to its conclusions and decisions on the Applications.*
>
> #### *2.    Claimants' Application dated 2 January 2013 for Document Production*
>
> *The procedure to compel document production has been concluded at a much earlier stage of the proceedings in this case. Insofar as a Party has not produced as ordered by the Tribunal, the consequences of such have already been identified in section 4 of PO-2. Issuing a further order on document production is not provided in the timetables of POs 6 and 7 and would seriously disturb the preparation of the Hearing both for the Parties and the Tribunal.*
>
> ***Therefore, this Application is dismissed. However, the Parties are free to argue at the hearing and in their Post-Hearing Briefs in this regard.***
>
> #### *3.    Claimants' Application dated 2 January 2013 to instruct Respondent that it is not excused from bringing Mr. Mynbaev and Mr. Suleimenov to the Hearing on Quantum*
>
> *The timetable of PO 6 provided that the last changes to the Parties' requests to have witnesses of the other side attending had to be submitted by 10 December 2012. On 20 December 2012, Claimants submitted a further change regarding the above mentioned witnesses. Claimants point out that Respondent has not articulated any prejudice by this late request. However, in view of the clear timetable set by PO 6, the Tribunal concludes that it is not appropriate to order the attendance of the two witnesses.*



> *Therefore, this Application is dismissed. However, Respondent is free to bring these witnesses to the Hearing and Parties are free to submit any arguments in this regard at the Hearing or in their Post-Hearing Briefs.*

**4.** **Claimants' submission on 31 December 2012 of the Sharing Agreement with Tristan Noteholders, and Respondent's request for leave to submit a written statement thereto**

> *The Sharing Agreement is a new development with relevance for the Hearing on Quantum and the submission could not be filed earlier in the procedure. Indeed, not filing it would have been inappropriate.*

> *Therefore, the Tribunal accepts this submission. The Parties are free to argue in this regard at the Hearing and in their Post-Hearing Briefs.*

**5.** **Respondent's Application to Postpone the Hearing on Quantum**

> *In view of the dismissal of Claimants' Applications in sections 2 and 3, above, the major reasons for this Application of Respondent are moot. The Tribunal is not persuaded by Respondent's arguments that, even in case of such dismissals, it would be prejudiced in its preparation of the Hearing. As provided above, the Parties are free to submit further arguments in this regard at the Hearing and in their Post-Hearing Briefs. For the same reason, the late submission of the Sharing Agreement does not justify a postponement of the Hearing. After the bifurcated and very long procedure in this case, a postponement of the hearing (which would probably delay the procedure for at least several months in order to find a new hearing period at which all concerned would be available) could only be justified for absolutely compelling reasons. In view of the above considerations and conclusions, such reasons do not exist.*

> *Therefore, this Application is dismissed. However, again, the Parties may submit further arguments in this regard at the Hearing and in their Post-Hearing Briefs.*

141. On **11 January 2013**, Respondent made a Procedural Objection regarding the Tribunal's decision to dismiss Respondent's Application for Postponement of the Hearing on Quantum.

142. On **11 January 2013**, Claimants and Respondent provided the Tribunal information regarding the Hearing on Quantum, pursuant to PO-6 and PO-7.

143. On **18 January 2013**, the SCC informed the Tribunal that the additional advance on costs has been paid as ordered.

144. On **18 January 2013**, Claimants requested authorization from the Tribunal to submit documents into evidence in advance of the Quantum Hearing.

145. On **19 January 2013**, the Tribunal invited Respondent to submit comments on Claimants' Applications of 18 January 2013 by 22 January 2013.



146. On **22 January 2013**, Respondent (1) requested that the Tribunal deny Claimants' request for leave to submit new documents, (2) proposed the order of witness and expert examination, (3) requested the Tribunal's guidance on whether the presence of Mr. Sachsalber would be necessary at the Hearing, (4) requested that Ms. Hardin appear at the Hearing, and (5) remarked on proposed corrections to the valuation experts' testimony.

