# Exhibit B



SVEA HOVRÄTT
Avdelning 02
Rotel 020106

**DOM**
2016-12-09
Stockholm

Mål nr
T 2675-14

**KÄRANDE**
Republiken Kazakstan
Ministry of Justice
Orynbor Street 8, House of Ministries, 13 Entrance
010000, Astana, Left Bank, Kazakstan

Ombud:
1. Advokaten Pontus Ewerlöf
MAQS Advokatbyrå AB
Box 7009, 103 86 Stockholm

2 och 3. Advokaten Alexander Foerster och jur. kand. Ludwig Metz
Mannheimer Swartling Advokatbyrå AB
Box 1711, 111 87 Stockholm

4. Advokaten Karl Guterstam
Frank Advokatbyrå
Box 7099, 103 87 Stockholm

**SVARANDE**
1. Ascom Group S.A.
75 A. Mateevici Street
Chisinau, MD-2009, Moldavien

2. Anatolie Stati
20 Dragomirna Street
Chisinau, MD-2008, Moldavien

3. Gabriel Stati
1A Ghioceilor Street
Chisinau, MD-2008, Moldavien

4. Terra Raf Trans Traiding Ltd.
Don House, Suite 31
30-38 Main Street, Gibraltar

Ombud för 1–4: Advokaterna Bo G H Nilsson, Therese Isaksson och Ginta Ahrel
Advokatfirman Lindahl KB
Box 1065, 101 39 Stockholm

**SAKEN**
Skiljedoms ogiltighet m.m. avseende skiljedom meddelad i Stockholm den
19 december 2013 med rättelse den 17 januari 2014

_____

Dok.Id 1302455

| Postadress | Besöksadress | Telefon | Telefax | Expeditionstid |
|---|---|---|---|---|
| Box 2290 | Birger Jarls Torg 16 | 08-561 670 00 | 08-561 675 09 | måndag – fredag |
| 103 17 Stockholm | | 08-561 675 00 | | 09:00-15:00 |
| | | **E-post**: svea.avd2@dom.se | | |
| | | www.svea.se | | |

SVEA HOVRÄTT                          **DOM**                              T 2675-14
Avdelning 02

**DOMSLUT**

1. Hovrätten lämnar Republiken Kazakstans talan utan bifall.

2. Republiken Kazakstan ska ersätta Ascom Group S.A. för rättegångskostnader med
4 614 358 SEK och 377 400,65 USD, varav 3 969 852 SEK avser ombudsarvode,
jämte ränta på de två förstnämnda beloppen enligt 6 § räntelagen (1975:635) från
dagen för hovrättens dom till dess betalning sker.

3. Republiken Kazakstan ska ersätta Anatolie Stati för rättegångskostnader med
4 114 357 SEK och 377 400,65 USD, varav 3 969 852 SEK avser ombudsarvode,
jämte ränta på de två förstnämnda beloppen enligt 6 § räntelagen från dagen för
hovrättens dom till dess betalning sker.

4. Republiken Kazakstan ska ersätta Gabriel Stati för rättegångskostnader med
4 114 357 SEK och 377 400,65 USD, varav 3 969 852 SEK avser ombudsarvode,
jämte ränta på de två förstnämnda beloppen enligt 6 § räntelagen från dagen för
hovrättens dom till dess betalning sker.

5. Republiken Kazakstan ska ersätta Terra Raf Trans Traiding Ltd. för rättegångs-
kostnader med 4 114 357 SEK och 377 400,65 USD, varav 3 969 852 SEK avser
ombudsarvode, jämte ränta på de två förstnämnda beloppen enligt 6 § räntelagen från
dagen för hovrättens dom till dess betalning sker.

_____

SVEA HOVRÄTT
Avdelning 02

**DOM**

T 2675-14

# Innehållsförteckning

**1. BAKGRUND** ....................................................................................................**5**

**2. YRKANDEN** ....................................................................................................**6**

**3. ÅBEROPADE RÄTTSLIGA GRUNDER OCH OMSTÄNDIGHETER I SAK** ..**8**
  **3.1 Kazakstan** .................................................................................................**8**
    3.1.1 Rättsliga grunder för talan ..................................................................8
    3.1.2 Omständigheter i sak .........................................................................8
      3.1.2.1 Ogiltighet på grund av det bedrägliga upplägget, falsk bevisning,
      vilseledande information m.m. ..................................................................8
      3.1.2.2 Upphävande på grund av att skiljedomen inte omfattas av ett giltigt
      skiljeavtal ..............................................................................................14
      3.1.2.3 Ogiltighet alternativt upphävande på grund av utnämningen av
      skiljenämnden ........................................................................................15
      3.1.2.4 Upphävande på grund av uppdragsöverskridande alternativt
      handläggningsfel (felaktig bevisvärdering m.m.) .....................................17
      3.1.2.5 Övriga uppdragsöverskridanden alternativt handläggningsfel .........20
  **3.2 Investerarna** ............................................................................................**22**
    3.2.1 Rättsliga grunder för bestridandet .....................................................22
    3.2.2 Omständigheter i sak .......................................................................22
      3.2.2.1 Ogiltighet på grund av det påstått bedrägliga upplägget, falsk bevisning,
      vilseledande information m.m. ................................................................22
      3.2.2.2 Skiljedomen omfattas av ett giltigt skiljeavtal ..............................28
      3.2.2.3 Utnämningen av skiljenämnden ...................................................30
      3.2.2.4 Uppdragsöverskridanden alternativt handläggningsfel (påstått felaktig
      bevisvärdering m.m.) .............................................................................32
      3.2.2.5 Övriga uppdragsöverskridanden alternativt handläggningsfel .........35

**4. UTREDNINGEN** ...........................................................................................**37**

**5. DOMSKÄL** ....................................................................................................**37**
  **5.1 Dispositionen av hovrättens domskäl** ....................................................**37**
  **5.2 Rättsliga utgångspunkter för hovrättens prövning** ...............................**38**
    5.2.1 Ordre public som grund för ogiltighet ...............................................38
    5.2.2 Uppdragsöverskridande och handläggningsfel som grund för upphävande 40
  **5.3 Frågan om skiljedomens ogiltighet alternativt upphävande** .......................**42**
    5.3.1 Ogiltighet på grund av det bedrägliga upplägget, falsk bevisning,
    vilseledande information m.m. ..................................................................42

SVEA HOVRÄTT
Avdelning 02

**DOM**

T 2675-14

5.3.2 Upphävande på grund av att skiljedomen inte omfattas av ett giltigt skiljeavtal .................................................................................................. 44

5.3.3 Ogiltighet alternativt upphävande på grund av utnämningen av skiljemännen ................................................................................................................... 51

5.3.4 Upphävande på grund av uppdragsöverskridande alternativt handläggningsfel .......................................................................................... 57

    5.3.4.1 Taras Khalelovs vittnesutlåtande och vittnesmål ................................ 57

    5.3.4.2 Kazakstans sakkunnig- och vittnesbevisning ....................................... 59

    5.3.4.3 Beaktande av invändningar avseende avdrag på skadeståndet m.m. .... 61

    5.3.4.4 Övriga påstådda uppdragsöverskridanden och handläggningsfel ......... 62

5.3.5 Hovrättens sammanfattande slutsatser och sammantagna bedömning av Kazakstans talan .......................................................................................... 66

**5.4 Rättegångskostnader ......................................................................................... 67**

5.4.1 Ersättningsskyldig part .................................................................................. 67

5.4.2 Investerarnas kostnadsyrkande ..................................................................... 67

5.4.3 Ersättning för parts eget arbete ..................................................................... 68

5.4.4 Ersättning för King & Spaldings biträde ....................................................... 68

5.4.5 Ersättning för King & Spaldings utlägg ........................................................ 69

5.4.6 Investerarnas ersättningsyrkande i övrigt ..................................................... 70

5.4.7 Sammanfattande bedömning .......................................................................... 70

**5.5 Överklagande ..................................................................................................... 71**

SVEA HOVRÄTT **DOM** T 2675-14
Avdelning 02

# 1. BAKGRUND

Republiken Kazakstan (Kazakstan) har naturtillgångar i form av olja och naturgas och har önskat att utländska investerare ska bistå landet i utvinning av dessa tillgångar. För detta syfte har Kazakstan ratificerat det internationella avtalet Energy Charter Treaty (ECT). Mellan åren 1999 och 2003 förvärvade Anatolie Stati och hans son Gabriel Stati via bolagen Ascom Group S.A. (Ascom) och Terra Raf Trans Traiding Ltd (Terra Raf) samtliga aktier i två kazakstanska bolag, Kazpolmunay LLP (KPM) och Tolkynneftegaz LLP (TNG). KPM ägde utvinningsrättigheter till oljefältet Borankol, på vilket den s.k. LPG-anläggningen skulle uppföras av TNG. TNG ägde motsvarande rättigheter till naturgasfältet Tolkyn. TNG hade också prospekteringsrättigheter enligt ett avtal benämnt "Avtal 302". Anatolie Stati, Gabriel Stati, Ascom och Terra Raf benämns nedan Investerarna.

Sedan Kazakstan år 2010 sagt upp avtalen om utvinningsrättigheter påkallade Investerarna skiljeförfarande och gjorde gällande att Kazakstan brutit mot sina skyldigheter enligt ECT genom överträdelser av investerarskyddsreglerna. Investerarna yrkade i skiljeförfarandet skadestånd om drygt 3 miljarder USD. Skiljeförfarandet ägde rum vid Stockholms handelskammare (SCC) och dom meddelades den 19 december 2013 i SCC:s mål nr V (116/2010), med rättelse den 17 januari 2014. Skiljenämnden bestod av professor Karl-Heinz Böckstiegel (ordförande), advokaten David Haigh och professor Sergei Lebedev. Under skiljeförfarandet anlitade vardera parten ekonomiska och geologiska experter för värdering av aktuella anläggningar.

Skiljenämnden ogillade vissa behörighetsinvändningar som framställts av Kazakstan och fann att Kazakstan brutit mot sina förpliktelser om "fair and equitable treatment" enligt art. 10 (1) ECT. Av denna artikel framgår att gjorda investeringar ska behandlas skäligt och rättvist. Vidare fann skiljenämnden att de åtgärder som Kazakstan vidtagit hade orsakat skada och att Kazakstan var skadeståndsskyldigt. Skiljenämnden fann också att Investerarna var berättigade till ett skadestånd om 508 130 000 USD jämte ränta från den 30 april 2009 enligt en räntesats motsvarande den genomsnittliga räntan på sexmånaders amerikanska statsskuldväxlar. Från skadeståndsbeloppet avdrogs ett belopp avseende skulder uppgående till 10 444 899 USD som skiljenämnden ansåg att

SVEA HOVRÄTT                    **DOM**                          T 2675-14
Avdelning 02

Investerarna inte längre svarade för. Det belopp som Kazakstan enligt skiljedomen
förpliktades att betala till Investerarna uppgick således till 497 685 101 USD. Kost-
naderna för skiljeförfarandet delades mellan parterna på så sätt att Kazakstan fick bära
tre fjärdedelar och Investerarna en fjärdedel. Kazakstan förpliktigades att ersätta
Investerarna för deras rättegångskostnader med 8 975 496,40 USD, vilket motsvarade
hälften av Investerarnas rättegångskostnader.

Två av skiljemännen var skiljaktiga. Sergei Lebedev var skiljaktig i fråga om skilje-
nämndens behörighet och David Haigh i fråga om skadeståndets storlek.

## 2. YRKANDEN

**Kazakstan** har yrkat att hovrätten i första hand ska förklara skiljedomen ogiltig i
dess helhet eller i vart fall i de delar domen avser LPG-anläggningen, dvs. med ett
belopp om 199 miljoner USD jämte ränta enligt skiljedomen samt en motsva-
rande reduktion av tillerkänd rättegångskostnad med 1 757 546 USD.

**Kazakstan** har yrkat att hovrätten i andra hand ska upphäva skiljedomen i dess
helhet eller delvis.

För det fall hovrätten finner att skiljedomen ska ogiltigförklaras eller upphävas delvis
har Kazakstan yrkat att enligt skiljedomen utdömda belopp ska reduceras med

1. 199 miljoner USD jämte ränta enligt skiljedomen samt en motsvarande reduk-
   tion av tillerkänd rättegångskostnad med 1 757 546 USD om hovrätten finner
   att Skiljenämnden har underlåtit att beakta avgörande vittnesbevisning be-
   träffande värdet på LPG-anläggningen, och/eller

2. 277,8 miljoner USD jämte ränta enligt skiljedomen samt en motsvarande
   reduktion av tillerkänd rättegångskostnad med 2 453 499 USD om hovrätten
   finner att Skiljenämnden har förlitat sig på Investerarnas geologiska experter
   utan att ange skäl härför och därvid helt underlåtit att beakta Kazakstans
   geologiska experter, och/eller

3. 215,3 miljoner USD jämte ränta enligt skiljedomen samt en motsvarande
   reduktion av tillerkänd rättegångskostnad med 1 901 506 USD om hovrätten

SVEA HOVRÄTT

**DOM**

T 2675-14

Avdelning 02

finner att Skiljenämnden har överskridit sitt uppdrag och begått ett handlägg-
ningsfel genom att inte fatta beslut om Kazakstans invändningar om att alla
intäkter som tillfallit Investerarna mellan värderingstidpunkten och dagen för
uppsägning av avtalet skulle avräknas från ett eventuellt skadestånd, och/eller

4.  99,5 miljoner USD jämte ränta enligt skiljedomen samt en motsvarande
    reduktion av tillerkänd rättegångskostnad med 878 773 USD om hovrätten
    finner att Skiljenämnden har överskridit sitt uppdrag och begått ett handlägg-
    ningsfel genom att inte ta hänsyn till och fatta beslut om Kazakstans invänd-
    ning om att en skiljedom för LPG-anläggningen endast kan omfatta hälften av
    det antagna värdet, och/eller

5.  277,8 miljoner USD jämte ränta enligt skiljedomen samt en motsvarande
    reduktion av tillerkänd rättegångskostnad med 2 453 499 USD om hovrätten
    finner att Skiljenämnden har överskridit sitt uppdrag och begått handlägg-
    ningsfel genom att beträffande värderingen av Tolkyn och Borankol felaktigt
    antagit att Kazakstan vitsordat ett visst värderingsresultat, då Kazakstan i själva
    verket klart och tydligt angett att värderingsresultatet var felaktigt och över-
    drivet.

**Investerarna** har motsatt sig bifall till Kazakstans talan i någon del. För det fall
hovrätten skulle finna att skiljenämnden överskred sitt uppdrag eller begick något
handläggningsfel har Investerarna begärt att hovrätten ska vilandeförklara målet och
bereda skiljenämnden tillfälle att vidta rättelse.

**Kazakstan** har motsatt sig att skiljenämnden ska få tillfälle att vidta rättelse.

**Parterna** har yrkat ersättning för sina rättegångskostnader.

# 3. ÅBEROPADE RÄTTSLIGA GRUNDER OCH OMSTÄNDIGHETER I SAK

## 3.1 Kazakstan

### 3.1.1 Rättsliga grunder för talan

1. Skiljedomen och det sätt på vilket skiljedomen har tillkommit är uppenbart oförenlig med grunderna för rättsordningen i Sverige, dvs. strider mot s.k. ordre public och är därför helt eller delvis ogiltig enligt 33 § första stycket 2 lagen (1999:116) om skiljeförfarande (LSF).

2. Skiljedomen ska upphävas helt eftersom
   a) den inte omfattas av ett giltigt skiljeavtal mellan parterna (34 § första stycket 1 LSF),
   b) skiljenämnden har utsetts i strid med skiljedomsreglerna för Stockholms Handelskammares Skiljedomsinstitut, SCC-reglerna, och med likabehandlingsprincipen (34 § första stycket 4 LSF) samt
   c) tillsättandet av skiljenämnden utgör ett handläggningsfel som sannolikt har inverkat på utgången (34 § första stycket 6 LSF).

3. Skiljedomen ska upphävas helt eller delvis eftersom skiljenämnden har överskridit sitt uppdrag och/eller begått handläggningsfel som vart och ett, eller i vart fall i kombination, har inverkat på målets utgång (34 § första stycket 2 och 6 LSF).

Mot bakgrund av att skiljemannen Sergei Lebedev har gått ur tiden i april 2016 saknas förutsättningar för skiljenämnden att vidta rättelse.

### 3.1.2 Omständigheter i sak

*3.1.2.1 Ogiltighet på grund av det bedrägliga upplägget, falsk bevisning, vilseledande information m.m.*

Skiljedomen och det sätt på vilket skiljedomen tillkommit är uppenbart oförenlig med grunderna för rättsordningen i Sverige, dvs. strider mot ordre public. Det är vidare

**DOM**

oförenligt med grunderna för rättsordningen att upprätthålla skiljedomar som är baserade på omfattande bedrägliga upplägg och korruption eller att tillåta process-bedrägeri i form av falsk bevisning.

För det första har uppförandet av LPG-anläggningen omgärdats av ett omfattande och avancerat bedrägligt upplägg, som utgör korruption, från Investerarnas sida. Upplägget har gått ut på att, genom skenavtal och skentransaktioner, skapa ett väsentligt fingerat värde i LPG-anläggningen. För det andra har Investerarna ägnat sig åt processbedrä-geri genom att medvetet presentera falsk bevisning i form av vittnesattester, vittnes-förhör och expertutlåtanden avseende det bedrägliga upplägget och därmed LPG-anläggningens värde, vilken bevisning vilselett Kazakstan, SCC och skiljenämnden. Investerarna har vidare medvetet undanhållit information avseende investeringen i och värderingen av LPG-anläggningen för att dölja det bedrägliga upplägget för Kazakstan, SCC och skiljenämnden. För det tredje har Investerarnas bedrägliga upplägg och vilseledande påverkat utgången i målet då det legat till grund för KazMunaiGas National Companys (KMG) indikativa bud och därmed skiljenämndens beräkning av skadeståndet. Vidare har den falska bevisningen påverkat skiljenämndens generella värdering av vittnesförhör, vittnesattester, expertrapporter och Investerarnas talan i stort, vilket både påverkat ansvarsfrågan och bedömningen av skadeståndets storlek.

Dessa omständigheter utgör var för sig och sammantaget att skiljedomen strider mot grunderna för rättsordningen i Sverige.

Det bedrägliga och vilseledande upplägget

Investerarna vilseledde medvetet skiljenämnden, SCC och Kazakstan beträffande sina investeringskostnader i LPG-anläggningen. Den påstådda investeringskostnaden om 245 miljoner USD utgjordes till stor del av fingerade kostnader. Det vilseledande upplägget innefattade följande.

De fingerade investeringskostnaderna hade sin grund i ett avtal (Perkwood-avtalet) mellan TNG och bolaget Perkwood Investment Limited (Perkwood). Trots att Perkwood enligt Perkwood-avtalet skulle ha agerat huvudleverantör av byggnads-

**DOM**

material och utrustning samt projektledare i projektet med uppförandet av LPG-anläggningen har Perkwood inte levererat några varor eller utfört några tjänster. Avtalet mellan Perkwood och TNG var i stället ett skenarrangemang. I skiljeförfarandet underlät Investerarna att upplysa skiljenämnden och Kazakstan om Perkwood-avtalet och om Perkwoods roll i projektet med uppförandet av LPG-anläggningen. Investerarna underlät vidare att informera revisorerna som granskade de av Investerarna upprättade årsredovisningarna om Perkwoods verkliga funktion och i synnerhet att Perkwood var ett TNG och Investerarna närstående bolag.

Genom det vilseledande upplägget skapade Investerarna en bild av att stora belopp hade investerats eller skulle investeras i LPG-anläggningen, vilket möjliggjorde för Investerarna att yrka ett högre skadestånd än de annars hade varit berättigade till. De fingerade investeringskostnaderna omfattade följande delar:

  i. *Fingerade inköpskostnader*

     Enligt Perkwood-avtalets Annex 2 skulle TNG betala cirka 93 miljoner USD till Perkwood för utrustning som var identisk med den som redan levererats av ett annat företag, Tractebel Gas Engineering GmbH (TGE). TGE var den verkliga huvudleverantören av komponenterna och utrustningen till LPG-anläggningen och hade levererat till ett pris vilket uppgick omräknat till 34,5 miljoner USD. Dessutom omfattade vissa tillägg till Perkwood-avtalet (Annex 14 och 16) föremål som ingick även i Annex 2 och som dessutom levererats tidigare.

  ii. *Fingerade komponentkostnader*

     TNG bokförde ett belopp om 72 miljoner USD avseende komponenter och utrustning som påståtts ha levererats men ännu inte installerats i LPG-anläggningen. I realiteten har denna utrustning aldrig existerat.

  iii. *Fingerade räntekostnader*

     Den påstådda räntekostnaden om 60 miljoner USD, avseende lån som upptagits för att finansiera uppförandet av LPG-anläggningen, är beräknad på de fingerade investeringskostnaderna och därmed fiktiv i samma utsträckning som kostnaden för komponenter och utrustning.

# DOM

iv.  *Fingerad management fee*

Den påstådda investeringskostnaden innefattar s.k. "management fee" om cirka 44 miljoner USD, vilken betalats till Perkwood utan någon avtalsrättslig grund och utan motprestation i form av lämnade tjänster.

Vidare betalade TNG cirka 37 miljoner USD i förskott till Perkwood för byggnads- material och utrustning som inte behövdes och som aldrig levererats, "Förskott på icke-levererade komponenter". Trots den uteblivna leveransen har beloppet inte återbetalats till TNG.

Det vilseledande upplägget har medfört att stora penningströmmar kunnat slussas ut från Kazakstan, vilket strider mot det grundläggande syftet med ECT, som är att skydda "good faith"-investeringar i värdlandet. Därefter riktade Investerarna ett krav mot staten Kazakstan, inledde ett skiljeförfarande och åberopade investerarskydd enligt ECT trots att sådant investerarskydd saknades på grund av ovan nämnda omständigheter.

Investerarna har presenterat falsk bevisning, lämnat vilseledande information och undanhållit relevant information i skiljeförfarandet

Det bedrägliga upplägget var avsett att vilseleda skiljenämnden och Kazakstan för att på så vis erhålla ett väsentligt högre skadestånd genom skiljedomen än vad som annars varit möjligt. För att åstadkomma detta åberopade Investerarna falsk bevisning i form av vittnesattester, vittnesförhör och expertrapporter samt lämnade vilseledande information i inlagor och under huvudförhandlingen i skiljeförfarandet enligt följande: "statement of claim" den 18 maj 2011, "claimant's reply memorial on jurisdiction and liability" den 28 maj 2012, "claimant's reply memorial on quantum" den 7 maj 2012, "Stati's first post hearing brief" den 8 april 2013, "Stati's second post hearing brief" den 3 juni 2013, "transcript from hearing on jurisdiction and the merits" den 1 oktober 2012, "transcript from hearing on quantum" den 28 januari 2013, Arthur Lungus första vittnesattest den 17 maj 2011, Anatolie Statis andra vittnesattest den 7 maj 2012 och Catalin Broscarus vittnesattest den 11 april 2011.

SVEA HOVRÄTT                                **DOM**                              T 2675-14
Avdelning 02

Investerarna vilseledde även skiljenämnden och Kazakstan genom att undanhålla information som kunnat avslöja det bedrägliga upplägget. Bland annat vilseledde Investerarna medvetet skiljenämnden och Kazakstan om vilka parter som varit delaktiga i investeringen i projektet med LPG-anläggningen, och följaktligen hur stor del av den totala investeringskostnaden som belöpt på Investerarna. Vilseledandet bestod i att Investerarna i skiljeförfarandet gjorde gällande att de ensamma hade stått för hela investeringskostnaden trots att denna i själva verket hade delats med Vitol, vilket Investerarna anförde i ett parallellet skiljeförfarande mellan Vitol och Montvale Invest Ltd. (Montvale), det s.k. Montvale-målet.

Investerarna vilseledde också skiljenämnden och Kazakstan beträffande berättigade parter i anslutning till projektet med LPG-anläggningen. Vilseledandet bestod i att Investerarna underlät att upplysa Kazakstan och skiljenämnden om att Terra Raf hade överlåtit samtliga rättigheter och skyldigheter hänförliga till LPG-anläggningen till det närstående bolaget Montvale, vilket Investerarna anförde i det parallella Montvale-målet. Denna uppgift skulle ha haft betydelse för skiljenämndens bedömning av Terra Rafs status som investerare under ECT och också för Terra Rafs rätt till skadestånd i skiljeförfarandet.

Investerarna undanhöll information om Perkwood, Perkwood-avtalet och Perkwoods roll i uppförandet av LPG-anläggningen. Investerarna har aldrig under skiljeförfarandet presenterat något dokument som klarlagt Perkwoods roll i projektet. Varken Kazakstan eller skiljenämnden har haft kännedom om det bedrägliga upplägget eller den falska bevisningen före det att skiljedomen meddelades.

Det var mot bakgrund av detta processbedrägeri som Investerarna framställde sitt yrkande i skiljeförfarandet och skiljedomen meddelades.

Värderingen av LPG-anläggningen

Skiljenämnden tog del av den falska bevisningen och den vilseledande informationen som hänvisas till ovan och detta påverkade sannolikt skiljenämndens bevisvärdering generellt och slutsatser avseende såväl jurisdiktion som ansvarsfrågan. Avseende

SVEA HOVRÄTT                           **DOM**                              T 2675-14
Avdelning 02

bedömningen av skadeståndets storlek valde dock skiljenämnden att inte förlita sig på
de expertrapporter som Investerarna åberopade i målet och vilka baserades på finge-
rade investeringskostnader. I stället tog skiljenämnden avstamp i KMG:s indikativa
bud, vilket även det baserades på Investerarnas vilseledande information om LPG-
anläggningens värde.

I skiljeförfarandet åberopade Investerarna ett s.k. indikativt bud på LPG-anläggningen
om 199 miljoner USD som lämnats av KMG som en alternativ grund för sitt skade-
ståndsyrkande i ECT-målet, punkten 1707 i skiljedomen. Felaktig och vilseledande
information från Investerarna till bolagets revisorer KPMG Audit LLC (KPMG), den
ryska investmentbanken Renaissance Capital och KMG låg till grund för det indikativa
budet.

Det indikativa budet grundade sig på investeringskostnaden för uppförandet av LPG-
anläggningen. KMG tog investeringskostnaden från "Information Memorandum" som
på uppdrag av Investerarna upprättats av Renaissance Capital. "Information Memo-
randum" byggde i sin tur på finansiell information om Investerarnas kazakstanska
tillgångar, vilka var upptagna i de konsoliderade årsredovisningarna för Tristan Oil
Ltd. (Tristan Oil), KPM och TNG. Dessa årsredovisningar hade upprättats av respek-
tive bolagsledning, i vilka Anatolie Stati ingick, och hade granskats av KPMG. Den
information avseende de belopp som investerats i LPG-anläggningen och som var del
av årsredovisningarna var felaktig och vilseledande på grund av de ovan beskrivna
fingerade kostnaderna. Investerarna underlät också att informera KPMG om att
Perkwood var en närstående part, vilket Investerarna hade en skyldighet att göra enligt
redovisningsstandarden International Financial Reporting Standards och "Information
Memorandum".

Med hänsyn till den värderingsmetod som angetts i det indikativa budet skulle KMG
ha värderat LPG-anläggningen till ett väsentligt lägre belopp om TNG:s verkliga
investeringskostnader för LPG-anläggningen hade återspeglats i de dokument som låg
till grund för KMG:s indikativa bud. Skiljenämndens bedömning av LPG-anlägg-
ningens värde och följaktligen det skadestånd som tilldömdes Investerarna grundade

SVEA HOVRÄTT
Avdelning 02

**DOM**

T 2675-14

sig på det indikativa budet, varför Investerarnas bedrägliga och vilseledande upplägg direkt har inverkat på utgången av målet, se punkten 1747 i skiljedomen.

### 3.1.2.2 Upphävande på grund av att skiljedomen inte omfattas av ett giltigt skiljeavtal

Skiljedomen omfattas inte av ett giltigt skiljeavtal mellan parterna eftersom Investerarna gav in sin påkallelseskrift endast fem dagar efter det att KPM:s och TNG:s avtal om utvinningsrättigheter sagts upp, och därigenom bröt mot den tvingande föreskriften om tre månaders förstegsförhandling i art. 26 (2) ECT. Kazakstans anbud att ingå skiljeavtal under ECT innefattade ett villkor om tre månaders förstegsförhandling enligt art. 26 (2) ECT. Påkallande av skiljeförfarande betraktas därmed som en oren accept av Kazakstans anbud. Förstegsförhandlingar har inte förts av Investerarna.

Det bestrids att kravet på förstegsförhandling har avhjälpts genom att förhandlingar genomförts efter det att skiljeförfarande hade inletts. Kravet enligt art. 26 ECT utgör en tvingande formföreskrift och är en förutsättning för att skiljeavtalet uppkom.

Det bestrids att Kazakstan avstod från sin invändning om bristande jurisdiktion i samband med att skiljenämnden vilandeförklarade målet i avvaktan på att parterna skulle försöka göra upp målet i godo.

Vidare bestrids att de brev som Investerarna skickat till Kazakstan kunde uppfattas som begäran om förstegsförhandlingar enligt ECT. Breven innehöll inte några krav hänförliga till ECT eller önskemål om förhandling för att uppnå en "amicable settlement". Vidare omfattade de inte Anatolie Stati och Gabriel Stati utan hänvisade endast till Terra Raf och Ascom. Det bestrids att det vid diskussionerna som hållits, bl.a. den 19 mars 2009 vid ett möte där Kazakstan deltog, gjordes någon hänvisning till ECT.

Det bestrids att bedömningen huruvida en förstegsförhandling på förhand är utsiktslös eller inte saknar betydelse för skyldigheten att delta i sådan förhandling. Vidare bestrids att en förstegsförhandling i detta fall skulle ha varit utsiktslös.

SVEA HOVRÄTT                              **DOM**                              T 2675-14
Avdelning 02

Skiljenämnden avgjorde inte frågan om dess behörighet på ett korrekt sätt senast i
samband med skiljedomen. Skiljenämnden skulle ha prövat om i ECT angivna
processförutsättningar var uppfyllda och om det förelåg ett giltigt skiljeavtal i
förhållande till var och en av Investerarna. (Se punkterna 828–830 i skiljedomen.)

*3.1.2.3 Ogiltighet alternativt upphävande på grund av utnämningen av skiljenämnden*

Kazakstan fick aldrig tillfälle att utse någon skiljeman. I Kazakstans ställe utsåg SCC
skiljemannen professor Sergei Lebedev. Förfarandet innebar en kränkning av
Kazakstans grundläggande processuella rättigheter och SCC-reglerna. Att Kazakstan
fråntogs rätten att utse sin egen skiljeman innebar att det sätt på vilket skiljedomen har
tillkommit är uppenbart oförenligt med grunderna för rättsordningen i Sverige. Alter-
nativt är detta en brist i utseendet av skiljenämnden. I vart fall har det förekommit fel i
SCC:s handläggning som inverkat på utgången i målet.

Det bestrids att det klart framgår av SCC-reglerna att Kazakstan skulle utse en
skiljeman i sin svarsskrift. Enligt SCC-reglerna ska svaranden *om tillämpligt*
inkomma med information om den skiljeman som har utsetts. Kazakstan har
antagit att SCC ska, liksom är fallet för andra frekvent anlitade skiljedomsinstitut,
först fatta beslut om antalet skiljemän.

Föreläggandena från SCC saknade uppgift om att Kazakstan skulle ha utsett en
skiljeman i sitt svar på påkallelseskriften. Föreläggandena från SCC saknade
vidare uppgift om att SCC skulle komma att utse skiljeman i Kazakstans ställe om
Kazakstan inte självt utsåg en skiljeman. SCC gav inte heller Kazakstan tillfälle
att yttra sig över Investerarnas begäran om att en skiljeman skulle utses för
Kazakstans räkning. SCC bröt därmed mot den i LSF förankrade likabehand-
lingsprincipen.

SCC agerade också i strid mot principen om ett rättvist förfarande och principen om
parternas likabehandling genom att bestämma för korta tidsfrister. Tidsfristen för
Kazakstan att inkomma med svarsskrift ska, i enlighet med SCC-reglerna, tidigast

SVEA HOVRÄTT
Avdelning 02

**DOM**

T 2675-14

räknas från den 11 augusti 2010 då Kazakstan tog del av föreläggandet. Det innebär att Kazakstan beviljades en tidsfrist om 15 dagar. De tidsfrister som bestämdes var alltför korta med hänsyn till att tvisten var komplex, att Kazakstan var en suverän stat, att skiljeförfarandet påkallats i strid mot föreskriven förhandlingsfrist, att befordran av handlingarna tog tid, att SCC:s förelägganden var otydliga, att Kazakstan inte med lätthet kunde förstå engelska, att Kazakstan måste ha rimlig tid på sig att anlita ett ombud, samt att utseendet av en skiljeman kräver noggrant övervägande och kommunikation.

SCC gav inte Kazakstan rätt att höras i samband med utnämnandet av en skiljeman i dess ställe. Kazakstan borde i vart fall fått tillfälle att yttra sig över Investerarnas begäran om att en skiljeman skulle utses för Kazakstans räkning.

Det bestrids att Kazakstan har avstått från sin rätt att utse skiljeman eller att föra talan om detta i hovrätten. Kazakstan har uppfyllt kraven på "reklamation" enligt 34 § andra stycket LSF och 31 § i SCC-reglerna. Kazakstan har inte vid något tillfälle bekräftat att skiljenämnden skulle ha varit konstituerad på ett riktigt sätt och alltså avstått från sin invändning härom. Uttalandet under förhandlingen den 8 oktober 2012, vilken hölls ca två år efter det att skiljenämnden konstituerats, åsyftade bara invändningar mot skilje-nämndens agerande under förhandlingen och inte hinder mot skiljeförfarandet i dess helhet.

SCC underlät att rätta sitt misstag genom att ge Kazakstan en möjlighet att utse en ny skiljeman.

SCC har inte följt sin tidigare praxis beträffande utseende av skiljeman.

Sergei Lebedev intog en mycket passiv roll under skiljeförfarandet och kunde inte säkerställa att Kazakstans talan uppfattades på ett korrekt sätt av skiljenämnden.

SVEA HOVRÄTT            **DOM**            T 2675-14
Avdelning 02

*3.1.2.4 Upphävande på grund av uppdragsöverskridande alternativt handläggningsfel (felaktig bevisvärdering m.m.)*

Taras Khalelovs vittnesutlåtande och vittnesmål

Skiljenämnden grundade sitt beslut att tillerkänna Investerarna skadestånd för LPG-anläggningen enbart på påståendet att Kazakstan hade arbetat för att färdigställa LPG-anläggningen sedan Investerarna lämnat landet. Påståendet grundade sig på två internetlänkar som fanns i en fotnot i en expertrapport, den s.k. FTI-rapporten, upprättad av Investerarnas experter, se punkten 1745 i skiljedomen. Internetlänkarna gavs inte in som bevisning och översattes inte, vilket stod i strid med punkten 7 i "Procedural Order No. 1", se punkten 20 i skiljedomen. Investerarna frånföll vidare påståendet i efterföljande inlagor. Skiljenämnden underlät att beakta avgörande muntlig bevisning i form av Taras Khalelovs vittnesutlåtande och vittnesmål vilken motbevisade detta påstående.

Detta har inverkat på målets utgång vad avser LPG-anläggningens värde med ett belopp om 199 miljoner USD motsvarande skiljenämndens uppskattning.

Kazakstans sakkunnig- och vittnesbevisning

Skiljenämnden underlät att beakta
  i. ingivna sakkunnigutlåtanden från professor Anatoly Didenko och Kadirbek Latifov och vittnesbevisning från Salamat Baymaganbetov avseende klassificeringen av pipelines,
  ii. sakkunnigutlåtande från professor Kulyash Ilyassova avseende lagligheten i avståndet från förköpsrätten,
  iii. sakkunnigutlåtande från professor Tomas Balco och vittnesbevisning från Nurlan Rahimgaliev avseende lagligheten i kvarskattebedömningen,
  iv. väsentliga delar av utlåtandet från Deloitte GmbH (Deloitte) avseende kausalitet, och
  v. väsentliga delar av Kazakstans geologiska experters, Gaffney Cline & Associates, rapport.

