# **Exhibit G**

Party: **Defendant**
Witness: **JAMES ROBERT RONALD**
Exhibits: "**JRR1**" and "**Confidential Exhibit JRR2**"
Date: 8 December 2017

FL-2017-000013

**FL-2017-000013**

IN THE HIGH COURT OF JUSTICE
BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES
COMMERCIAL COURT (QBD)
FINANCIAL LIST

B E T W E E N:

    1) **NATIONAL BANK OF KAZAKHSTAN**
    2) **THE REPUBLIC OF KAZAKHSTAN**

<u>Claimants</u>

- and -

**THE BANK OF NEW YORK MELLON SA/NV, LONDON BRANCH**

<u>Defendant</u>

---

**WITNESS STATEMENT OF
JAMES ROBERT RONALD**

---

I, **James R Ronald** of **One Canada Square, London E14 5AL**, WILL SAY:

**Introduction**

1. I am a Managing Director and Relationship Executive (EMEA) at The Bank of New York Mellon (London Branch). I am authorised by The Bank of New York Mellon SA/NV ("**BNYM SA/NV**") to make this witness statement on its behalf.

2. Unless I indicate otherwise, the facts and matters set out in this witness statement are within my own knowledge or derived from documents which I identify. Where I rely on information provided by others, I identify the source of information which is true to the best of my knowledge, information and belief.

3. There is now produced and shown to me two paginated bundle of documents marked "**JRR1**" and "**Confidential Exhibit JRR2**" respectively, which are the exhibits to this

witness statement. The contents of the Confidential Exhibit JRR2 may be confidential to the National Bank of Kazakhstan (the "**NBK**") because they contain details of the NBK's accounts held with BNYM SA/NV. Unless otherwise stated, references to page numbers in this witness statement are to page numbers in **JRR1.**

**Background**

4. I joined The Bank of New York Mellon (London Branch) on 3 June 1998 as an Assistant Secretary, in the role of team leader, Operations.

5. Between June 1998 and mid-2003, I served various roles within the Operations, Projects and Client Services departments. In mid-2003, I was recruited into Relationship Management and my first client was the NBK. I was promoted to Assistant Vice President in 2004, and to Vice President in 2006. In 2012, I was further promoted to Managing Director.

6. My current position is as Relationship Executive (EMEA) of The Bank of New York Mellon (London Branch). My role involves overseeing client relationships with respect to the asset servicing solutions provided by The Bank of New York Mellon (London Branch) and BNYM SA/NV (and its branches) to central banks, sovereign funds and other clients mainly based in Central Asia and Eastern Europe.

7. I am the main relationship manager with regards to the NBK. The NBK has been a significant customer of BNYM SA/NV (or its predecessors) since 2001.

**The Bank of New York Mellon SA/NV**

8. BNYM SA/NV is a company incorporated in Belgium. It is registered under Brussels RPM-RPR number 0806.743.159 and is a limited liability company in the form of a Belgian Société Anonyme / Naamloze Vennootschap.

9. The registered office of BNYM SA/NV is 46 Rue Montoyerstraat, B-1000 Brussels, Belgium.

10. BNYM SA/NV is authorised and regulated as a significant credit institution by the European Central Bank and the National Bank of Belgium under the Single Supervisory Mechanism and by the Belgian Financial Services and Markets Authority. BNYM SA/NV is also a member of the Deposits Protection Scheme (Fonds de Protection des Depots) in Belgium.

11. BNYM SA/NV is fully owned by The Bank of New York Mellon Corporation through its US subsidiaries, The Bank of New York Mellon (owning all shares but one) and BNY International Financing Corporation (one share). The Bank of New York Mellon does not have authority to act on behalf of BNYM SA/NV, whether by way of signing agreements on its behalf or otherwise.

12. BNYM SA/NV provides financial services, primarily comprising asset servicing products focused on global custody and collateral management, to international securities market participants. The services provided by BNYM SA/NV mainly include asset servicing, corporate trust services, depository receipt services and broker dealer and advisor services. The June 2017 version of the BNYM SA/NV "At a Glance" factsheet is exhibited at pages 1 to 2.  C/3/1-2

13. As of 31 December 2016, BNYM SA/NV held non-cash assets of around €3.45 trillion in custody for its clients and also had a total cash deposit base of approximately €32.6 billion.