147. On **23 January 2013**, the Tribunal issued **Procedural Order (PO) No. 9 Regarding further Applications of the Parties and further Details of the Hearing (PO-9)**, provided below:

### *Procedural Order (PO) No.9*
### *Regarding further Applications of the Parties*
### *and further Details of the Hearing*

#### *1. Introduction*

*By letters dated 11, 18, and 22 January 2013, the Parties have submitted several further Applications and some information and suggestions regarding the conduct of the Hearing scheduled from 28 to 31 January 2013. As they are well-known to all concerned, the Tribunal will not repeat or summarize these submissions or the arguments put forward by the Parties. And, as it is in the interest of the Parties to have these matters decided without any delay, to avoid the need of longer deliberation exchanges between members of the Tribunal, this PO will not go into any details of the Tribunal's reasoning in considering the arguments presented by the Parties. Rather, in this PO, the Tribunal will immediately turn to its conclusions and decisions.*

#### *2. Claimants' Application dated 18 January 2013 for leave to submit certain documents*

*The submission of a considerable number of further documents just a few days before the hearing would seriously disturb the preparation of the Hearing, both for the Parties and the Tribunal, and would not provide Respondent sufficient time to evaluate the documents, formulate replies, and try to find any rebuttal evidence. The Sharing Agreement has already been accepted by section 4 of PO-8 and, as mentioned in section 1 of Respondent's letter of 22 January 2013, has been available to Respondent since 31 December 2012.*

***Therefore, with the exception of the admission of the Sharing Agreement, this Application is dismissed. However, the Parties are free to argue at the hearing and in their Post-Hearing Briefs in this regard.***

#### *3. Respondent's Application to submit a two-page note correcting minor errors in Deloitte's valuation report of 30 November 2012.*

***Since such a note would be more convenient for all concerned than oral corrections at the beginning of the examination of the expert, the submission is admitted.***

#### *4. Agenda of the Hearing*



*Taking into account the submissions from the Parties, and subject to any final changes agreed at the beginning of the Hearing, the Tribunal intends to follow the following Agenda:*

1.    **Introduction** *by the Chairman of the Tribunal.*

2.    **Opening Statements** *of a length determined by each Party*

3.    **Examination of Fact Witnesses**

      3.1.    *In order to make most efficient use of time at the Hearing, written Witness Statements shall generally be used in lieu of direct oral examination, though exceptions may be admitted by the Tribunal. Therefore, insofar as, at the Hearing, witnesses are invited by the presenting Party or asked to attend at the request of the other Party, the* ***presenting Party may introduce the witness for up to 5 minutes, and add a short direct examination*** *on issues, if any, which have occurred after the last written statement of the witness has been submitted. The remaining hearing time shall be reserved for cross-examination and re-direct examination, as well as for questions by the Arbitrators.*

      3.2.    *Unless otherwise agreed by the Parties: first, there will be the Examination of* ***Claimants' fact witnesses*** *in the order set by Claimants:*

            *For each witness, the examination will be conducted as follows:*

            *a)    Affirmation of witness to tell the truth*
            *b)    Short introduction by Claimants*
            *c)    Cross-examination by Respondent.*
            *d)    Re-direct examination by Claimants, but only on issues raised in cross-examination*
            *e)    Re-cross examination by Respondent but only on issues raised in re-direct examination*
            *f)    Remaining questions by members of the Tribunal, but they may raise questions at any time.*

      3.3.    *Examination of* ***Respondent's fact witnesses*** *in the order set by Respondent:*

            *For each: the examination will be conducted in the same pattern vice versa as mentioned for Claimants' witnesses.*

4.    **Examination of Experts**



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

4.1    By letters of 11 January 2013, the Parties have
       communicated an agreement, and the Tribunal agrees, on
       the following order of examination:

      *a)*    *Claimants' experts*

      \*    *Direct examination of Claimants' expert by
       Claimants*
      \*    *Cross-examination by Respondent*
      \*    *Re-direct examination by Claimants, but only on
       issues raised in cross- examination*
      \*    *Re-cross examination by Respondent but only on
       issues raised in re-direct examination*

      *b)*    *Respondent's experts*

      *The same order vice versa as for Claimants' expert shall
       apply*

      *c).*    *Experts conferencing by the Tribunal*
      *d)*    *Follow-up questions by the Parties on the
       questions raised by the Tribunal, if any*

5.     *Any witness or expert may only be **recalled** for rebuttal
       examination by a Party or the members of the Tribunal, if such
       intention is announced in time to assure the availability of the
       witness during the time allotted to the Parties at the Hearing.*