**DOM**                                    T 2675-14

Skiljenämnden, som grundade sin skiljedom på ett stort antal omständigheter som sammantaget ansågs utgöra en samordnad trakasserikampanj ("string of measurement of coordinated harassment"), hade inte kunnat komma fram till de bedömningar som gjorts om den beaktat bevisning som åberopats av Kazakstan.

i.   Skiljenämnden underlät att beakta innehållet i kazakstansk rätt angående klassificeringen av pipelines, punkten 1090 i skiljedomen, trots att parterna var eniga om att kazakstansk rätt härvid skulle tillämpas. I skiljeförfarandet åberopade Kazakstan sakkunnigutlåtanden från professorerna Anatoly Didenko och Kadirbek Latifov samt skriftligt vittnesutlåtande från Salamat Baymaganbetov, vilka samtliga gav stöd åt Kazakstans inställning avseende klassificeringen av pipelines. Skiljenämnden underlät emellertid att ens nämna att dessa utlåtanden hade getts in, jfr punkterna 82, 174, 1088, 1090 i skilje-domen.

ii.  Skiljenämnden avgjorde en fråga om kazakstansk civilrätt utan att beakta det av Kazakstan åberopade sakkunnigutlåtandet från Kulyash Ilyassova, se punkterna 1093, 1095 och 1417 i skiljedomen. Den aktuella frågan gällde Kazakstans förköpsrätt till aktierna i TNG vid Terra Rafs förvärv år 2005. I stället för att tillämpa kazakstansk civilrätt konstaterade skiljenämnden att Kazakstans åter-kallande av bemyndigandet av denna överlåtelse utgjorde en del av den sam-ordnade trakasserikampanjen.

iii. Skiljenämnden avgjorde en fråga om kazakstansk skatterätt utan att beakta av Kazakstan åberopade sakkunnigutlåtanden från Tomas Balco och vittnes-utlåtande från Nurlan Rahimgaliev, vilka gav stöd åt Kazakstans inställning avseende restskattefrågan, se punkterna 1541 och 1798 – 1800 i skiljedomen. Tomas Balco och Nurlan Rahimgaliev nämns inte ens i domskälen i skilje-domen. I stället för att tillämpa kazakstansk skatterätt konstaterade skiljenämn-den att Kazakstans åläggande av restskatt för KPM och TNG "were created by Respondent's conduct which this Tribunal found above to be a breach of the

SVEA HOVRÄTT                    **DOM**                         T 2675-14
Avdelning 02

ECT", alltså en del av den samordnade trakasserikampanjen, se punkterna 1541
och 1798–1800 i skiljedomen.

iv.   Skiljenämnden har avgjort frågan om orsakssamband mellan den påstådda
      trakasserikampanjen och den av Investerarna påstådda skadan utan att beakta
      Kazakstans ekonomiska expert Deloitte. I skiljeförfarandet åberopade
      Kazakstan sakkunnigutlåtanden från Deloitte som visade att Investerarnas
      bolag befann sig i ekonomiskt trångmål, helt oberoende av Kazakstans
      åtgärder, och att orsakssamband därför saknades. Skiljenämnden fann att,
      eftersom Deloitte inte gjort en direkt bedömning av KPM:s och TNG:s för-
      mågor att betala sina skulder enligt obligationslånet från Tristan Oil, vilket
      uppenbart är fel, så accepterade skiljenämnden slutsatsen från Investerarnas
      expert FTI Consulting (FTI) att bolagens finansiella ställning var god före
      oktober 2008, se punkten 1456 i skiljedomen.

v.    Skiljenämnden beaktade i skadeståndsbedömningen enbart Investerarnas
      geologiska experter (Ryder Scott) och bortsåg från Kazakstans geologiska
      experter (Gaffney Cline & Associates) utan att ange något skäl för detta. Trots
      att frågan om den geologiska bedömningen av tillgångarna i Tolkyn- och
      Borankolfälten var mycket omfattande och komplicerade samt att respektive
      expert hade gett in fyra sakkunnigutlåtanden vardera, fastställde skiljenämnden
      i en enda mening att Investerarnas expert Ryder Scott var övertygande i sin
      metodologi och slutsats ("considers that the Ryder Scott reports on reserv
      estimates are convincing in their approach and results"), se punkten 1625 i
      skiljedomen.

Ej beaktat invändningar avseende avdrag på skadeståndet

Skiljenämnden beaktade inte Kazakstans invändningar om att vissa avdrag skulle göras
från ett eventuellt tilldömt skadestånd. Skiljenämndens domskäl är i denna del så
minimala att det kan likställas med att domskäl saknas, se punkterna 1535–1542 i
skiljedomen. I skiljeförfarandet invände Kazakstan *dels* att alla intäkter som tillfallit
Investerarna efter värderingstidpunkten skulle avräknas, se skiljedomen punkterna

SVEA HOVRÄTT
Avdelning 02

**DOM**

T 2675-14

1486 och 1487, *dels* att eventuellt skadestånd för LPG-anläggningen endast kunde uppgå till hälften av värdet på grund av att Vitol hade finansierat hälften av LPG-anläggningen och att Vitol också hade rätt till hälften av den framtida avkastningen av LPG-anläggningen, allt enligt ett avtal mellan Investerarna med Vitol (JOA-avtalet), se punkterna 1738–1741 i skiljedomen. För den del som finansierats av Vitol kunde Investerarna inte erhålla skadestånd av Kazakstan. Invändningarna kan likställas med genkäromål eller kvittningsinvändningar. Skiljenämnden fullgjorde således inte sitt uppdrag att pröva tvisten i dess helhet. Underlåtenheten att beakta invändningarna inverkade på målets utgång. På grund av detta uppdragsöverskridande alternativt handläggningsfel ska skiljedomen upphävas med i vart fall ett belopp om 314,8 miljoner USD. Beloppet motsvarar de intäkter som tillfallit Investerarna efter värderingstidpunkten, 215,3 miljoner USD, och hälften av det antagna värdet för LPG-anläggningen, 99,5 miljoner USD.

### 3.1.2.5 Övriga uppdragsöverskridanden alternativt handläggningsfel

Skiljenämnden överskred sitt uppdrag och begick handläggningsfel genom att vid flera tillfällen gå utöver parternas åberopanden samt genom att underlåta att beakta parternas åberopanden och tillämplig lag, enligt vad som anges nedan.

KazAzot

i.  I frågan om Kazakstans ansvar, orsakssambandet mellan Kazakstans handlande och skadan, skadebeloppet samt om bolaget KazAzots roll, grundade skilje-nämnden sina slutsatser på den omständigheten att KMG och Timur Kulibayev hade påverkat KazAzot, vilket dock inte hade åberopats av någon av parterna, se punkten 1418 i skiljedomen. Investerarna hade åberopat KazAzots roll endast för prissättningen av gas. Skiljenämnden underlät också att tillämpa tillämplig lagstiftning i frågan om att tillskriva kazakstanska staten KazAzots beslut att inte underteckna det s.k. trepartsavtalet (sedvanlig internationell rätt om statligt ansvar inklusive "Articles on Responsibility of States for Inter-nationally Wrongful Acts" som är upprättade av International Law

Commission [ILC Draft Articles][1]). (Se punkterna 1094 och 1418 i skilje-
domen.)

Interfax

ii.    Skiljenämnden grundade sin slutsats om att en pressrelease från Interfax, som
enligt skiljenämnden utgjorde en del av den samordnade trakasserikampanjen,
hade orsakats av Kazakstans agerande redan i oktober och november 2008,
trots att detta inte anförts av någon av parterna och framhöll felaktigt att denna
omständighet var ostridig, se punkten 994 i skiljedomen.

Finanspolisen

iii.   Beträffande den kazakstanska finanspolisens agerande förlitade skiljenämnden
sig på påståendet att finanspolisen hade rapporterat till Kazakstans vice
premiärminister att den funnit att KPM och TNG drev huvudrörledningar
("trunk pipelines") trots att detta inte hade åberopats av någon av parterna.
Skiljenämnden fann dessutom felaktigt att Kazakstan skulle ha medgivit att så
varit fallet, se punkten 990 i skiljedomen.

Tristanobligationerna

iv.    I frågan om det från företagsvärdet för KPM och TNG skulle göras avdrag för
de s.k. Tristanobligationerna underlät skiljenämnden att beakta parternas
rättsliga argument, se punkterna 1768–1771 i skiljedomen. Skiljenämnden
grundade också sitt beslut på ett påstått medgivande från Kazakstan som aldrig
lämnats. Om det funnits ett sådant medgivande hade Kazakstan återkallat detta.
Värdet på Tristanobligationerna uppgick till i vart fall ett belopp om
497 685 101 USD den 30 april 2009. (Se punkterna 1536–1537 i skiljedomen.)

Värderingsmetod

v.     I frågan om värderingen av Tolkyn- och Borankolfälten antog skiljenämnden
felaktigt att Kazakstan medgett en viss värderingsmetod, se punkten 1625 i

---

[1] ICL Draft Articles är en kombination av kodifiering och fortlöpande utveckling av internationell rätt.
Förenta nationerna (FN) generalförsamling antog resolutionen 56/83 den 12 december 2001 genom
vilken ICL Draft Articles anförtroddes regeringar utan förpliktelser.

SVEA HOVRÄTT                       **DOM**                          T 2675-14
Avdelning 02

skiljedomen. På grund av detta ska skiljedomen upphävas med i vart fall ett
belopp om 277, 8 miljoner USD.

På grund av vart och ett av uppdragsöverskridandena alternativt handläggningsfelen
ska skiljedomen upphävas. I vart fall utgör bristerna sammantaget skäl för upphävande
av skiljedomen.

### 3.2 Investerarna

### 3.2.1 Rättsliga grunder för bestridandet

Skiljedomen och det sätt på vilket skiljedomen har tillkommit är inte uppenbart
oförenlig med rättsordningen i Sverige.

Skiljedomen omfattas av ett giltigt skiljeavtal mellan parterna.

Skiljenämnden har inte utsetts i strid med parternas avtal eller likabehandlings-
principen.

SCC:s tillsättande av skiljenämnden har inte utgjort ett handläggningsfel som inverkat
på utgången.

Nämnden har varken överskridit sitt uppdrag eller begått handläggningsfel som
inverkat på utgången.

Skiljenämnden är beslutsför även med två skiljemän.

### 3.2.2 Omständigheter i sak

*3.2.2.1 Ogiltighet på grund av det påstått bedrägliga upplägget, falsk bevisning,
vilseledande information m.m.*

Skiljedomen eller det sätt på vilket skiljedomen tillkommit är inte uppenbart oförenlig
med grunderna för den svenska rättsordningen. Skiljedomen ska därför inte förklaras
ogiltig.

Det bestrids att skiljedomen är baserad på ett bedrägligt upplägg, korruption eller falsk bevisning.

Allt sedan Investerarna förvärvade KPM och TNG investerade de hundratals miljoner USD för utveckling av olje- och gasfälten samt uppförande av LPG-anläggningen. Dessa kostnader är ingalunda fiktiva eller fingerade.

Uppförandet av LPG-anläggningen har inte skett genom ett bedrägligt upplägg, korruption, skenavtal eller skentransaktioner. Investerarna presenterade inte falsk bevisning (vittnesattester, vittnesförhör och expertutlåtanden) och vilseledde inte heller Kazakstan, SCC eller skiljenämnden eller undanhöll information avseende investeringen i och värderingen av LPG-anläggningen. KMG grundade sitt indikativa bud även på egna antaganden och beräkningar. Det finns inget adekvat orsakssamband mellan de påstått vilseledande handlingarna och skiljenämndens dom såvitt gäller LPG-anläggningens värde.

Skiljedomen grundar sig inte på falsk bevisning eller osanna utsagor. Den information i "Information Memorandum" och årsredovisningar som påstås vara falsk eller vilseledande har inte skapats med skiljeförfarandet i åtanke, utan för ett annat syfte, och dessutom långt före inledandet av ECT-målet. Även om Kazakstans anklagelser skulle vara till någon del befogade, vilket bestrids, tjänade dessa handlingar inte som något direkt underlag för KMG:s indikativa bud eller skiljenämndens dom såvitt gäller LPG-anläggningens värde.

Även om oriktig dokumentation eller osanna uppgifter på något vis skulle ha legat till grund för skiljedomen i denna del vore detta inte tillräckligt för att ogiltigförklara skiljedomen helt eller delvis.

Det bedrägliga och vilseledande upplägget är uppdiktat

Investerarna vilseledde inte skiljenämnden, SCC eller Kazakstan beträffande sina investeringskostnader i LPG-anläggningen. Investeringskostnaden i LPG-anläggningen

**DOM**

är inte fingerad. Den bestod inte enbart av kostnader för utrustning utan även av kostnader för byggmaterial och arbeten för anläggningens uppförande. Vid expropriationstillfället var anläggningen i det närmaste färdigställd.

Perkwood-avtalet innebar inte något skenarrangemang. Perkwoods roll var att sköta upphandlingen och leveransen av utrustning för byggnation av LPG-anläggningen. Perkwood har importerat utrustning till ett värde om cirka 138 miljoner USD till TNG i Kazakstan och omkring 24,7 miljoner USD har betalats till de kazakstansk myndigheterna genom tullavgifter och skatter. Dessutom utredde de kazakstanska tullmyndigheterna TNG i oktober 2008 utan att finna att bolaget överträtt några lagar eller bestämmelser i sina mellanhavanden med Perkwood eller annars. Det har alltså inte varit fråga om något vilseledande upplägg eller skenavtal mellan TNG och Perkwood. Vid granskning av de upprättade årsredovisningarna hade TNG:s revisorer, KPMG, full tillgång till alla redovisningshandlingar. KPMG kände till Perkwoods funktion. Under skiljeförfarandet lade Investerarna fram ett antal handlingar där Perkwoods roll i projektet med uppförandet av LPG-anläggningen redovisades.

Investerarna har investerat betydande belopp i LPG-anläggningen vilket Kazakstan var medvetet om.

Det bestrids att Investerarna redovisat fingerade inköpskostnader. Perkwood-avtalet var mer omfattande än kontraktet mellan TGE och Azalia Ltd. (Azalia)/Ascom, och innehöll en stor mängd utrustning och material som inte fanns med i TGE-avtalet. Leveransvillkoren var också annorlunda. TGE sålde vissa delar av utrustningen till LPG-anläggningen till Azalia, men varken TGE eller Azalia var ansvarigt för leveransen av utrustningen till Kazakstan. Det var Perkwood som sålde utrustning till TNG och levererade denna till Kazakstan. Den utrustning som framgår av Annex 2, 14 och 16 till Perkwood-avtalet kunde därför inte ha levererats av TGE tidigare. Annex 14 omfattade inte samma utrustning som Annex 2 utan avsåg reservdelar som beställdes för att säkra den kommande driften. I vart fall reglerades senare det erlagda förskottet för utrustningen enligt Annex 14 om cirka 37 miljoner USD mellan Perkwood och TNG.

SVEA HOVRÄTT                          **DOM**                          T 2675-14
Avdelning 02

Det bestrids att Investerarna redovisat fingerade komponentkostnader. Perkwood har levererat utrustning och material till ett värde motsvarande det belopp om 72 miljoner USD som bokförts av TNG såsom levererat men ännu inte installerat i LPG-anläggningen. Samma belopp för denna utrustning har redovisats i en rapport från en oplanerad inspektion av TNG som genomfördes mellan den 25 januari och den 5 februari 2010 av Kazakstans Ministerium för Energi- och Naturresurser, se punkten 1072 i skiljedomen.

Det bestrids att Investerarna redovisat fingerade räntekostnader. Ränteutgifter om 60 miljoner USD som upptagits för att finansiera uppförandet av LPG-anläggningen har redovisats i TNG:s bokföring och motsvarar den faktiska kostnaden.

Det bestrids att Investerarna redovisat fingerad "management fee". Den avtalsrättsliga grunden för betalningen av "management fee" finns i § 10.1 i Perkwood-avtalet.

Det bestrids att Investerarna redovisat förskott på icke-levererade komponenter. Perkwood accepterade att återbetala förskottet till TNG. TNG överlät sedermera sin fordran mot Perkwood avseende återbetalning av förskott om cirka 37 miljoner USD till Tristan Oil den 9 februari 2010. Parterna skrev under ett avtal varigenom Tristan Oil underrättade Perkwood om överlåtelsen och samtidigt avskrev motsvarande del i TNG:s utestående lån.

Påståendet om att det inte föreligger någon "good faith"-investering i Kazakstan bestrids. Detta påstående prövades och underkändes av skiljenämnden, se punkterna 812–813 i skiljedomen.

Investerarna presenterade inte falsk bevisning, lämnade inte vilseledande information eller undanhöll inte relevant information i skiljeförfarandet

Det bestrids att de angivna dokumenten utvisar att Investerarna lämnade falsk eller vilseledande information i skiljeförfarandet.

SVEA HOVRÄTT                          **DOM**                          T 2675-14
Avdelning 02

Det bestrids att Investerarna undanhöll "information som kunnat avslöja det bedrägliga upplägget". Investerarna vilseledde inte skiljenämnden eller Kazakstan om vilka parter som varit delaktiga i investeringen i projektet. Vitol har aldrig haft en ägarandel i LPG-anläggningen. Avsikten var att Vitol skulle förskottera hälften av finansieringen för dess uppförande. Investerarna gjorde inte gällande att de ensamma hade stått för hela investeringskostnaden. (Se punkterna 1702–1703 och 1740 i skiljedomen.)

Frågan om Ascoms tvist med Vitol i det s.k. JOA-målet hade betydelse när Investerarnas skadeståndsanspråk avseende LPG-anläggningen prövades av skiljenämnden. Skiljenämnden konstaterade att det saknade betydelse för den fråga som skiljenämnden hade att bedöma, nämligen vad som enligt internationell rätt utgjorde skäligt mark-nadsvärde för LPG-anläggningen, och huruvida Vitol hade medverkat tillsammans med Investerarna i de investeringar som gjordes i LPG-anläggningen. (Se punkterna 1539 och 1542 i skiljedomen.)

Investerarna vilseledde inte skiljenämnden eller Kazakstan beträffande berättigade parter i anslutning till projektet med LPG-anläggningen. Det påstods aldrig i Montvale-målet att Terra Raf hade överfört samtliga sina rättigheter och skyldigheter avseende LPG-anläggningen till det närstående bolaget Montvale. Det som hände var att Terra Raf överlät sina samtliga rättigheter och skyldigheter under JOA-avtalet, avseende den gemensamma finansieringen av LPG-anläggningen med Vitol, till Montvale genom ett "Novation Agreement" där även Vitol var part. Terra Raf:s status som TNG:s ensamma aktieägare förändrades aldrig. Följaktligen saknade denna uppgift någon som helst betydelse för bedömningen av Terra Raf:s status som investerare under ECT eller rätt till skadestånd. Information om "Novation Agree-ment" fanns återgiven i Squire Sanders "Due Diligence"-rapport som Kazakstan lämnade in i skiljeförfarandet och åberopade vid ett flertal tillfällen, se punkterna 1177, 1197, 1489 och 1793 i skiljedomen. Det hade under alla förhållanden ingen betydelse för utgången.

Det bestrids att Investerarna gjorde sig skyldiga till processbedrägeri genom att undanhålla information om Perkwood, Perkwood-avtalet och Perkwoods roll i uppförandet av LPG-anläggningen.

SVEA HOVRÄTT                          **DOM**                          T 2675-14
Avdelning 02

Värderingen av LPG-anläggningen

Investerarna lämnade inte vilseledande information avseende investeringskostnader till
sina revisorer eller någon annan. Uppgifterna om investeringskostnader för LPG-
anläggningen påverkade inte bedömningen av skadeståndets storlek.

Av KMG:s indikativa bud och interna beslutsunderlag, som Kazakstan lämnade in i
skiljeförfarandet, framgår att bolaget grundade sitt indikativa bud *dels* på "Information
Memorandum", *dels* på egna antaganden och beräkningar.

Investerarna åberopade inte det indikativa budet som en alternativ grund för sitt
skadeståndsyrkande i skiljeförfarandet. Information om KMG, jämte sju andra bud-
givares, indikativa bud lämnades som stöd för Investerarnas beräkningar avseende
värdet av de exproprierade tillgångarna eftersom Kazakstan ifrågasatte Investerarnas
värderingsmetoder. I skiljeförfarandet intog Kazakstan ståndpunkten att investerings-
kostnaden var irrelevant eftersom diskonterad kassaflödesmetod eller nuvärdes-
beräkning ("Discounted Cash Flow") skulle tillämpas vid marknadsvärdering ("Fair
Market Value") samt vidare att investeringskostnaderna i själva verket var mycket
högre och att Investerarna hade försökt gömma dem, se punkterna 1724 och 1718 i
skiljedomen.

Skiljenämnden grundade sin bedömning av värdet av LPG-anläggningen väsentligen
på det indikativa bud om 199 miljoner USD som lämnats av KMG. Det indikativa
budet var preliminärt och grundades på ett antal osäkra antaganden. KMG beaktade
inte endast "Information Memorandum" utan även annan allmänt tillgänglig
information och gjorde egna antaganden och beräkningar. Budet har inte heller grundat
sig endast på TNG:s investeringskostnader i LPG-anläggningen utan har beräknats
som ett aritmetiskt medeltal mellan "the matrix of the comparative methods value and
cost method value". Medeltalet landade på 199 miljoner USD eftersom investerings-
kostnaden var 193 miljoner USD och beloppet enligt den jämförande värderings-
metoden uppgick till 205 miljoner USD.

SVEA HOVRÄTT **DOM** T 2675-14
Avdelning 02

Det bestrids att uppgifter om Investerarnas kazakstanska tillgångar, vilka var intagna i de konsoliderade årsredovisningarna för Tristan Oil, KPM och TNG, var felaktiga eller vilseledande.

KPMG kände till Perkwoods funktion.

Det bestrids att Anatolie Stati ingick i ledningen för KPM och TNG.

KMG:s vittne, Medet Suleimenov, uppgav i förhör att det indikativa budet var baserat på begränsad information och att det var strategiska överväganden som bestämde budets storlek, se punkten 1736 i skiljedomen. Det är därför omöjligt att säga på vilket sätt, om något, ändringar i investeringskostnaden skulle ha påverkat budets storlek.

*3.2.2.2 Skiljedomen omfattas av ett giltigt skiljeavtal*

Kazakstan och samtliga av Investerarna har träffat skiljeavtal på grundval av Kazakstans i ECT intagna stående anbud om skiljeförfarande enligt SCC-reglerna för investeringstvister och Investerarnas accept genom påkallelse av skiljeförfarande under åberopande av detta anbud.

Iakttagandet av föreskriften om förstegsförhandling är inte ett villkor för slutande av skiljeavtal. Av art. 26 (3) (a) ECT följer att Kazakstan har lämnat ett villkorslöst samtycke till skiljeförfarande. Genom Investerarnas påkallande av skiljeförfarande uppstod ett bindande skiljeavtal, varigenom skiljenämnden blev behörig.

Bestämmelserna i art. 26 ECT utgör inte tvingande formföreskrifter. Underlåtenhet att iaktta förstegsförhandling är inte ett rättegångshinder.

Under alla förhållanden vilandeförklarades skiljeförfarandet under tre månader på begäran av Kazakstan för att möjliggöra förhandlingar jämlikt art. 26 (2) ECT. Eventuell brist före skiljeförfarandet har därför läkts och Kazakstan har förlorat rätten till jurisdiktionsinvändning.

SVEA HOVRÄTT                    **DOM**                         T 2675-14
Avdelning 02

Investerarna accepterade Kazakstans begäran om vilandeförklaring på villkor att
Kazakstan avstod från att framställa någon invändning på den grunden att fristen inte
uppfyllts, vilket Kazakstan genom sitt dåvarande ombud accepterade. Kazakstan
fortsatte sedan att delta i processen utan att informera Investerarna om att invänd-
ningen vidhölls. I vart fall hade Investerarna anledning att tro att Kazakstan avstod från
sin invändning, vilket Kazakstan måste ha varit medvetet om. Parternas överens-
kommelse var bindande för Kazakstan och Kazakstan var även på grund härav
skiljeavtalsbunden gentemot Investerarna, i vart fall efter tremånadersfristens utgång.

Investerarna uppfyllde kraven på förstegsförhandling enligt art. 26 (2) ECT innan
skiljeförfarandet inleddes. Det enda krav som uppställs avseende inledande av
förstegsförhandling är en begäran om uppgörelse i godo av någon av de investerare
som berörs, vilken inte behöver vara skriftlig. Det finns alltså inget krav på att samtliga
investerare ska skriva under samtliga brev eller delta i förstegsförhandling. Vidare var
Anatolie Stati under den aktuella tiden behörig att företräda Gabriel Stati. Det är
tillräckligt att hänvisning sker till en traktats föremål så att den stat mot vilken krav
riktas informeras om att det föreligger eller kan komma att föreligga en tvist rörande
detta föremål. Av Investerarnas brev till Kazakstan framgår tydligt att Investerarna
vänder sig mot Kazakstans behandling av KPM och TNG, dvs. Investerarnas
investeringar i Kazakstans territorium. Under åren 2008–2010 påtalade Investerarna
flera gånger de tvistiga förhållandena för Kazakstan och försökte få till stånd en dialog.
Investerarna gav också både muntliga och skriftliga förslag till en uppgörelse av
tvisten samt angav att de avsåg att hänskjuta tvisten till internationellt skiljeförfarande
enligt SCC-reglerna om inte en lösning kunde nås. Under denna tid var grundorsaken
till tvisten densamma. Förstegsförhandling skedde mer än ett år innan tvisten hänsköts
till skiljeförfarande vilket är tillfyllest. Att orden "i godo" eller liknande inte användes
saknar betydelse.

Något krav på att delta i förstegsförhandling under tre månader finns inte om sådan
framstår som utsiktslös, vilket framgår av art. 26 (1) ECT. Kazakstan underlät att
besvara de flesta av Investerarnas framställningar och visade inget intresse att för-
handla. Kazakstans agerande före inledandet av skiljeförfarandet visar att det inte var
möjligt att nå en förlikning av tvisten.

**DOM**

Skiljenämnden avgjorde frågan om sin behörighet på ett korrekt sätt och i förhållande till var och en av Investerarna.

### 3.2.2.3 Utnämningen av skiljenämnden

SCC bröt inte mot parternas skiljeavtal, av vilket SCC-reglerna utgör en del, eller grundläggande principer och rättigheter vid utseendet av skiljenämnden. Kazakstan har inte fråntagits rätten att utse sin egen skiljeman, utan antingen på grund av sin egen underlåtenhet försuttit sin möjlighet att göra detta eller medvetet valt att inte delta vid utseendet av skiljenämnden. Det bestrids vidare att det förekommit en brist i utseendet av skiljenämnden samt att det förekommit ett handläggningsfel hänförligt till SCC:s utseende av skiljenämnden som inverkat på utgången av målet.

Att svaranden ska utse en skiljeman i sitt svar på påkallelseskriften följer av skilje-avtalet. SCC:s regler är klara i detta hänseende. Eftersom parterna inte avtalat om annat skulle skiljenämnden bestå av tre skiljemän och vardera parten få möjlighet att utse en skiljeman, om inte SCC beslutade om annat. SCC har inte beslutat om något annat. Att skiljeförfarandet skulle avgöras av tre skiljemän framgick inte enbart av SCC-reglerna, utan även av SCC:s brev och påkallelseskriften.

SCC:s förelägganden var tydliga. Till föreläggandet att inkomma med svarsskrift bifogades bl.a. påkallelseskriften och en kopia av SCC-reglerna, av vilka framgår att Kazakstan i sin svarsskrift behövde ange vilken skiljeman Kazakstan hade utsett. Investerarna yrkade redan i påkallelseskriften att SCC, för det fall Kazakstan underlät att utse en skiljeman, skulle utse en skiljeman i Kazakstans ställe. Från delfåendet av påkallelseskriften till dess att Sergei Lebedev tillfrågades hade Kazakstan haft 40 dagar på sig att ge in svarsskrift eller begära anstånd. När svarsfristen hade löpt ut fick Kazakstan en påminnelse och ytterligare 14 dagar på sig att följa föreläggandet, samt upplysning om att Kazakstans uteblivna svar inte hindrade skiljeförfarandet från att fortskrida. SCC-reglerna föreskriver inte att SCC:s föreläggande måste innehålla en uttrycklig anmodan att utse skiljeman. Kazakstan anmodades därtill att yttra sig över

SVEA HOVRÄTT                          **DOM**                          T 2675-14
Avdelning 02

Investerarnas förslag att de partsutsedda skiljemännen skulle utse skiljenämndens
ordförande. SCC bröt inte mot likabehandlingsprincipen.

Svar och utseende av skiljeman ska ske inom den tid som SCC beslutar. SCC:s
agerande i detta avseende var i enlighet med skiljeavtalet, SCC:s praxis och
grundläggande principer och rättigheter. Kazakstan hade kompetenta och erfarna
medarbetare med erforderliga språkkunskaper. Det finns även en rysk översättning av
SCC-reglerna på SCC:s hemsida. Dessutom har Kazakstan varit part i ett stort antal
skiljeförfaranden vid SCC före det här aktuella ECT-målet och var väl förtroget med
tillämpliga regler och praxis. Det saknas grund för att Kazakstan borde ha behandlats
mer förmånligt i egenskap av stat eller på grund av att det var fråga om en komplex
investeringstvist. Varken sättet för befordran av handlingarna, Kazakstans egen
byråkrati, dess påstådda bristande engelskakunskaper eller dess behov av ombud
motiverade utsättande av en längre tidsfrist. Kazakstan begärde inte anstånd och deltog
över huvud taget inte i förfarandet förrän mer än en månad efter det att SCC utsett
skiljeman för Kazakstans räkning.

Kazakstan underlät att utse en skiljeman inom den tid som SCC beslutade. SCC utsåg
därför en skiljeman för Kazakstans räkning, utan hörande av någondera parten. I den
uppkomna situationen medger inte skiljeavtalet Kazakstan någon rätt att höras.

Kazakstan underlät att i tid invända mot utseendet av skiljenämnden och har därför
försuttit sin rätt att göra gällande det eventuella felet. Kazakstan bekräftade efter
utseendet av Sergei Lebedev och Karl-Heinz Böckstiegel inför skiljenämnden under
förhandlingen i jurisdiktionsfrågan den 8 oktober 2012, att det inte fanns några
invändningar mot förfarandet som det dittills genomförts. Kazakstan har förlorat sin
rätt att göra gällande det påstådda felet.

Det bestrids att SCC borde ha gett Kazakstan möjlighet att utse en ny skiljeman när
Kazakstan till slut deltog i skiljeförfarandet.

SCC begick inte något misstag utan agerade i enlighet med SCC-reglerna och följde
sin praxis beträffande utseende av skiljeman.

SVEA HOVRÄTT
Avdelning 02

**DOM**

T 2675-14

Det bestrids att Sergei Lebedev skulle ha intagit en passiv roll eller att en partsutsedd skiljeman har till uppgift att säkerställa att partens talan uppfattas på ett korrekt sätt av skiljenämnden.

*3.2.2.4 Uppdragsöverskridanden alternativt handläggningsfel (påstått felaktig bevisvärdering m.m.)*

<u>Taras Khalelovs vittnesutlåtande och vittnesmål</u>

Fråga var om LPG-anläggningen skulle värderas som en "going concern" vilket Investerarna hävdade, eller till ett skrotvärde vilket Kazakstan hävdade. Skiljenämnden beaktade inte omständigheter eller bevis som inte hade åberopats av Investerarna.

Investerarna återkallade aldrig påståendet att Kazakstan ämnade slutföra konstruktionen och påbörja driften av LPG-anläggningen. Detta förändras inte av att Investerarna inte senare upprepade påståendet. Investerarna angav dessutom i sina "Post-Hearing Briefs" att de vidhöll allt som tidigare anförts i målet.

Bevisningen i form av information från allmänt tillgängliga webbsidor för Mangystau-regionen och den kazakiska ambassaden i Israel fördes in i målet på ett korrekt sätt genom Investerarnas expertbevisning från FTI och som bilagor till Investerarnas inlaga av den 7 maj 2012. Investerarna åberopade även annan bevisning i form av Victor Romanosovs vittnesutlåtande.

Skiljenämnden beaktade all skriftlig och muntlig bevisning som hade åberopats av parterna, inklusive Taras Khalelovs vittnesutlåtande och vittnesmål. Även om skiljenämnden skulle ha begått ett handläggningsfel genom att inte beakta denna bevisning så har detta fel i vart fall inte inverkat på målets utgång. Bevisningen var inte tillräcklig för att motbevisa de omständigheter på vilka skiljenämnden baserade sina slutsatser om värdet på LPG-anläggningen.

**DOM**

Skiljenämnden överskred följaktligen inte sitt uppdrag eller begick inte något hand-
läggningsfel som sannolikt påverkat utgången i målet.

<u>Kazakstans sakkunnig- och vittnesbevisning</u>

Skiljenämnden beaktade all bevisning, inklusive bevisning avseende:

– klassificeringen av pipelines,

– förköpsrätten,

– kvarskattebedömningen,

– kausalitet, och

– geologiska frågor.

Kazakstans påståenden i denna del är grundlösa och utgör varken var för sig eller
tillsammans uppdragsöverskridanden eller handläggningsfel som sannolikt inverkat på
utgången i målet.

Skiljenämnden beaktade Kazakstans bevisning om innehållet i kazakstansk rätt
angående klassificeringen av pipelines. Frågan om rättvis och skälig behandling
innefattade frågor rörande klassificeringen av pipelines enligt kazakstansk lag. Redan
Kazakstans godtyckliga hantering av klassificeringsfrågan stred mot skyldigheten att
iaktta rättvis och skälig behandling och kazakstansk rätt hade begränsad betydelse för
bedömningen avseende klassificeringen.

Skiljenämnden redovisade i kronologiskt ordning parternas huvudskrifter utan att
räkna upp sakkunnigutlåtanden eller vittnesutlåtanden. Kazakstans påståenden
avseende Anatoly Didenko, Kadirbek Latifov och Salamat Baymaganbetov är
felaktiga. Anatoly Didenkos utlåtande nämns i skiljedomen, se punkten 193 i
skiljedomen. Kadirbek Latifovs utlåtande gavs in som vittnesutlåtande (inte
sakkunnigutlåtande) till Kazakstans andra skrift. Kazakstan redovisade inte heller
några kostnader för Kadirbek Latifovs utlåtande, jfr punkten 1872 i skiljedomen.
Skiljenämnden noterade att Salamat Baymaganbetov hördes den 8 oktober 2012, se
punkten 117 i skiljedomen.

SVEA HOVRÄTT                    **DOM**                         T 2675-14
Avdelning 02

Kazakstans påstående om att skiljenämnden avgjorde en fråga om kazakstansk civilrätt utan att beakta det av Kazakstan åberopade sakkunnigutlåtandet från Kulyash Ilyassova saknar grund. Kulyash Ilyassovas synpunkter avseende Kazakstans förköpsrätt till aktierna i TNG som överläts från Gheso till Terra Raf har redovisats i skiljedomen, se punkterna 787 och 993 i skiljedomen.

Skiljenämnden har korrekt avgjort frågan om kazakstansk skatterätt hänförlig till restskattefrågan och med beaktande av allt som Kazakstan anfört inklusive sakkunnigbevisning genom Tomas Balco och vittnet Nurlan Rahimgaliev. Både Tomas Balco och Nurlan Rahimgaliev omnämns på ett flertal platser i skiljedomen under både Investerarnas och Kazakstans inställning.

Skiljenämnden avgjorde korrekt frågan om orsakssamband – inklusive frågan om mellankommande orsak och den ekonomiska strukturen på KPM och TNG - med beaktande av allt som Kazakstan anfört inklusive experterna från Deloitte, se punkterna 1456 och 1503 i skiljedomen.

Skiljenämnden beaktade korrekt all geologisk expertis inklusive Gaffney Cline & Associates och skiljedomen saknar inte domskäl såvitt gäller betydelsen av de geologiska frågorna för skadeberäkningen.

Invändningar avseende avdrag på skadeståndet

Skiljenämnden beaktade Kazakstans invändningar om att vissa avdrag skulle göras från eventuellt skadestånd, både vad gäller intäkter som tillfallit Investerarna efter värderingstidpunkten (215,3 miljoner USD) och om att skadeståndet för LPG-anläggningen högst kunde uppgå till hälften av värdet på grund av Investerarnas avtal med Vitol (99,5 miljoner USD). Kazakstans invändningar avsåg frågan om skadeståndets storlek och utgjorde inte ett genkäromål eller en kvittningsinvändning. Skiljenämnden redovisade i domskälen fullgott sina bedömningar och fann korrekt att några avdrag inte skulle göras, se punkterna 1530, 1531 och 1539 i skiljedomen.

SVEA HOVRÄTT                          **DOM**                                T 2675-14
Avdelning 02

Vinster, som Kazakstan hänvisade till och som hade delats ut, hade tjänats in före såväl
den värderingspunkt som skiljenämnden stannade för som den som Investerarna
åberopade. Sådana vinster skulle inte dras av från skadeståndet, vilket skulle motsvara
nuvärdet på vinster som KPM och TNG förväntades generera i framtiden. (Jfr
punkterna 1473–1477 i skiljedomen.)

Vitol ägde inte någon del av LPG-anläggningen och Vitols avtal med Investerarna om
finansieringen av LPG-anläggningen, JOA-avtalet, motiverade inte något avdrag från
skadeståndet. Skiljenämnden överskred inte sitt uppdrag och begick inte något hand-
läggningsfel som sannolikt påverkat utgången i målet, se punkten 1539 i skiljedomen.