**The London Branch of BNYM SA/NV**

14. BNYM SA/NV operates in the UK through its London branch located at 160 Queen Victoria Street, London and One Canada Square, London (the "**London Branch**"). BNYM SA/NV also has branches in Frankfurt, Amsterdam, Paris, Dublin, Luxembourg and Milan. The branches of BNYM SA/NV, including the London Branch, are not separate legal entities to the Belgian-registered entity, BNYM SA/NV.

15. BNYM SA/NV is registered in England and Wales as an Overseas Company with registration number FC029379. The London Branch of BNYM SA/NV is registered as a UK Establishment with registration number BR014361. Copies of the Companies House extracts for the Overseas Company and UK Establishment registrations of BNYM are at pages 3 to 5. As noted above, BNYM SA/NV is authorised and regulated by the European Central Bank and the London Branch, as a branch within the UK, is also subject to regulation by the Financial Conduct Authority and the Prudential Regulation Authority.  C/3/3-5

16. Strategic decisions affecting the London Branch are made by the board of directors of BNYM SA/NV in Belgium. The London Branch does not have its own board of directors (separate from that of BNYM SA/NV itself). Major decisions affecting the London Branch are referred to and are subject to approval by the overseas management of

BNYM SA/NV in Belgium. The Branch Manager of the London Branch reports to the executive committee and the board of directors of BNYM SA/NV.

17. The London Branch does not have any employees; the London Branch's local activities are outsourced to the London branch of The Bank of New York Mellon (BNYM SA/NV's parent company based in New York, as described at paragraph 11 above).

**Assets held by BNYM SA/NV for the NBK**

18. The NBK carries out certain trust management services with respect to certain assets on behalf of the Republic of Kazakhstan (the "**National Fund**").

19. It is my understanding that certain assets of the National Fund are in turn held by BNYM SA/NV for the NBK under a global custody agreement between BNYM SA/NV and the NBK dated 24 December 2001, as amended from time to time (the "**GCA**"). A copy of the GCA is exhibited to the witness statement of Aliya Moldabekova dated 21 November 2017 at AM1/92-118.     B1/2/92-118

20. The original parties to the GCA were Boston Safe Deposit and Trust Company and Mellon Bank N.A., London Branch, but the GCA was novated to BNYM SA/NV (then called ABN AMRO Mellon Global Securities Services B.V.) by an agreement dated 25 January 2003. The novation agreement is at pages 6 to 16.     C/3/6-16

21. Under the GCA, BNYM SA/NV currently holds 14 custody portfolios of securities and fixed income assets for the NBK, each portfolio being managed by a separate external manager. There are 4 additional portfolios which hold small cash balances or are pending receivable amounts. As of 31 October 2017, the total value of the assets held pursuant to the GCA (the "**GCA Assets**") was US$22,601,954,393.

**Asset classes**

22. From time to time, the GCA Assets broadly fall within the following classes:

    a) Cash & Cash Equivalents;

    b) Equities;

    c) Fixed Income;

    d) Futures Contracts; and

    e) Preferred Securities.

23. In particular, in relation to each of the classes above:

a) the Cash & Cash Equivalents class contains cash, non-US Government Short Term bonds and US 1 Year (to maturity or less) Treasury Bills. As of 31 October 2017, this class of asset amounted to US$333,351,049;

b) the Equities class contains all equities, split by market and sector. As of 31 October 2017, this class amounted to US$11,370,710,923;

c) the Fixed Income class includes Corporate Bonds, Canadian Government Bonds, Canadian Government Agencies, Certificates of Deposit, UK Government Bonds, Other Government Bonds, Provincial Bonds, Supranational Bonds, US Tips, UK Corporate Bonds, US Agencies and US Government Bonds (that do not fall within the Cash and Cash Equivalent class above). As of 31 October 2017, this class amounted to US$10,806,513,486;

d) no assets are currently being held in custody in relation to the Future Contracts class. It contains accounting entries for valuation purpose as these are not assets held in BNYM SA/NV's custody. Such contracts are made directly by the external asset managers; and

e) the Preferred Securities class contains preferred corporate stocks. As of 31 October 2017, this class amounts to US$91,378,935.