6.     *Remaining **questions by the members of the Tribunal**, if any.*

7.     ***Discussion of the further procedure**, taking into account the
       timetable already established by PO-6, and any new developments
       and submissions after that PO.*

## 5.    **Certain Further Details of the Conduct of the Hearing**

5.1.   *The Tribunal has taken note of the Parties' communications regarding the
       attendance of witnesses and experts.*

5.2.   *Unless, in reply to Respondent's letter of 22 January 2013, Claimants
       notify Respondent no later than **12 noon Friday 25 January 2013 Paris
       time**, that they insist on orally examining **Mr. Sachsalber, Mr. Powell and
       Mr. Rhodes**, these persons do not have to attend the hearing.*

5.3.   *In view of the explanation in Respondent's letter of 22 January 2013, the
       Tribunal accepts that **Mr. Seitinger**, who is situated in Pakistan, will be
       examined at the hearing in the morning of the last day of the hearing, i.e.
       31 January 2013.*



> *5.4.*   *If, as notified by Claimants' letter of 11 January 2013, **Ms. Hardin** will not be available for examination at the hearing, the Parties are free to argue at the hearing and in their Post-Hearing Briefs in this regard.*

> **6.**   **Respondent's Application to Extend the Time limits for Submission of the Post-Hearing Briefs and Cost Submissions**

> ***This matter will be discussed with the Parties at the end of the Hearing on Quantum in order to find an agreement between and with the Parties, and otherwise will be decided by the Tribunal.***

148. On **23 January 2013**, Respondent submitted its "*Additional Note to the Expert Report dated 30 November 2012*" to the Tribunal.

149. On **24 January 2013**, Claimants requested leave to submit an explanatory note from FTI to correct errors that FTI discovered in reviewing the Deloitte GmbH expert report and preparing for the expert conferences.

150. On **25 January 2013** the Tribunal admitted FTI's 6 page correction note.

151. On **25 January 2013**, Respondent submitted the joint issue list of Claimants' expert Ryder Scott and Respondent's expert GCA.

152. On **25 January 2013**, Claimants submitted (1) the Sharing Agreement (C-721), (2) the Explanatory Note of FTI, and (3) a revised translation of Catalin Broscaru's witness statement, to the Tribunal. Claimants also gave notice that they intend to call Mr. Romanosov for direct examination.

153. On **26 January 2013**, Respondent wrote to the Tribunal with regard to Claimants' submission of the "*FTI Amendments to Expert Report*" and the Direct Examination of Mr. Romanosov and other witnesses.

154. On **27 January 2013**, Claimants submitted the revised schedules and supporting documents requested by Respondent on 26 January 2013.

155. The Hearing on Quantum was held at the ICC Hearing Centre in Paris from **28 – 31 January 2013**. A transcript was made. Reginald Smith, Kenneth Fleuriet, Kevin Mohr, James Toher, Heloise Herve, Amy Roebuck Frey, Alexandra Kotlyachkova, and Valerya Subocheva of King & Spalding appeared on behalf of Claimants. Dr. Patricia Nacimiento, Max Stein, and Sven Lange of Norton Rose, LLP and Joseph Tirado of Winston & Strawn appeared on behalf of Respondent. Also appearing for Claimants were Zhennia Silverman and Vicki Mason of King & Spalding, and Mihail Popovici of Ascom Group, SA. Also appearing for Respondent were Zhanibek Saurbek, Anastasia Maltseva, and Natalia Nikiforova of Norton Rose, Marat Beketayev, Secretary of the Ministry of Justice and Deputy Minister of Justice, Yerlan Tuyakbayev, Director of the Department of Legal Support and International Cooperation of the Financial Police, Aman Sagatove, Senior Prosecutor of the Division on the Supervision over Compliance with Environmental Legislation of the Department of Supervision over Compliance with Legislation in the socio-economic sphere of the GPO, Gani Bitenov, Director of the Department of Protection of the States Property Rights, Ministry of Justice, and



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF C-**482**-

Done Tulegen, Deputy Director of the Legal Services Department, and the Ministry of Oil and Gas.