*3.2.2.5 Övriga uppdragsöverskridanden alternativt handläggningsfel*

Skiljenämnden dömde inte över omständigheter som inte åberopats och underlät inte
att beakta något som den borde ha beaktat. De omständigheter som Kazakstan gör
gällande att skiljenämnden dömde över utan erforderligt åberopande är bevisfakta.
Skiljenämnden får ex officio beakta bevisfakta på grundval av det föreliggande
processmaterialet. Skiljenämnden beaktade tillämplig lag och internationella rätts-
principer korrekt.

KazAzot
Skiljenämnden grundade sina överväganden i fråga om KazAzot på omständigheter
som åberopats av parterna. Investerarna åberopade att Timur Kulibayev, svärson till
Kazakstans president, kontrollerade KazAzot och att internationella rättsprinciper om
statligt ansvar är tillämpliga på KazAzots beslut att inte underteckna det s.k. treparts-
avtalet. (Se punkterna 639, 674 och 1094 i skiljedomen.) Även om parterna hanterade
KazAzot som en fråga om både ansvar i och för sig och skadeståndets storlek, stod det
skiljenämnden fritt att bedöma det som en ansvarsfråga. Skiljenämnden tillämpade
internationell lag korrekt och underlät inte att beakta något.

Interfax
Skiljenämndens bedömning i frågan om Kazakstans ansvar för pressreleasen från
Interfax var en rättslig bedömning som låg inom ramen för skiljenämndens behörighet.

Skiljenämnden dömde inte över en icke åberopad omständighet. Investerarna hade

åberopat att pressmeddelandet från Interfax orsakades av statlig inblandning och var en

del av en större kampanj riktad mot KPM och TNG. (Se punkterna 348, 1122, 1335

och 1339 i skiljedomen.)

Finanspolisens klassificering av rörledningar

I frågan om den kazakstanska finanspolisens beslut om klassificeringen av rörled-

ningar grundade skiljenämnden sitt beslut på omständigheter som åberopats av

Investerarna. Investerarna hade åberopat att finanspolisen den 10 december 2008

meddelade vice premiärminstern att den hade beslutat att KPM:s och TNG:s rör-

ledningar var huvudrörledningar och inte fältrörledningar, se punkten 343 i skilje-

domen. I en skrivelse medgav Kazakstan att ett brev från finanspolisen till den

biträdande premiärministern angav att finanspolisen hade beslutat att de aktuella

ledningarna var huvudrörledningar. Skiljenämnden har haft rätt att beakta medgivandet

som bevisfaktum, se punkten 990 i skiljedomen.

Tristanobligationerna

I frågan om Tristanobligationerna och företagsvärdet av KPM och TNG grundade

skiljenämnden sitt beslut på omständigheter som åberopats av parterna. Investerarna

hade åberopat att de hade fortsatt ansvar för Tristanobligationerna och att de från

utdömt skadestånd skulle tvingas avstå skulden enligt Tristanobligationerna, se

punkterna 1752–1758 i skiljedomen. Kazakstan medgav att "enterprise value" var en

korrekt värderingsmetod, om Investerarna var ersättningsskyldiga mot obligations-

innehavarna. Eftersom skiljenämnden konstaterade att så var fallet, var det korrekt att

parterna var överens om vilken värderingsmetod som skulle tillämpas, se punkterna

1769–1771 i skiljedomen. Kazakstan hade rätt att ompröva sitt medgivande, men

skiljenämnden var ändå fri att beakta vilken bevisbetydelse det tidigare medgivandet

kunde ha.

Värderingsmetod

I frågan om skadeståndet hänförligt till Tolkyn- och Borankolfälten grundade skilje-

nämnden sitt beslut om skadeståndets storlek på en alternativ beräkning som

Kazakstan introducerat och beskrivit som lämplig, se punkten 1625 i skiljedomen.

SVEA HOVRÄTT                         **DOM**                         T 2675-14
Avdelning 02

Skiljenämnden grundade inte sin bedömning på ett formellt medgivande av Kazakstan
utan gjorde en bevisvärdering, vilket är en materiell fråga.

Skiljenämnden överskred följaktligen inte sitt uppdrag eller begick inte något fel som
sannolikt påverkat utgången i målet.

## 4. UTREDNINGEN

Parterna har åberopat förhållandevis omfattande bevisning, såväl muntlig som skriftlig.
Vad gäller muntlig bevisning har på begäran av Kazakstan hörts diplomerade
ingenjören Ernst Kallweit, projektledaren Franjo Zaja, auktoriserade revisorn Thomas
Gruhn, professorn Thomas Grant och advokaten Dr Horacio A. Grigera Naón. På
begäran av Investerarna har hörts advokaterna Kenneth R. Fleuriet, Johan Gernandt
och Gary B. Born.

## 5. DOMSKÄL

### 5.1 Dispositionen av hovrättens domskäl

Målet gäller ogiltighet och klander av en skiljedom genom vilken skiljenämnden
prövat ersättningsanspråk som Investerarna riktat mot Kazakstan med anledning av
investeringar som Investerarna gjort inom Kazakstans territorium. Kazakstans talan
vilar på den grunden att skiljedomen är ogiltig eftersom domen i sig eller det sätt på
vilket den tillkommit är uppenbart oförenlig med grunderna för rättsordningen i
Sverige (ordre public). Kazakstan har också åberopat att skiljedomen ska upphävas på
grund av att den inte omfattas av något giltigt skiljeavtal mellan parterna och då en av
skiljemännen utsetts på felaktigt sätt. Därutöver har Kazakstan gjort gällande att
domen i vart fall ska upphävas på grund av att skiljemännen i flera avseenden över-
skridit sitt uppdrag och att det förekommit ett flertal handläggningsfel, som inverkat på
utgången i målet.

Hovrätten kommer inledningsvis att redogöra för de generella, rättsliga utgångspunkter
som hovrätten har för prövningen av de grunder för ogiltighet respektive upphävande

SVEA HOVRÄTT          **DOM**          T 2675-14
Avdelning 02

av skiljedomen som Kazakstan har åberopat. Förutsättningar för ett giltigt skiljeavtal i relation till art. 26 ECT kommer hovrätten dock att behandla samlat i avsnitt 5.3.2.

Efter redogörelsen för de rättsliga utgångspunkterna för prövningen kommer hovrätten att ta ställning till Kazakstans talan utifrån de omständigheter i sak som Kazakstan har åberopat. Hovrätten kommer att göra prövningen i den ordning som följer av den disposition som Kazakstan har valt för att presentera sina grunder för talan och som framgår av redovisningen av Kazakstans talan ovan i avsnitt 3.1.

Avslutningsvis kommer hovrätten också att redovisa sina sammanfattande slutsatser av ställningstagandena och sin sammantagna bedömning av de grunder som Kazakstan har åberopat till stöd för att skiljedomen ska förklaras ogiltig alternativt upphävas.

Sist i domskälen kommer hovrätten att redovisa sin bedömning i frågan om rättegångs-kostnader.

## 5.2 Rättsliga utgångspunkter för hovrättens prövning

### 5.2.1 Ordre public som grund för ogiltighet

Enligt 33 § första stycket 2 LSF är en skiljedom ogiltig om skiljedomen eller det sätt på vilket skiljedomen tillkommit är uppenbart oförenligt med grunderna för rättsord-ningen i Sverige.

Svensk rätt intar en restriktiv inställning till möjligheten att få en skiljedom ogiltig-förklarad med stöd av nämnda bestämmelse. Av förarbetena till bestämmelsen framgår att den är avsedd att omfatta endast höggradigt stötande fall och att den på grund av sitt snäva tillämpningsområde ytterst sällan blir aktuell att tillämpa samt att den omfattar fall då grundläggande rättsprinciper av materiell eller processuell art har åsidosatts (se prop. 1998/99:35 s. 142 och 234). I sammanhanget kan också nämnas att Skiljedoms-institutet vid SCC i sin handbok ger uttryck för att begreppet ordre public ska tolkas mycket snävt och tillämpas då det är fråga om synnerligen stötande fall där elementära principer har ignorerats (se Öhrström, Stockholms Handelskammares Skiljedoms-institut – En handbok och regelkommentar för skiljeförfaranden, 2009, s. 80). Vidare

SVEA HOVRÄTT                          **DOM**                          T 2675-14
Avdelning 02

följer av Högsta domstolens avgörande i NJA 2015 s. 433 att om parternas utredning
ger stöd för att en skiljedom skulle vara uppenbart stridande mot grunderna för
rättsordningen bör domstolen självmant uppmärksamma parterna på detta och ge dem
möjlighet att utveckla sina ståndpunkter i den frågan.

I förarbetena till lagen om skiljeförfarande nämns följande som exempel på när en
skiljedom anses vara uppenbart oförenlig mot grunderna för rättsordningen i Sverige
(a. prop., s.141 f.). Så anses vara fallet när skiljenämnden har prövat en fråga som en
allmän domstol inte skulle befatta sig med såsom anspråk som grundas på spel eller
kriminella handlingar (t.ex. förpliktande att betala en avtalad muta). Andra fall som
anges är att någon genom skiljedomen har förpliktats till en prestation som är för-
bjuden enligt lag eller att skiljedomen har en sådan karaktär av straff att den inte kan
anses godtagbar. Vidare nämns som exempel att skiljenämnden har avgjort en tvist
utan att ta hänsyn till en rättsregel som är tvingande till förmån för tredje man eller ett
allmänt intresse (a.s.).

Bestämmelsen i 33 § första stycket 2 LSF om ordre public tar också sikte på grund-
läggande rättsprinciper av procedurmässig art genom hänvisningen till det sätt på
vilket skiljedomen tillkommit. Som exempel på en sådan situation när detta kan
aktualiseras anges i förarbetena att skiljedomen har tillkommit efter brott, t.ex. efter
hot mot eller bestickning av en skiljeman (a. prop., s. 142).

Även skiljedomar som grundas på falsk bevisning torde kunna omfattas av ordre
public-begreppet (se Skiljedomsutredningens betänkande SOU 1994:81, s. 182).
Skiljedomsutredningen övervägde införandet av en uttrycklig lagbestämmelse om att
en skiljedom skulle kunna upphävas på talan av en part om en handling som åberopats
till bevis varit förfalskad eller förvanskad eller om någon annan än en part eller en
ställföreträdare för en part avgett en medvetet osann utsaga och handlingen eller
utsagan kunde antas ha inverkat på målets utgång (se a.a., avsnitt 6.5). Att göra
resningsbestämmelserna fullt ut tillämpliga på skiljedomar ansåg dock utredningen
komma alltför mycket i konflikt med syftet att ett skiljeförfarande utan tidsutdräkt ska
leda till ett definitivt avgörande. Utredningen lämnade därför ett förslag som endast i
viss utsträckning var i linje med rättegångsbalkens bestämmelser om resning (se a.a.,

SVEA HOVRÄTT **DOM** T 2675-14
Avdelning 02

s. 182). Regeringen valde dock att inte genomföra skiljedomsutredningens förslag i denna del och motiverade sitt ställningstagande att inte införa en möjlighet att få en skiljedom upphävd om falsk bevisning eller osanna utsagor inverkat på utgången, främst med intresset av att regelverket i största möjliga utsträckning skulle tillgodose parternas krav på en snabb och effektiv handläggning och att garantera en skiljedoms slutgiltighet (se a. prop., s. 150 ff.). I detta syfte ansågs det särskilt angeläget att undvika regler som genom sin konstruktion inbjuder till en klandertalan och under lång tid skapar osäkerhet om skiljedomens giltighet (a.s.). Regeringen hänvisade emellertid också till utredningens slutsats att situationen när falsk bevisning hade åberopats torde innefattas i det ordre public-begrepp som UNCITRAL Model Law on International Commercial Arbitration (modellagen) och 1958 års New York-konvention om erkännande och verkställighet av utländska skiljedomar använde (a.s.). I litteraturen har antagits att en skiljedom i vissa undantagsfall skulle kunna anses ogiltig på grund av ordre public i den nu beskrivna situationen (se Heuman, a.a., s. 600 f.). Som skäl härför har anförts bl.a. strävanden att harmonisera svensk rätt med utländsk praxis. Det har dock också samtidigt framhållits att ordre public-bestämmelsen inte får tillämpas på ett sådant sätt att det öppnas en tidsobegränsad möjlighet att få skiljedomen ogiltigförklarad på denna grund (se Heuman a.a., s. 600).

### 5.2.2 Uppdragsöverskridande och handläggningsfel som grund för upphävande

En skiljedom kan också enligt 34 § första stycket 2, 4 respektive 6 LSF upphävas efter klander om skiljemännen har överskridit sitt uppdrag, om en skiljeman utsetts i strid med parternas överenskommelse eller LSF eller om det annars utan parternas vållande har förekommit något fel i handläggningen som sannolikt har inverkat på utgången. Skiljenämndens uppdrag styrs av skiljeavtalet, eventuella partsöverenskommelser om förfarandet och parternas talan i skiljeförfarandet. Det kan ibland vara svårt att avgöra vad som ligger i begreppet uppdrag och om vissa processuella fel ska bedömas enligt bestämmelsen i punkten 2 eller om de ska bedömas enligt generalklausulen i punkten 6 som tar sikte på andra handläggningsfel (se Heuman, a.a., s. 605 f., och Lindskog, Skiljeförfarande. En kommentar, Zeteo, maj 2016, kommentaren till 34 §, avsnitt 4.2.3).

SVEA HOVRÄTT                        **DOM**                        T 2675-14
Avdelning 02

I rättsfallet NJA 2009 s. 128 sammanfattade Högsta domstolen, med hänvisningar till

motiv och litteratur sin syn på när ett begånget fel skulle anses vara ett uppdragsöver-

skridande eller ett handläggningsfel. Högsta domstolen uttalade också vilka krav som

kan ställas på skiljedomens domskäl. Domstolen anförde:

> Bestämmelsen i 34 § första stycket 2 LSF om uppdragsöverskridande tar sikte på ramarna för
> skiljenämndens materiella prövning av den överlämnade frågan. Ett exempel på uppdragsöver-
> skridande är att skiljenämnden gått utöver parternas yrkanden, ett annat att den grundat sitt
> avgörande på ett rättsfaktum som inte åberopats (prop. 1998/99:35 s. 145; jfr bl.a. Lindskog,
> Skiljeförfarande En kommentar, 2005, s. 960 f.).
>
> Parterna kan även på andra sätt än genom yrkanden och åberopanden begränsa omfattningen av
> skiljenämndens prövning. Exempelvis kan de inskränka skiljenämndens prövning till att gälla
> tillämpningen av ett visst lagrum eller på annat begränsande sätt disponera över förfarandet. Av
> 21 § LSF följer att skiljenämnden då skall följa vad parterna har bestämt, om det inte finns något
> hinder mot det. Åsidosätts en sådan begränsande instruktion från parterna torde i regel ett
> uppdragsöverskridande föreligga (a. prop. s. 146, jfr bl.a. Heuman, Skiljemannarätt, 1999,
> s. 616).
>
> Annorlunda förhåller det sig med instruktioner som tar sikte på hur förfarandet skall genomföras
> inom de ramar som följer av skiljeavtalet, yrkanden, åberopade omständigheter och införd
> bevisning. Följer inte skiljenämnden en sådan instruktion är det normalt fråga om ett
> handläggningsfel enligt 34 § första stycket 6 LSF (se t.ex. Heuman, a.a. s. 652 f. och Lindskog,
> a.a. s. 965 f.). --- Det kan finnas olika anledningar till en föreskrift i skiljeavtalet om att
> skiljedomen skall innehålla domskäl. Parterna kan också, i brist på mer preciserade föreskrifter
> om vad domskälen skall innehålla, ha mer eller mindre långtgående förväntningar på
> skiljenämndens redovisning av sina överväganden. Från vad parterna med eller utan fog
> förväntar sig beträffande motivering och vad som i det hänseendet kan anses vara god sed bland
> skiljemän måste dock skiljas frågan huruvida skiljenämndens domskäl är så bristfälliga, att det
> utgör klandergrund.
>
> En redovisning av tillräckliga domskäl i en skiljedom utgör en rättssäkerhetsgaranti, eftersom
> den tvingar skiljenämnden att analysera rättsfrågorna och bevisningen. Mot värdet av att skälen
> för utgången anges fullständigt får emellertid, när fråga är om klanderbarhet, ställas intresset av
> skiljedomens slutgiltighet. En klanderprövning ger inte utrymme för en materiell överprövning
> av skiljenämndens ställningstaganden. På grund av detta och då en kvalitativ bedömning av
> domskälen skulle ge upphov till stora gränsdragningssvårigheter, kan bara en total avsaknad av
> domskäl eller domskäl som med hänsyn till omständigheterna måste anses vara så ofullständiga
> att det kan likställas med att domskäl saknas medföra att ett handläggningsfel föreligger.

Det är vanligt förekommande att en skiljenämnd i en "procedural order" fattar beslut i

olika processuella frågor och om de närmare formerna för skiljeförfarandet. I många

fall återspeglar en "procedural order" inte en partsöverenskommelse som ger ramen för

skiljenämndens uppdrag utan är i stället ett handläggningsbeslut fattat av skiljenämn-

den inom ramen för uppdraget (jfr Born, International Commercial Arbitration, vol. 2,

2014, s. 2230).

SVEA HOVRÄTT
Avdelning 02

**DOM**

T 2675-14

Enligt 21 § LSF ska skiljemännen handlägga tvisten opartiskt, ändamålsenligt och snabbt och de ska därvid följa vad parterna har bestämt, om det inte finns något hinder mot det. Vid handläggningen ska skiljenämnden alltså iaktta bl.a. den likabehandlings-princip som följer av den nämnda paragrafen, dvs. att parterna i processuella avseen-den ska behandlas lika.

Mot bakgrund av dessa rättsliga utgångspunkter går nu hovrätten över till att pröva de av Kazakstan åberopade grunderna för skiljedomens ogiltighet respektive upphävande.

## 5.3 Frågan om skiljedomens ogiltighet alternativt upphävande

### 5.3.1 Ogiltighet på grund av det bedrägliga upplägget, falsk bevisning, vilseledande information m.m.

Kazakstan har gjort gällande att skiljedomen och det sätt på vilket den tillkommit strider mot ordre public under åberopande av de närmare omständigheter som finns redovisade i avsnitt 3.1.2.1.

Hovrätten gör följande bedömning.

I det aktuella skiljeförfarandet gjorde Investerarna gällande att Kazakstan hade brutit mot sina skyldigheter enligt ECT genom överträdelser av investerarskyddsreglerna i ECT och att Kazakstan därför var skadeståndsskyldigt mot Investerarna, bl.a. avseende den s.k. LPG-anläggningen. Det är ostridigt i målet att anläggningen existerar och genom den här framlagda utredningen står det också klart att investeringar gjorts i denna. Av skiljedomen framgår att Kazakstan bestred Investerarnas anspråk, vilket medförde att skiljenämnden gjorde en materiell prövning av anspråket. Mot denna bak-grund saknas anledning att ifrågasätta att det funnits ett bakomliggande verkligt rätts-förhållande mellan parterna (jfr Högsta domstolens avgörande i NJA 2002 C 45) och ett anspråk som Investerarnas kan, enligt hovrättens bedömning, inte på något sätt jämföras med ett sådant anspråk som en allmän domstol skulle vägra att ta befattning med. Sveriges åtaganden enligt Förenta nationernas konvention mot korruption leder inte till någon annan bedömning. Inte heller avser skiljedomen sådana frågor som i förarbetena framhållits i övrigt som typexempel på när skiljedomen kan anses stri-

**DOM**

dande mot ordre public. Redan med utgångspunkt i dessa slutsatser står det alltså, enligt hovrätten, helt klart att vad Kazakstan gör gällande i denna del inte kan medföra bedömningen att skiljedomen i sig är uppenbart stridande mot grunderna för den svenska rättsordningen och därmed ogiltig.

I skiljeförfarandet åberopade Investerarna bevisning i form av vittnesmål, vittnes-attester och expertrapporter till styrkande av att investeringskostnaden i LPG-anlägg-ningen hade uppgått till det påstådda beloppet. Av skiljedomen framgår emellertid att skiljenämnden grundade sin bedömning i frågan om skadeståndet för LPG-anlägg-ningen på det s.k. indikativa budet som hade lämnats av KMG, se punkterna 1746–1748 i skiljedomen.

Som hovrätten redovisat i det föregående har ordre public-bestämmelsen ett mycket snävt tillämpningsområde och lagstiftaren har också klart tagit ställning för att inte införa någon bestämmelse motsvarande resningsinstitutet i lagen om skiljeförfaranden. Det bör därför, enligt hovrättens bedömning, inte komma i fråga att ogiltigförklara en skiljedom enbart av det skälet att falsk bevisning eller osanna utsagor har förekommit när det inte står klart att dessa har varit direkt avgörande för utgången (jfr Heuman, a.a., s. 600 f.). Det kan dock tänkas situationer när åberopande av falsk utredning kan ha en indirekt påverkan på skiljenämnden vid dess prövning av tvisten. Med hänsyn till det snäva tillämpningsområdet och den restriktivitet som bör råda för att öppna upp för en ny materiell prövning av skiljetvisten inom ramen för en ogiltighetsprocess, bör det dock enligt hovrätten inte komma i fråga att låta en sådan indirekt påverkan på skilje-nämnden medföra att skiljedomen anses ogiltig annat än när det framstår som uppenbart att denna indirekta påverkan har haft avgörande betydelse för utgången i målet.

Eftersom skiljenämnden lade det indikativa budet till grund för sin bedömning har den av Investerarna åberopade bevisningen i form av vittnesmål, vittnesattester och expert-rapporter avseende investeringskostnadens storlek, vilken bevisning Kazakstan gjort gällande var falsk, inte varit av direkt betydelse för utgången. Redan vid detta för-hållande kan denna bevisning i sig, även om den skulle visas vara falsk, enligt hovrätten inte utgöra tillräcklig grund för att anse skiljedomen ogiltig. Enligt hovrätten

**DOM**

är det inte heller uppenbart att denna bevisning, genom en indirekt påverkan av skilje-
nämnden, hade avgörande betydelse för utgången i målet.

När det sedan gäller frågan om det indikativa budet i sig utgjorde falsk bevisning är det
ostridigt att KMG innan skiljeförfarandet inleddes hade lämnat det aktuella budet om
199 miljoner USD avseende LPG-anläggningen. Det indikativa budet är därmed inte i
sig att betrakta som falsk bevisning även om eventuellt felaktiga uppgifter avseende
det belopp som investerats i LPG-anläggningen genom årsredovisningarna för Tristan
Oil, KPM och TNG, varit några av de faktorer som KMG beaktat vid beräkningen av
budets storlek. De påstått falska uppgifterna i årsredovisningarna låg alltså inte direkt
till grund för skiljenämndens bedömning av LPG-anläggningens värde. Mot denna
bakgrund utgjorde inte Investerarnas åberopande av det indikativa budet ett åbero-
pande av falsk bevisning.

Vad slutligen gäller Kazakstans påstående om att Investerarna i skiljeförfarandet, för
skiljenämnden och Kazakstan, undanhöll viss information som skulle ha kunnat
påverka utgången i målet konstaterar hovrätten att det inte kan krävas av en part i ett
dispositivt förfarande, såsom ett skiljeförfarande, att parten ska tillhandahålla mot-
parten information som talar mot partens egen sak. Något utrymme för att anse att
skiljedomen är ogiltig på denna grund finns inte, i synnerhet inte med hänsyn till ordre
public-regelns mycket snäva tillämpningsområde.

Sammanfattningsvis finner hovrätten att ingen av de omständigheter som Kazakstan
har åberopat i denna del, varken var för sig eller tillsammans, är sådana att skiljedomen
eller det sätt på vilket den tillkommit är uppenbart oförenlig med grunderna för
rättsordningen i Sverige.

### 5.3.2 Upphävande på grund av att skiljedomen inte omfattas av ett giltigt skiljeavtal

Kazakstan har i denna del gjort gällande att skiljedomen inte omfattas av ett giltigt
skiljeavtal mellan parterna eftersom Investerarna gav in sin påkallelseskrift endast fem
dagar efter det att KPM:s och TNG:s avtal om utvinningsrättigheter sagts upp och

SVEA HOVRÄTT
Avdelning 02

**DOM**

T 2675-14

därigenom bröt mot den tvingande föreskriften om tre månaders förstegsförhandling i
art. 26 (2) ECT. Kazakstan har här åberopat de närmare omständigheter som finns
redovisade i avsnitt 3.1.2.2.

Hovrätten gör följande bedömning.

För att en skiljenämnd ska vara behörig att pröva en tvist måste det finnas ett giltigt
skiljeavtal mellan de tvistande parterna. Frågan om det i förevarande fall funnits ett
skiljeavtal mellan Investerarna och Kazakstan ska bedömas med utgångspunkt i
art. 26 ECT, vilken artikel Investerarna i sin påkallelse av skiljeförfarande mot
Kazakstan som gavs in till SCC den 26 juli 2010 åberopade som grund för
skiljenämndens behörighet.

ECT är ett multilateralt s.k. investeringsskyddsavtal mellan stater. Art. 26 ECT
innehåller bestämmelser om lösning av tvister mellan en fördragsslutande stat och en
investerare från en annan fördragsslutande stat. Artikeln har i nu relevanta delar
följande lydelse.

> (1) Disputes between a Contracting Party and an Investor of another Contracting Party relating
> to an Investment of the latter in the Area of the former, which concern an alleged breach of an
> obligation of the former under Part III shall, if possible, be settled amicably.
>
> (2) If such disputes cannot be settled according to the provisions of paragraph (1) within a
> period of three months from the date on which either party to the dispute requested amicable
> settlement, the Investor party to the dispute may choose to submit it for resolution:
> (a) to the courts or administrative tribunals of the Contracting Party party to the dispute;
> (b) in accordance with any applicable, previously agreed dispute settlement procedure; or
> (c) in accordance with the following paragraphs of this Article.
>
> (3)(a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its
> unconditional consent to the submission of a dispute to international arbitration or conciliation
> in accordance with the provisions of this Article. […]
>
> (4) In the event that an Investor chooses to submit the dispute for resolution under
> subparagraph (2)(c), the Investor shall further provide its consent in writing for the dispute to
> be submitted to: […]
> (c) an arbitral proceeding under the Arbitration Institute of the Stockholm Chamber of
> Commerce.

Art. 26 ECT innefattar ett erbjudande från var och en av de fördragsslutande staterna
till investerare från en annan fördragsslutande stat, om att lösa vissa tvister enligt ECT
bl.a. genom skiljeförfarande. I ett enskilt fall uppkommer ett skiljeavtal mellan en stat

SVEA HOVRÄTT
Avdelning 02

**DOM**

T 2675-14

och en investerare, som ger en skiljenämnd behörighet att pröva en tvist mellan
parterna, genom att investeraren antar statens erbjudande, vilket sker i form av en
påkallelse av skiljeförfarande mot staten.

Parterna är oense om tolkningen av ECT i frågan om en stats erbjudande om skiljeför-
farande enligt art. 26 ECT innefattar ett villkor om att de förutsättningar som anges i
punkten (2) – dvs. att tvisten mellan parterna inte kunnat lösas inom tre månader från
den dag då någon av dem begärde en uppgörelse i godo – måste vara uppfyllda vid
tidpunkten för en investerares påkallelse av skiljeförfarande mot staten för att ett
skiljeavtal mellan parterna ska uppkomma genom påkallelsen. Frågan är således om
bestämmelsen uppställer ett villkor som måste vara uppfyllt för att en skiljenämnd ska
vara behörig att pröva tvisten.

Eftersom ECT är en traktat mellan stater ska tolkningen av art. 26 ECT ske enligt
art. 31 och 32 i Wienkonventionen om traktaträtten. Art. 31 innehåller en allmän
tolkningsregel som anger att en traktat ska tolkas ärligt i överensstämmelse med den
gängse meningen av traktatens uttryck sedda i sitt sammanhang och mot bakgrund av
traktatens ändamål och syfte. Utgångspunkten för tolkningen är alltid traktatens orda-
lydelse. Är ordalydelsen klar blir den i princip också slutpunkten för tolkningen. En
traktats ändamål och syfte är inte ett självständigt tolkningsmedel, utan en del av den
tolkningsoperation som ska göras enligt art. 31 för att förstå traktatens gängse mening
(jfr Svea hovrätts dom den 18 januari 2016 i mål nr T 9128-14 med där gjorda hän-
visningar).

Enligt art. 32 i Wienkonventionen kan supplementära tolkningsmedel, innefattande
förarbetena till traktaten och omständigheterna vid dess ingående, användas för att få
bekräftelse på en tolkning som gjorts enligt art. 31 eller för att fastställa innebörden,
när en tolkning enligt art. 31 inte undanröjer tvetydigheter eller oklarheter, eller leder
till ett uppenbart orimligt eller oförnuftigt resultat.

I enlighet med det anförda ska tolkningen av art. 26 i ECT göras med utgångspunkt i
bestämmelsens ordalydelse.

SVEA HOVRÄTT
Avdelning 02

**DOM**

T 2675-14

I art. 26 (1) ECT anges inledningsvis att tvister mellan en fördragsslutande stat och en investerare om möjligt ska lösas i samförstånd. Enligt punkten (2) får en investerare, om en tvist inte kan lösas på detta sätt inom tre månader från den dag någon av parterna begärde en uppgörelse i godo, välja att hänskjuta tvisten till olika former av tvistlösning, bl.a. skiljeförfarande enligt de följande punkterna i artikeln.

De berörda bestämmelserna ger enligt sin ordalydelse inte något svar på vad som eventuellt åligger parterna under den uppställda tremånadersfristen, exempelvis i fråga om de försök som ska göras för att nå en samförståndslösning. Det framgår inte heller vad som gäller om det redan innan utgången av tidsfristen står klart att tvisten inte kan lösas i samförstånd inom tre månader. De anförda omständigheterna talar enligt hovrättens mening mot att bestämmelserna är avsedda att uppställa villkor för en skiljenämnds behöriget. Denna tolkning får ytterligare stöd vid beaktande av utformningen av art. 27 ECT som rör tvistlösning mellan två fördragsslutande stater. Enligt denna bestämmelse får en stat hänskjuta en tvist till ett s.k. ad hoc-skiljeförfarande om tvisten inte kunnat lösas inom rimlig tid via diplomatiska kanaler. Svårigheterna förenade med bedömningen av vad som utgör rimlig tid talar för att det inte är fråga om ett villkor för skiljenämndens behörighet. Den omständigheten att bestämmelserna i art. 26 och 27 ECT har en liknande uppbyggnad talar enligt hovrättens mening för att de bör tolkas på samma sätt.

Även om det är tydligt att syftet bakom bestämmelserna i art. 26 (1) och (2) ECT är att parterna ska ha viss tid på sig att nå en samförståndslösning innan ett skiljeförfarande inleds, konstaterar hovrätten att bestämmelserna inte uttryckligen behandlar villkoren för en stats samtycke till skiljeförfarande och förutsättningarna för att ett skiljeavtal ska uppkomma mellan parterna. Denna fråga berörs däremot i punkt (3)(a) som anger att varje fördragsslutande stat ger sitt ovillkorliga samtycke till hänskjutande av en tvist till internationellt skiljeförfarande eller medling i enlighet med bestämmelserna i artikeln. Förbehåll görs endast för de undantagsfall som anges i punkt 3(b) och (c), vilka inte är aktuella i förevarande fall. Hovrätten konstaterar att punkten (3) inte innehåller någon hänvisning till punkten (2) och de förutsättningar som anges där. Enligt hovrättens mening kan hänvisningen till att staten lämnar sitt samtycke till

SVEA HOVRÄTT                           **DOM**                          T 2675-14
Avdelning 02

skiljeförfarande "i enlighet med bestämmelserna i denna artikel" inte tolkas på så sätt
att ytterligare villkor därigenom uppställs för statens samtycke.

Sammanfattningsvis bedömer hovrätten att ordalydelsen och utformningen av art. 26
ECT talar för att en stats samtycke till skiljeförfarande inte innefattar ett villkor om att
de förutsättningar som anges i punkten (2) måste vara uppfyllda vid tidpunkten för en
investerares påkallelse av skiljeförfarande mot staten för att ett skiljeavtal mellan
parterna ska uppkomma genom påkallelsen. Enbart artikelns ordalydelse kan emeller-
tid inte anses ge ett otvetydigt svar på denna fråga.

Hovrätten konstaterar att det i den juridiska litteraturen och bland internationella
skiljenämnder som haft att ta ställning till frågan är en omdiskuterad fråga huruvida
bestämmelser av aktuellt slag – som stadgar att ett skiljeförfarande får inledas först
sedan viss tid förflutit från det att en part begärt en uppgörelse i godo eller från det att
de händelser som gett upphov till tvisten ägt rum – uppställer villkor som måste vara
uppfyllda för att en skiljenämnd ska vara behörig att pröva en tvist, eller inte. I
litteraturen finns stöd för båda uppfattningarna (se sakkunnigutlåtande av Gary B.
Born den 19 augusti 2015, s. 5 f. och 10 samt sakkunnigutlåtande av Dr. Thomas D.
Grant den 14 juli 2015, s. 19 och 39 f., med där gjorda hänvisningar).

Utifrån vad som anförts i de nämnda sakkunnigutlåtandena, konstaterar hovrätten
vidare att det bland internationella skiljenämnder inte verkar finnas någon enhetlig
praxis i frågan om tolkningen av art. 26 ECT och liknande bestämmelser i andra
investeringsskyddsavtal (se sakkunnigutlåtande av Gary B. Born den 19 augusti 2015,
s. 13–20 och sakkunnigutlåtande av Thomas D. Grant den 14 juli 2015, s. 23–38, med
där gjorda hänvisningar). Hovrätten konstaterar emellertid att inget exempel har lyfts
fram i utlåtandena där en skiljenämnd med tillämpning av ECT har avvisat en
investerares talan på den grunden att investeraren inte iakttagit vad som anges i
art. 26(2) ECT. Vidare har endast ett fåtal avgöranden rörande tillämpningen av andra
investeringsskyddsavtal där en investerarens talan har avvisats på den aktuella grunden
lyfts fram. Även om det alltså inte i litteraturen eller i praxis från internationella
skiljenämnder går att hitta en samstämmig syn i frågan om hur art. 26 ECT ska tolkas i
nu aktuellt avseende, synes det enligt hovrättens mening finnas en viss övervikt för

uppfattningen att dylika bestämmelser inte ska anses utgöra villkor för skiljenämndens behörighet.

Eftersom således varken ordalydelsen i och utformningen av art. 26 ECT eller juridisk litteratur och internationell praxis ger erforderligt stöd för tolkningen har hovrätten att beakta även bestämmelsens syfte och ändamål.

Bestämmelserna om internationell tvistlösning i ECT har tillkommit mot bakgrund av den oro som fanns beträffande neutraliteten, kompetensen och effektiviteten hos de nationella domstolarna i vissa av de fördragsslutande staterna (Energy Charter Secretariat, The Energy Charter Treaty: A Reader's Guide, 2002, s. 51). Syftet med att i ECT tillhandahålla alternativa metoder för tvistlösning inför internationella skilje-nämnder var bl.a. att bidra till ökat förtroende hos investerare och främja flödet av investeringar mellan de fördragsslutande staterna (a.a., s. 51). Syftet med tvistlösnings-bestämmelsen i art. 26 ECT får således enligt hovrätten anses vara huvudsakligen att ge investerare möjlighet att lösa tvister enligt ECT med en fördragsslutande stat genom internationellt skiljeförfarande.

Tvistlösning genom skiljeförfarande syftar till att parterna ska få ett snabbt och slutligt avgörande av sin tvist. Dessa intressen har i litteraturen och av internationella skilje-nämnder förts fram som argument mot att uppfatta bestämmelser, som innebär att parterna under viss tid ska ha försökt lösa en tvist i samförstånd innan skiljeförfarande får påkallas, som villkor som måste vara uppfyllda för att en skiljenämnd ska vara behörig att pröva tvisten (se sakkunnigutlåtande av Gary B. Born den 19 augusti 2015, s. 5 f. med där gjorda hänvisningar). I detta sammanhang har framhållits bl.a. att den uppställda tidsfristen ofta har löpt ut när skiljenämnden prövar frågan om sin behörig-het. Om skiljenämnden i en sådan situation skulle avvisa investerarens talan därför att skiljeförfarandet inletts innan tidsfristen hade löpt ut, kan investeraren genast väcka talan på nytt. En avvisning skulle i ett sådant fall endast leda till att förfarandet för-senas i onödan.