**Management of portfolios**

24. The GCA Assets are managed externally by asset managers appointed by the NBK. The managers are responsible for taking investment and trading decisions in respect of the assets. BNYM SA/NV (including through any of its branches) is not involved in such decisions.

25. In relation to the fixed income asset portfolios, the various managers are Union Bancaire Privee, UBS, Nomura, Mitsubishi, Wellington, Deutsche Asset Management, Schroders, Amundi and Pictet. In relation to the equity portfolios, the various managers are HSBC, State Street, JPMorgan, UBS and Mitsubishi.

26. BNYM SA/NV is not the immediate holder of GCA Assets which are securities, as in each case such assets are held under sub-custodian or depository arrangements, in the relevant local market where the securities are exchanged. Most securities are held through sub-custodians, while the remainder are, for example, held directly by the bank with a securities depository, such as Euroclear Nederland.

27. Omnibus accounts are accounts in which securities of more than one client or beneficial owner are commingled by the relevant custodian or its relevant sub-custodian, and are held by sub-custodians in the local market in the name of BNYM SA/NV. Segregated accounts are accounts in which securities for one client or beneficial owner are held separately from those of other clients. For NBK such accounts are usually held by the sub-custodians in the local market in the name of BNYM SA/NV a/c NBK or some other similar variation depending on the requirements and customs of the relevant market. The sub-custodian deposits securities with a local Central Securities Depository ("**CSD**") rather than holding securities itself.

28. At pages 1 to 14 of Confidential Exhibit JRR2, there is a document generated by the bank as at the end of November 2017, setting out the sub-custodian accounts in relation to the securities component of the GCA Assets. A further document setting out the details of the CSDs associated with the GCA Assets arranged by their respective locations, is exhibited at page 15 to 18 of Confidential Exhibit JRR2. The depositories used are generally the same irrespective of whether they hold equities or fixed income assets.  
 <span style="float:right">C/4/1-14</span>  
 <span style="float:right">C/4/15-18</span>

29. The external asset managers trade GCA Assets on exchanges in the following countries:

    a) for fixed income assets, Australia, Austria, Belgium, Canada, Denmark, Euroclear, Finland, France, Germany, Hong Kong, Ireland, Italy, Japan, the Netherlands, New Zealand, Norway, Portugal, Singapore, South Korea, Spain, Sweden, Switzerland, UK, US; and

    b) for equities, Australia, Austria, Belgium, Canada, Denmark, Euroclear, Finland, France, Germany, Hong Kong, Ireland, Israel, Italy, Japan, the Netherlands, New Zealand, Norway, Portugal, Singapore, Spain, Sweden, Switzerland, UK, US.

**GCA Asset locations**

30. Given the GCA Assets are not physical assets and are held and represented, in effect, electronically on the bank's IT systems, it is not meaningful, in a physical sense, to describe them as being located at any particular place or branch of the bank.

31. So far as I am aware, none of the securities held under the GCA have any physical existence (such as physical share certificates) as these assets are held and transferred electronically. To the extent that any physical documents may exist that I am not aware

of, such documents would likely be held at a central securities depository such as Euroclear Nederland.

32. For the bank's own organisational purposes, all customers' accounts are treated as being based at a particular branch of BNYM SA/NV (or at the BNYM SA/NV head office). The account location is aligned with the law governing the (contractual) relationship between BNYM SA/NV and the account holder. The assets of the NBK held by the bank under the GCA are treated as being based at the London Branch of BNYM SA/NV given that the GCA was executed with the London Branch of BNYM SA/NV and the GCA is governed by English law. In the Custody Stock Records, which constitutes the books and records of BNYM SA/NV, all of the accounts for the NBK under the GCA are given the identifier "521" in the "contracting legal entity" field. The identifier "521" is used for any account held with the London Branch.