156. On **28 January 2013**, the Tribunal heard opening statements on Quantum from Claimants and from Respondent. The Tribunal also heard testimony from Mr. Artur Lungu. Counsel for Claimants and counsel for the Respondent also indicated that they had agreed to request *"an additional hour or two"* per side, to present their case. The Tribunal indicated that the hearing could not go beyond Thursday evening, but stated that it may be possible to add time at the end.

157. On **29 January 2013**, the Tribunal heard testimony from Mr. Victor Romanosov, Mr. Catalin Broscaru, Mr. Alexandru Cojin, Mr. Anatolie Stati, and Mr. Nurlan Rahimgaliev.

158. On **30 January 2013**, the Tribunal heard testimony from Prof. Martha Brill Olcott, Prof. Tomas Balco, Mr. Michael Nowicki, and James Latham of Ryder Scott, and Dr. Stephen Wright, Mr. Tony Goodearl, and Mr. Michael Wood of GCA. The Tribunal, after considering arguments from both Parties, decided to give each Party an additional hour to present its case, over Dr. Nacimiento's objection.

159. On **31 January 2013**, the Tribunal heard testimony from Mr. Michael Nowicki, Jr. James Latham, Dr. Stephan Wright, Mr. Michael Wood, and Mr. Tony Goodearl via witness conferencing. The Tribunal also heard testimony from Mr. Howard Rosen of FTI and Mr. Tomas Gruhn of Deloitte GmbH, separately, before taking testimony from both via witness conferencing. The Tribunal also heard testimony from Mr. Peter Seitinger. Finally, the Tribunal discussed the further procedure with the Parties. At the close of the hearing, the Chairman asked the Parties if they had any objections to the way the Tribunal has conducted the procedure up until that point. Dr. Nacimiento, on behalf of the Respondent, answered *"we have filed objections and, with all due respect, we uphold our objections."* Mr. Smith for Claimants answered that there were no objections on behalf of Claimants.

160. On **4 February 2013**, Claimants provided Respondent and the Tribunal access to the 3D seismic data, via a secured website and a CD/DVD.

161. On **6 February 2013**, the Tribunal sent its draft of PO-10 to the Parties and requested comments thereto by 13 February 2013.

162. On **13 February 2013**, Respondent submitted its response to draft PO-10, together with a reiteration of Respondent's objections and 5 Annexes.

163. On **13 February 2013**, Claimants stated that they have no comments to PO-10.

164. On **14 February 2013**, the Chairman, on behalf of the Tribunal, invited Claimants to submit any comments it may have to Respondent's submission, no later than Saturday, 16 February 2013.

165. On **16 February 2013**, Claimants responded to Respondent's submission of 13 February 2013 by letter supported by three annexes.



166. On **17 February 2013,** Respondent responded to Claimants' letter of 16 February 2013.

167. On **20 February 2013,** the Tribunal issued **Procedural Order (PO) No. 10 Regarding the Further Procedure**:

### *Procedural Order (PO) No. 10*
### *Regarding the Further Procedure*

#### *1.       Introduction*

*1.1     This PO contains rulings resulting from the discussion between the Parties and the Tribunal at the January Hearing. On 6 February 2013, a draft of this PO was circulated to the Parties for comments within one week. Taking into account the discussion at the hearing and the comments received from the Parties, this PO is now issued in its final form.*

*1.2     The Tribunal records that, at the end of the hearing, Claimants agreed to provide, by Monday 4 February 2013, the 3D Seismic data discussed at the hearing and the related documentation to Respondent.*

#### *2.       Respondent's Applications dated 13 February 2013.*

*2.1.    In reply to the Tribunal's invitation to comment on the Tribunal's draft of PO-10, on 13 February 2013, Respondent filed a submission which included the following Applications:*

*(a)     Allow for an opportunity to submit an expert report on the new subject matter introduced by Claimants within a period of three months as of submission of the full data information and documents as specified below;*

*(b)     Provide for a hearing with the opportunity to address the new subject matter introduced by Claimants, in particular through examination of the parties' experts and witnesses;*

*(c)     Order Claimants to submit data, information and documents as specified below;*

*(d)     Allow Respondent to submit further witness and/or expert testimony relating to the new subject matter introduced by Claimants as specified below;*

*(e)     The proposed periods for the two rounds of post-hearing briefs and the oral closing submissions shall be maintained and shall commence after the hearing on the new subject matter introduced by Claimants*