Det kan också konstateras att det skulle innebära en omotiverad fördröjning av en investerares möjlighet att få ett anspråk enligt ECT mot en stat prövat genom inter-

SVEA HOVRÄTT
Avdelning 02

**DOM**

T 2675-14

nationellt skiljeförfarande, att kräva att investeraren väntar med att väcka talan under tre månader från det att en begäran om uppgörelse i godo har gjorts när det redan innan tidsfristen har löpt ut står klart att det saknas förutsättningar att nå en förlikning.

Vidare skulle skiljenämndens prövning av sin behörighet kunna få en omfattning som medför att förfarandet fördröjs på ett icke önskvärt sätt. Som exempel kan nämnas att skiljenämnden skulle behöva pröva vilka krav som ska ställas på en parts begäran om en uppgörelse i godo och om det krävs att den part som påkallat skiljeförfarande först har gjort ett ärligt försök att nå en samförståndslösning. Som anförts tidigare ger art. 26 (1) och (2) ECT inget svar på dessa frågor. Frågan om skiljenämndens behörighet kan också komma att hänskjutas till domstol för prövning (jfr 2 § LSF), vilket kan fördröja förfarandet ytterligare.

Även parternas intresse av att en skiljedom innebär ett slutligt avgörande av deras tvist talar mot att betrakta bestämmelser om att ett skiljeförfarande ska föregås av förlik-ningsförhandlingar under viss tid som villkor för skiljenämndens behörighet. I annat fall kan en skiljedom komma att klandras på den aktuella grunden, och senare upp-hävas för det fall den domstol som prövar klandertalan gör en annan bedömning i behörighetsfrågan än den som skiljenämnden har gjort. Vidare kan av samma skäl verkställighet av skiljedomen komma att vägras lång tid efter det att skiljeförfarandet avslutats.

I detta sammanhang konstaterar hovrätten vidare att syftena bakom bestämmelserna i art. 26 (1) och (2) ECT i vart fall delvis kan tillgodoses även efter det att ett skilje-förfarande inletts. Dessa syften får anses vara främst att uppmuntra parterna att försöka nå samförståndslösning i syfte att undvika onödiga tvister, men också att ge parterna tid för förberedelse inför en eventuell tvist. Detta kan åstadkommas genom att skilje-nämnden vilandeförklarar målet under viss tid för att ge parterna möjlighet att föra förlikningsförhandlingar och tid till förberedelse. En sådan hantering framstår som vanligt förekommande bland internationella skiljenämnder och skedde också i skilje-förfarandet mellan Investerarna och Kazakstan. Bestämmelserna blir således inte verkningslösa även om de inte anses uppställa villkor för skiljenämndens behörighet, utan kan hanteras av skiljenämnden inom ramen för förfarandet.

SVEA HOVRÄTT                    **DOM**                    T 2675-14
Avdelning 02

Med hänsyn till det anförda bedömer hovrätten att tungt vägande skäl talar för en tolkning av art. 26 ECT som innebär att de förutsättningar som anges punkten (2) inte utgör villkor som måste vara uppfyllda vid tidpunkten för en investerares påkallelse för att ett skiljeavtal som ger skiljenämnden behörighet att pröva tvisten ska uppkomma genom påkallelsen. De fördragsslutande staterna har enligt punkten (3) lämnat sitt ovillkorliga samtycke till att lösa vissa tvister enligt ECT genom skiljeförfarande. Ytterligare villkor för att ett skiljeavtal ska uppkomma när en investerare accepterar erbjudandet genom att påkalla skiljeförfarande mot staten, bör enligt hovrättens mening inte uppställas utan uttryckligt stöd i bestämmelsernas ordalydelse. Sådant stöd saknas i förevarande fall.

Sammanfattningsvis innebär den tolkning av art. 26 ECT som hovrätten har gjort att ett skiljeavtal mellan Investerarna och Kazakstan, som gav skiljenämnden behörighet att pröva tvisten mellan parterna, uppkom genom Investerarnas påkallelse av skiljeförfarande mot Kazakstan som gavs in till SCC den 26 juli 2010, oavsett om de förutsättningar som anges i punkt (2) var uppfyllda vid tidpunkten för påkallelsen eller inte. Skiljedomen ska därför inte upphävas på den grunden att den inte omfattas av ett giltigt skiljeavtal mellan parterna.

### 5.3.3 Ogiltighet alternativt upphävande på grund av utnämningen av skiljemännen

Kazakstan har i denna del åberopat såväl att skiljedomen är ogiltig enligt 33 § första stycket 2 LSF som att det finns grund för att upphäva domen enligt 34 § första stycket 4 eller 6 LSF. Kazakstan har här åberopat de närmare omständigheter som finns redovisade i avsnitt 3.1.2.3. Sammanfattningsvis har Kazakstan huvudsakligen åberopat att Kazakstan aldrig fick tillfälle att utse en skiljeman, att tidsfristerna för inkommande med svarsskrift var för korta och att Kazakstan aldrig fick tillfälle att yttra sig över utnämningen av Sergei Lebedev. Enligt Kazakstan bröt SCC därmed inte bara mot grunderna för rättsordningen i Sverige utan även mot sina egna regler och lagen om skiljeförfarande. Kazakstan har här också gjort gällande att det i allt fall har förekommit handläggningsfel som har inverkat på utgången i målet. Kazakstan har i

SVEA HOVRÄTT **DOM** T 2675-14
Avdelning 02

anslutning härtill lyft fram att skiljemannen Sergei Lebedev agerat passivt under
skiljeförfarandet.

Investerarna har invänt att det saknas skäl såväl för ogiltigförklaring som upphävande.
De har tillagt *dels* att Kazakstan försuttit sin rätt att göra gällande det eventuella felet,
*dels* att Kazakstan i oktober 2012 enligt vad som antecknats i skiljedomen har uppgett
att det inte fanns några invändningar mot förfarandet.

Hovrätten inleder med att redogöra för vad som framkommit om vad som förevarit hos
SCC vid utnämningen av skiljenämnden då Sergei Lebedev utsågs.

Den 5 augusti 2010 skickade SCC Investerarnas påkallelseskrift med bilagor till
Kazakstan jämte ett föreläggande, avfattat på engelska, att inkomma med ett svar
senast den 26 augusti 2010. I föreläggandet hänvisades till § 5 i SCC:s regler för skilje-
förfarande, vilka också bifogades. Det påpekades också särskilt bl.a. att Kazakstan
skulle yttra sig över Investerarnas förslag att de partsutsedda skiljemännen skulle utse
ordföranden. I påkallelseskriften hade Investerarna begärt att skiljenämnden skulle
bestå av tre skiljemän samt att SCC, enligt § 13 (3) i SCC:s regler, skulle utse skilje-
man om Kazakstan inte utsåg någon skiljeman. Till föreläggandet bifogades också
uppgifter om handläggande tjänstemän vid SCC:s kansli med kontaktuppgifter.
Handlingarna skickades med kurir och anlände till Kazakstan den 9 augusti och togs
emot av Justitiedepartementet två dagar senare. Femton dagar därefter löpte svars-
fristen ut, dock utan att Kazakstan hade låtit sig avhöra. Den 27 augusti skickades en
påminnelse, även denna på engelska, till Kazakstan att inkomma med svaromål enligt
§ 5 i SCC:s regler. Hänvisning gjordes också till föreläggandet den 5 augusti. Vidare
upplystes Kazakstan om att uteblivet svar inte hindrade att skiljeförfarandet gick
vidare. Ny tid för svaromål angavs till den 10 september.

Justitiedepartementet i Kazakstan tog emot påminnelsen den 1 september men
Kazakstan lät sig inte avhöras inom den angivna tidsfristen. Den 13 september begärde
Investerarna att SCC skulle utse skiljeman för Kazakstans räkning. Framställningen
skickades samma dag till Kazakstan. Tio dagar senare utsåg SCC Sergei Lebedev till
skiljeman för Kazakstans räkning. Vidare beslutade SCC att skiljenämndens säte

SVEA HOVRÄTT                           **DOM**                           T 2675-14
Avdelning 02

skulle vara Stockholm. Kazakstan tog emot beslutet den 27 september. Dagen därefter
utsåg SCC Karl-Heinz Böckstiegel att vara nämndens ordförande. Det beslutet togs
emot av Kazakstan den 1 oktober. Drygt en månad därefter, den 8 november, anmälde
Kazakstan sitt ombud i förfarandet, varvid förbehåll gjordes för eventuella invänd-
ningar om jurisdiktion och förfarandet. I ett brev till SCC den 2 december framställdes
invändningar mot såväl förfarandet som utnämningen av skiljemannen Sergei
Lebedev. Den 15 december underrättade SCC parterna och skiljemännen om att
invändningen mot Sergei Lebedev hade avslagits. Den 27 december underrättades SCC
av Kazakstan om att invändningarna mot förfarandet och utnämningen av Sergei
Lebedev vidhölls.

Hovrätten gör följande bedömning.

Av utredningen framgår alltså att Kazakstan fick tillfälle att komma in med svar på
Investerarnas påkallelseskrift och att det då fanns möjlighet för Kazakstan att utse en
skiljeman. I varken föreläggandet eller påminnelsen angavs dock uttryckligen att en
skiljeman skulle utses av Kazakstan. Frågan är om Kazakstan därigenom betogs sin
rätt att utse skiljeman. Kazakstan har hänvisat till att i tidigare mål enligt SCC:s
skiljedomsregler, där Kazakstan har varit part, har uttryckliga förelägganden givits att
utse skiljeman samt upplysning lämnats om konsekvenserna av om så inte sker. Enligt
hovrättens mening är det av betydelse för bedömningen att det i det nu aktuella
föreläggandet hänvisades till § 5 i SCC-reglerna, vilka också bifogades. Enligt § 5 ska
svaranden, i förekommande fall, i sitt yttrande ange namn på och adress till den av
parten utsedda skiljemannen. I påkallelseskriften hade Investerarna begärt att skilje-
nämnden skulle bestå av tre ledamöter och av § 12 i SCC-reglerna följer att nämnden
ska bestå av tre ledamöter om parterna inte kommit överens om annat och om SCC
inte beslutar att tvisten ska avgöras av en ensam skiljeman. I förevarande fall hade
SCC inte fattat något sådant beslut. Genom föreläggandet och de ytterligare handlingar
som bifogades fick Kazakstan, enligt hovrättens bedömning, med tillräcklig tydlighet
information om att skiljenämnden skulle bestå av tre ledamöter och att Kazakstan hade
möjlighet att utse en av dem.

**DOM**

Kazakstan har också invänt att svarsfristen till SCC var alltför kort och att man hade svårt att förstå dokumenten från SCC eftersom de var avfattade på engelska. Vad gäller tidsfristernas längd kan hovrätten konstatera att de inte kan anses ha varit oacceptabelt korta, inte ens sett ur ett internationellt perspektiv. Av särskild betydelse för bedömningen av både språk- och tidsfrågorna är dessutom att Kazakstan över huvud taget inte hörde av sig till SCC med begäran om anstånd. I det första föreläggandet var de handläggande tjänstemännen namngivna med både e-postadresser och internationellt direkttelefonnummer. Av SCC-reglerna framgår också att det finns möjlighet för en part att få förlängd tidsfrist. I sammanhanget ska även beaktas att Kazakstan tidigare varit part i skiljeförfaranden som handlagts på engelska av SCC.

Vad härefter gäller frågan att Kazakstan aldrig fick tillfälle att yttra sig över SCC:s förslag att Sergei Lebedev skulle utnämnas som skiljeman för Kazakstans räkning, kan till en början konstateras att SCC-reglerna inte innehåller någon bestämmelse om en sådan yttrandemöjlighet. Att SCC inte beredde Kazakstan tillfälle att yttra sig över förslaget på skiljeman i en situation då Kazakstan över huvud taget inte hade låtit sig avhöras, kan enligt hovrätten på inget sätt bedömas stå i strid med grunderna för den svenska rättsordningen.

Sammanfattningsvis finner hovrätten att SCC:s förfarande vid utnämningen av skiljemannen Sergei Lebedev inte har varit uppenbart oförenlig med grunderna för rättsordningen i Sverige. Inte heller på denna grund är skiljedomen ogiltig.

Kazakstan har även begärt att skiljedomen ska upphävas på den grunden att utseendet av skiljemännen skedde i strid med skiljeavtalet, dvs. i strid med SCC:s regler, lagen om skiljeförfarande eller att det vid utseendet av skiljmännen förekom något annat fel som påverkat utgången. I denna del har Kazakstan hänfört sig till de rättsliga klandergrunderna i 34 § första stycket 4 eller 6 LSF. Av betydelse i detta sammanhang är också bestämmelsen i paragrafens andra stycke om att part kan förlora sin rätt att åberopa en omständighet genom att delta i förfarandet utan invändning eller genom att på annat sätt få anses ha avstått från att göra invändningen gällande. Regeln i detta stycke bygger på den allmänna principen att en part inte kan göra gällande ett processuellt fel som han tidigare har avstått från att påtala. En missnöjd part måste

SVEA HOVRÄTT          **DOM**          T 2675-14
Avdelning 02

sålunda vara aktiv och protestera för att inte i ett senare skede gå miste om sin rätt att göra invändningen gällande (se bl.a. Heuman, a.a., s. 286). Investerarna har gjort gällande att Kazakstan har förlorat sin klanderrätt enligt bestämmelsen i paragrafens andra stycke. Hovrätten inleder prövningen i denna del med att ta ställning till den frågan.

Inledningsvis kan konstateras att det dröjde knappt tre månader från det att Kazakstan fick del av SCC:s första föreläggande till dess att man yttrade sig första gången. Däremellan hade Kazakstan också fått del av SCC:s handläggningsbeslut angående utnämningen av Sergei Lebedev. Det gick således förhållandevis lång tid innan Kazakstan yttrade sig första gången men då framfördes också invändningarna beträffande bl. a. förfarandet. Någon bestämd tidsfrist inom vilken invändning ska göras följer inte av lagen om skiljeförfarande. Hovrätten har i ett tidigare avgörande (se RH 2009:55 med vidare hänvisningar till bl.a. förarbeten och litteratur) angett att behörighetsinvändningar i skiljeförfaranden ska framföras senast i svaromålet. I doktrinen har, med hänvisning till modellagen, anförts att invändningen ska framföras utan oskäligt uppehåll (se Heuman, a.a., s. 292 f.). Eftersom Kazakstan gjorde för-behåll för eventuella invändningar då ombudet anmälde sig i förfarandet samt då invändningen framfördes när det första yttrandet gavs in till SCC och vidhölls sedan SCC hade avslagit begäran om annan skiljeman i stället för Sergei Lebedev, kan Kazakstan enligt hovrätten inte anses ha förlorat sin rätt att nu påtala angivna even-tuella fel i förfarandet. Enligt hovrättens bedömning visar inte noteringen i punkten 117 i skiljedomen – med hänsyn till Kazakstans förklaring att uttalandet avsåg endast förfarandet inför skiljenämnden – att Kazakstan därigenom avstod från eller åter-kallade invändningen mot utnämningen av skiljemännen.

Hovrätten övergår därför till att pröva frågan om det förekommit sådant fel vid utseendet av Sergei Lebedev som avses i 34 § första stycket 4 LSF. Bestämmelsen tar i första hand sikte på att en skiljeman utsetts i strid med överenskomna kvalifikationer, men även avsteg från procedurregler i skiljeavtal kan omfattas. Av betydelse är också den likabehandlingsprincip som kommer till uttryck i 21 § LSF. Principen gäller inte endast för skiljemännen utan även för förfarandet då dessa utses.

**DOM**

I förevarande fall kan konstateras att det genom skiljeavtalet bestämdes att SCC:s regelverk skulle gälla beträffande förfarandet, däribland utnämningen av skiljemännen. Regler om hur skiljeförfarandet inleds, inklusive utformningen av svar på påkallelseskriften, finns i §§ 2–11 SCC-reglerna. Regler om bl.a. skiljenämndens sammansättning och utseende finns i §§ 12–17 SCC-reglerna. Av särskilt intresse är här § 13 (3) som reglerar det fall då skiljenämnden ska bestå av flera ledamöter. I bestämmelsen anges att "[o]m någon av parterna underlåter att utse en skiljeman eller skiljemän inom den förskrivna tiden ska styrelsen utse skiljemannen eller skiljemännen." Det anges dock inte vilken tidsfrist som ska gälla. § 13 innehåller även bestämmelser om vad som ska beaktas då SCC utser en skiljeman, exempelvis språk och nationalitet. Som redogjorts för i det föregående anges däremot inte att parten också ska beredas tillfälle att yttra sig över vem som ska utses när SCC utser en skiljeman för en parts räkning. Vad som framkommit genom utredningen i målet om SCC:s handläggning visar inte enligt hovrättens bedömning att det i förhållande till SCC-reglerna eller lagen om skiljeförfarande förekommit något fel i handläggningen då skiljeförfarandet inleddes och då Sergei Lebedev utnämndes. Således kan inte heller principen om att parter ska behandlas lika anses ha blivit överträdd, särskilt med hänsyn tagen till att Kazakstan fick del av alla relevanta dokument och bereddes vederbörlig tid för yttrande. Någon grund för att upphäva skiljedomen med hänvisning till 34 § första stycket 4 LSF föreligger således inte i nu aktuellt avseende.

Kazakstan har även gjort gällande att det vid utseendet av skiljemännen förekommit handläggningsfel som inverkat på utgången i målet och att skiljedomen därför i vart fall ska upphävas med stöd av 34 § första stycket 6 LSF. Vilka andra omständigheter i handläggningen som har att göra med skiljemännens utseende, utöver de som åberopats och som hovrätten har haft att pröva i förhållande till bestämmelsen i 34 § första stycket 4 LSF, är inte helt klart för hovrätten. I anslutning till att Kazakstan har angripit förfarandet vid utnämningen av skiljemännen, har Kazakstan dock gjort gällande att Sergei Lebedev intog en mycket passiv roll under skiljeförfarandet och att han därmed inte kunde säkerställa att Kazakstans talan uppfattades på ett korrekt sätt. Enligt hovrätten ger emellertid inte utredningen något stöd åt Kazakstans påstående i denna del. Hovrätten kan därför avslutningsvis konstatera, att Kazakstan inte heller i

SVEA HOVRÄTT                           **DOM**                           T 2675-14
Avdelning 02

övrigt förmått visa att det förekommit något fel i handläggningen hos skiljenämnden
som har sin grund i att Sergei Lebedev utnämndes till skiljeman.

Sammanfattningsvis har alltså hovrätten kommit till den slutsatsen att Kazakstan inte
förmått visa att det vid utnämningen av skiljemännen förekommit några sådana
omständigheter som kan utgöra grund för skiljedomens ogiltighet enligt 33 § första
stycket 2 LSF eller grund för upphävande av domen enligt 34 § första stycket 4 eller 6
LSF.

### 5.3.4 Upphävande på grund av uppdragsöverskridande alternativt handläggningsfel

*5.3.4.1 Taras Khalelovs vittnesutlåtande och vittnesmål*

Kazakstan har här åberopat de närmare omständigheter som finns redovisade i avsnitt
3.1.2.4 under rubriken "Taras Khalelovs vittnesutlåtande och vittnesmål". Kazakstans
påståenden avser den del av skiljeförfarandet och skiljedomen där skiljenämnden
bestämde storleken på skadeståndet, se punkterna 1743–1748 i skiljedomen.

Som hovrätten konstaterat ovan, grundades skiljenämndens bedömning av skade-
ståndets storlek på det s.k. indikativa budet från det statsägda kazakstanska bolaget
KMG. Det förekom emellertid också annan bevisning, bl.a. vittnesutsagor. En utsaga
lämnades på begäran av Kazakstan av direktören Taras Khalelov den 29 januari 2013.
Taras Khalelov hade också lämnat ett skriftligt vittnesutlåtande till skiljenämnden.
Kazakstan har i denna del gjort gällande att skiljenämnden underlät att beakta utsa-
gorna från Taras Khalelov, vilket enligt Kazakstan utgör ett handläggningsfel som
påverkade utgången i målet. Enligt Kazakstan beaktade skiljenämnden dessutom
bevisning, i form av Internet-länkar, som inte var åberopade i målet, vilket enligt
Kazakstan utgör ett uppdragsöverskridande. Dokumenten, som Internet-länkarna
hänvisade till, var avfattade på ryska språket.

Hovrätten gör följande bedömning.

Vad först gäller Taras Khalelovs utsagor framgår av skiljenämndens protokoll från
sammanträdet den 29 januari 2013 om skadeståndsbeloppets storlek att Taras Khalelov

SVEA HOVRÄTT                    **DOM**                    T 2675-14
Avdelning 02

hördes den aktuella dagen och att han också fick tillfälle att kommentera sitt skriftliga utlåtande. Enligt de uppgifter som Taras Khalelov lämnade fanns det inga planer från Kazakstans sida på att färdigställa LPG-anläggningen och några sådana arbeten hade inte heller utförts. De uppgifter som Taras Khalelov lämnade avhandlades enligt hovrättens bedömning av skiljenämnden i punkten 1745 i skiljedomen där det hänvisas till "Respondent's and their experts' conclusion", vilka enligt vad som anges inte övertygade skiljenämnden. Visserligen noterade skiljenämnden i punkten 157 i skiljedomen inte att Taras Khalelov hördes den aktuella dagen. Det utgör dock inte något handläggningsfel i den mening som avses i 34 § första stycket 6 LSF och förbiseendet kan inte heller leda till slutsatsen att det är visat att skiljenämnden underlät att beakta Taras Khalelovs vittnesmål vid sin bedömning. Det saknas också stöd i utredningen för att Investerarna hade frånfallit påståendet att Kazakstan hade planer på att färdigställa LPG-anläggningen.

Beträffande Internet-länkarna framgår vidare av punkten 1745 i skiljedomen att skiljenämnden fäste avseende vid dokument som kunnat studeras via de aktuella länkarna. Länkarna var emellertid hänvisade till och beskrivna i FTI-rapporten, vilken var åberopad av Investerarna i skiljeförfarandet. Dokumenten ska enligt Investerarna ha varit utskrivna och bifogade FTI-rapporten. I punkten 1745 hänvisas också uttryckligen till de ställen i FTI-rapporten där webb-adresserna till länkarna fanns angivna. Det saknas således fog för påståendet att nämnden beaktat bevisning som inte var åberopad.

De aktuella webb-adresserna var dock i FTI-rapporten skrivna på ryska språket och de dokument som adresserna hänvisade till var också avfattade på ryska. Kazakstan har gjort gällande att det har utgjort ett procedurfel i skiljeförfarandet att åberopa dokument som inte var översatta till engelska, vilket var ett krav enligt "Procedural Order No. 1". Mot bakgrund av vad hovrätten redovisat i de rättsliga utgångspunkterna för prövningen kan det normalt inte bli fråga om ett uppdragsöverskridande när skiljenämnden åsidosätter vad som fastlagts i "Procedural orders". Frågan blir därmed om det förekommit ett handläggningsfel. Hovrätten konstaterar att det av punkten 1745 i skiljedomen framgår att skiljenämnden också grundade sin bedömning på vad som anges i punkten 7.7 av FTI-rapporten, vilken var avfattad på engelska. Kazakstan har därför i

SVEA HOVRÄTT                           **DOM**                           T 2675-14
Avdelning 02

vart fall inte förmått göra sannolikt att det eventuella handläggningsfel som skilje-
nämndens hänvisning till de ryska Internet-länkarna kan ha utgjort har påverkat målets
utgång.

Sammanfattningsvis har alltså hovrätten funnit att Kazakstan i denna del inte förmått
visa att det förekommit något uppdragsöverskridande eller handläggningsfel som kan
utgöra grund för upphävande av skiljedomen.

*5.3.4.2 Kazakstans sakkunnig- och vittnesbevisning*

Kazakstan har här åberopat de närmare omständigheter som finns redovisade i avsnitt
3.1.2.4 under rubriken "Kazakstans sakkunnig- och vittnesbevisning". Kazakstan har
gjort gällande att skiljenämnden underlåtit att beakta stora delar av den sakkunnig- och
vittnesbevisning som Kazakstan hade åberopat i ett flertal frågor. Kazakstan har även
gjort gällande att det i vissa delar inte framgår av domen hur skiljenämnden gjorde sina
bedömningar eller att skiljenämndens bedömningar är mycket kortfattade.

Hovrätten gör följande bedömning.

Vad först gäller frågan om skiljenämnden beaktade utlåtanden från Anatoly Didenko,
Kadirbek Latifov och Salamat Baymaganbetov angående innehållet i kazakstansk rätt
om klassificering av pipelines, är parterna eniga om att utlåtandena var åberopade av
Kazakstan i skiljeförfarandet. Att skiljenämnden i sina domskäl inte redovisade vart
och ett av de åberopade bevisen eller underlät att omnämna ett visst bevis visar i sig
inte att skiljenämnden inte tog del av och vid sin prövning beaktade den åberopade
bevisningen. Än mindre kan, av det förhållandet att skiljenämnden gjorde en annan
bedömning än den som en part anser framgår av ett visst bevis, den slutsatsen dras att
skiljenämnden vid sin prövning inte beaktade beviset. Enligt hovrättens mening ger
utredningen inte stöd åt Kazakstans påstående att skiljenämnden underlät att beakta
den nu angivna bevisningen vid sin prövning. Det är inte heller visat att skiljenämnden
tillämpade annan rätt än kazakstansk rätt i frågan.

SVEA HOVRÄTT
Avdelning 02

**DOM**

T 2675-14

Beträffande utlåtandet av Kulyash Ilyassova om innehållet i kazakstansk civilrätt är parterna eniga om att det åberopades av Kazakstan. Utlåtandet är beaktat i punkterna 993 och 1368 i skiljedomen. De omständigheter som Kazakstan fört fram till grund för sin talan i denna del utgör inte tillräckligt stöd för att det ska anses visat att ett uppdragsöverskridande eller ett klanderbart handläggningsfel förekommit.

Angående utlåtandena av Tomas Balco och Nurlan Rahimgaliev om innehållet i kazakstansk skatterätt, framgår av såväl skiljedomen som av åberopade protokoll från skiljenämndens sammanträde om skadeståndets storlek att skiljenämnden tagit del av utlåtandena. Som hovrätten angivit ovan behöver den omständigheten att skiljenämnden inte omnämnt viss utredning i domskälen inte betyda att skiljenämnden inte hade tagit del av och beaktat den. Att utredningen inte uttryckligen omnämns i domskälen kan nämligen lika gärna avspegla skiljenämndens aktiva val av hur skiljenämnden ansåg att domskälen bör redovisas i den aktuella frågan. Enbart den omständigheten att viss utredning inte omnämns i domskälen visar alltså inte att skiljenämnden inte beaktade den vid sin prövning. Inte heller i denna del har Kazakstan alltså visat att det förekommit uppdragsöverskridande eller handläggningsfel.

Kazakstan har vidare gjort gällande att skiljenämnden inte beaktade ett utlåtande från revisionsfirman Deloitte. Av punkten 1456 i skiljedomen framgår emellertid att skiljenämnden beaktade utlåtandet, men däremot inte delade den slutsats som dras i utlåtandet om företagen KPM:s och TNG:s finansiella ställning. Inte heller i denna del är det således visat att något uppdragsöverskridande eller klanderbart handläggningsfel förekommit.

Slutligen har Kazakstan påstått att skiljenämnden utan att motivera det bortsåg från de geologiska experter vid konsultfirman Gaffney, Cline & Associates som Kazakstan hade åberopat. Kazakstan har också gjort gällande att skiljenämnden behandlade den åberopade utredningen i alltför knapphändiga domskäl. Av protokoll från skiljenämndens sammanträde om skadeståndets storlek framgår att experterna från Gaffney, Cline & Associates hördes under skiljeförfarandet. I punkten 1624 i skiljedomen redovisade skiljenämnden utgångspunkterna för sin bedömning av de olika expertutlåtandena. I den följande punkten övervägde skiljenämnden de olika expertutlåtandena varefter

SVEA HOVRÄTT                           **DOM**                        T 2675-14
Avdelning 02

skiljenämnden tog ett slutligt ställningstagande. Skiljenämndens utformning av dom-
skälen i de nu påtalade delarna är långt i från så bristfälliga att skälens utformning
skulle kunna utgöra ett handläggningsfel (se NJA 2009 s. 128). Inte heller är det visat
att det förekommit något uppdragsöverskridande (se nämnda rättsfall).

Sammanfattningsvis har hovrätten även i denna del funnit att Kazakstan inte förmått
visa att det förekommit något uppdragsöverskridande eller handläggningsfel som kan
utgöra grund för upphävande av skiljedomen.

### 5.3.4.3 Beaktande av invändningar avseende avdrag på skadeståndet m.m.

Kazakstan har i denna del åberopat de närmare omständigheter som finns redovisade i
avsnitt 3.1.2.4 under rubriken "Ej beaktat invändningar avseende avdrag på skade-
ståndet". Kazakstan har här gjort gällande att skiljenämnden inte beaktade vissa
invändningar som Kazakstan gjorde angående belopp som skulle avräknas från
skadeståndsbeloppet och om skadeståndets storlek. Kazakstan har även gjort gällande
att domskälen i denna del är så bristfälliga att det kan likställas med att domskäl
saknas.

Hovrätten gör följande bedömning.

Vad först gäller frågan om avräkning av intäkter som Investerarna skulle ha haft efter
den värderingstidpunkt som bestämdes av skiljenämnden, framgår att skiljenämnden
tog ställning i denna fråga i punkterna 1530 och 1531 i skiljedomen. Vidare framgår att
skiljenämnden redovisade *dels* i punkten 1542 vilka avräkningar som enligt skilje-
nämndens bedömning skulle göras från skadeståndet, *dels* i punkten 1539 sina ställ-
ningstaganden avseende Vitol och JOA-avtalet. Dessa ställningstaganden kan, enligt
hovrättens bedömning, inte förstås på annat sätt än att de har relevans även för den
invändning från Kazakstans sida som redovisas under punkterna 1738–1749 i skilje-
domen. Kazakstan har således inte fog för sina påståenden om att skiljenämnden inte
beaktade Kazakstans gjorda, här aktuella, invändningar.

SVEA HOVRÄTT
Avdelning 02

**DOM**

T 2675-14

Med beaktande av de utgångspunkter som Högsta domstolen angett i NJA 2009 s. 128 är skiljedomens skäl, enligt hovrättens bedömning, inte heller här så bristfälliga att domskälens utformning skulle kunna utgöra ett handläggningsfel.

Kazakstan har således inte heller i denna del visat att det förekommit uppdragsöver-skridande eller handläggningsfel.

*5.3.4.4 Övriga påstådda uppdragsöverskridanden och handläggningsfel*

Kazakstan har också gjort gällande att skiljenämnden på ett ytterligare antal angivna punkter överskred sitt uppdrag och begick handläggningsfel genom att underlåta att beakta parternas åberopanden och tillämplig lag. Kazakstan har i dessa delar åberopat de närmare omständigheter som finns redovisade i avsnitt 3.1.2.5. Kazakstans klander-talan i denna del rör nämndens hantering av frågor kring bolaget KazAzots roll, pressmeddelandet från Interfax, finanspolisens agerande avseende klassificeringen av rörledningar, de s.k. Tristanobligationerna och val av värderingsmetod avseende Tolkyn- och Borankolfälten.

KazAzot

Kazakstan har gjort gällande att skiljenämndens bedömning i punkterna 1094 och 1418 i skiljedomen grundades på den inte åberopade omständigheten att KMG och presi-denten Nursultan Nazarbayevs svärson, Timur Kulibayev, tillika ordförande för KMG, hade påverkan på KazAzot. Kazakstan har hävdat att omständigheten visserligen hade åberopats av Investerarna men endast för frågan om prissättningen av gas. Kazakstan har även gjort gällande att skiljenämnden med avseende på bedömningen av det s.k. trepartsavtalet underlät att tillämpa viss internationell rätt på området. Kazakstan har i dessa delar hänvisat till punkterna 1094 och 1418 i skiljedomen.

Hovrätten gör följande bedömning.

Hovrätten konstaterar att det av utredningen i målet, bl.a. punkten 674 i skiljedomen, framgår att relationen mellan KMG, Timur Kulibayev och KazAzot hade förts in i målet av Investerarna. I punkten 674 anges bl.a. att "Claimants' first allegation that

**DOM**

KazAzot was controlled by Mr. Kulibayev was made at the Hearing on Jurisdiction and Liability." Enligt hovrättens bedömning har Kazakstan inte förmått visa att Investerarna skulle ha begränsat sitt åberopande av omständigheten på det sätt som Kazakstan har gjort gällande, dvs. endast med avseende på prissättningen av gas. Det förhållandet att omständigheten inte omnämns i reciten under avsnitten J och K i skiljedomen såsom i dessa delar särskilt åberopad av Investerarna påverkar inte bedömningen i förevarande fall. Enligt hovrättens mening saknas det därför fog för påståendet att skiljenämnden skulle ha beaktat omständigheten utan att den hade åberopats av part. Något uppdragsöverskridande eller klanderbart handläggningsfel har således inte visats i denna del.

Kazakstan har inte närmare utvecklat påståendet om att skiljenämnden skulle ha underlåtit att tillämpa viss internationell rätt om statligt ansvar och hur denna underlåtenhet skulle ha inverkat på målets utgång. De här aktuella avsnitten i skiljedomen, punkterna 1094 och 1418, behandlar i allt väsentligt skiljenämndens bevisvärdering och vilka slutsatser som skiljenämnden ansett sig kunnat dra utifrån vad man funnit utrett i målet. Det har inte visats i målet att skiljenämndens bedömning skulle ha innefattat någon oriktig rättstillämpning som skulle kunna utgöra ett uppdragsöverskridande eller ett klanderbart handläggningsfel.

Pressmeddelandet från Interfax

Även i denna fråga har Kazakstan anfört att skiljenämnden grundade sin bedömning på en omständighet som inte var åberopad. Enligt Kazakstan ska skiljenämnden dessutom ha utgått från att omständigheten var ostridig. Kazakstan har i denna del hänvisat till punkten 994 i skiljedomen.

Hovrätten gör följande bedömning.

Enligt vad skiljenämnden antecknat i det aktuella avsnittet av domen, var parterna oense om på vilket sätt Interfax hade fått tillgång till informationen och huruvida Kazakstan hade haft något med detta att göra. Skiljenämnden gjorde därefter, i denna tvistiga fråga, en samlad bedömning av vad som föranledde publiceringen. Skiljenämnden angav här i sina skäl att "Even if Claimants have not shown that the Republic

SVEA HOVRÄTT                                    **DOM**                                    T 2675-14
Avdelning 02

was in any way involved in the publication of the INTERFAX item, it is obvious and
not disputed by Respondent, that it was Respondent's actions starting in October 2008
that caused the publication". Skiljenämnden gjorde således en sedvanlig bevisvärde-
ring av den nu aktuella omständigheten inom ramen för Investerarnas övergripande på-
stående om att KPM och TNG var utsatta för en trakasserikampanj från Kazakstans
sida. Det går enligt hovrätten inte heller att dra någon annan slutsats av domskälen i
denna del än att skiljenämnden, förutom konstaterandet att Kazakstan inte hade gjort
någon invändning, gjorde en egen prövning av omständigheten. Inte heller i denna del
har Kazakstan alltså förmått visa att skiljenämnden har överskridit sitt uppdrag eller att
det annars skulle ha förekommit något klanderbart handläggningsfel.

Finanspolisens klassificering av rörledningar

Kazakstan har även i denna fråga anfört att skiljenämnden grundade sin bedömning på
en omständighet som inte var åberopad. Enligt Kazakstan ska skiljenämnden även i
detta fall dessutom felaktigt ha utgått från att omständigheten var medgiven av
Kazakstan. Kazakstan har i denna del hänvisat till punkten 990 i skiljedomen.

Hovrätten gör följande bedömning.

Genom utredningen i målet har framkommit följande. Av Investerarnas yttrande till
skiljenämnden den 7 maj 2012 framgår att Investerarna åberopade att finanspolisen
hade tillskrivit Kazakstans vice premiärminister i frågan om hur rörledningarna skulle
klassificeras. Kazakstan bekräftade skrivelsen och dess innehåll i yttrande till skilje-
nämnden den 13 augusti 2012 men argumenterade angående tolkningen av brevet.
Skiljenämnden beskrev kortfattat den aktuella skrivelsen i punkten 343 i skiljedomen
och hänvisade där till parternas inlagor.

Enligt hovrättens bedömning är det således helt klart att Investerarna hade åberopat
den ifrågasatta omständigheten. Skiljenämndens bedömning i frågan redovisas i
punkten 990 i skiljedomen. Av domskälen framgår klart att skiljenämnden inte lade
något medgivande från Kazakstans sida till grund för sin bedömning i sak. Däremot
framgår att skiljenämnden instämde i den bedömning som Kazakstans tidigare hade
gett uttryck för under skiljeförfarandet i denna fråga. Skiljenämndens bedömning av

SVEA HOVRÄTT           **DOM**           T 2675-14
Avdelning 02

utredningen i denna del utgör inte ett klanderbart handläggningsfel. Kazakstan har

alltså inte heller i denna del visat att det förekommit något uppdragsöverskridande eller

handläggningsfel.