33. However, as noted in paragraph 26 above, BNYM SA/NV in turn holds the non-cash GCA Assets with a sub-custodian or depository. Accordingly, for this purpose, it treats securities as being located in various places around the world by reference to the location where such assets are held either by sub-custodians or on accounts directly with the local CSD.

34. As there is no intermediary in respect of cash accounts, the cash component of the GCA Assets is treated internally as being located at the London Branch of BNYM SA/NV, though as set out in more detail at paragraph 40, access to these cash assets is not limited to the London Branch.

35. By what I say in paragraphs at 30 to 34 above, I do not intend, nor am I in a position, to refer to the location of the GCA Assets as a matter of law.

**Instructions and SWIFT addresses**

36. As the portfolios for the GCA Assets are all externally managed, BNYM SA/NV accepts trade and other related instructions from these asset managers. They will typically give instructions via the SWIFT or Workbench systems, but they can also send instructions by fax. The NBK is the only accountholder in respect of the GCA Assets and, as such, is able to send instructions (via the same methods above) to BNYM SA/NV on the portfolios. However, the NBK would typically only do so when terminating a manager or reorganising portfolios.

37. Generally, a SWIFT address (also commonly known as a Bank Identifier Code or SWIFT code) is assigned to a particular bank in order that automated payments can be

sent quickly and accurately to that bank. It uniquely identifies the name of the bank and the country in which it is located.

38. The London Branch of BNYM SA/NV typically receives instructions electronically to the SWIFT address, "*IRVTBEBB*", which is the SWIFT address of BNYM SA/NV in Brussels. Other SWIFT addresses used by external asset managers are "IRVTUS3N" and "IRVTGB2X" which are the SWIFT address for The Bank of New York Mellon based in New York and its London branch. The London Branch of BNYM SA/NV also has its own SWIFT address, "*BNYMGB21*", but this is not typically used to send instructions in relation to the GCA Assets.

39. As BNYM SA/NV (including its branches) is a global bank, it operates on a global electronic platform (known as GSP). Asset managers and the NBK are therefore able to give instructions to BNYM SA/NV from anywhere in the world provided that they are set up to give instructions via Workbench, which is BNYM's internet based platform.

40. Therefore, from the perspective of BNYM SA/NV and each of its branches, all of the GCA assets are accessible from anywhere and there are no GCA Assets that are only accessible from some locations or from one or some of the branches of BNYM SA/NV. There is no limitation under the terms of the GCA itself as to the locations from which instructions can be given.

41. Provided SWIFT instructions are received in a correct format and contain all correct and relevant information, they will automatically update on the global GSP platform. GSP will then generate an outgoing SWIFT message to the sub-custodian, authorising the sub-custodian to take the required action (including settling trades as instructed).

42. Instructions sent by SWIFT or Workbench are directly entered onto the GSP platform. There is no need for such instructions to be given to any particular branch at all. The NBK or its asset managers can simply give instructions through SWIFT or the Workbench platform to BNYM SA/NV and these are automatically updated onto the GSP platform. If there are any errors in the instructions, or they involve non-STP (Straight Through Processing) which are transactions which cannot be automated and need to be dealt with manually, the relevant trade will be routed to an Instruction Processing Team.

43. In relation to instructions received manually by fax, these are first routed to an Instruction Verification Centre to confirm and authorise the signatures, who then forward the instructions to an Operations Team.

44. The locations of the Instruction Processing Team, the Instruction Verification Centre and the Operation Team used will vary depending on the time the instruction was received but the most commonly used locations are New York, Manchester, and Pune (India).

**Client relationship**

45. The client service team for the NBK is located at BNYM SA/NV's headquarters in Brussels. That team provides day-to-day contact for the NBK and services relating to failed trades, overdrafts, incorrect instructions and requests for information.

46. The client relationship with the NBK is generally managed from the London Branch of BNYM SA/NV, where I am located. This involves liaising with BNYM SA/NV's contacts at the NBK to develop and deliver solutions to meet their business needs. The Relationship Executive would be expected to have a very good understanding of the client's business, their challenges, and opportunities. The role can also involve negotiating new legal agreements, fee agreements, working on new business opportunities, acting as an escalation point for unresolved issues, and effectively being the client's advocate within the bank.