*91      In addition, Respondent seeks clarification as to the scope of the first round of Post Hearing Briefs as specified in the second bullet point of section 2.1 and the admissibility of new documents as specified in the last bullet point of section 2.1.*



2.2. On 14 February 2013, the Tribunal invited Claimants to submit any comments they may have. On 16 February 2013, Claimants filed a submission which included the following request:

Claimants firmly oppose the bulk of the relief requested in Respondent's Submission. Claimants do acknowledge that the Munaibay 3D information has only recently been analyzed by Ryder Scott and GCA, and Claimants do not object to cross-examination of the quantum experts regarding, and limited to, the Munaibay 3D information – if that examination is scheduled in a manner that does not delay the procedural calendar.

2.3. Thereafter, the Parties filed further submissions providing further arguments and maintaining their above requests.

2.4. As they are well-known to all concerned, the Tribunal will not repeat or summarize these submissions of the Parties or the arguments put forward by the Parties. Indeed, many of the arguments presented in the most recent submissions by Respondent and, in reply, by Claimants, were already presented during the January hearing and taken into account in the Tribunal's deliberations after that hearing and in the draft PO-10 resulting from these deliberations which was sent to the Parties for comments. While all arguments of the Parties have been considered by the Tribunal, in this PO the Tribunal will thus focus on the arguments it considers determinative for its conclusions and decisions.

2.5. It is recalled that, according to Art. 19 SCC Rules, the Tribunal **may** conduct the arbitration in such a manner as it considers appropriate (19.1), but **shall** conduct the procedure in an expeditious manner (19.2). It is further recalled that, for the same purpose, Art. 37 SCC Rules provides a time limit of 6 months for the final award, and that this time limit has already been extended considerably in the present case.

2.6. The Tribunal's duty to conduct the procedure in an impartial manner (Art. 19.2) includes an obligation to take into account the interests of both Claimants and Respondent. In that context, obviously, due process does not mean that every application of a party must be accepted. In particular, it is the Tribunal's authority and duty to decide on the most efficient consideration of evidence in a given phase of the procedure as long as both sides have an opportunity to present their case.

2.7. In the present case, there have been long and many opportunities for the Parties to submit evidence and two hearings to orally examine witnesses and experts presented by the Parties.

2.8. In the judgment of the Tribunal, any new information and evidence that became available to the Parties before and at the hearing on quantum, can be commented by the Parties in a following written procedure without the need for another evidentiary hearing. Therefore, the Tribunal had suggested, in its draft for this PO



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

485 -

*     *a first round of Post-Hearing Briefs within a period of more than two months after the hearing,*

*     *a hearing for oral closing arguments three weeks later,*

*     *a final round of Post-Hearing Briefs within a period of one further month after that hearing.*

2.9.     *Nevertheless, the Tribunal considers that the hearing scheduled for 2 May 2013 could also be used for an oral examination of the technical experts of both sides on the update of the Munaibay 3D information. The Tribunal considers that these further three rounds provide the Parties more than ample opportunities to evaluate, comment, and rebut whatever they consider new information and evidence that became available before, at, and immediately after the hearing on quantum.*

2.10.     *Taking all these considerations into account, Respondent's Applications are therefore dismissed in so far as they are not covered by the timetable set hereafter.*

### 3.     **New Timetable**

*The **timetable originally set in PO-6** is changed and amended as follows:*

3.1.     **By 8 April 2013,** *the Parties shall simultaneously submit their respective **1st round Post Hearing Briefs** to the Tribunal:*

*     *Regarding all issues addressed in the October 2012 and January 2013 hearings,*

*     *Regarding any submissions and documents admitted by the Tribunal and filed by the other side after the October 2012 hearing.*

*     *The Tribunal recalls that, according to section 4.5 of PO-4 and section 1.2 of PO-6, no new evidence may be submitted unless authorized by the Tribunal. However, the Parties may attach to the Post Hearing Briefs the following:*

  *     *As provided in § 3.3.1 of the Chairman's letter of 11 September 2012, comments of their experts on issues of jurisdiction and liability, but only regarding any new developments or issues which these have not addressed in their earlier reports,*

  *     *updates of the Reports of Claimants' and Respondent's technical experts and quantum experts heard at the hearing on quantum,*