Tristanobligationerna

Kazakstans klandergrund i denna del rör skiljenämndens hantering och bedömning av

frågan om avdrag för en obligationsskuld till Tristan Oil vid värderingen av företagen

KPM och TNG. Kazakstan har här gjort gällande att skiljenämnden grundade sitt

beslut på ett påstått medgivande från Kazakstan, trots att medgivande saknades.

Kazakstan har också gjort gällande att skiljenämnden inte beaktade parternas rättsliga

argumentation. Kazakstan har i denna del hänvisat till punkterna 1536–1537 och

1768–1771 i skiljedomen.

Hovrätten gör följande bedömning.

I punkterna 1536 och 1769 i skiljedomen, vilka punkter är likalydande, konstaterade

skiljenämnden att Kazakstan möjligen återtagit en tidigare ståndpunkt i frågan. Skilje-

nämnden anslöt sig dock i sin bedömning till den ståndpunkt som Kazakstan tidigare

gett uttryck för under skiljeförfarandet. I de efterföljande punkterna 1537 respektive

1770, vilka också är likalydande, utvecklade skiljenämnden sin bedömning närmare.

Skiljenämnden lade alltså inte något medgivande till grund för sitt beslut i denna fråga

utan gjorde en bedömning av utredningen och beaktade de olika positioner som inta-

gits av Kazakstan i frågan. Skiljenämndens bedömning i frågan om avdrag skulle göras

med anledning av obligationerna utgör varken uppdragsöverskridande eller klanderbart

handläggningsfel. Detsamma gäller för påståendet att skiljenämnden inte beaktade par-

ternas rättsliga argumentering i frågan. Inte heller i denna del har Kazakstan således

visat att det förekommit något uppdragsöverskridande eller handläggningsfel.

Värderingsmetod

Kazakstans talan i denna del rör skiljenämndens bedömning i frågan om val av metod

för beräkning av skadestånd avseende Borankol- och Tolkynfälten. Kazakstan har gjort

gällande att skiljenämnden felaktigt utgick från ett visst medgivande av Kazakstan.

Kazakstan har här hänvisat till punkten 1625 i skiljedomen.

SVEA HOVRÄTT                    **DOM**                    T 2675-14
Avdelning 02

Hovrätten gör följande bedömning.

Av den aktuella punkten i skiljedomen framgår att skiljenämnden inledningsvis
bedömde att det beräkningsunderlag som Investerarna presenterat var mindre över-
tygande och att Investerarna därför inte hade uppfyllt sin bevisbörda. Skiljenämnden
ansåg emellertid, enligt vad som anges i nämnda punkt, att eftersom Investerarna hade
orsakats skada, kunde beräkningen av skadeståndets storlek göras med utgångspunkt i
den alternativa skadeberäkningsmetod som Kazakstan hade presenterat i målet.
Skiljenämnden hänvisade också till den inlaga där Kazakstan angett metoden med
hänvisning till olika konsultrapporter. Skiljenämnden gjorde alltså i frågan om
skadeståndets storlek en bedömning av parternas talan och åberopad bevisning samt
tog slutligt ställning till vilken beräkningsmetod som bör användas för bestämmande
av skadeståndets storlek. En sådan bedömning utgör varken uppdragsöverskridande
eller klanderbart handläggningsfel. Kazakstan har alltså inte heller i denna del visat att
det förekommit uppdragsöverskridande eller handläggningsfel.

### 5.3.5 Hovrättens sammanfattande slutsatser och sammantagna bedömning av Kazakstans talan

Hovrättens bedömning ovan av de grunder som Kazakstan har åberopat till stöd för sin
talan innebär följande.

Hovrätten har inte i något avseende funnit att det förelegat sådana omständigheter som
skulle kunna utgöra grund för skiljedomens ogiltighet enligt bestämmelsen i 33 §
första stycket 2 LSF. Detta gäller såväl Kazakstans påståenden om det s.k. bedrägliga
upplägget, falsk bevisning och vilseledande information under skiljeförfarandet som
påståendena om brister i SCC:s hantering vid utnämningen av skiljemännen. (Se
avsnitt 5.3.1 och 5.3.3 i domen.)

Vidare har hovrätten, efter en tolkning av bestämmelserna om förstegsförhandlingar i
art. 26 ECT, funnit att ett giltigt skiljeavtal uppkommit mellan parterna genom

SVEA HOVRÄTT
Avdelning 02

**DOM**

T 2675-14

Investerarnas påkallelseskrift oavsett om det som föreskrivs om förstegsförhandlingar i den nu nämnda artikeln har följts eller inte. (Se avsnitt 5.3.2 i domen.)

Hovrätten har också funnit att det inte förekommit några brister eller handläggningsfel vid utnämningen av skiljemännen (se avsnitt 5.3.3 i domen).

Slutligen har hovrätten funnit att Kazakstan inte förmått visa att i övrigt påstådda uppdragsöverskridanden och handläggningsfel förekommit (se avsnitt 5.3.4 i domen). Därmed kan inte heller en sammantagen bedömning av skiljenämndens handlande, på det sätt som Kazakstan gjort gällande, leda till slutsatsen att det förekommit uppdragsöverskridande och handläggningsfel.

Kazakstans talan ska därför lämnas helt utan bifall.

## 5.4 Rättegångskostnader

### 5.4.1 Ersättningsskyldig part

Hovrättens bedömning av Kazakstans talan innebär att Kazakstan, som tappande part, ska ersätta Investerarna för deras rättegångskostnad (se 18 kap. 1 § rättegångsbalken).

### 5.4.2 Investerarnas kostnadsyrkande

Investerarna har yrkat ersättning med 16 957 429 SEK och med 1 509 602,59 USD. Av ersättningsyrkandet i svenska kronor avser 15 879 409 SEK ombudsarvode, 578 020 SEK utlägg och 500 000 SEK parts eget arbete. Av yrkandet i amerikanska dollar avser 1 106 317,25 USD utlägg avseende ersättning för biträde av advokater vid advokatfirman King & Spalding och 403 285,34 USD utlägg som King & Spalding har haft för biträde åt ombuden i målet här.

Kazakstan har överlämnat till hovrätten att pröva skäligheten av yrkat belopp och har redovisat invändningar beträffande ersättningen avseende parts eget arbete, arvode för biträde av advokater från King & Spalding och King & Spaldings utlägg.

SVEA HOVRÄTT
Avdelning 02
**DOM**
T 2675-14

**5.4.3 Ersättning för parts eget arbete**

Vad först gäller den begärda ersättningen för parts eget arbete har Investerarna anfört att den avser sammanlagt 1 000 timmars arbete som utförts av anställda på juridik- och ekonomiavdelningarna vid Ascom. Arbetet har, enligt Investerarna, bestått bl.a. i framtagande av bevismaterial. Kazakstan har invänt att det, med hänsyn till innehållet i och utformningen av Investerarnas yttranden och deras processföring i övrigt, är osannolikt att så många timmar har arbetats, särskilt som Kazakstans frågor och önskemål om klargöranden och information inte har besvarats eller tillmötesgåtts av Investerarna. Kazakstan har även påpekat att inga anställda eller företrädare för Ascom har varit närvarande under processen i hovrätten.

Hovrätten gör följande bedömning.

Hovrätten konstaterar att Investerarna är svarandeparter i målet och att de därmed haft att förhålla sig till Kazakstans utformning av talan och processföring samt att det arbete som Investerarna i sin egenskap av svarandeparter behövt lägga ned på målet för att ta tillvara sin rätt inte nödvändigtvis behöver avspegla sig i deras inlagor och processföring. Av betydelse för bedömningen är däremot Kazakstans utformning av käromålet. Kazakstans talan har omfattat bl.a. påståenden om ett stort antal omständigheter avseende komplexa ekonomiska förhållanden. Hovrätten bedömer mot denna bakgrund att det inte finns skäl att ifrågasätta att det påstådda arbetet av anställda hos Ascom har utförts och att det också har varit motiverat för att ta tillvara Ascoms och övriga svarandeparters rätt. Det yrkade beloppets storlek får anses skäligt.

**5.4.4 Ersättning för King & Spaldings biträde**

Investerarna har anfört att advokaterna vid King & Spalding har biträtt de svenska ombuden under hela hovrättsprocessen och att det har varit motiverat eftersom advokaterna vid King & Spalding varit insatta i såväl här aktuellt skiljeförfarande som JOA- och Montvalemålen. Kazakstan har invänt att yrkat belopp synes vara högt med hänsyn främst till att advokaten Kenneth Fleuriet i sitt vittnesförhör angav att hans eget biträde åt de svenska ombuden varit blygsamt.

SVEA HOVRÄTT                       **DOM**                       T 2675-14
Avdelning 02

Hovrätten gör följande bedömning.

Hovrätten konstaterar att det aktuella skiljeförfarandet varit synnerligen omfattande. Vidare har även Kazakstans ogiltighets- och klandertalan i hovrätten varit av betydande omfattning och avsett ett stort antal förhållanden från skiljeförfarandet. Eftersom de svenska ombuden inte var ombud åt Investerarna i skiljeförfarandet saknas det enligt hovrätten anledning att ifrågasätta att det för de svenska ombuden funnits ett behov av att få ingående information om vad som förekommit i skiljeförfarandet för att kunna bemöta Kazakstans talan. Nämnda förhållanden motiverar väl enligt hovrättens bedömning biträdet från advokaterna vid King & Spalding. Hovrätten noterar i sammanhanget att den begärda ersättning i denna del inte avser enbart biträde av Kenneth Fleuriet och det saknas anledning att ifrågasätt att biträde har lämnats i angiven utsträckning. Det yrkade beloppets storlek får anses skäligt.

### 5.4.5 Ersättning för King & Spaldings utlägg

Enligt Investerarnas kostnadsräkning avser King & Spaldings utlägg – förutom bl.a. kost, logi och resor – väsentligen ersättning åt experten Gary B. Born med 347 745,28 USD. Investerarna har uppgett att dennes utlåtanden även har åberopats i utländska verkställighetsförfaranden beträffande skiljedomen men att yrkandet är begränsat enbart till kostnader som är direkt hänförliga till klandermålet. Kazakstan har invänt att den begärda ersättningen framstår som hög mot bakgrund av att Gary B. Borns arbete rimligen bara kan avse arbete med det ena av hans två sakkunnigutlåtanden, förberedelse inför och inställelse vid huvudförhandlingen samt vissa ytterligare kontakter.

Hovrätten gör följande bedömning.

Den begärda ersättningen för Gary B. Borns medverkan är mycket hög, men hovrätten konstaterar att även Kazakstan har haft utlägg för arvoden åt experter uppgående till avsevärda belopp. Hovrätten saknar anledning att ifrågasätta Investerarnas uppgift att den begärda ersättningen hänför sig till kostnader för Gary B. Borns medverkan i

SVEA HOVRÄTT                           **DOM**                        T 2675-14
Avdelning 02

ogiltighets- och klandermålet och även i denna del bedömer hovrätten den begärda
ersättningens storlek som skälig.

### 5.4.6 Investerarnas ersättningsyrkande i övrigt

Investerarnas ersättningsyrkande avser i övrigt ersättning till de svenska ombuden
jämte utlägg. Kazakstan har inte framfört några preciserade invändningar mot dessa
ersättningsposter men överlämnat skälighetsbedömningen av begärda belopp till
hovrätten.

Hovrätten gör följande bedömning.

Även i de här aktuella delarna uppgår Investerarnas ersättningsyrkande till mycket
stora belopp. Med hänsyn till målets omfattning och vid en jämförelse med det
rättegångskostnadsanspråk som Kazakstan framställt i hovrätten, vilket uppgår till
närmare 60 miljoner SEK, bedömer hovrätten att skäligheten av det av Investerarna
yrkade beloppet får godtas.

### 5.4.7 Sammanfattande bedömning

Hovrättens bedömning i det föregående innebär att Kazakstan ska förpliktas betala
ersättning för Investerarnas rättegångskostnad med yrkat belopp jämte ränta.

Investerarna har inte närmare angett hur den yrkade rättegångskostnaden fördelar sig
mellan svarandena. Av den lämnade preciseringen av Investerarnas kostnadsyrkande
framgår att den ersättning som avser parts eget arbete i sin helhet är hänförlig till
Ascom. Ersättningsyrkandet i den delen får därför anses framställt för Ascoms räkning.
När det sedan gäller ersättningsyrkandet i övrigt får yrkat belopp, i avsaknad av
närmare precisering, anses belöpa på Investerarna med en fjärdedel vardera.

SVEA HOVRÄTT             **DOM**             T 2675-14
Avdelning 02

## 5.5 Överklagande

Enligt 43 § andra stycket LSF får hovrättens dom överklagas bara om rätten anser det
vara av vikt för ledningen av rättstillämpningen att överklagandet prövas av Högsta
domstolen. Hovrätten anser att det inte finns skäl att tillåta att avgörandet överklagas.

**Hovrättens avgörande får inte överklagas.**

I avgörandet har deltagit hovrättsråden Ulrika Beergrehn, Magnus Ulriksson (referent
och skiljaktig) och Kerstin Norman.

Skiljaktig mening, se nästa sida.

**Skiljaktig mening**

Magnus Ulriksson är skiljaktig i fråga om motiveringen till att det uppkommit ett
giltigt skiljeavtal mellan parterna och anför:

Domsrätt för en skiljenämnd att avgöra en tvist uppkommer vanligen genom att
parterna i förväg genom avtal har kommit överens om att eventuella tvister ska lösas
på det sättet. I förevarande fall saknas ett sådant avtal. Skiljeförfarandet inleddes
genom att Investerarna tillskrev skiljedomsinstitutet vid Stockholms handelskammare
(SCC) och åberopade, med uttryckligt samtycke, art. 26, punkt 4 c, ECT som grund för
förfarandet. Frågan är om det härigenom uppkom ett skiljeavtal mellan parterna i
målet.

ECT är ett internationellt traktat mellan stater och syftar till att främja ett långsiktigt
samarbete inom energisektorn (art. 2 ECT). För de olika slags tvister som anges i
traktatet erbjuder staterna flera olika sätt för lösning av uppkomna frågor. Vad gäller
tvister mellan parterna i traktatet anges i art. 27 att sådana tvister i första hand ska lösas
genom diplomatiska kontakter och om det inte lyckas inom en rimlig tidsperiod kan
tvisten hänskjutas till en *ad hoc* – tribunal. För tvister mellan en stat och en investerare
från en annan stat som är part i avtalet anges i art. 26 olika sätt för lösning av tvisten,
bl a skiljeförfarande enligt SCC:s regelverk. Om investeraren agerar i enlighet med vad
som anges i artikeln uppkommer således det avtal som gör den utsedda skiljenämnden
behörig att avgöra tvisten.

Bestämmelserna i artikeln är uppställda på så sätt att det i första punkten anges att
tvister i första hand ska lösas genom förlikning ("be settled amicably"). I den andra
punkten anges att om tvister inte kan lösas på det sättet inom tre månader från det att
framställan gjordes om förlikning, kan investeraren välja bland de olika mekanismerna
som förutom skiljeförfarande erbjuder process inför värdlandets nationella domstolar.
Beträffande alternativet med skiljeförfarande ger de kontraktslutande parterna sitt
ovillkorliga samtycke i enlighet med vad som anges i artikeln. Investeraren som väljer
skiljeförfarande ska i sin framställan också lämna sitt uttryckliga samtycke. Denna
beskrivning av förfarandet framgår, utöver av avtalstexten, även av den läsanvisning

SVEA HOVRÄTT                          **DOM**                          T 2675-14
Avdelning 02

("A reader's guide") som ges ut av sekretariatet för administrationen av ECT (se även Kaj Hobér i *Journal of International Dispute Settlement*, vol 1. 2010, pp. 153 – 190). Även Investerarna synes ha haft uppfattningen att förlikningsförhandlingar ska ha ägt rum då skiljeförfarandet påkallas. I punkt 108 av påkallelseskriften anges att "[a]rticle 26(2) of the ECT provides for a three month notice before the commencement of arbitration. This requirement is satisfied." Enligt min mening kan art. 26 ECT inte uppfattas på annat sätt än att förfarandet som anges där måste ha iakttagits för att ett giltigt skiljeavtal ska uppkomma då skiljeförfarande påkallas som i nu aktuellt fall.

Meningsskiljaktigheter hade uppkommit mellan Investerarna och Republiken Kazakstan angående bl.a. den i målet benämnda LPG-anläggningen. Investerarna var härvid beredda att sälja sina tillgångar i Kazakstan (se skiljedomens avsnitt F II). Meningsskiljaktigheterna föranledde ägarna till anläggningen att under februari och mars 2009 vid olika tillfällen skicka brev till relevanta företrädare för Kazakstan, bl. a. med ett konkret förlikningsförslag. Det förekom även ett sammanträffande mellan parterna i mars 2009. Den 7 maj 2009 skickade Anatolie Stati ett brev ställt direkt till Kazakstans president Nursultan Nazarbaev där Anatolie Stati hänvisade till tvisten angående hans verksamhet i Kazakstan. I brevet begärde Anatolie Stati att presidenten personligen skulle utvärdera verksamheten och tillse att tvisten upphörde. Brevet avslutas med att om så inte skedde återstod inget annat alternativ än att påkalla skiljeförfarande. Såvitt framgår erhöll Anatolie Stati inget svar från presidenten. Däremot framgår av ett brev den 28 september 2009 från Kazakstans energimini-sterium till Industri- och handelsministeriet att det skulle inledas förhandlingar med ägarna till bl. a. TNG om förvärv av bolagets tillgångar. Av brevet framgår också att ministeriet var medvetet om att en eventuell tvist skulle lösas genom internationellt skiljeförfarande. Uppenbarligen var förhandlingarna resultatlösa och i juli 2010 sade Kazakstan upp avtalet om utvinningsrättigheter. Några dagar efter uppsägningen påkallade Investerarna förfarandet inför SCC.

Det kan enligt min mening inte råda något tvivel om att Investerarna agerat helt i enlighet med det förfarande som anges i art. 26 ECT och att det av detta skäl följer att ett giltigt avtal om skiljeförfarande ska anses ha uppkommit mellan Investerarna och Kazakstan för avgörande av den aktuella tvisten. Brevet den 7 maj 2009 från Anatolie

SVEA HOVRÄTT
Avdelning 02

**DOM**

T 2675-14

Stati är undertecknat av honom själv och avsänt av honom som företrädare för såväl Ascom Group som Terra Raf. Härutöver företrädde han även Gabriel Stati enligt ett särskilt avtal dem emellan. Mot bakgrund av intensiteten i kontakten mellan parterna vid tillfället får det framstå som helt överflödigt att uppställa krav på en uttrycklig hänvisning till ECT då förlikning begärs. Kazakstan var väl medvetet om vad tvisten gällde. Vad gäller tidsperioden från framställan av förlikningsförhandlingar till påkallandet av skiljeförfarande, ca 15 månader, så överstiger den med bred marginal de tre månader som föreskrivs i ECT. Det finns dock ingen maximal tidsgräns angiven i ECT för förlikningsförhandlingarna, vilket framstår som välgrundat. Av skiljedomens avsnitt F II framgår de förhållandevis intensiva kontakter som ägde rum mellan parterna bl.a. under hösten 2009 och vintern/våren 2010. Mot bakgrund härav får det bedömas som rimlig att påkallandet av skiljeförfarandet dröjde något bl.a. med tanke på komplexiteten i frågan. När avtalet sades upp i juli 2010 fanns därmed inget krav på Investerarna att vänta ytterligare en tid innan skiljeförfarandet påkallas. Tvisten var alltjämt densamma.

Jag är således ense med majoritetet att det uppkom ett giltigt skiljeavtal mellan Investerarna och Kazakstan när förfarandet påkallades i juli 2010 och att det därmed är obehövligt att bedöma den skriftväxling som ägde rum mellan parternas ombud under vintern 2011 och som resulterade i ett uppskjutande av skiljeförfarandet i tre månader.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANATOLIE STATI; GABRIEL STATI; ASCOM GROUP, S.A.; TERRA RAF TRANS TRAIDING LTD., <br><br> Petitioners, <br><br> v. <br><br> REPUBLIC OF KAZAKHSTAN, <br><br> Respondent. | ) ) ) ) ) ) ) ) ) ) ) ) ) |

Civil Action No. 1:14-cv-1638-ABJ

**<u>JOINT REPORT</u>**

# EXHIBIT 2



| SVEA COURT OF APPEAL | **JUDGMENT** | Case no. | 1 |
|---|---|---|---|
| Department 02 | 2016-12-09 | T 2675-14 | |
| Division 020106 | Stockholm | | |

**CLAIMANT**

Republic of Kazakhstan

Ministry of Justice

Orynbor Street 8, House of Ministries, 13 Entrance

010000, Astana, Left Bank, Kazakhstan


Counsel:

1. Attorney at law Pontus Ewerlöf

MAQS Law Firm Advokatbyrå AB

Box 7009, 103 86 Stockholm


2. and 3. Attorney at law Alexander Foerster and lawyer Ludvig Metz

Mannheimer Swartling Advokatbyrå AB

Box 1711, 11 87 Stockholm


4. Attorney at law Karl Guterstam

Frank Advokatbyrå

Box 7009, 103 87 Stockholm


**RESPONDENTS**

1. Ascom Group S.A.

75 A. Mateevici Street

Chisinau, MD-2009, Moldavia


2. Anatolie Stati

20 Dragomirna Street

Chisinau, MD-2008, Moldova


3. Gabriel Stati

1A Ghioceilor Street

Chisinau, MD-2008, Moldova


4. Terra Raf Trans Traiding Ltd

Don House, Suite 31

30-38 Main Street, Gibraltar


Counsel for 1–4: Attorneys at law Bo G H Nilsson, Therese Isaksson and Ginta Ahrel

Advokatfirman Lindahl KB

Box 1065, 101 39 Stockholm


MATTER

Annulment etc. of arbitration award rendered 19 December 2013 in Stockholm with amendment dated 17 January 2014

| **Postal address** | **Visiting address** | **Telephone** | **Telefax** | **Office hours** |
|---|---|---|---|---|
| Box 2290 | Birger Jarls Torg 16 | 08-561 670 00 | 08-561 675 09 | Monday – Friday |
| 103 17 Stockholm | | 08-561 675 00 | | 09:00-15:00 |
| | | **E-mail**: svea.avd2@dom.se | | |
| | | www.svea.se | | |

SVEA COURT OF APPEAL          **JUDGMENT**                                    2
Department 02                                        T 2675-14

**JUDGMENT**

1. The Court of Appeal dismisses the action of the Republic of Kazakhstan.

2. The Republic of Kazakhstan shall recompense Ascom Group S.A. for litigation costs in the amounts of SEK 4 614 358 and USD 377 400.65, of which SEK 3 969 852 relates to fees to counsel, plus interest on the first two amounts according to section 6 of the Interest Act (1975:635) from the date of the Court's decision until payment is made.

3. The Republic of Kazakhstan shall recompense Anatolie Stati for litigation costs in the amounts of SEK 4 114 357 and USD 377 400.65, of which SEK 3 969 852 relates to fees to counsel, plus interest on the first two amounts according to section 6 of the Interest Act (1975:635) from the date of the Court's decision until payment is made.

4. The Republic of Kazakhstan shall recompense Gabriel Stati for litigation costs in the amounts of SEK 4 114 357 and USD 377 400.65, of which SEK 3 969 852 relates to fees to counsel, plus interest on the first two amounts according to section 6 of the Interest Act (1975:635) from the date of the Court's decision until payment is made.

5. The Republic of Kazakhstan shall recompense Terra Raf Trans Traiding Ltd. for litigation costs in the amounts of SEK 4 114 357 and USD 377 400.65, of which SEK 3 969 852 relates to fees to counsel, plus interest on the first two amounts according to section 6 of the Interest Act (1975:635) from the date of the Court's decision until payment is made.

_____

SVEA COURT OF APPEAL      **JUDGMENT**            3

Department 02                                         T 2675-14

**TABLE OF CONTENTS**

1. BACKGROUND ...................................................................................... 5

2. PRAYERS FOR RELIEF ........................................................................ 6

3. LEGAL GROUNDS REFERRED TO BY THE PARTIES AND LEGALLY RELEVANT CIRCUMSTANCES ........................................................... 8

   3.1 Kazakhstan ....................................................................................... 8

      3.1.1 Legal grounds for the action ......................................................... 8

      3.1.2 Legally relevant circumstances ..................................................... 8

         3.1.2.1 Annulment due to the fraudulent arrangement, false evidence, misleading information etc. ................................................................................... 8

         3.1.2.2 Setting aside of the award on the ground that it is not covered by a valid arbitration agreement ................................................................................ 13

         3.1.2.3 Annulment alternatively setting aside of the award due to the appointment of the arbitral tribunal .................................................... 14

         3.1.2.4 Setting aside of the award on the ground of an excess of mandate alternatively  procedural error (incorrect evaluation of evidence etc.) ............... 16

         3.1.2.5 Other instances of excesses of mandate alternatively procedural errors. 19

   3.2 The Investors ................................................................................... 21

      3.2.1 Legal grounds for contesting the claim ....................................... 21

      3.2.2 Legally relevant circumstances ................................................... 21

         3.2.2.1 Annulment due to the allegedly fraudulent arrangement, false evidence, misleading information etc. ................................................................................ 21

         3.2.2.2 The award is covered by a valid arbitration agreement ......................... 26

         3.2.2.3 The appointment of the arbitral tribunal ................................. 28

         3.2.2.4 Excesses of mandate or procedural error (alleged faulty assessment of evidence etc.) ........................................................................................ 30

         3.2.2.5 Other excesses of mandate or alternatively procedural errors ............... 33

4. THE INVESTIGATION .......................................................................... 35

5. THE COURT'S FINDINGS .................................................................... 35

   5.1 The layout of the findings ............................................................... 35

   5.2 Legal starting points for the Court's examination................................. 36

      5.2.1 Ordre public as a ground for annulment ....................................... 36

      5.2.2 Excess of mandate and procedural errors as grounds for annulment ............ 38

5.3 The question of the annulment alternatively setting aside of the award ..............40

  5.3.1 Annulment due to the fraudulent arrangement, false evidence, misleading information etc. ...............................................................................................40

  5.3.2 Setting aside the award on the ground that it is not covered by a valid arbitration agreement ...............................................................................42

  5.3.3 Annulment or setting aside of the award on the grounds of the appointment of the arbitrators ........................................................................................48

  5.3.4 Setting aside the award on the ground of an excess of mandate or alternatively a procedural error ...............................................................54

    5.3.4.1 Taras Khalelov's witness statement and testimony ................54

    5.3.4.2 Kazakhstan's expert and testimonial evidence .......................56

    5.3.4.3 Consideration of objections to deductions from the damages etc...........57

    5.3.4.4 Other alleged excesses of mandate and procedural errors .....................58

  5.3.5 The Court's summary conclusions and overall assessment of Kazakhstan's action.......................................................................................62

5.4 Litigation costs ....................................................................................63

  5.4.1 The party liable for damages........................................................63

  5.4.2 The Investors' claim for costs.......................................................63

  5.4.3 Compensation for the party's own work.......................................64

  5.4.4 Compensation for King & Spalding's assistance ..........................64

  5.4.5 Compensation for King & Spalding's expenses ............................65

  5.4.6 The Investors' claim for compensation in general ........................66

  5.4.7 Summary assessment ...................................................................66

5.5 Appeal .................................................................................................66

SVEA COURT OF APPEAL      **JUDGMENT**           5
Department 02                                   T 2675-14

# 1. BACKGROUND

The Republic of Kazakhstan (Kazakhstan) possesses natural resources in the form of oil
and natural gas and has expressed a desire for investors to assist it in the exploitation of
these resources. For this purpose Kazakhstan has ratified the international Energy
Charter Treaty (ECT). Between 1999 and 2003 Anatolie Stati and his son, Gabriel Stati,
acquired via Ascom Group S.A. (Ascom) and Terra Raf Trans Traiding Ltd (Terra Raf)
all the shares of two Kazakh companies: Kazpolmunay LLP (KPM) and Tolkynneftegaz
LLP (TNG). KPM owned exploitation rights to the Borankol oil field, where the so-
called LPG Plant which was to be built by TNG. TNG owned the same rights to the
Tolkyn natural gas field and also held exploration rights under a contract designated
"Contract 302". Anatolie Stati, Gabriel Stati, Ascom and Terra Raf are referred to below
as the Investors.

Following the termination of the exploitation agreements by Kazakhstan in 2010, the
Investors initiated arbitration, claiming that Kazakhstan had been in breach of its
obligations under the ECT through violations of the investor protection rules. In the
arbitration the Investors claimed damages of just over USD 3 billion. The arbitration
was held at the Stockholm Chamber of Commerce (the SCC) and an award was
rendered on 19 December 2013 in SCC case no. V (116/2010), amended on 17 January
2014. The arbitral tribunal consisted of Professor Karl-Heinz Böckstiegel (chairman),
attorney at law David Haigh and Professor Sergei Lebedev. During the arbitration each
party engaged financial experts and geological experts for the valuation of the assets in
question.

The arbitral tribunal rejected certain jurisdictional objections made by Kazakhstan,
finding that the latter had breached its obligations regarding "fair and equitable
treatment" under Article 10(1) ECT. This article makes clear that investments should be
trated fairly and equitably. Further the tribunal found that the measures taken by
Kazakhstan had caused loss and that Kazakhstan was liable for damages. The tribunal
also found that the Investors were entitled to damages of USD 508 130 000, plus
interest from 30 April 2009 at a rate equivalent to the average rate of interest for six-
month US treasury bills. An amount of USD 10 444 899 was deducted from the
damages, for which the tribunal considered the Investors no longer to be liable. The
amount which Kazakhstan according to the arbitral award was ordered to pay to the
Investors thus amounted to USD 497 685 101. The arbitration costs were shared

between the parties, with Kazakhstan bearing three-quarters and the Investors one-quarter of them. Kazakhstan was ordered to pay half of the Investors' legal costs amounting to USD 8 975 496.40, which corresponded to halv of the Investors' litigation costs.

Two of the arbitrators were dissenting. Sergei Lebedev dissented in relation to the jurisdiction of the arbitral tribunal and David Haigh in relation to the amount of damages.

## 2. PRAYERS FOR RELIEF

**Kazakhstan** has claimed that the Court of Appeal in the first place should declare the award invalid in its entirety or at least in respect of the LPG Plant, i.e. in an amount of USD 199 million plus interest in accordance with the arbitral award and a corresponding reduction in the litigation cost awarded amounting to USD 1 757 546.

**Kazakhstan** has requested in the alternative that the Court of Appeal should set aside the arbitral award in its entirety or in part.

In the event that the Court of Appeal finds that the arbitral award should be declared invalid or set aside in part, Kazakhstan has requested that the amount awarded be reduced by

1. USD 199 million plus interest in accordance with the arbitral award and a corresponding reduction in the litigation cost awarded amounting to USD 1 757 546) if the Court finds that the tribunal failed to consider crucial witness evidence regarding the value of the LPG facility; and/or

2. USD 277.8 million plus interest in accordance with the arbitral award and a corresponding reduction in the litigation cost awarded amounting to USD 2 453 499) if the Court of Appeal finds that the tribunal has relied on the Investors' geological experts without stating reasons for this and has thereby completely disregarded Kazakhstan's geological experts; and/or

3. USD 215.3 million plus interest in accordance with the arbitral award and a corresponding reduction in the litigation cost awarded amounting to USD 1 901 506 if the Court of Appeal finds that the Tribunal has exceeded its mandate and committed a procedural error by failing to

decide on Kazakhstan's objections that all revenues accruing to the Investors between the valuation date and the date of termination of the exploration agreement should be deducted from any damages; and/or

4.  USD 99.5 million plus interest in accordance with the arbitral award and a corresponding reduction in the litigation cost awarded amounting to USD 878 773 if the Court finds that the Tribunal has exceeded its mandate and committed a procedural error by failing to consider and decide on Kazakhstan's objection that an arbitral award for the LPG Plant can cover only half of the assumed value; and/or

5.  USD 277.8 million plus interest in accordance with the arbitral award and a corresponding reduction in the litigation cost awarded amounting to USD 2 453 499 if the Court finds that the tribunal has exceeded its mandate and committed a procedural error by wrongly assuming in regard to the valuation of Tolkyn and Borankol that Kazakhstan had acknowledged a certain valuation result, when Kazakhstan in fact clearly stated that the valuation result was incorrect and exaggerated.

**The Investors** have contested all claims. In the event the Court of Appeal would find that the tribunal has exceeded its mandate or committed a procedural error; the Investors have requested that the Court of Appeal stay the proceedings and grant the tribunal an opportunity to amend its decision.

**Kazakhstan** has objected to the tribunal being given an opportunity to amend its decision.

**The parties** have claimed compensation for their litigation costs.

# 3. LEGAL GROUNDS REFERRED TO BY THE PARTIES AND LEGALLY RELEVANT CIRCUMSTANCES

## *3.1 Kazakhstan*

### 3.1.1 Legal grounds for the action

1. The award and the manner in which the award arose, is clearly incompatible with the basic principles of the Swedish legal system, i.e. it contravenes so-called *ordre public* and is therefore invalid in its entirety or partially according to section 33(1)(2) of the Swedish Arbitration Act (1999:116) (SAA).

2. The arbitral award should be set aside in its entirety since

> a) it is not covered by a valid arbitration agreement between the parties (section 34(1)(1) SAA).
> b) the arbitral tribunal was appointed contrary to the Arbitration Rules of the Stockholm Chamber of Commerce, the SCC Rules, and to the principle of equal treatment (section 34(1)(4) SAA), and
> c) the appointment of the arbitral tribunal amounts to a procedural error which probably influenced the outcome (section 34(1)(6) SAA).

3. The arbitral award should be set aside in its entirety or in part because the arbitrators exceeded their mandate and/or committed procedural errors which individually, or at least in combination, have influenced the outcome of the case (section 34(1)(2 and 6) SAA).

Given that the arbitrator Sergei Lebedev passed away in April 2016, it is not possible for the tribunal to make any corrections.

### 3.1.2 Legally relevant circumstances

#### *3.1.2.1 Annulment due to the fraudulent arrangement, false evidence, misleading information etc.*

The award and the manner in which the award arose, is clearly incompatible with the basic principles of the Swedish legal system, i.e. it is contrary to *ordre public*. It is also incompatible with the basic principles of the legal system to uphold arbitral awards that are based on extensive fraudulent arrangement and corruption or to allow procedural fraud by use of false evidence.

Firstly, the construction of an LPG Plant was surrounded by an extensive and sophisticated fraudulent arrangement, which constitutes corruption by the Investors. The purpose of the structure has been, through sham contracts and sham transactions, to create a substantial fictitious value for the LPG Plant. Secondly, the Investors have indulged in procedural fraud by presenting false evidence in the form of witness statements, witness testimony and expert opinions concerning the fraudulent arrangement and thus LPG Plant's value, which evidence misled Kazakhstan, the SCC and the arbitral tribunal. The Investors have also deliberately withheld information regarding the investment in and the valuation of the LPG Plant to conceal the fraudulent arrangement from Kazakhstan, the SCC and the arbitral tribunal. Thirdly, the Investors' deceptive and misleading approach influenced the outcome of the case since it formed the basis for the indicative bid of KazMunaiGas National Company (KMG) and thus the arbitral tribunal's calculation of damages. Furthermore, the false evidence has affected the tribunal's general valuation of witness testimony, witness statements, expert reports and the Investors' actions at large, which both affected the question of liability and the assessment of the amount of damages.

These circumstances, individually and collectively, have the effect that the arbitral award is in conflict with the basic principles of the Swedish legal system.

The fraudulent and misleading arrangement

The Investors deliberately misled the arbitral tribunal, SCC and Kazakhstan about their investment costs in the LPG Plant. The alleged investment cost of USD 245 consisted largely of fictitious costs. The misleading arrangement includes the following.

The fictitious investment costs were based on an agreement (the Perkwood Agreement) between TNG and the company Perkwood Investment Limited (Perkwood). Despite the fact that Perkwood according to the Perkwood Agreement should have acted as the main supplier of building materials and equipment and as project leader for the construction of the LPG Plant, Perkwood did not supply any goods or performed any services. Instead, the contract between Perkwood and TNG was a sham arrangement. During the arbitration the Investors neglected to inform the arbitral tribunal and Kazakhstan about the Perkwood Agreement and about Perkwood's role in the project for the construction of the LPG Plant. The Investors also neglected to inform the

auditors who examined the annual accounts prepared by the Investors about Perkwood's real function and, in particular, the fact that Perkwood was a related company to TNG and the Investors.