**The Belgian and Dutch Orders**

47. BNYM SA/NV was served with a garnishment order on 13 October 2017, issued by the Dutch Language Court of First Instance in Brussels two days earlier (the "**Belgian Order**"). The Belgian Order imposes "protective attachment" on various assets of the Republic of Kazakhstan and the National Fund "in the hands of" BNYM SA/NV. A similar order had been served on BNYM SA/NV in the Netherlands on 14 September 2017 (the "**Dutch Order**" and together with the Belgian Order, the "**Orders**").

48. The Orders were served on the bank without any prior notice either from the applicants for the order or from the NBK. Neither I, as BNYM SA/NV's main relationship manager with regards to the NBK, nor any of my colleagues from both BNYM SA/NV and the London Branch received any prior notification of the Belgian and Dutch proceedings from any of our contacts at the NBK.

49. Upon being served with the Orders, BNYM SA/NV took legal advice promptly to comply with its legal obligations under the Orders. I understand that the terms of the Orders may extend to assets held pursuant to the GCA with the NBK. Further, I understand that, while the Orders were made in support of anticipated enforcement proceedings in respect of an arbitral award made against the Republic of Kazakhstan, the effects are

A35461461

9

not limited (in terms of the value of the assets to which they attach) by reference to the quantum of the arbitral award. I understand that non-compliance with the Orders could, under Belgian and Dutch law, attract civil liability against BNYM SA/NV, as well as the risk of criminal liability. This is described in more detail in the witness statements of Françoise Lefèvre and Daniella Strik*.*

50. Having considered the legal advice and after having duly investigated the legal relationships, the decision was made by BNYM SA/NV to freeze all assets held pursuant to the GCA. BNYM SA/NV considers that it is entitled to take these actions pursuant to clause 16(i) of the GCA which specifically refers to *"any order… imposed by any … judicial … authority"*. The decision to freeze was implemented by BNYM SA/NV as a Belgian company to comply with its obligations under the Orders as a matter of both Belgian and Dutch law and took effect with regards to all accounts and assets held by BNYM SA/NV and its branches including the London Branch pursuant to the GCA (irrespective of where in the world the sub-custodians or depositories holding those assets might be considered to be located).

51. The NBK is a key client of BNYM SA/NV and the Orders placed BNYM SA/NV in a very difficult commercial position. BNYM SA/NV places great value on its client relationship with the NBK and has sympathy for any commercial difficulties faced by NBK (and its external managers). BNYM SA/NV certainly would not have taken the steps it has taken to freeze the assets that are the subject of the present dispute, if it did not consider that it was required to do so in order to comply with its obligations under the Orders.

52. BNYM SA/NV has no interest in the underlying dispute between the NBK and the parties who secured the Orders. BNYM SA/NV is essentially caught in the middle of a dispute to which it is not a party and BNYM SA/NV has incurred substantial costs and expenses as a result of circumstances which are beyond its control. Being neutral in relation to the underlying dispute, BNYM SA/NV's main concern in the context of the present proceedings is to avoid being placed in the invidious position of being subject to competing judgments and orders of, on the one hand, the English court and, on the other hand, the courts of Belgium and the Netherlands.  BNYM SA/NV is anxious at all times to act in accordance with its obligations under the GCA, but also in accordance with the binding and effective orders of the courts in other jurisdictions.

**STATEMENT OF TRUTH**

I believe that the facts stated in this witness statement are true.

**Dated 8 December 2017**

Signed:.........*[signature]*.........
**JAMES ROBERT RONALD**

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (QBD)**

**FINANCIAL LIST**

**WITNESS STATEMENT OF
JAMES ROBERT RONALD**

Linklaters LLP

One Silk Street

London EC2Y 8HQ

Tel: (+44) 20 7456 4401

Fax: (+44) 20 7456 2222

Solicitors for the Defendant

Ref: Tom Lidstrom / Jonathan Swil

A35461461

12