Through this misleading arrangment the Investors created a picture of large sums that had been invested or were due to be invested in the LPG Plant, enabling them to claim greater damages than they would otherwise have been entitled to. The fictitious investment cost comprised the following elements:

i. *Fictitious purchase costs*

Under the Perkwood Agreement, Annex 2, TNG was to pay to Perkwood approximately USD 93 million for equipment that was identical to what had already been delivered by another company, Tractebel Gas Engineering GmbH (TGE). TGE was the actual main supplier of components and equipment for the LPG Plant and had delivered it for a total price of USD 34.5 million expressed in dollars. Furthermore, certain amendments to the Parkwood agreement (Annexes 14 and 16) included objects that were also included in Annex 2 and which had been delivered earlier as well.

ii. *Fictitious component costs*

TNG has posted in its accounts the sum of USD 72 million for components and equipment that allegedly had been delivered but not yet installed in the LPG Plant. In reality, this equipment never existed.

iii. *Fictitious interest costs*

The alleged interest charges of USD 60 million for loans taken in order to finance the construction of the LPG Plant are false, calculated on the fictitious investment costs and thereby false to the same extent as the cost of components and equipment.

iv. *Fictitious management fee*

The alleged investment cost claimed includes the so-called "management fee" of approximately USD 44 million, which was paid to Perkwood without any contractual basis and without counterperformance in the form of performed services.

Furthermore, TNG advanced Perkwood approximately USD 37 million for building materials and equipment that were not needed and were never supplied, "The advance payment for undelivered components". Despite the absent delivery, the amount has not been repaid to TNG.

The misleading arrangement has enabled large sums of money to be channelled out of
Kazakhstan, which is contrary to the basic purpose of the ECT, which is to protect
"good faith" investments in the host country. The investors then brought a claim against
the Republic of Kazakhstan, initiated arbitration proceedings and invoked investor
protection under the ECT, despite the lack of such protection due to the above-
mentioned circumstances.

<u>The Investors have presented false evidence, submitted misleading information and
withheld relevant information in the arbitration</u>

The fraudulent arrangement was intended to mislead the arbitral tribunal as well as
Kazakhstan and thus obtain significantly higher damages through arbitration than would
otherwise have been possible. To accomplish this, the Investors invoked false evidence
in the form of witness statements, witnesses testimony and expert reports as well as
made misleading statements in written submissions and during the oral hearing as set
out in the following: "statement of claim" of 18 May 2011, "claimant's reply memorial
on jurisdiction and liability" of 28 May 2012, "claimant's reply memorial on quantum"
of 7 May 2012, "Stati's first post hearing brief" of 8 April 2013, "Stati's second post
hearing brief" of 3 June 2013, "transcript from hearing on jurisdiction and the merits" of
1 October 2012, "transcript from hearing on quantum" of 28 January 2013, Arthur
Lungu's first witness statement of 17 May 2011, Anatolie Stati's second witness
statement of 7 May 2012 and Catalin Broscaru's witness statement of 11 April 2011.

The Investors also misled the arbitral tribunal and Kazakhstan by withholding
information that could reveal the fraudulent arrangement. Among other things, the
Investors deliberately mislead the tribunal and Kazakhstan about the parties involved in
the investment in the LPG Plant project, and thus about how much of the total
investment cost was incurred by the Investors. The misleading consisted of the Investors
claiming in the arbitration that they alone had borne the entire investment cost despite
the fact that it had actually been split with Vitol, which the Investors put forward in a
parallel arbitration between Vitol and Montvale Invest Ltd (Montvale), the so-called
Montvale case.

The Investors also misled the arbitral tribunal and Kazakhstan regarding the legitimate
parties in relation to the LPG Plant project. The misleading consisted of the Investors

neglecting to inform Kazakhstan and the tribunal that Terra Raf had transferred all the rights and obligations relating to the LPG Plant to the related company Montvale, which the Investors put forward in the parallel Montvale case. This information would have been relevant for the tribunal's assessment of Terra Raf's status as an investor under the ECT as well as for Terra Raf's right to damages in the arbitration.

The Investors withheld information about Perkwood, the Perkwood Agreement and Perkwood's role in the construction of the LPG Plant. During the arbitration, the Investors never presented any document explaining Perkwood's role in the project. Neither Kazakhstan nor the arbitral tribunal had knowledge of the fraudulent arrangement or the false evidence before the arbitral award was rendered.

It was in the light of this procedural fraud that the Investors presented their claim in the arbitration and the arbitral award was rendered.

<u>The valuation of the LPG Plant</u>

The arbitral tribunal took note of the false evidence and misleading information referred to above, which probably influenced the tribunal's evaluation of the evidence generally and conclusions regarding both jurisdiction and the question of liability. Regarding the assessment of the amount of damages, however, the tribunal opted not to rely on the expert reports relied on by the Investors in the case, which were based on fictitious investment costs. Instead, it took as its starting point KMG's indicative bid, which also was based on the Investors' misleading information about the LPG Plant's value.

In the arbitration the Investors referred to a so-called indicative bid for the LPG Plant of USD 199 million made by KMG as an alternative ground for its claim for damages in the ECT case, ¶1707 of the award. Incorrect and misleading information from the Investors to the company's accountants KPMG Audit LLC (KPMG), the Russian investment bank Renaissance Capital and KMG laid at the basis for the indicative bid.

The indicative bid was based on the investment cost for the construction of the LPG Plant. KMG took the investment cost from the "Information Memorandum" drawn up by Renaissance Capital upon instruction from the the Investors. "Information Memorandum" in its turn was based on financial information about the Investors' Kazakh assets taken from the consolidated annual reports of Tristan Oil Ltd. (Tristan

Oil), KPM and TNG. These annual reports had been drawn up by the respective companies' management, which included Anatolie Stati, and had been examined by KPMG. The information about the amounts invested in the LPG Plant and that were included in the financial statements was inaccurate and misleading because of the fictitious costs described above. The Investors also neglected to inform KPMG that Perkwood was a related party, something which they had an obligation to do according to the International Financial Reporting Standards (IFRS) and the "Information Memorandum".

With regard to the method of valuation set out in the indicative bid, KMG would have valued the LPG Plant at a substantially lower amount if TNG's actual investment costs for the LPG Plant had been reflected in the documents that formed the basis of KMG's indicative bid. The arbitral tribunal's assessment of the LPG Plant's value and hence the damages awarded to the Investors were based on the indicative bid, which is why the Investors' fraudulent and misleading arrangement directly has influenced the outcome of the case, see ¶ 1747 of the award.

### 3.1.2.2 Setting aside of the award on the ground that it is not covered by a valid arbitration agreement

The award is not covered by a valid arbitration agreement between the parties since the Investors submitted their request for arbitration only five days after the termination of KPM's and TNG's agreements about exploitation rights, which breached the mandatory provision of a three-month cooling off period in Article 26(2) ECT. Kazakhstan's offer to enter into an arbitration agreement under the ECT includes a prerequisite for a three-month cooling off period under Article 26(2) ECT. The request for arbitration is therefore regarded as qualified acceptance of Kazakhstan's offer. The Investors did not engage in the settlement negotiations.

It is disputed that the requirement of cooling off period has been remedied by way of settlement negotiations conducted after the arbitration proceedings had been initiated. The requirement stipulated in Article 26 ECT is a mandatory procedural requirement and is a prerequisite for the arbitral agreement's existance.

It is denied that Kazakhstan waived its objection regarding the lack of jurisdiction in connection with the arbitral tribunals' stay of proceedings while awaiting the parties' efforts to reach an amicable settlement.

It is also disputed that the letters that the Investors sent to Kazakhstan could be understood as a request for settlement negotiations in accordance with the ECT. The letters did not include any requests relating to the ECT or requirements for a negotiation aimed at reaching an "amicable settlement". Furthermore, they did not cover Anatolie Stati and Gabriel Stati, but referred only to Terra Raf and Ascom. It is disputed that in the discussions that were held, including *inter alia* on 19 March 2009 at a meeting attended by Kazakhstan, any reference was made to the ECT.

It is disputed that the assessment, in advance, of whether or not a settlement negotiations have any hope of success is irrelevant for the obligation to take part in such a negotiation. It is also disputed that a settlement negotiation in this case would have been futile.

The arbitral tribunal did not decide correctly the question of its jurisdiction at the latest when rendering the arbitral award. It should have examined whether the procedural prerequisites in the ECT had been satisfied and whether there was a valid arbitration agreement in relation to every one of the Investors. (see ¶¶ 828–830 of the award).

### 3.1.2.3 Annulment alternatively setting aside of the award due to the appointment of the arbitral tribunal

Kazakhstan never got an opportunity to appoint an arbitrator. The SCC appointed Professor Sergei Lebedev as arbitrator on Kazakhstan's behalf. This procedure involved a violation of Kazakhstan's basic procedural rights and the SCC Rules. The fact that Kazakhstan was deprived of the right to appoint its own arbitrator means that the manner in which the award has arisen is clearly incompatible with the basic principles of the Swedish legal system. Alternatively, it amounts to a shortcoming in the appointment of the tribunal. In any event, it is a procedural error by the SCC which influenced the outcome of the case.

It is denied that it follows clrearly from the SCC Rules that Kazakhstan had to appoint an arbitrator in its reply. According to the SCC Rules, the respondent, *if applicable*,

shall submit information about the appointed arbitrator. Kazakhstan assumed that the SCC must first, as is the case for other frequently employed arbitration institutes, decide on the number of arbitrators.

The SCC's instructions contained no information that Kazakhstan would have to appoint an arbitrator in its answer to the request for arbitration. Neither did the instruction from the SCC contain information that the SCC would appoint an arbitrator in Kazakhstan's place if Kazakhstan did not itself appoint an arbitrator. Nor did the SCC give Kazakhstan an opportunity to comment on the Investors' request that an arbitrator should be appointed on Kazakhstan's behalf. The SCC thereby violated the principle of equal treatment of the parties which is rooted in the Swedish Arbitration Act.

Further, the SCC acted contrary to the principle of fair procedure and the principle of equal treatment of the parties by setting deadlines that were too short. The time limit for Kazakhstan to reply, according to the SCC Rules, runs at the earliest from 11 August 2010, when Kazakhstan received the instruction. This means that Kazakhstan was granted a time limit of 15 days. The deadlines that were set were too short, given that the dispute was complicated, that Kazakhstan was a sovereign state, that the arbitration had been initiated in contradiction of the prescribed negotiating period, that the delivery of the documents took time, that the SCC's instructions were unclear, that Kazakhstan did not easily understand English, that Kazakhstan needed reasonable time to engage a counsel, and that the appointment of an arbitrator requires careful consideration and communication.

The SCC did not grant Kazakhstan the right to be consulted in connection with the appointment of an arbitrator on its behalf. Kazakhstan should in any event have been given an opportunity to comment on the Investors' request that an arbitrator should be appointed on Kazakhstan's behalf.

It is denied that Kazakhstan waived its right to appoint an arbitrator or its right to take action regarding this in the Court of Appeal. Kazakhstan has met the requirements for a "complaint" in section 34(2) SAA and article 31 of the SCC Rules. Kazakhstan has at no time confirmed that the arbitral tribunal was constituted properly and therefore waived its objection about this. The statements given during the hearing on 8 October 2012, which took place about two years after the constitution of the arbitral tribunal, did

only refer to objection to the arbitral tribunals' actions during the proceedings and not to obstacles of the arbitration in its entirety.

The SCC failed to correct its mistake by not giving Kazakhstan an opportunity to appoint a new arbitrator.

The SCC has not followed its earlier practice regarding the appointment of an arbitrator.

Sergei Lebedev adopted a very passive role during the arbitration and was unable to ensure that Kazakhstan's defence was correctly understood by the arbitral tribunal.

### 3.1.2.4 Setting aside of the award on the ground of an excess of mandate alternatively procedural error (incorrect evaluation of evidence etc.)

Taras Khalelov's witness statement and testimony

The arbitral tribunal based its decision to award the Investors damages in respect of the LPG Plant solely on the assertion that Kazakhstan had worked on the completion of the LPG Plant after the Investors had left the country. This assertion was based on two internet links contained in a footnote in an expert report, the so-called FTI-report, drawn up by the Investors' experts, see ¶ 1745 of the award. The internet links were not submitted in evidence and were not translated, which contravened section 7 of the "Procedural Order No. 1", see ¶ 20 of the award. Furthermore, the Investors withdrew this assertion in subsequent submissions. The tribunal failed to take note of decisive oral testimony in form of Taras Khalelov's witness statement and testimony which rebutted this assertion.

This has influenced the outcome of the case with regard to the LPG Plant's value in respect of an amount of USD 199 million, corresponding to the tribunal's estimate of the value.

Kazakhstan's expert and testimonial evidence

The tribunal failed to take into account

       i.   submitted expert opinions by Professor Anatoly Didenko and Kadirbek Latifov and Salamat Baymaganbetov's testimony concerning the classification of pipelines,

    ii.    expert opinion from Professor Kulyash Ilyassova on the legality of refraining from the pre-emption right,

    iii.    expert opinion from Professor Tomas Balco and Nurlan Rahimgaliev's testimony regarding the legality of the assessment of back taxes,

    iv.    substantial parts of the opinion from Deloitte GmbH (Deloitte) regarding causality, and

    v.    substantial parts of Kazakhstan's geological experts, Gaffney Cline & Associates, report.

The arbitral tribunal, which based its award on a large number of circumstances which together were considered to constitute a concerted harassment campaign ("a string of measures of coordinated harassment"), would not have been able to arrive at such conclusions it made if it had taken into account the evidence invoked by Kazakhstan.

    i.    The tribunal failed to consider the content of Kazakh law on the classification of pipelines, ¶ 1090 of the award, despite the fact that the parties agreed that Kazakh law should be applied. In the arbitration Kazakhstan invoked expert reports from Professors Anatoly Didenko and Kadirbek Latifov as well as written witness statement from Salamat Baymaganbetov, all of which supported Kazakhstan's position concerning the classification of pipelines. The tribunal, however, omitted even to mention that these statements had been filed, cf. ¶¶ 82, 174, 1088 and 1090 of the award.

    ii.    The tribunal decided an issue of Kazakh civil law without taking into account the expert opinion of Professor Kulyash Ilyassova invoked by Kazakhstan, see ¶¶ 1093, 1095, 1417 of the award. The issue in question was Kazakhstan's pre-emtion right to buy the shares in TNG in connection with Terra Raf's acquisition in 2005. Instead of applying Kazakh civil law, the tribunal noted that Kazakhstan's withdrawal of the authorisation of this transfer was part of the concerted harassment campaign.

    iii.    The tribunal has decided an issue of Kazakh tax law without taking into account the expert report from Tomas Balco and the witness statement

from Nurlan Rahimgaliev, which supported the Kazakhstan's position
regarding the back tax issue, see ¶¶ 1541 and 1798–1800 of the award.
Tomas Balco and Nurlan Rahimgaliev were not even mentioned in the
reasons for the award. Instead of applying the Kazakh tax law, the
tribunal established that Kazakhstan's imposition of back taxes for
KPM and TNG "were created by Respondent's conduct which this
Tribunal found above to be a breach of the ECT" and thus a part of the
coordinated harassment campaign, see ¶¶ 1541 and 1798-1800 of the
award).

iv.  The tribunal has ruled on the question of causation between the alleged
harassment campaign and the damage claimed by the Investors without
taking into account Kazakhstan's economic expert Deloitte. In the
arbitration Kazakhstan invoked expert opinion from Deloitte showing
that the Investors' companies were in financial distress, completely
regardless of Kazakhstan's actions, and that causation was therefore
lacking. The tribunal found that since Deloitte did not make a direct
assessment of KPM's and TNG's ability to pay their debts under the
bond loan from Tristan, which is obviously wrong, the tribunal
accepted the conclusion of the Investors' expert FTI Consulting (FTI)
that the companies' financial position was good before October 2008,
see ¶ 1456 of the award.

v.  The tribunal in its assessment of damages took into account solely the
Investors' geological expert (Ryder Scott) and ignored Kazakhstan's
geological experts (Gaffney Cline & Associates) without giving any
reasons for this. Despite the fact that the issue of the geological
assessment of the assets of the Tolkyn and Borankol fields was very
extensive and complex and the fact that each of the experts had
submitted four expert statements, the tribunal established in a single
sentence that the Investors expert Ryder Scott was convincing in its
methodology and conclusion ("considers that the Ryder Scott reports on
reserve estimates are convincing in their approach and results"), see ¶
1625 of the award.

Unconsidered objections to deduction from the damages

The arbitral tribunal took no account of Kazakhstan's objections that certain deductions should be made from any damages eventually to be awarded. The reasons for the arbitral tribunal's decision in this respect are so minimal that they are tantamount to an absence of reasoning, see ¶¶ 1535–1542 of the award. In the arbitration Kazakhstan objected on one hand, that all the revenues accruing to the Investors after the valuation date should be deducted, see ¶¶ 1486 and 1487 of the award, and, on the other hand, that any damages in respect of the LPG Plant could only amount to half its value because Vitol had financed half of the LPG Plant and also, that Vitol had the right to half of the future returns from the LPG Plant; all under an agreement between the Investors and Vitol (the JOA-agreement), see ¶¶ 1738–1741 of the award. In respect of the part financed by Vitol, the Investors could not receive damages from Kazakhstan. The objections can be equated with a counterclaim or a set-off objection. Accordingly, the tribunal did not fulfil its task of examining the dispute in its entirety. The failure to take into account the objections influenced the outcome of the case. Due to the tribunal exceeding its mandate in this way or alternatively procedural error, the award should be set aside in any event in respect of an amount of USD 314.8 million. The amount is equivalent to the revenues accruing to the Investors after the valuation date, USD 215.3 million, and half of the value accepted for the LPG Plant, USD 99.5 million.

### 3.1.2.5 Other instances of excesses of mandate alternatively procedural errors

The arbitral tribunal exceeded its mandate and committed procedural errors by going beyond the references made by the parties on several instances and also by failing to take note of the parties' references and the applicable law, as indicated below.

KazAzot

i.     With regard to Kazakhstan's liability, causality between Kazakhstan's actions and the damage, the amount of damages and also the role of the company KazAzo, the arbitral tribunal based its conclusions on the fact that KMG and Timur Kulibayev had influenced KazAzot, although none of the parties had invoked this, see ¶1418 of the award. The Investors had invoked KazAzot's role only for gas pricing. The tribunal also failed to apply the applicable legislation on the question of ascribing to the Republic of Kazakhstan KazAzot's decision not to sign the tripartite agreement (a customary international law of state liability, including "Articles on Responsibility of States for Internationally

Wrongful Acts" as established by the International Law Commission [ILC Draft Articles][1]). (See ¶¶ 1094 and 1418 of the award.)

<u>Interfax</u>

ii.     The arbitral tribunal based its conclusion that a press release from Interfax, which according to the tribunal was part of the concerted harassment campaign, had been prompted by Kazakhstan's action as early as October and November 2008, despite this not being invoked by any of the parties, and wrongly stressed that this circumstance was not in dispute, see ¶ 994 of the award.

<u>The Financial Police</u>

iii.    Regarding the actions of the Kazakh financial police, the tribunal relied on the allegation that the financial police had reported to the Kazakh deputy prime minister that they had found that KPM and TNG operated trunk pipelines, despite no reference to this having been made by any of the parties. The tribunal also found incorrectly that Kazakhstan had admitted that this was the case, see ¶ 990 of the award.

<u>The Tristan notes</u>

iv.     On the question of whether a deduction should be made from the enterprise values of KPM and TNG for the so-called Tristan notes, the arbitral tribunal failed to take into account the parties' legal arguments, see ¶¶ 1768–1771 of the award. The tribunal also based its decision on an alleged admission by Kazakhstan that had never been made. If there had been such an admission, Kazakhstan had revoked it. The Tristan notes had in any case a value of USD 497 685 101 on 30 April 2009. (See ¶¶ 1536–1537 of the award.

<u>Method of valuation</u>

v.      With regard to the valuation of the Tolkyn and Borankol fields, the arbitral tribunal incorrectly assumed that Kazakhstan had agreed to a specific valuation

---

[1] The ICL Draft Articles is a combination of a codification and progressive development of international law. The United Nations (UN) General Assembly adopted resolution 56/83 on 12 December 2001, through which the ICL Draft Articles were commended to governments without obligations.

method, see ¶ 1625 of the award. For this reason the award should be set aside in respect of an amount of USD 277.8 million.

On the grounds of each and every one of the excesses of mandate, alternatively the procedural errors, the award should be set aside. In any case the irregularities taken together give a reason to set aside the award.

## 3.2 The Investors

### 3.2.1 Legal grounds for contesting the claim

The award, and the manner in which the award arose, is not clearly incompatible with basic principles of the Swedish legal system.

The award is covered by a valid arbitration agreement between the parties.

The arbitral tribunal was not appointed contrary to the agreement of the parties or the principle of equal treatment.

The SCC's appointment of the arbitral tribunal did not constitute a procedural error which influenced the outcome.

The arbitral tribunal neither exceeded its mandate nor committed procedural errors that influenced the outcome.

The arbital tribunal are competent to act even with two arbitrators.

### 3.2.2 Legally relevant circumstances

#### 3.2.2.1 Annulment due to the allegedly fraudulent arrangement, false evidence, misleading information etc.

The arbitral award, or the manner in which it arose, is not clearly incompatible with the basis of the Swedish legal system. The award should therefore not be declared invalid.

It is contested that the arbitral award is based on a fraudulent arrangement, corruption or false evidence.

Ever since the Investors had acquired KPM and TNG, they had invested hundreds of millions of dollars in the development of oil and gas fields and also in the construction of the LPG Plant. These costs are in no way imaginary or fictitious.

The construction of the LPG Plant was not based on a fraudulent arrangement, corruption, sham contracts or sham transactions. The Investors neither presented false evidence (witness statements, witness testimonies and expert opinions) nor did they mislead Kazakhstan, the SCC or the arbitral tribunal or withheld information regarding the valuation of the LPG plant. KMG based its indicative bid also on its own assumptions and calculations. There is no adequate causation between the allegedly misleading measures and the arbitral award as regards the valuation of the LPG Plant.

The arbitral award is not based on false evidence or untrue statements. The information in the "Information Memorandum" and annual reports that are alleged to have been falsified or misleading was not created with the arbitration proceedings in mind, but for other purposes, and also long before the start of the ECT case. Even if Kazakhstan's accusations were to be considered to some extent legitimate, which is denied, neither KMG's indicative bid nor the award were based directly on these documents as regards the value of the LPG Plant.

Even if this part of the award had been based on incorrect documentation or false information, it would not be sufficient for the award to be declared invalid in whole or in part.

<u>The fraudulent and misleading arrangement is fictional</u>

The Investors did not mislead the tribunal, the SCC or Kazakhstan regarding their investment cost for the LPG plant. The investment cost in the LPG plant is not fictitious. It did not consist solely of equipment costs, but also costs of construction materials and labour for the construction of the facility. At the time of its expropriation, the plant was almost complete.

The Perkwood Agreement was not a sham arrangement. Perkwood's role was to take care of the procurement and delivery of equipment for the construction of the LPG Plant. Perkwood imported equipment worth approximately USD 138 million to TNG in Kazakhstan and approximately USD 24.7 million was paid to the Kazakh authorities in

customs duties and taxes. Moreover, the Kazakh customs authorities investigated TNG in October 2008 without finding that the company violated any laws or regulations in its dealings with Perkwood or otherwise. In other words, there was no misleading arrangement or sham agreement between TNG and Perkwood. During the examination of the annual financial accounts, TNG's auditors, KPMG, had full access to all the accounting records. KPMG was aware of Perkwood's function. During the arbitration the Investors submitted several documents in which Perkwood's role in the LPG Plant project was described.

The Investors invested substantial amounts in the LPG plant, which Kazakhstan was aware of.

It is denied that the Investors presented fictitious purchase costs. The Perkwood Agreement was more comprehensive than the agreement between TGE and AzaliaLtd. (Azalia)/Ascom, and included a large amount of equipment and material which were not included in the TGE Agreement. The terms of delivery were also different. TGE sold certain parts of the equipment for the LPG plant to Azalia, but neither TGE nor Azalia were responsible for the delivery of the equipment to Kazakhstan. It was Perkwood which sold the equipment to TNG and delivered it to Kazakhstan. The equipment mentioned in Annexes 2, 14 and 16 to the Perkwood Agreement could therefore not have been delivered by TGE earlier. Annex 14 did not include the same equipment as in Annex 2 instead it consisted of spare parts which were ordered by way of back-up to ensure operation of the Plant. In any event, the advance payment of around USD 37 million for the equipment covered by Annex 14 was later settled between Perkwood and TNG.

It is denied that the Investors presented fictitious component costs. Perkwood delivered equipment and materials corresponding to a value of USD 72 million, which were recorded in the books of TNG as delivered to the LPG Plant but not yet installed. The same amount for this equipment was presented in a report on an unscheduled inspection at TNG, which was performed between 25 January and 5 February 2010 by Kazakhstan's Ministry of Energy and Natural Resources, see ¶ 1072 of the award.

It is denied that the Investors presented fictitious interest costs. The interest expense amounting to USD 60 million for financing the construction of LPG Plant was recorded in TNG's accounting and corresponds to the actual cost.

It is contested that the Investors presented a fictitious "management fee". The contractual basis for the payment of the "management fee" is set out in section 10.1 of the Perkwood Agreement.

It is contested that the Investors reported the advance on components not delivered. Perkwood agreed to repay the advance payment to TNG. TNG subsequently transferred its claim against Perkwood regarding the repayment of the advance payment of around USD 37 million to Tristan Oil on 9 February 2010. The parties signed an agreement whereby Tristan Oil notified Perkwood of the transfer and wrote off the corresponding part of TNG's remaining loan.

The allegation that there is no good faith investment in Kazakhstan is contested. Furthermore, this allegation was examined and rejected by the tribunal, see ¶¶ 812-813 of the arbitral award.

<u>The Investors did not submit false evidence, provide misleading information or withhold relevant information in the arbitration</u>

It is denied that the named documents show that the Investors submitted false or misleading information in the arbitration.

It is denied that the Investors withheld "information that could have exposed the deceptive arrangement". The Investors did not mislead the arbitral tribunal or Kazakhstan about the identity of the parties involved in the investment in the project. Vitol has never had an equitable interest in the LPG Plant. The intention was that Vitol would pay half of the funding for the construction of the plant in advance. The Investors did not claim that they alone had been responsible for the entire investment cost, see ¶¶ 1702–1703 and 1740 of the award.

The question of whether Ascom's dispute with Vitol in the so-called JOA arbitration had any bearing on the damages claimed by the Investors for the LPG Plant was examined by the arbitral tribunal. The tribunal concluded that this was irrelevant to the matter on which the tribunal had to decide, namely what constituted a reasonable market value for the LPG Plant under international law and whether Vitol had contributed with

the Investors to the investments made in the LPG Plant. (See ¶¶ 1539 and 1542 of the award).

The Investors did not mislead the tribunal or Kazakhstan concerning the legitimate parties in connection with the LPG Plant project. It was never alleged in the Montvale case that Terra Raf had transferred all of its rights and obligations with regard to the LPG Plant to the related company Montvale. What happened was that Terra Raf transferred all its rights and obligations under the JOA Agreement, regarding the joint financing of the LPG plant with Vitol, to Montvale through a "Novation Agreement" to which also Vitol was a party. Terra Raf's status as TNG's sole shareholder never changed. Consequently, this fact was of no importance at all for the assessment of Terra Raf's status as an investor under the ECT or its right to damages. Information about the "Novation Agreement" was presented in Squire Sanders "Due Diligence" report, which Kazakhstan submitted during the arbitration and which it invoked on several occasions, see ¶¶ 1177, 1197, 1489 and 1793 of the award. In any event, this had no bearing on the outcome of the case.

It is contested that the Investors have committed procedural fraud by withholding information about Perkwood, the Perkwood Agreement and Perkwood's role in the construction of the LPG plant.


The valuation of the LPG Plant


The Investors did not provide misleading information regarding the investment costs to their auditors or anyone else. The information about the investment costs relating to the LPG plant did not affect the assessment of the damages.


From KMG's indicative bid and internal decision data which Kazakhstan submitted during the arbitration, it is clear that the company based its indicative bid partly on the "Information Memorandum" and partly on its own assumptions and estimates.


The Investors did not invoke the indicative bid as an alternative basis for its claim for damages in the arbitration. The information about KMG's indicative bid, along with information about indicative offers of seven other bidders, was submitted in support of the Investors' valuation of the expropriated assets because Kazakhstan challenged the Investors' valuation methods. In the arbitration Kazakhstan took the position that the investment cost was irrelevant since the discounted cash flow method was to be used when calculating the fair market value, and further that the investment costs were, in

fact, much higher and that the Investors had tried to hide them, see ¶¶ 1724 and 1718 of the award.

The tribunal based its estimate of the value of the LPG Plant mainly on the indicative offer of USD 199 million made by KMG. The indicative offer was a preliminary one and was based on a number of uncertain assumptions. KMG took into account not only the Information Memorandum, but also other publicly available information and made its own assumptions and calculations. Nor was the bid based solely on TNG's investment costs in the LPG Plant, but was calculated as an arithmetic average between "the matrix of the comparative methods value and cost method value". The average ended up on USD 199 million since the investment cost was USD 193 million and the amount according to the comparative method of valuation was USD 205 million.

It is disputed that information about the Investors' assets in Kazakhstan contained in the consolidated annual reports of Tristan Oil, KPM and TNG was false or misleading.

KPMG was aware of Perkwood's role.

It is disputed that Anatolie Stati was part of the management of KPM and TNG.

Medet Suleimenov, KMG's witness, testified that the indicative bid was based on limited information and that strategic considerations determined the size of the bid (see ¶ 1736 of the award). It is therefore impossible to say how, if at all, changes in the investment cost would have influenced the value of the bid.

### 3.2.2.2 The award is covered by a valid arbitration agreement

Kazakhstan and all of the Investors entered into an arbitration agreement on the basis of Kazakhstan's standing offer in the ECT of arbitration according to the SCC Rules for investment disputes and the Investors' acceptance through their request for arbitration, referring to this offer.

Observance of the provision on cooling off period is not a condition of the conclusion of an arbitration agreement. It follows from Article 26(3)(a) ECT that Kazakhstan gave its unconditional consent to arbitration. As a result of the Investors' request for arbitration, a binding arbitration agreement arose, which gave the arbitral tribunal jurisdiction.

The provisions of Article 26 ECT do not constitute mandatory procedural requirements. Failure to observe a preliminary negotiation does not constitute a bar to proceedings.

Under all circumstances, the arbitral proceedings were stayed for three months at the request of Kazakhstan to allow for negotiations under Article 26(2) ECT. Any deficiency before the arbitration was thus corrected and Kazakhstan has lost its right to jurisdictional objection.

The Investors agreed to Kazakhstan's request for stay on condition that Kazakhstan refrained from making any objection on the ground that the time limit had not been observed, which Kazakhstan accepted through its counsel at the time. Kazakhstan then continued to take part in the proceedings without informing the Investors that it maintained the objection. In any event, the Investors had reason to believe that Kazakhstan was abandoning its objection, which Kazakhstan must have been aware of. The parties' agreement was binding on Kazakhstan and Kazakhstan also for this reason was bound by the arbitration agreement with the Investors, in any event after the end of the three-month time limit.

The Investors satisfied the requirements for a preliminary negotiation according to Article 26(2) ECT prior to the initiation of the arbitration. The only requirement laid down regarding the start of a preliminary negotiation is a request for an amicable settlement by one of the investors concerned, which need not be in writing. Thus there is no requirement that all investors must sign all letters or participate in the settlement negotiations. Furthermore, Anatolie Stati was at that time authorised to represent Gabriel Stati. It is enough that a reference is made to the object of a treaty so that the state against which a claim is made is informed that there is an existing or potential dispute regarding this object. It is shown clearly by the Investors' letters to Kazakhstan that they were addressing Kazakhstan's treatment of KPM and TNG, i.e. the Investors' investments on the territory of Kazakhstan. Between 2008 and 2010 the Investors drew Kazakhstan's attention on several occasions to the disputed conditions and tried to enter into a dialogue. The Investors also made both oral and written proposals for settling the dispute and stated that they intended to refer the dispute to international arbitration under the SCC Rules if no solution could be reached. During this period the basic cause of the dispute was the same. Settlement negotiations took place more than a year before the dispute was submitted to arbitration, which is sufficient. That "amicable" or similar words were not used is irrelevant.

There is no requirement to participate in a preliminary negotiation lasting three months if this is clearly futile, as Article 26(1) ECT makes clear. Kazakhstan failed to respond to most of the Investors' representations and showed no interest in negotiating. Kazakhstan's actions before the initiation of arbitration proceedings demonstrate that it was not possible to achieve a settlement of the dispute.

The arbitral tribunal decided the matter of its jurisdiction in a proper manner and in relation to each of the Investors.

### 3.2.2.3 The appointment of the arbitral tribunal

The SCC was not in breach of the parties' arbitration agreement, of which the SCC Rules form part, or basic principles and rights in regard to the appointment of the arbitral tribunal. Kazakhstan has not been deprived of its right to appoint its own arbitrator, but has either lost its opportunity to do this as a result of its own negligence or has deliberately chosen not to participate in the appointment of the tribunal. It is further denied that there has been an error in the appointment of the tribunal and that there has been a procedural error in respect of the SCC's appointment of the tribunal which influenced the outcome of the case.

It follows from the arbitration agreement that the respondent should appoint an arbitrator in its answer to the request for arbitration. The SCC Rules are clear in this respect. Since the parties had not agreed otherwise, the arbitral tribunal should consist of three arbitrators and each party should have an opportunity to appoint an arbitrator, unless the SCC decides otherwise. The SCC has not made any other decision. It was clear from the SCC Rules, the SCC's letters and the request for arbitration that the proceedings should be decided by three arbitrators.

The instructions from the SCC were clear. Enclosed with the instruction to submit an answer were, among other things, the request for arbitration and a copy of the SCC Rules, which make clear that Kazakhstan needed to give the name of the arbitrator it had appointed in its written reply. In their request for arbitration the Investors had already demanded that, should Kazakhstan fail to appoint an arbitrator, the SCC should appoint one on Kazakhstan's behalf. From the time when it received the request for arbitration until Sergei Lebedev was approached, Kazakhstan had 40 days in which to submit an answer or to request an extension of time. When the deadline ran out,

Kazakhstan received a reminder and a further 14 days in which to comply with the instruction, along with information that the absence of any reply from Kazakhstan was no obstacle to the arbitration continuing. The SCC Rules do not lay down that SCC's instructions must contain an explicit request to appoint an arbitrator. Kazakhstan was also requested to comment on the Investors' proposal that the arbitrators appointed by the parties should appoint the chairman of the tribunal. The SCC did not act in breach of the principle of equal treatment.

An answer and an appointment of an arbitrator should take place within the time prescribed by the SCC. The actions of the SCC in this respect were in accordance with the arbitration agreement, the SCC's practice and basic principles and rights. Kazakhstan had competent and experienced officials with the necessary language skills. There is also a Russian translation of the SCC Rules on SCC's website. In addition, Kazakhstan has been involved in a large number of arbitrations at the SCC before this ECT case and was well acquainted with the relevant rules and practices. There is no ground for why Kazakhstan should have been treated more favourably in its capacity as a state or because the matter concerned a complicated investment dispute. Neither the method of sending the documents, Kazakhstan's own bureaucracy, its alleged shortcomings in English or its need for counsel justified the setting of a longer time limit. Kazakhstan did not request an extension and did not participate in any way in the process until more than a month after the SCC appointed an arbitrator on its behalf.

Kazakhstan failed to appoint an arbitrator within the period set by the SCC. The SCC therefore appointed an arbitrator on Kazakhstan's behalf, without consulting any of the parties. In the situation that arose, the arbitration agreement gives Kazakhstan no right to be consulted.

Kazakhstan failed to object in time to the appointment of the arbitral tribunal, thereby forfeiting its right to protest against this potential error. Following the appointment of Sergei Lebedev and Karl-Heinz Böckstiegel Kazakhstan confirmed to the tribunal at the hearing on the jurisdiction issue on 8 October 2012, that there were no objections to the proceedings up until then. Kazakhstan has lost its right to assert the alleged error.

The notion that the SCC should have given Kazakhstan the opportunity to appoint a new arbitrator when Kazakhstan finally engaged in the arbitration is contested.

The SCC did not commit a mistake, but acted in accordance with its rules and followed its practice regarding the appointment of an arbitrator.

It is denied that Sergei Lebedev adopted a passive role, or that an arbitrator appointed by a party has a duty to ensure that the party's case is correctly understood by the tribunal.

### 3.2.2.4 Excesses of mandate or procedural error (alleged faulty assessment of evidence etc.)

Taras Khalelov's witness statement and testimony

The question was whether the LPG Plant should be valued as a "going concern", as the Investors claimed, or at a scrap value, as Kazakhstan claimed. The tribunal did not consider facts or evidence which had not been referred to by the Investors.

The Investors never withdrew the claim that Kazakhstan intended to complete the construction and start up the operation of the LPG Plant. This is not altered by the fact that the Investors did not subsequently repeat this assertion. The Investors also stated in their "Post-Hearing Briefs" that they maintained everything that had been stated earlier in the case.

The evidence in the form of information from publicly available websites for the Mangystau region and the Kazakh embassy in Israel was introduced in the case in a proper manner as a result of the Investors' expert testimony from FTI and as attachments to the Investors' submission dated 7 May 2012. The Investors also put forward other evidence consisting of Victor Romanosov's witness statement.

The arbitral tribunal took account of all the written and oral evidence that had been referred to by the parties, including Taras Khalelov's witness statement and testimony. Even if the tribunal would have committed a procedural error by not taking account of this evidence, this error would not at any rate have influenced the outcome of the case. The evidence was not sufficient to rebut the circumstances on which the tribunal based its conclusions regarding the value of the LPG Plant.

The tribunal has consequently not exceeded its mandate or committed any procedural error that has probably influenced the outcome of the case.

Kazakhstan's expert and testimonial evidence

The arbitral tribunal took note of all the evidence, including evidence relating to:

- the classification of pipelines
- the pre-emptive rights
- the back tax assessment
- causality, and
- geological issues.

Kazakhstan's assertions in this part are groundless and neither individually nor taken together amount to an excess of mandate or procedural errors which probably influenced the outcome of the case.

The arbitral tribunal did take into account Kazakhstan's evidence concerning the content of Kazakh law on the classification of pipelines. The issue of fair and equitable treatment included questions concerning the classification of pipelines under Kazakh law. Even Kazakhstan's arbitrary handling of the classification issue was contrary to the obligation to respect fair and equitable treatment and Kazakh law was of limited significance for the assessment of classification.

The tribunal accounted for the parties' main submissions in chronological order without mentioning expert reports or witness statements. Kazakhstan's assertions regarding Anatoly Didenko, Kadirbek Latifov and Salamat Baymaganbetov are incorrect. Anatoly Didenko's statement is mentioned in the arbitral award, see ¶ 193 of the award). Kadirbek Latifov's statement was submitted as a witness statement (not as an expert report) to Kazakhstan's second submission. Further, Kazakhstan did not account for any costs relating to Kadirbek Latifov's statement, cf. ¶ 1872 of the award. The tribunal noted that Salamat Baymaganbetov was heard on 8 October 2012, see ¶ 117 of the award.

Kazakhstan's allegation regarding the tribunal having decided an issue of Kazakh civil law without taking into account the expert opinion of Kulyash Ilyassova, invoked by Kazakhstan, is unfounded. Kulyash Ilyassova's opinion on Kazakhstan's pre-emptive rights relating to the shares in TNG which were transferred from Gheso to Terra Raf is accounted for in the arbitral award, see ¶¶ 787 and 993 of the award.

The tribunal has correctly decided the issue of Kazakh tax law relating to the back tax issue, taking into account everything put forth by Kazakhstan, including expert testimony by Tomas Balco and the witness Nurlan Rahimgaliev. Both Tomas Balco and Nurlan Rahimgaliev are mentioned on several occasions in the award in connection with the positions of both the Investors and Kazakhstan.

The tribunal has correctly decided the issue of causality – including the issue of intervening cause and the financial structure of KPM and TNG – taking into account everything put forth by Kazakhstan, including the experts from Deloitte, see ¶¶ 1456 and 1503 of the award.

The tribunal has correctly taken note of all geological expertise, including Gaffney Cline & Associates, and the award does not lack reasons regarding the significance of the geological issues in relation to the amount of damage.

Objections regarding deductions from the damages

The arbitral tribunal took note of Kazakhstan's objections that certain deductions should be applied to any damages, as far as both revenues that had accrued to the Investors after the valuation date (USD 215.3 million) and the fact that the damages in respect of the LPG Plant could not exceed half its value by reason of the Investors' agreement with Vitol (USD 99.5 million) were concerned. Kazakhstan's objections related to the question of the amount of damages and did not constitute a counterclaim or a set-off objection. The arbitral tribunal has in the reasons for the award adequately presented their assessments and correctly found that no deductions would be made, see ¶¶ 1530– 1531 and 1539 of the award.

Profits, to which Kazakhstan referred and which had been distributed, had been earned before both the valuation date used by the tribunal and the valuation date on which the Investors relied. Such profits would not be deducted from the damages, which were to correspond to the present value of profits KPM and TNG were expected to generate in the future. (Cf. ¶¶ 1473-1477 of the award).

Vitol did not own any part of the LPG Plant and Vitol's agreement with the Investors for the financing of the LPG Plant, the JOA Agreement, did not motivate any

deductions from damages. The tribunal did not exceed its mandate or committed any procedural error that probably influenced the outcome of the case, see ¶ 1539 of the award.

### 3.2.2.5 Other excesses of mandate or alternatively procedural errors

The arbitral tribunal made no judgement regarding circumstances that had not been invoked and did not neglect to take account of anything that it should have done. The circumstances that Kazakhstan claims the tribunal made a judgement on without the necessary references are evidentiary facts. The tribunal can take note ex officio of evidentiary facts on the basis of the existing facts and documents presented. The tribunal took into account the applicable law and the principles of international law correctly.

KazAzot

The arbitral tribunal based its considerations in respect of KazAzot on circumstances invoked by the parties. The Investors invoked the fact that Timur Kulibayev, the President's son-in-law, controlled KazAzot and that international legal principles of state liability are applicable on KazAzot's decision not to sign the so-called tripartite agreement. (See ¶¶ 639, 674 and 1094 of the award). Even if the parties treated KazAzot as a question of both liability per se and the size of the damages, the tribunal was free to decide this as a question of liability. The tribunal correctly applied international law and did not neglect to take account of anything.

Interfax

The arbitral tribunal's assessment of Kazakhstan's liability for the press release from Interfax was a legal assessment that lay within the framework of the arbitral tribunal's mandate. The tribunal made no judgement in respect of a circumstance that had not been invoked. The Investors invoked that the press release from Interfax was the result of involvement by the government and was part of a larger campaign aimed at KMP and TNG. (See ¶¶ 348, 1122, 1335 and 1339 of the award).

The financial police's classification of pipelines

As regards the decision of the Kazakh financial police regarding the classification of pipelines, the arbitral tribunal based its decision on circumstances invoked by the Investors. The Investors referred to the fact that on 10 December 2008 the Financial Police informed the Deputy Prime Minister of its decision that KPM's and TNG's pipelines were trunk pipelines and not field pipelines, see ¶ 343 of the award. Kazakhstan admitted in writing that a letter from the finance police to the Deputy Prime Minister stated that the financial police had decided that the pipelines in question were trunk pipelines. The tribunal was entitled to take account of this admission as an evidentiary fact, see ¶ 990 of the award.

The Tristan notes

With regard to the Tristan notes and the enterprise value of KPM and TNG, the arbitral tribunal based its decision on circumstances invoked by the parties. The Investors invoked the fact that they had a continued responsibility for the Tristan notes and that they would have to deduct the debt under the Tristan notes from the awarded damages, see ¶¶ 1752–1758 of the award. Kazakhstan admitted that the "enterprise value" was a correct method of evaluation if the Investors were liable to pay compensation to the holders of the notes. Since the arbitral tribunal concluded that this was the case, it was correct that the parties were in agreement on which valuation method should apply, see ¶¶ 1769–1771 of the award. Kazakhstan was entitled to reconsider its admission, although the tribunal was still free to take note of what evidentiary value the previous admission might have.

Valuation method

With regard to the damages relating to the Tolkyn and Borankol fields, the arbitral tribunal based its decision on the amount of the damages on an alternative calculation that Kazakhstan had introduced and described as suitable, see ¶ 1625 of the award. The arbitral tribunal did not base its decision on a formal admission by Kazakhstan, but instead made an evaluation of the evidence, which is a substantive issue.

The arbitral tribunal has thus not exceeded its mandate or committed any error which probably influenced the outcome of the case.

SVEA COURT OF APPEAL          **JUDGMENT**                              35
Department 02                                        T 2675-14

# 4. THE INVESTIGATION

The parties have relied on fairly extensive testimony, both oral and written. As far as the oral testimony is concerned, certified engineer Ernst Kallweit, project manager Franjo Zaja, authorised public accountant Thomas Gruhn, Professor Thomas Grant and attorney at law Dr Horacio A. Grigera Naón appeared on behalf of Kazakhstan, while attorneys at law Kenneth R. Fleuriet, Johan Gernandt and Gary B. Born appeared on behalf of the Investors.

# 5. THE COURT'S FINDINGS

## 5.1 The layout of the findings

The case involves the annulment and challenge of an award in which the arbitral tribunal examined compensation claims brought by the Investors against Kazakhstan relating to investments they had made on Kazakhstan territory. Kazakhstan's action rests on the ground that the award is invalid since in itself, or in the manner in which it arose, it is clearly incompatible with the basic principles of the Swedish legal system (ordre public). Kazakhstan has also argued that the award should be set aside on the ground that it is not covered by a valid arbitration agreement between the parties and because one of the arbitrators was not appointed in the proper manner. In addition, it has claimed that the award should in any event be set aside on the ground that the arbitrators in several respects exceeded their mandate and a number of procedural errors occurred that affected the outcome of the case.

The Court will first set out the general legal starting points that it has for examining the grounds for annulment and setting aside of the award that Kazakhstan has invoked. However, the preconditions for a valid arbitration agreement in relation to article 26 ECT will be dealt with as a whole by the Court in section 5.3.2.

After setting out the legal starting points for its examination, the Court will reach a view on Kazakhstan's action according to the factual circumstances case that Kazakhstan has referred to and will carry out the examination in the same order as in the layout chosen by Kazakhstan for the presentation of the grounds for its action above in section 3.1.

Finally, the Court will also set out a summary of its conclusions and its overall assessment of the grounds referred to by Kazakhstan in support of the award being annulled or set aside.

In the last part of its findings the Court will set out its decision in regard to litigation costs.

## 5.2 Legal starting points for the Court's examination

### 5.2.1 Ordre public as a ground for annulment

According to s.33 (1) (2) SAA, an award is invalid if it, or the manner in which it arose, is clearly incompatible with the basic principles of the Swedish legal system.

Swedish law takes a restrictive approach to the possibility of having an arbitral award annulled pursuant to the above provision. The legislative history of the provision makes clear that it is intended only to cover extremely invidious cases and that, due to its narrow scope, it will only be applicable extremely rarely, together with the fact that it covers cases where basic legal principles of a substantive or procedural nature have been disregarded (see Bill 1998/99:35 pp. 142 and 234). In this connection it may also be mentioned that the handbook of the SCC's Arbitration Institute states that the term ordre public should be interpreted very narrowly when clearly invidious cases are involved in which elementary principles have been ignored (see Öhrström, Stockholm Chamber of Commerce Arbitration Institute, A Handbook and Rule Commentary for Arbitration Proceedings, 2009, p. 80). Moreover, it follows from the ruling by the Supreme Court in NJA 2015 s. 433 that if the circumstances of the case as presented by the parties support the view that an award would clearly be contrary to the legal system, the court should inform the parties of this of its own accord and give them an opportunity to develop their views in the matter.

In the legislative history of the Swedish Arbitration Act, the following is mentioned as an example of when an award is considered to be clearly incompatible with the basic principles of the Swedish legal system (Bill ibid., p. 141 f.). This is considered to be the case when the arbitral tribunal has examined a question that a public court should not be involved in, such as a claim based on gambling or criminal acts (e.g. an order to pay an agreed bribe). Other cases mentioned are when someone has been forced as a result of

the award to act in a way that is forbidden by law or the award is of such a punitive kind that it cannot be regarded as acceptable. Another example is when the tribunal has heard a dispute without taking account of a mandatory rule of law in favour of a third party or a public interest (ibid.).

The provision of s.33 (1) (2) SAA regarding ordre public also focuses on fundamental legal principles of a procedural nature through its reference to the way in which the award has arisen. An example of such a situation when this may happen is stated in the legislative history to be when the award has arisen after a crime, e.g. following a threat to or bribery of an arbitrator (Bill ibid., p. 142).

Also awards that are based on false evidence seem to be covered by the term ordre public (see the Report of the Arbitration Committee, SOU 1994:81, p. 182). This Committee considered the introduction of an explicit legal provision whereby an award could be set aside on the action of a party if a document invoked in evidence had been forged or misrepresented or if someone other than a party or a representative of a party had deliberately made a false statement and the document or statement could be assumed to have influenced the outcome of the case (ibid., paragraph 6.5). However, making the judicial case review provisions fully applicable to awards was considered by the Committee to be too much at variance with the aim that arbitration should result in a definitive decision without delay. The Committee therefore put forward a proposal which was only to some extent in line with the provision for a case review in the Code of Judicial Procedure (ibid., p. 182). The Government, however, chose not to implement the proposal of the Arbitration Committee in this respect, justifying its position not to allow the option of having an award set aside if false evidence or untrue oral testimony has influenced the outcome mainly with the interest that the regulations should as far as possible satisfy the parties' demands for a swift and efficient procedure and guarantee the finality of an award (Bill ibid., p. 150 ff.). To this end, it was considered to be particularly important to avoid rules that through their construction invite a set aside action and create uncertainty for a long time about the validity of the award (ibid.). The Government, however, also referred to the Committee's conclusion that the situation where false evidence had been invoked should be included in the term ordre public, as in the UNCITRAL Model Law on International Commercial Arbitration and the 1958 New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards (ibid.). In the literature it has been assumed that an award could be considered invalid in certain exceptional cases on the ground of ordre public in the situation just described

(see Heuman, ibid., p. 600 f). Put forward as a reason for this have been, inter alia, attempts to harmonise Swedish law with foreign practice. It has also been pointed out at the same time, however, that the ordre public provision may not be applied in such a way as to create an open-ended opportunity of having the award declared invalid on this ground (see Heuman, ibid., p. 600).

### 5.2.2 Excess of mandate and procedural errors as grounds for annulment

An award may also, according to s. 34 (1) (2, 4 and 6) SAA, be set aside following a challenge if the arbitrators have exceeded their mandate, if an arbitrator has been appointed contrary to the agreement between the parties or the SAA or, without fault of the parties, if there has otherwise been an irregularity during the proceedings which has probably influenced the outcome. The mandate of the arbitral tribunal is governed by the arbitration agreement, by any agreements between the parties about the procedure, and by the actions of the parties in the procedure. It may sometimes be difficult to decide what is included in the term mandate and whether certain procedural errors should be decided according to the provision in paragraph 2 or whether they should be decided according to the general clause in paragraph 6, which is aimed at other procedural errors (see Heuman, ibid., p. 605 f., and Lindskog, Arbitration. A commentary, Zeteo, May 2016, the comments on s. 34, para. 4.2.3).

In the case NJA 2009 s. 128, the Supreme Court, referring to reasons and the literature, summarised its view as to when an error that has been committed should be considered to be an excess of mandate or a procedural error. The Supreme Court also sets out what are the requirements on the reasons given in an award, as follows:

> The provision in s.34 (1) (2) SAA about an excess of mandate is aimed at the framework for the arbitral tribunal's substantive examination of the matter assigned to it. One example of an excess of mandate is when the arbitral tribunal goes beyond the parties' claims, while another is that it has based its decision on a legal fact that has not been invoked (Bill 1998/99:35 p. 145; cf., inter alia, Lindskog, Arbitration. A commentary, 2005, p. 960 f.).

> The parties can also other than through claims and references limit the extent of the arbitral tribunal's examination. For example, they can limit it to the application of a particular legal provision or in another limiting way be in control of the procedure. It follows from s.21 SAA that the tribunal should then abide by what the parties have decided unless there is something that prevents this. Should such a limiting instruction from the parties be disregarded, as a rule there will probably be an excess of mandate (Bill ibid., p. 146, cf., inter alia, Heuman, Arbitration Law, 1999, p. 616).

> The situation is different with instructions aimed at how the procedure should be conducted within the framework that follows from the arbitration agreement, claims, facts invoked and evidence introduced. If the tribunal does not follow an instruction of this kind, there will normally

> be a question of a procedural error according to s.34 (1) (6) SAA (see, for example, Heuman, ibid., p. 652 f. and Lindskog, ibid., p. 965 f.). … There may be different reasons for an instruction in the arbitration agreement that the award should include the reasoning behind it. The parties, in the absence of more detailed provisions about what should be included in the reasons for the decision, may also have more or less far-reaching expectations of the tribunal's account of its deliberations. However, the question of whether the tribunal's reasoning is so deficient that it amounts to a ground for a challenge must be separated from what the parties with or without justification expect of the reasons for the award and what in this respect can be regarded as good practice among arbitrators.
>
> The setting out of adequate reasoning behind an award amounts to a guarantee of the rule of law, since it obliges the tribunal to analyse the legal issues and the evidence. Against the value of having the reasons for the outcome set out in full, however, should be set the interest of the finality of the award when there is a question of a challenge. A challenge does not allow for a substantive review of the tribunal's viewpoints. For this reason and because a qualitative assessment of its reasoning would give rise to significant difficulties of demarcation, only a complete absence of reasons, or reasons which, under the circumstances, must be regarded as so incomplete that they can be equated with their absence, can imply the existence of a procedural error.

It is usual for an arbitral tribunal in a procedural order to take decisions in different procedural issues and in regard to the detailed forms of the procedure. In many cases a procedural order does not reflect an agreement between the parties that provides the framework for the tribunal's mandate, but is instead a procedural decision taken by the tribunal within the framework of the mandate (cf. Born, International Commercial Arbitration, vol. 2, 2014, p. 2230).

Section 21 of SAA says that the arbitrators shall handle the dispute in an impartial, practical, and speedy manner and that they shall thereupon act in accordance with the decisions of the parties insofar as there is no impediment to so doing. This means that the tribunal, in its handling of the dispute, shall observe, among other things, the principle of equal treatment that follows from this section, namely that the parties should be treated equally in procedural respects.

In the light of these legal starting points, the Court of Appeal will now proceed to examine the grounds adduced for the annulment and setting aside of the award.

## 5.3 The question of the annulment alternatively setting aside of the award

### 5.3.1 Annulment due to the fraudulent arrangement, false evidence, misleading information etc.

Kazakhstan has claimed that the award, and the manner in which it arose, is contrary to ordre public, referring to the detailed circumstances described in para. 3.1.2.1.

The Court of Appeal makes the following assessment:

In the arbitration in question the Investors claimed that Kazakhstan had breached its obligations under the ECT by violating the investment protection rules in the ECT and that Kazakhstan was therefore liable to pay damages to the Investors in respect of the so called LPG Plant, among other things. The existence of the plant is not in dispute in the case and it is also clear from the investigation put forward here that investments were made in it. It is clear from the award that Kazakhstan disputed the Investors' claim, which meant that the arbitral tribunal carried out a substantive examination of the claim. In the light of this, there is no reason to question that there has been a underlying genuine legal relationship between the parties (cf. the decision of the Supreme Court in NJA 2002 C 45), and a claim such as that of the Investors, in the Court's view, is in no way comparable with a claim that a public court would refuse to take note of. Sweden's undertakings under the United Nations Convention against Corruption do not lead to any other assessment. Neither does the award otherwise deals with questions noted in the legislative history as typical examples of when an award can be considered to be contrary to ordre public. In other words, it is already entirely clear on the basis of these conclusions that what Kazakhstan is asserting cannot lead here to the assessment that the award in itself is clearly contrary to the basic principles of the Swedish legal system and is thus invalid.

In the arbitration the Investors invoked evidence in the form of oral testimony, witness statements and expert reports as corroboration of the fact that the investment costs in the LPG Plan corresponded to the amount claimed. It is clear from the award, however, that the tribunal based its decision regarding the damages for the LPG Plant on the so-called indicative bid made by KMG, see ¶¶ 1746–1748 of the award.

As the Court has described above, the scope of the ordre public provision is very narrow and the legislator has also clearly come down on the side of not introducing a provision in the Arbitration Act corresponding to the case review mechanism. In the Court's opinion, there should therefore be no question of annulling an award solely for the reason that there has been false evidence or untrue statements when it is not clear that these have been directly determinative for the outcome (cf. Heuman, ibid., p. 600 f). Situations may, however, be envisaged where the invoking of a false statements may have an indirect effect on the tribunal in its examination of the dispute. However, in view of the narrow area of application and the restrictiveness that should exist on opening the way to a new substantive examination of the matter in dispute within the scope of an annulment process, there should be no question, in the view of the Court, of allowing such an indirect influence on the arbitral tribunal to result in the award being considered to be invalid other than when it is obvious that this indirect influence has been of decisive importance for the outcome of the case.

Since the tribunal based its decision on the indicative bid, the evidence invoked by the Investors in the form of oral testimony, witness statements and expert reports regarding the amount of the investment cost – evidence which Kazakhstan claimed was false – has not been of direct significance for the outcome. This circumstance alone means that this evidence per se, even if it should prove to be false, cannot constitute sufficient grounds, in the Court's view, for considering the award to be invalid. Neither is it obvious, according to the Court, that this evidence, through an indirect influence on the tribunal, was of decisive importance for the outcome of the case.

When it then comes to the question of whether the indicative bid per se amounted to false evidence, it is not disputed that KMG, before the arbitration was initiated, had made the bid in question of USD 199 million for the LPG Plant. The indicative offer per se is thus not to be regarded as false evidence even if potentially incorrect details of the amount invested in the LPG Plant through the annual reports of Tristan Oil, KPM and TNG have been among the factors that KMG took into account when calculating the size of the bid. The allegedly false information in the annual reports thus did not directly lie behind the tribunal's decision regarding the value of the LPG Plant. In this light, the reference made by the Investors to the indicative bid did not amount to an invocation of false evidence.

Finally, in regard to Kazakhstan's assertion that in the arbitration the Investors withheld from the tribunal and Kazakhstan certain information that could have influenced the outcome of the case, the Court observes that one party in a case amenable to out-of-court settlement like arbitration cannot be required to provide the opposite party with information that is prejudicial to its own case. There is no scope for considering that the award is invalid on this ground, particularly in the light of the very narrow scope of the ordre public rule.

In summary, the Court finds that none of the circumstances invoked by Kazakhstan here, either individually or as a whole, are such that the award, or the manner in which it arose, is clearly incompatible with the basic principles of Swedish law.

### 5.3.2 Setting aside the award on the ground that it is not covered by a valid arbitration agreement

Kazakhstan has claimed here that the award is not covered by a valid arbitration agreement between the parties since the Investors submitted their request for arbitration only five days after the KPM and TNG's agreement on exploitation rights had been terminated and so breached the mandatory provision of a three-month preliminary negotiation set out in article 26 (2) ECT. Kazakhstan has invoked here the circumstances described in section 3.1.2.2.

The Court of Appeal makes the following assessment:

In order for an arbitral tribunal to have jurisdiction to examine a dispute, a valid arbitration agreement must exist between the disputing parties. The question of whether in the present case there had been an arbitration agreement between the Investors and Kazakhstan must be decided on the basis of article 26 ECT, which was invoked by the Investors as a ground for the jurisdiction of the tribunal in their request for arbitration against Kazakhstan, which was submitted to the SCC on 26 July 2010.

The ECT is a multilateral so-called investment protection treaty entered into by states. Article 26 ECT contains provisions for the resolution of disputes between a contracting state and an investor from another contracting state. The relevant parts of this article read as follows:

> (1) Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an

obligation of the former under Part III shall, if possible, be settled amicably.

(2) If such disputes cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:
(a) to the courts or administrative tribunals of the Contracting Party party to the dispute;
(b) in accordance with any applicable, previously agreed dispute settlement procedure; or
(c) in accordance with the following paragraphs of this Article.

(3)(a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article. […]

(4) In the event that an Investor chooses to submit the dispute for resolution under subparagraph (2)(c), the Investor shall further provide its consent in writing for the dispute to be submitted to: […]
(c) an arbitral proceeding under the Arbitration Institute of the Stockholm Chamber of Commerce.

Article 26 ECT contains an offer from each and every one of the contracting states to investors from another contracting state to resolve certain disputes under the ECT through, among other things, arbitration. In an individual case an arbitration agreement arises between a state and an investor, which gives an arbitral tribunal jurisdiction to examine a dispute between the parties through the investor accepting the state's offer, which it does in the form of a request for arbitration against the state.

The parties disagree about the interpretation of the ECT as to whether the offer of arbitration from a state under article 26 ECT contains a condition whereby the requirements that are stated in paragraph (2) – namely that it has not been possible to resolve the dispute between the parties within three months of when one of them requests an amicable settlement – must have been met at the time an investor requests arbitration against the state in order for an arbitration agreement between the parties to arise as a result of the request. The question is thus whether the provision lays down a condition that must be met in order for an arbitral tribunal to have jurisdiction to examine the dispute.

Since the ECT is a treaty between states, the interpretation of article 26 ECT shall be in accordance with articles 31 and 32 of the Vienna Convention on Treaty Law. Article 31 contains a general rule of interpretation which states that a treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty viewed in their context and in the light of the object and purpose of the treaty. The starting point of the interpretation is invariably the wording of the treaty. If the wording is clear, it also basically becomes the endpoint of the interpretation. The object and purpose of a treaty are not an independent means of interpretation, but part of the

interpretation to be carried out under article 31 in order to understand the ordinary meaning of the treaty (cf. the decision of the Court of Appeal on 18 January 2016 in case no. T 9128-14, together with the references there).

According to article 32 of the Vienna Convention, recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order confirm the meaning resulting from the application of article 31, or to establish the meaning when an interpretation under article 31 leaves the meaning ambiguous or obscure or leads to a result which is manifestly absurd or unreasonable.

In accordance with what has been stated, the interpretation of article 26 ECT shall be made with the wording of the provision as the starting point.

Article 26 (1) ECT states initially that disputes between a contracting state and an investor should, if possible, be resolved by mutual agreement. According to paragraph (2), if a dispute cannot be resolved in this way within three months of the date on which one of the parties requests an amicable settlement, an investor may choose to refer the dispute to various forms of dispute resolution, including arbitration according to the following paragraphs in the article.

The wording of the provisions concerned does not provide an answer to what may be incumbent on the parties during the three-month deadline, e.g. on the question of the attempts to be made in order to reach a mutually agreed resolution. Nor is it clear what applies if it is already clear before the expiry of the deadline that no mutual agreement can be reached within three months. In the Court's opinion, the circumstances mentioned do not support the view that the provisions are intended to lay down conditions for the jurisdiction of an arbitral tribunal. This interpretation receives further support when account is taken of the drafting of article 27 ECT, which is about dispute resolution between two contracting states. According to this provision, a state may refer a dispute to so-called ad hoc arbitration if its resolution has not proved possible within a reasonable time through diplomatic channels. The difficulties of deciding what constitutes *a reasonable time* support the view that it is not a question of a condition for the jurisdiction of an arbitral tribunal. The fact that the provisions in articles 26 and 27 ECT have a similar construction points towards, in the Court's view, that they should be interpreted in the same way.

While it is clear that the purpose of the provisions in article 26 (1) and (2) ECT is to allow the parties some time to reach a consensus before arbitration starts, the Court notes that the provisions do not explicitly deal with the conditions for consent on the part of a state to arbitration and the conditions for an arbitration agreement arising between the parties. This question is touched upon, on the other hand, in paragraph (3)(a), which states that each contracting state gives its unconditional consent to the referral of a dispute to international arbitration or conciliation in accordance with the provisions of the article. A reservation is made only for the exceptions stated in paragraphs 3(b) and (c), which are not relevant to the case at hand. The Court notes that paragraph (3) contains no mention of paragraph (2) and the conditions stated therein. In the Court's view, the reference to the state giving its consent to arbitration "in accordance with the provisions of this article" cannot be interpreted as saying that additional conditions are thereby laid down for the state's consent.

In summary, the Court is of the opinion that the wording and the formulation of article 26 ECT support the conclusion that the consent of a state to arbitration does not include a condition that the prerequisites mentioned in paragraph (2) must have been met at the time that an investor requests arbitration against the state in order for an arbitration agreement between the parties to arise as a result of the request. The wording of the article alone, however, cannot be considered to give an unambiguous reply to this question.

The Court observes that in the legal literature and among international arbitral tribunals that have had to decide in this matter it is a disputed question whether provisions of this kind – which prescribe that arbitration must be initiated after a certain time has passed from when a party requested an amicable settlement or from when the events that gave rise to the dispute took place – lay down conditions that must be met in order for a tribunal to have or not have jurisdiction to examine a dispute. In the literature there is support for both views (see Gary B. Born's expert opinion of 19 August 2015, p. 5 f. and 10 and Dr Thomas D. Grant's expert opinion of 14 July 2015, pp. 19 and 39 f., together with the references there).

Based on what has been stated in these expert opinions, the Court further notes that there appears to be no uniform practice among international arbitral tribunals regarding the interpretation of article 26 ECT and similar provisions in other investment

protection treaties (see the expert opinions of Gary B. Born of 19 August 2015, pp. 13–20 and Dr Thomas D. Grant of 14 July 2015, pp. 23–38, together with the references there). However, the Court notes that no example has been identified in the opinions where an arbitral tribunal applying the ECT has rejected a claim on the ground that the investor has not taken account of what is stated in article 26 (2) ECT. Furthermore, only a few decisions regarding the application of other investment protection treaties in which the claim of an investor has been rejected on the ground in question have been identified. In other words, even if it is not possible to find a unanimous view about how article 26 ECT should be interpreted in the current respect, there appears, in the Court's opinion, to be some preponderance for the view that such provisions should not be considered to constitute conditions for the arbitral tribunal's jurisdiction.

Since therefore neither the wording in and the formulation of article 26 ECT or legal literature and international practice provide the necessary support for the interpretation, the Court needs also to take account of the object and purpose of the provision.

The provisions governing international dispute resolution in the ECT have arisen against the background of the disquiet that existed in regard to the neutrality, competence and effectiveness of the national courts in some of the contracting states (Energy Charter
Secretariat, The Energy Charter Treaty: A Reader's Guide, 2002, p. 51). One of the purposes of providing in the ECT alternative methods of dispute resolution before international arbitral tribunals was to contribute to greater confidence on the part of investors and to encourage the flow of investments between the contracting states (ibid., p. 51). The main purpose of the dispute resolution provision in article 26 ECT should therefore be considered, according to the Court, to be to give investors an opportunity to resolve disputes under the ECT with a contracting state through international arbitration.

The resolution of disputes through arbitration is aimed at giving the parties a swift and definitive decision regarding their dispute. These interests have been advanced in the literature and by international arbitral tribunals as an argument against interpretation of the provisions as meaning that the parties must have attempted to resolve a dispute by consensus before arbitration can be requested as conditions that must be met if the tribunal is to have jurisdiction to examine the dispute (see the expert opinion of Gary B. Born of 19 August 2015, p. 5 f., together with the references there). In this connection it has been pointed out, among other things, that the prescribed deadline has often passed

when the arbitral tribunal examines the question of its jurisdiction. If the tribunal in such a situation were to reject the investor's claim because the arbitration had been initiated before the deadline had passed, the investor could immediately raise the claim anew. A rejection would in this case only result in the arbitration being unnecessarily delayed.

It may also be noted that it would amount to an unjustified delay in an investor's opportunity to have a claim against a state under the ECT examined by international arbitration to require the investor to postpone raising the claim for three months from when a request for an amicable settlement was made, when it is already clear before the deadline has passed that there are no prospects of obtaining a settlement.

Moreover, the arbitral tribunal's examination of its jurisdiction could be so extensive that the proceedings are delayed in a manner that is not desirable. One example that may be mentioned is that the tribunal would need to examine what requirements should be placed on the request by a party for an amicable settlement and whether the party that has requested arbitration is required first to have made an attempt in good faith to reach a resolution through mutual agreement. As mentioned earlier, article 26 (1) and (2) ECT gives no answer to these questions. The question of the arbitral tribunal's jurisdiction may also be referred to a court for examination (cf. s.2 SAA), which may further delay the procedure.

The interest also that the parties have in an award entailing a final decision of their dispute is evidence against regarding provisions that arbitration should be preceded by settlement negotiations for a certain period as a condition of the tribunal's jurisdiction. Otherwise an award could be challenged on the ground in question and later set aside should the court which hears the set aside action come to another decision on the question of jurisdiction than the one made by the tribunal. Furthermore, for the same reason the enforcement of the award may be withheld for a long time after the arbitral proceedings were concluded.

In this connection the Court further notes that the aims of the provisions in article 26 (1) and (2) ECT in any event may partly be met even after arbitration has commenced. These aims should be considered mainly not only to encourage the parties to try and reach consensus with a view to avoiding unnecessary disputes, but also to give the parties time to prepare for a possible dispute. This can be achieved by the arbitral

tribunal declaring a stay the proceedings for a certain period to give the parties an opportunity to conduct settlement negotiations as well as time in which to prepare. Such action appears to be common among international arbitral tribunals and did also take place in the proceedings between the Investors and Kazakhstan. The provisions thus do not become ineffectual even though they are not considered to lay down conditions for the jurisdiction of the tribunal, but may be dealt with by the tribunal within the scope of the procedure.

In the light of what has been stated, the Court finds that there are weighty reasons in favour of an interpretation of article 26 ECT whereby the conditions stated in paragraph (2) do not constitute conditions that must be met at the time when an investor requests arbitration in order for an arbitration agreement giving the tribunal jurisdiction to examine the dispute to arise through the request. The contracting states have, according to paragraph (3), given their unconditional consent to the resolution of certain disputes under the ECT through arbitration. Additional conditions for an arbitration agreement to arise when an investor accepts the offer by requesting arbitration against the state should not, in the Court's view, be laid down without explicit support in the wording of the provisions. Such support is lacking in the present case.

In summary, the interpretation of article 26 ECT made by the Court means that an arbitration agreement between the Investors and Kazakhstan that gave the tribunal jurisdiction to examine the dispute between the parties arose as a result of the Investors' request for arbitration against Kazakhstan, which was submitted to the SCC on 26 July 2010, regardless of whether or not the conditions stated in paragraph (2) had been met at the time of the request. The award should therefore not be set aside on the grounds that it is not covered by a valid arbitration agreement between the parties.

### 5.3.3 Annulment or setting aside of the award on the grounds of the appointment of the arbitrators

Kazakhstan has argued here both that the award is invalid according to s.33 (1) (2) SAA and that grounds exist for setting aside the award according to s.34 (1) (4 or 6) SAA. Kazakhstan has also invoked the detailed circumstances describe in section 3.1.2.3. In summary, Kazakhstan has mainly argued that it was never given an opportunity to appoint an arbitrator, that the deadlines for submitting a reply were too short and that it was at no time able to comment on the appointment of Sergei Lebedev. According to

Kazakhstan, the SCC in this way breached not only the basic principles of the Swedish legal system, but also its own rules and the Arbitration Act. Kazakhstan has also claimed here that at any rate procedural errors occurred which influenced the outcome of the case, highlighting in this connection the fact that the arbitrator Sergei Lebedev acted passively during the arbitration.

The Investors have objected that there is no ground for either the annulment or setting aside of the award. They have added that Kazakhstan forfeited its right to claim the potential error and that in October 2012, according to what was noted in the award, Kazakhstan stated that there were no objections to the procedure.

The Court will first describe what emerged about what the situation was at the SCC in connection with the appointment of the arbitral tribunal when Sergei Lebedev was nominated.

On 5 August 2010 the SCC sent the Investors' request for arbitration, including appendices, to Kazakhstan, instructing it in English to submit a reply by 26 August 2010 and referring it to Article 5 of the SCC Arbitration Rules, which were also enclosed. It was also pointed out, in particular, that Kazakhstan should comment on the Investors' proposal that the arbitrators appointed by the parties should appoint the chairman. In their request for arbitration the Investors had asked that the tribunal should consist of three arbitrators and that the SCC, according to Article13 (3) of the SCC Rules, should appoint an arbitrator if Kazakhstan did not appoint anyone. Enclosed with the instruction were also the names of the officials dealing with the matter at the SCC's office, together with their contact details. The documents were sent by courier and reached Kazakhstan on 9 August and were received at the Department of Justice two days later. Fifteen days later the deadline ran out, with no word from Kazakhstan. On 27 August a reminder, also in English, was sent, asking Kazakhstan to submit a statement of defence according to Article 5 of the SCC Rules. Reference was also made to the instruction dated 5 August. In addition, Kazakhstan was informed that the absence of a reply would not prevent the arbitration from proceeding. A new deadline for a statement of defence was given, namely 10 September.

The Department of Justice in Kazakhstan received the reminder on 1 September, but no reply came from Kazakhstan before the deadline passed. On 13 September the Investors asked the SCC to appoint an arbitrator on Kazakhstan's behalf, and notice of this

request was sent to Kazakhstan on the same day. Ten days later the SCC appointed Sergei Lebedev arbitrator on Kazakhstan's behalf, also deciding that the seat of the arbitration should be Stockholm. Kazakhstan received this decision on 27 September. On the following day the SCC appointed Karl-Heinz Böckstiegel chairman of the tribunal and Kazakhstan learned of this decision on 1 October. Just over a month later, on 8 November, Kazakhstan gave notice of its counsel in the arbitration, in which connection a reservation was made for possible objections regarding jurisdiction and the procedure. In a letter to the SCC on 2 December, objections were made against both the procedure and the appointment of Sergei Lebedev as arbitrator. On 15 December the SCC informed the parties and the arbitrators that the objection to Sergei Lebedev had been rejected. On 27 December the SCC was informed by Kazakhstan that it stood by its objections to the procedure and the appointment of Sergei Lebedev.

The Court of Appeal makes the following assessment:

Thus it appears from the investigation that Kazakhstan had an opportunity to submit a reply to the Investors' request for arbitration and that it was then possible for Kazakhstan to appoint an arbitrator. However, in neither the instruction nor the reminder was it explicitly stated that an arbitrator should be appointed by Kazakhstan. The question is whether Kazakhstan was in this way deprived of its right to appoint an arbitrator. Kazakhstan has referred to the fact that in previous cases subject to the SCC Rules, in which Kazakhstan was a party, explicit instructions had been given to appoint an arbitrator and information had been given about the consequences if this was not done. In the Court's view, it is relevant to its assessment that in the instruction in question reference was made to Article 5 of the SCC Rules, which were also enclosed. According to Article 5, the Respondent in its statement should, where applicable, state the name and address of the arbitrator appointed by it. In the request for arbitration the Investors had asked that the tribunal should consist of three members, and it follows from Article 12 of the SCC Rules that the tribunal should consist of three members unless the parties have agreed otherwise and the SCC decides that the dispute should be decided by a single arbitrator. In the present case the SCC had not made any such decision. Through the instruction and the additional documents that were enclosed, Kazakhstan was given sufficiently clear information, in the Court's view, that the arbitral tribunal would consist of three members and that Kazakhstan had an opportunity to appoint one of them.

Kazakhstan has also objected that the deadline for replying to the SCC was too short and that it had some difficulty understanding the documents from the SCC because they were written in English. As far as the length of the deadline is concerned, the Court notes that it cannot be considered to be unacceptably short, even from an international perspective. Of particular significance for the assessment of both the language and time issues is also the fact that Kazakhstan at no time contacted the SCC to request extension of time. In the first instruction the officials dealing with the matter were named, with their email addresses and international direct phone numbers. It also appears from the SCC Rules that it is possible for a party to obtain an extension to a deadline. In this connection account should also be taken of the fact that Kazakhstan had previously been a party in proceedings conducted by the SCC in English.

As for the question that Kazakhstan never had an opportunity to comment on the SCC's proposal that Sergei Lebedev should be appointed arbitrator on Kazakhstan's behalf, it may be observed to start with that the SCC Rules contain no provision allowing such a comment. The fact that the SCC did not afford Kazakhstan an opportunity to comment on the proposed arbitrator in a situation where Kazakhstan had not replied to it at all, cannot in any way, in the Court's view, be judged to be contrary to the basic principles of the Swedish legal system.

In summary, the Court finds that the procedure followed by the SCC regarding the appointment of the arbitrator Sergei Lebedev has not been clearly incompatible with the basic principles of the Swedish legal system. The award is not invalid on this ground either.

Kazakhstan has also requested that the award should be set aside on the ground that the appointment of the arbitrators took place contrary to the arbitration agreement, i.e. it was contrary to the SCC Rules and the Arbitration Act, or that some other error occurred in connection with the appointment of the arbitrators that influenced the outcome. Kazakhstan has referred here to the legal grounds of challenge in s.34 (1) (4 or 6) SAA. Also of significance in this connection is the provision in the second paragraph that a party may lose its right to invoke a circumstance by taking part in the procedure without objection or by otherwise being considered to have refrained from making the objection. The rule in this paragraph is based on the general principle that a party cannot claim a procedural error that it has previously refrained from pointing out. A dissatisfied party must therefore actively protest in order not to subsequently lose the right to make

the objection (see, among others, Heuman, ibid., p. 286). The Investors have claimed that Kazakhstan has lost its right to challenge the award according to the second paragraph of the provision. The Court will start its examination here by assessing this question.

Firstly, it may be noted that just under three months went by after Kazakhstan learned of the SCC's first instruction until it made its first statement. In the meantime Kazakhstan had also received the SCC's procedural decision regarding the appointment of Sergei Lebedev. A relatively long time thus went by before Kazakhstan first commented, when it also made objections to the procedure, among other things. No specific deadline for the making of an objection follows from the Arbitration Act. In an earlier decision (see Court of Appeal Case RH 2009:55 with further references to, inter alia, the legislative history and the literature) the Court stated that objections to jurisdiction in arbitration should be made no later than in the statement of defence. In the doctrine, it has been stated with reference to the model law that the objection should be made without unreasonable delay (see Heuman, ibid., p. 292 f.). Since Kazakhstan made a reservation for possible objections when its counsel introduced itself in the proceedings and as the objection was made when it made its first statement to the SCC and was maintained after the SCC had rejected its request for another arbitrator instead of Sergei Lebedev, Kazakhstan cannot, in the Court's view be considered to have lost its right to complain now about possible procedural errors. In the Court's opinion, the note made in ¶ 117 of the award – referring to Kazakhstan's explanation that the statement related only to the procedure before the arbitral tribunal – does not show that Kazakhstan thereby waived or withdrew the objection to the appointment of the arbitrators.

The Court therefore goes on to examine the question of whether an error of the kind referred to in s.34 (1) (4) SAA had been made in connection with the appointment of Sergei Lebedev. This provision focuses primarily on the appointment of an arbitrator contrary to agreed qualifications, although departures from procedural rules in an arbitration agreement may be covered. Also of importance is the principle of equal treatment expressed in s.21 SAA. This principle applies not only to arbitrators, but also to the procedure when they are appointed.

In the present case it may be noted that by way of the arbitration agreement it was decided that the SCC Rules should apply to the procedure, which included the appointment of the arbitrators. Provisions governing how the arbitration is initiated,

including the drafting of an answer to the request for arbitration, are found in Articles 2–11 of the SCC Rules. Provisions governing, among other things, the composition of the arbitral tribunal and its appointment are found in Articles 12–17 of the SCC Rules. Of special interest here is Article 13 (3), which regulates the case where the tribunal is to consist of several members. The provision states that "where a party fails to appoint arbitrator(s) within the stipulated time period, the board shall make the appointment." However, no mention is made of what the deadline should be. Article 13 also contains provisions governing what should be taken into account when the SCC appoints an arbitrator, such as language and nationality. As has been described above, on the other hand, there is no mention that the party should also be given an opportunity to comment on who should be appointed when the SCC appoints an arbitrator on its behalf. What has emerged from the investigation in the case about the SCC's administration does not show, in the opinion of the Court, that in relation to the SCC Rules or the Arbitration Act any error of procedure was made when the arbitration was initiated and when Sergei Lebedev was appointed. Accordingly, neither can the principle that parties should receive equal treatment be considered to have been violated, especially in view of the fact that Kazakhstan received all the relevant documents and was given adequate time in which to comment. No ground for setting aside the award with reference to s.34 (1) (4) SAA exists in the present respect.

Kazakhstan has also claimed that a procedural error occurred in connection with the appointment of the arbitrators which influenced the outcome of the case and that the award should in any case be set aside pursuant to s.34 (1) (6) SAA. What other circumstances in the procedure have to do with the appointment of the arbitrators, apart from those which have been referred to and which the Court has had to examine in relation to the provision in s.34 (1) (4) SAA, is not entirely clear to the Court. In connection, however, with the criticism of the procedure made by Kazakhstan concerning the appointment of the arbitrators, Kazakhstan has claimed that Sergei Lebedev adopted a very passive role during the arbitration and that he was therefore unable to ensure that Kazakhstan's action was correctly understood. According to the Court, however, the investigation provides no support for Kazakhstan's assertion here. The Court is thus able to conclude that Kazakhstan likewise has not been able to show that a procedural error was made by the arbitral tribunal based on the appointment of Sergei Lebedev as an arbitrator.

In summary, the Court has therefore come to the conclusion that Kazakhstan has been unable to show that in connection with the appointment of the arbitrators any of the circumstances existed that can constitute a ground for annulment of the award pursuant to s.33 (1) (2) SAA or a ground for setting aside the award pursuant to s.34 (1) (4 or 6) SAA.

### 5.3.4 Setting aside the award on the ground of an excess of mandate or alternatively a procedural error

#### 5.3.4.1 Taras Khalelov's witness statement and testimony

Kazakhstan has relied here upon the detailed circumstances described in section 3.1.2.4 under the heading "Taras Khalelov's witness statement and testimony". Kazakhstan's assertions relate to that part of the arbitration and the award in which the tribunal determined the amount of the damages (see ¶¶ 1743–1748 of the award).

As the Court has noted above, the tribunal's assessment of the damages was based on the indicative bid from the state-owned Kazakh company KMG. However, there was also other evidence, including oral testimony. One statement was made at the request of Kazakhstan by director Taras Khalelov on 29 January 2013. Taras Khalelov had also submitted a written witness statement to the tribunal. Kazakhstan has claimed here that the tribunal failed to take account of Khalelov's oral testimony, which, according to Kazakhstan, amounted to a procedural error that influenced the outcome of the case. According to Kazakhstan, the tribunal also took account of evidence in the form of Internet links that had not been invoked in the case, which, according to Kazakhstan, constituted an excess of mandate. The documents to which the links referred were in Russian.

The Court of Appeal makes the following assessment:

Firstly, as far as Taras Khalelov's oral testimony is concerned, it is clear from the arbitral tribunal's record of the meeting on 29 January 2013 about the amount of damages that Khalelov was questioned on the day in question and that he was also given an opportunity to comment on his written statement. According to the details that Taras Khalelov gave, Kazakhstan had no plans to complete the LPG Plant; nor had any such work been carried out. The information supplied by Khalelov was discussed, in the Court's view, by the tribunal in ¶ 1745 of the award, where reference is made to

"Respondent's and their experts' conclusion", which reportedly did not persuade the tribunal. It is true that the tribunal made no note in ¶ 157 of the award that Khalelov's testimony was held on that day. However, this does not amount to a procedural error in the meaning of s.34 (1) (6) SAA; nor can the oversight lead to the conclusion that it has been shown that the tribunal neglected to take account of Khalelov's evidence in its assessment. There is also no support in the investigation for the view that the Investors had withdrawn their assertion that Kazakhstan had plans to complete the LPG Plant.

Regarding the Internet links, it is also clear from ¶ 1745 of the award that the tribunal paid attention to the documents that could have been studied via the links in question. The links were, however, mentioned and described in the FTI Report, which was referred to by the Investors during the proceedings. According to the Investors, printouts of the documents were enclosed with the FTI Report. Explicit reference is also made in ¶ 1745 to where in the FTI Report the internet links were given. Justification is thus lacking for the assertion that the tribunal took account of evidence that had not been referred to.

The internet links in question, however, were written in Russian in the FTI Report and the documents that they referred to were also in Russian. Kazakhstan has claimed that it was a procedural error in the arbitration to refer to documents that had not been translated into English, which was required by Procedural Order No. 1. In view of what the Court has referred to in the legal starting points for its examination, there cannot normally be a question of an excess of mandate when the arbitral tribunal disregards what has been laid down in a Procedural Order. The question is therefore whether a procedural error was made. The Court notes that it follows from ¶ 1745 of the award that the tribunal also based its decision on what is stated in paragraph 7.7 of the FTI Report, which was written in English. Kazakhstan has therefore at any rate not been able to establish the probability that any procedural errors that may have been entailed by the tribunal's reference to the Russian Internet links have influenced the outcome of the case.

In summary, the Court has therefore found that Kazakhstan has been unable here to show that there was an excess of mandate or a procedural error that can amount to a ground for setting aside the award.

### 5.3.4.2 Kazakhstan's expert and testimonial evidence

Kazakhstan has here relied on the detailed circumstances described in section 3.1.2.4 under the heading "Kazakhstan's expert and testimonial evidence". Kazakhstan has claimed that the tribunal neglected to take account of large parts of the expert and testimonial evidence that Kazakhstan had relied upon in a number of questions. Kazakhstan has also claimed that in certain parts of the award it is not clear how the tribunal arrived at its decisions or that the tribunal's assessments are very brief.

The Court of Appeal makes the following assessment:

In regard first to the question of whether the tribunal took account of the reports of Anatoly Didenko, Kadirbek Latifov and Salamat Baymaganbetov concerning the content of Kazakh law on the classification of pipelines, the parties are in agreement that the reports were invoked in the arbitration. The fact that the tribunal in its reasons did not describe every one of the items of testimony that were relied upon or omitted to mention a particular piece of evidence does not show in itself that the tribunal did not take note of and in its examination did not consider the evidence relied upon. Still less can the conclusion be drawn from the fact that the tribunal came to a different decision from what one party considers to be clear from a particular piece of evidence that the tribunal in its examination did not consider this evidence. In the Court's view, the investigation does not support Kazakhstan's assertion that the tribunal neglected to consider the evidence just mentioned in its examination. Nor has it been shown that the tribunal applied anything other than Kazakh law in this issue.

Regarding the opinion of Kulyash Ilyassova about the content of Kazakh civil law, the parties are in agreement that it was invoked by Kazakhstan. This opinion is considered in ¶¶ 993 and 1368 of the award. The circumstances that Kazakhstan brought up as a ground for its claim here do not provide sufficient support for the view that it has been shown that there was an excess of mandate or a procedural error that was a ground for challenge.

Regarding the opinions of Tomas Balco and Nurlan Rahimgaliev about the content of Kazakh tax law, it appears from both the award and the invoked record of the tribunal's meeting about the amount of damages that the tribunal did take note of these opinions. As the Court has stated above, the fact that the tribunal did not mention a particular

investigation in its reasons may, in fact, just as well reflect the tribunal's active choice of how the tribunal considered that its reasons should be described in the relevant matter. In other words, the mere fact that a particular investigation is not mentioned in the reasons for the judgment does not show that the tribunal did not take note of it in its examination. Nor has Kazakhstan shown here that an excess of mandate or a procedural error occurred.

Kazakhstan has also claimed that the tribunal did not take account of an opinion from the auditing firm Deloitte. It follows from ¶ 1456 of the award, however, that the tribunal did take account of the opinion, although it did not share the conclusion that was drawn about the financial status of KPM and TNG. Here, too, it has not been shown that an excess of mandate or a procedural error took place that is a ground for challenge.

Finally, Kazakhstan has alleged that the tribunal without explanation disregarded the geological experts from the consulting firm Gaffney, Cline & Associates that Kazakhstan had relied upon. Kazakhstan has also claimed that the tribunal discussed the investigation referred to in reasons that were too sketchy. The record from the tribunal's meeting about the amount of the damages shows that the experts from Gaffney, Cline & Associates were heard in the arbitration. In ¶ 1624 of the award the tribunal set out the starting points for its assessment of the different expert reports. In the next paragraph the tribunal considered the expert reports, after which it formed its final viewpoint. The tribunal's formulation of its reasoning in the parts just raised are far from being so inadequate as to amount to a procedural error (see NJA 2009 p. 128). Nor has it been shown that an excess of mandate occurred (see the legal case mentioned).

In summary, the Court has also found here that Kazakhstan has been unable to show that an excess of mandate or a procedural error occurred which can constitute a ground for setting aside the award.

### 5.3.4.3 Consideration of objections to deductions from the damages etc.

Kazakhstan has here referred to the detailed circumstances set out in section 3.1.2.4 under the heading "Unconsidered objections to deduction from the damages". Kazakhstan has claimed that the tribunal did not take account of certain objections that it had made about deductions to be made from the amount of damages and about the

size of the damages. Kazakhstan has also claimed that the reasoning here is so insufficient that it is tantamount to an absence of reasoning.

The Court of Appeal makes the following assessment:

Firstly, regarding the question of deductions from revenues that the Investors would have had after the date of valuation decided by the tribunal, it appears that the tribunal formed a view on this question in ¶¶ 1530 and 1531 of the award. It is also appears that the tribunal described in ¶ 1542 what deductions it considered should be made from the damages and in ¶ 1539 the positions it took regarding Vitol and the JOA agreement. In the Court's opinion, these positions cannot be understood in any way other than that they are also relevant for the objection on the part of Kazakhstan that is described in ¶¶ 1738–1749 of the award. Kazakhstan thus has no justification for its assertions that the tribunal did not consider the objections in question that it made.

Having regard to the starting points stated by the Supreme Court in NJA 2009 s. 128, neither are the grounds for the award, in the Court's view, so inadequate that their formulation could amount to a procedural error.

Here, too, Kazakhstan has thus not shown that there has been an excess of mandate or a procedural error.

### 5.3.4.4 Other alleged excesses of mandate and procedural errors

Kazakhstan has also claimed that the tribunal in several additional points exceeded its mandate and committed procedural errors by neglecting to take account of the parties' arguments and the applicable law. Here Kazakhstan has relied on the detailed circumstances set out in section 3.1.2.5. Kazakhstan's action here concerns the handling by the tribunal of questions about the role of the company KazAzot, the press release from Interfax, the actions of the financial police in regard to the classification of the pipelines, the so-called Tristan notes and the choice of valuation method for the Tolkyn and Borankol fields.

#### KazAzot
Kazakhstan has claimed that the decision of the tribunal in ¶¶ 1094 and 1418 of the award was based on the uninvoked circumstance that KMG and President Nazarbayev's son-in-law, Timur Kulibayev, who was also the chairman of KMG, exerted an influence

over KazAzot. Kazakhstan has maintained that this circumstance had indeed been invoked by the Investors, but only in respect of the question about gas pricing. Kazakhstan has also claimed that the tribunal in regard to its assessment of the so-called tripartite agreement neglected to apply certain international legislation in this area. Kazakhstan has here referred to ¶¶ 1094 and 1418 of the award.

The Court of Appeal makes the following assessment:

The Court concludes that it follows from the investigation in the case, including ¶ 674 of the award, that the relationship between KMG, Timur Kulibayev and KazAzot had been introduced in the case by the Investors. In ¶ 674 it is stated, among other things, that "Claimants' first allegation that KazAzot was controlled by Mr. Kulibayev was made at the Hearing on Jurisdiction and Liability." In the view of the Court, Kazakhstan has been unable to show that the Investors would have limited their reference to this circumstance in the manner claimed by Kazakhstan, i.e. only in respect of the pricing of gas. The fact that the circumstance is not mentioned in the recital under sections J and K in the award as having been specially referred to there by the Investors does not affect the assessment in the present case. In the opinion of the Court, there is therefore no justification for the assertion that the tribunal took account of the circumstance without it having been invoked by a party. No excess of mandate or procedural error that is a ground for challenge has therefore been shown here.

Kazakhstan has not gone into more detail of the assertion that the tribunal neglected to apply certain international legislation about state liability and how this omission has influenced the outcome of the case. The relevant parts of the award, ¶¶ 1094 and 1418, deal essentially with the tribunal's evaluation of evidence and what conclusions the tribunal considered that it was able to draw from what its findings in the case. It has not been shown in the case that the tribunal's decision entailed any incorrect application of the law that could amount to an excess of mandate or a procedural error that is a ground for challenge.

The press release from Interfax

On this question, too, Kazakhstan has stated that the tribunal based its decision on a circumstance that had not been invoked. According to Kazakhstan, the tribunal must also have assumed that the circumstance was not in dispute. Kazakhstan has referred here to ¶ 994 of the award.

The Court of Appeal makes the following assessment:

According to the notes made by the tribunal in the relevant section of the award, the parties were at odds about how Interfax had obtained access to the information and whether Kazakhstan had had anything to do with this. Regarding this disputed question, the tribunal then made a overall assessment of what caused the information to be published. The tribunal stated in its reasons that "Even if Claimants have not shown that the Republic was in any way involved in the publication of the INTERFAX item, it is obvious and not disputed by Respondent, that it was Respondent's actions starting in October 2008 that caused the publication." The tribunal thus made a customary assessment of the evidence for the relevant circumstance within the scope of the Investors' overall assertion that KPM and TNG were subjected to a campaign of harassment by Kazakhstan. Nor is it possible, according to the Court, to draw any conclusion from the reasoning here other than that the tribunal, apart from establishing that Kazakhstan had not made any objection, made its own examination of the circumstance. Here, too, Kazakhstan has thus been unable to show that the tribunal exceeded its mandate or that there otherwise occurred a procedural error that is a ground for challenge.

The classification by the financial police of pipelines

On this question, too, Kazakhstan has stated that the tribunal based its decision on a circumstance that had not been invoked. According to Kazakhstan, the tribunal also incorrectly assumed in regard to this issue that the circumstance had been admitted by Kazakhstan. Kazakhstan has here referred to ¶ 990 of the award.

The Court of Appeal makes the following assessment:

The following has emerged from the investigation in the case. The Investors' submission to the tribunal on 7 May 2012 shows that they referred to the fact that the financial police had written to the Kazakh Deputy Prime Minister on the subject of how the pipelines should be classified. Kazakhstan confirmed this letter and its contents in its submission to the tribunal on 13 August 2012, but disputed the interpretation of the letter. The tribunal gave a brief description of this letter in ¶ 343 of the award, where it referred to the parties' submissions.

In the Court's view, it is thus entirely clear that the Investors had invoked the circumstance in question. The tribunal's decision in this matter is described in ¶ 990 of the award. Its reasoning clearly shows that it did not make an admission on the part of Kazakhstan a ground for its assessment of the facts. On the contrary, it is clear that the tribunal concurred with the assessment previously voiced by Kazakhstan in the arbitration in this matter. The tribunal's assessment of the investigation here does not constitute a procedural error that is a ground for challenge. Here, too, Kazakhstan has thus not shown that there was an excess of mandate or procedural error.

<u>The Tristan notes</u>

Kazakhstan's ground for challenge here concerns the tribunal's handling and assessment of the question of a deduction for a bond loan to Tristan Oil in connection with the valuation of the companies KPM and TNG. Kazakhstan has claimed here that the tribunal based its decision on an alleged admission from Kazakhstan, despite the absence of such an admission. Kazakhstan has also claimed that the tribunal did not consider the parties' legal arguments. Kazakhstan has referred here to ¶¶ 1536–1537 and 1768–1771 of the award.

The Court of Appeal makes the following assessment:

In the identically worded ¶¶ 1536 and 1769 of the award, the tribunal observed that Kazakhstan had possibly retracted its previous stance in this matter. However, in its assessment the tribunal aligned itself to the stance previously taken by Kazakhstan during the arbitration. In the following ¶¶ 1537 and 1770, also identical in their wording, the tribunal set out its assessment in more detail. In other words, the tribunal did not make an admission a ground for its decision in this matter, but made an assessment of the investigation and took account of the various viewpoints adopted by Kazakhstan in the matter. The tribunal's assessment of whether a deduction should be made for the bonds amounts to neither an excess of mandate nor a procedural error that is a ground for challenge. The same applies to the assertion that the tribunal did not consider the parties' legal arguments in this matter. Here, too, Kazakhstan has thus not shown that there was an excess of mandate or procedural error.

<u>Valuation method</u>

Kazakhstan's claim here concerns the tribunal's decision regarding the choice of the method of calculating damages for the Borankol and Tolkyn fields. Kazakhstan has

claimed that the tribunal incorrectly based its decision on a particular admission by Kazakhstan. Here Kazakhstan has referred to ¶ 1625 of the award.

The Court of Appeal makes the following assessment.

The relevant paragraph of the award shows that the tribunal initially decided that the calculations presented by the Investors were less convincing and that they had therefore not met their burden of proof. However, it considered, according to what is stated in the paragraph in question, that since the Investors had suffered damage, the calculation of the damages could be made on the basis of the alternative method of calculating damage that Kazakhstan had presented in the case. The tribunal also referred to the submission in which Kazakhstan had mentioned the method, referring to various consultants' reports. In other words, the tribunal in the matter of the amount of damages made an assessment of the parties' actions and evidence invoked and took a final view about which calculation method should be used to determine the amount of damages. Such an assessment amounts to neither an excess of mandate nor a procedural error that is a ground for challenge. Here, too, Kazakhstan has thus not shown that there was an excess of mandate or procedural error.

### 5.3.5 The Court's summary conclusions and overall assessment of Kazakhstan's action

The Court's assessment above of the grounds that Kazakhstan has relied on to support its claim amounts to the following.

The Court has not found in any respect that there were circumstances that could constitute grounds for annulment of the award according to the provision in s.33 (1) (2) SAA. This applies both to Kazakhstan's assertions of the so-called fraudulent arrangement, false evidence and misleading information during the arbitration as well as to its assertions of shortcomings in the SCC's actions in connection with the appointment of the arbitrators (see 5.3.1 and 5.3.3 of the judgment.)

Further, the Court, following an interpretation of the provisions concerning cooling off period in article 26 ECT, has found that a valid arbitration agreement arose between the parties as a result of the Investors' request for arbitration, regardless of whether or not

what was laid down regarding cooling off period in this article had been followed or not (see 5.3.2 of the judgment.)

The Court has also found that there were no shortcomings or procedural errors in connection with the appointment of the arbitrators (see 5.3.3 of the judgment).

Finally, the Court has found that Kazakhstan has been unable to show that otherwise alleged excesses of mandate or procedural errors occurred (see 5.3.4 of the judgment). Accordingly, an overall assessment of the tribunal's actions, in the manner claimed by Kazakhstan, also cannot lead to the conclusion that there has been an excess of mandate and a procedural error.

Kazakhstan's action is therefore dismissed.

## 5.4 Litigation costs

### 5.4.1 The party liable for damages

The Court's assessment of Kazakhstan's claim means that Kazakhstan, as the losing party, must compensate the Investors for their litigation cost (see ch.18 s.1 of the Code of Judicial Procedure).

### 5.4.2 The Investors' claim for costs

The Investors have claimed damages in the amounts of SEK 16 957 429 and USD 1 509 602.59. Of the claim in Swedish kronor, SEK 15 879 409 is for fees to counsel, SEK 578 020 for expenses and SEK 500 000 for the party's own work. Of the claim in dollars, USD 1 106 317.25 relates to compensation for the assistance of lawyers from the law firm King & Spalding and USD 403 285 for expenses incurred by King & Spalding for assistance to the counsel in the case here.

Kazakhstan has left it to the Court of Appeal to examine the reasonableness of the amount claimed and has raised objections regarding the compensation for the party's own work, remuneration for assistance from lawyers from King & Spalding and King & Spalding's expenses.

SVEA COURT OF APPEAL          **JUDGMENT**                                    64
Department 02                                                      T 2675-14

**5.4.3 Compensation for the party's own work**

Firstly, regarding the compensation claimed for the party's own work, the Investors have stated that this relates to a total of 1 000 hours of work carried out by employees at the legal and finance departments at Ascom. According to the Investors, the work has comprised, among other things, the production of evidence. Kazakhstan has objected that, in the light of the contents and the drafting of the Investors' submissions and their litigation in general, it is improbable that so many hours of work have been involved, particularly as Kazakhstan's questions and requests for clarification and information have not met with a response from or been granted by the Investors. Kazakhstan has also pointed out that no employees or representatives of Ascom have been present during the court proceedings.

The Court of Appeal makes the following assessment.

The Court notes that the Investors are respondents in the case and that they have therefore had to relate to Kazakhstan's formulation of its claim and its conduct of proceedings and that the work that the Investors, as respondents, have had to put in during the case in order to safeguard their rights need not necessarily be reflected in their submissions and conduct of proceedings. At the same time, Kazakhstan's formulation of its claim is of significance for the assessment. Kazakhstan's claim has, among other things, included assertions about a large number of circumstances relating to complex financial conditions. In the light of this, the Court finds that there are no reasons to question the work allegedly performed by employees at Ascom and that it has also been justified in order to safeguard Ascom's and other respondents' rights. The amount claimed therefore is found reasonable.

**5.4.4 Compensation for King & Spalding's assistance**

The Investors have stated that the lawyers at King & Spalding assisted the Swedish counsel throughout the proceedings in the Court of Appeal and that this has been justified since the lawyers at King & Spalding are familiar with both the present arbitration and the JOA and Montvale cases. Kazakhstan has objected that the amount claimed seems large, mainly in the light of the fact that the lawyer Kenneth Fleuriet stated in his testimony that his own assistance to the Swedish counsel had been modest.

The Court of Appeal makes the following assessment.

The Court notes that the arbitration in question has been extraordinary comprehensive. Furthermore, the extent of Kazakhstan's annulment and challenge action in the Court of Appeal has been extensive and has concerned a large number of circumstances from the arbitration proceedings. Since the Swedish counsel did not act for the Investors in the arbitration, there is no reason, in the Court's view, to question the need for the Swedish counsel to obtain detailed information about what occurred in the arbitration in order to respond to Kazakhstan's claim. In the Court's view, the circumstances mentioned no doubt justify the assistance given by the lawyers at King & Spalding. The Court notes in this connection that the compensation requested here does not relate solely to the assistance given by Kenneth Fleuriet and there is no reason to question that assistance has been given in the degree stated. The amount claimed is found reasonable.

## 5.4.5 Compensation for King & Spalding's expenses

According to the Investors' statement of costs, King & Spalding's expenses (apart from food, accommodation and travel) relate essentially to USD 347 745.28 for the expert Gary B. Born. The Investors have stated that his reports have also been relied upon in foreign enforcement proceedings relating to the award, but that the claim has been limited solely to costs directly attributable to the challenge action. Kazakhstan has objected that the compensation claim appears to be high, given that the work done by Gary B. Born can reasonably only relate to work on one of his two expert reports, preparation for and appearance at the main proceedings, and certain additional contacts.

The Court of Appeal makes the following assessment.

While the amount claimed for Gary B. Born's assistance is very large, the Court notes that Kazakhstan has also had expenses for fees for experts amounting to considerable sums. The Court finds no reason to question the information from the Investors that the amount of compensation relates to costs for the assistance of Gary B. Born in the annulment and challenge action, and here, too, it considers the compensation claimed to be reasonable.

### 5.4.6 The Investors' claim for compensation in general

The amount claimed by the Investors relates generally to compensation for the Swedish counsel, plus expenses. Kazakhstan has not made any detailed objections to these items, but has left the assessment of reasonableness to the Court.

The Court of Appeal makes the following assessment.

Here, too, the amounts claimed by the Investors appear to be very large. In view of the extent of the case and compared with the claim for litigation costs made by Kazakhstan in the Court of Appeal, which comes to almost SEK 60 million, the Court finds that the amount claimed by the Investors is acceptable.

### 5.4.7 Summary assessment

The Court's assessment above means that Kazakhstan is obliged to pay compensation for the Investors' litigation costs in the amount claimed plus interest.

The Investors have not given details of the apportionment of the claimed litigation costs between the Respondents. It is clear from the amounts specified by the Investors for their costs that the compensation relating to the party's own work is attributable entirely to Ascom. The compensation claimed here must therefore be considered to have been made on Ascom's behalf. As for the amount otherwise claimed, in the absence of further details, it is considered to go the Investors, who each receive one quarter.

## 5.5 Appeal

According to section 43(2) SAA, the decision of the Court of Appeal may only be appealed if the court considers it to be of importance as a matter of precedent that the appeal be considered by the Supreme Court. The Court of Appeal does not consider that there is reason to grant leave of appeal.

**The decision of the Court of Appeal can not be appealed.**

SVEA COURT OF APPEAL     **JUDGMENT**               67
Department 02                                             T 2675-14

/signature/                   /signature/                   /signature/

Taking part in this decision have been Court of Appeal judges Ulrika Beergrehn,
Magnus Ulriksson (rapporteur and dissentiente) and Kerstin Norman.

For the dissenting opinion, see the next page.

**Dissenting opinion**

Magnus Ulriksson is of a different opinion regarding the reasons for that a valid
agreement has arisen between the parties, commenting as follows:

The jurisdiction of an arbitral tribunal to decide a dispute normally arises as a result of
parties having previously entered into a formal agreement whereby any disputes should
be resolved in this way. In the present case no such agreement exists. The arbitration
was initiated when the Investors wrote to the Arbitration Institute at the Stockholm
Chamber of Commerce (SCC), referring with their express approval to article 26 (4 c)
ECT as a ground for the procedure. The question is whether an arbitration agreement
between the parties in the case thereby arose.

The ECT is an international treaty between states, its purpose being to promote long-
term cooperation in the energy sector (article 2 ECT). For the various kinds of dispute
mentioned in the treaty, the states offer a number of ways of resolving issues. With
regard to disputes between the parties in the treaty, article 27 states that they should in
the first place be resolved through diplomatic channels and, if this does not succeed
within a reasonable period of time, the dispute can be referred to an ad hoc tribunal. In
the case of disputes between a state and an investor from another state that is a party to
the agreement, article 26 mentions various way of resolving the dispute, including
arbitration under the SCC Rules. If the investor acts in accordance with what is stated in
the article, the agreement that gives the arbitral tribunal that is appointed jurisdiction to
decide the dispute will thus arise.

The provisions of the article are laid out in such a way that the first paragraph states that
disputes should in the first place be settled amicably. The second paragraph states that if
disputes cannot be resolved in this way within three months of when the request for a
settlement was made, the investor can choose between the different mechanisms, which
besides arbitration offer a hearing in the host country's national courts. Regarding the
arbitration option, the contracting parties give their unconditional consent in accordance
with what is stated in the article. The investor that opts for arbitration shall in its request
also give its unconditional consent. This description of the procedure is also made clear,
apart from the text of the agreement, in "A Reader's Guide", which is published by the
Energy Charter Secretariat (see also Kaj Hobér in the *Journal of International Dispute
Settlement*, vol 1. 2010, pp. 153–190). The Investors, too, appear to have understood the

text to say that settlement negotiations must have taken place when the arbitration is requested. In paragraph 108 of the request for arbitration it is stated that "article 26(2) of the ECT provides for a three-month notice before the commencement of arbitration. This requirement is satisfied." In my opinion, article 26 ECT can only be understood to say that the procedure which is stated there must have been observed in order for a valid arbitration agreement to arise when arbitration is requested as in the present case.

Differences of opinion had arisen between the Investors and the Republic of Kazakhstan, among other things in relation to what was referred to in the case as the LPG Plant. The Investors were ready in this connection to sell their assets in Kazakhstan (see F II in the award). These differences of opinion caused the owners of the plant on different occasions in February and March 2009 to send letters to relevant representatives of Kazakhstan, which included a concrete settlement proposal. A meeting was also held between the parties in March 2009. On 7 May 2009 Anatolie Stati sent a letter addressed to President Nazarbaev, in which he referred to the dispute over his operations in the Republic. In the letter Stati asked the President to personally look into the business and to ensure that the dispute was settled. The letter concluded by saying that unless this happened, there remained no other option but to request arbitration. Apparently Stati received no reply from the President. On the other hand, it is clear from a letter dated 28 September 2009 from MEMR to the Ministry of Industry and Trade that negotiations would be initiated with the owners of TNG and other companies about the acquisition of the company's assets. The letter also makes clear that the Ministry was aware that any dispute would be resolved through international arbitration. The negotiations evidently came to nothing and in July 2010 Kazakhstan terminated the agreement about exploitation rights. A few days after this the Investors requested arbitration from the SCC.

There can be no doubt, in my opinion, that the Investors acted entirely in accordance with the procedure stated in article 26 ECT and that it follows for this reason that a valid arbitration agreement must be considered to have arisen between the Investors and Kazakhstan for the resolution of the dispute in question. The letter dated 7 May 2009 from Anatolie Stati was signed by him personally and sent by him as the representative of both the Ascom Group and Terra Raf. Besides this, he also represented Gabriel Stati according to a separate agreement between them. In the light of the intensive contacts between the parties on this occasion, it would appear entirely redundant to lay down a requirement for an explicit reference to the ECT when an amicable settlement is

SVEA COURT OF APPEAL　　　　**JUDGMENT**　　　　　　　　　　70
Department 02　　　　　　　　　　　　　　　　　T 2675-14

requested. Kazakhstan was well aware of what the dispute concerned. As for the period from the request for settlement negotiations to the request for arbitration, which was about 15 months, this exceeds by a broad margin the three months prescribed in the ECT, although no maximum time limit is stated in the ECT for the conciliation negotiations, which seems to be well founded. Paragraph F II in the award makes clear the relatively intensive contacts that took place between the parties in autumn 2009 and winter/spring 2010 and at other times. In the light of this, it must be found reasonable that the request for arbitration was delayed somewhat, given, among other things, the complex nature of the issue. When the agreement was terminated in July 2010, there was thus no requirement that the Investors should wait any longer before requesting arbitration. The dispute remained the same.

I am thus in agreement with the majority that a valid arbitration agreement arose between the Investors and Kazakhstan when the arbitration was requested in July 2010 and that there is therefore no need to assess the correspondence which took place between the parties' counsel in the winter of 2011 and which resulted in a three-month delay in the arbitration.